**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, SERIES PMPI, a designated series of MAO-MSO RECOVERY, LLC, a Delaware series limited liability company; and MSPA CLAIMS 1, LLC, a Florida limited liability company, | CIVIL ACTION NO. |
| | COMPLAINT |
| | DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| vs. | |
| ACTAVIS ELIZABETH LLC, a Delaware limited liability company; ACTAVIS HOLDCO US, INC., a Delaware corporation; ACTAVIS PHARMA, INC., a Delaware corporation; AKORN, INC., a Louisiana corporation; APOTEX CORP., a Delaware corporation; BRECKENRIDGE PHARMACEUTICAL, INC., a Delaware corporation; DR. REDDY'S LABORATORIES, INC., a New Jersey corporation; EPIC PHARMA, LLC, a Delaware limited liability company; FOUGERA PHARMACEUTICALS INC., a New York corporation; GLENMARK PHARMACEUTICALS INC., USA, a Delaware corporation; HERITAGE PHARMACEUTICALS INC., a Delaware corporation; HI-TECH PHARMACEUTICAL CO., INC., a Delaware corporation; IMPAX LABORATORIES, LLC, a Delaware limited liability company; LANNET COMPANY, INC., a Delaware corporation; LUPIN PHARMACEUTICALS, INC., a Delaware corporation; MORTON GROVE PHARMACEUTICALS, INC., a Delaware corporation; MYLAN INC., a Pennsylvania corporation; MYLAN PHARMACEUTICALS, INC., a West Virginia corporation; MYLAN N.V., a Dutch company; PAR PHARMACEUTICALS, INC., a New York corporation; PAR PHARMACEUTICAL COMPANIES, INC., a | |

1

Delaware corporation; PERRIGO COMPANY
PLC, an Irish corporation; PERRIGO NEW
YORK, INC., a Delaware corporation;
SANDOZ, INC., a Colorado corporation;
SUN PHARMACEUTICALS INDUSTRIES,
INC., a Michigan corporation; TARO
PHARMACEUTICALS INDUSTRIES LTD.,
an Israeli company, TARO
PHARMACEUTICALS USA, INC., a New
York corporation; TELIGENT, INC., a
Delaware corporation; TEVA
PHARMACEUTICALS USA, INC., a
Delaware corporation; UPSHER-SMITH
LABORATORIES, LLC, a Minnesota
corporation; WEST-WARD
PHARMACEUTICALS CORP., a Delaware
corporation; WOCKHARDT USA LLC, a
Delaware limited liability company; ZYDUS
PHARMACEUTICALS (USA) INC., a New
Jersey corporation.

Defendants.

## **COMPLAINT**

Plaintiffs, MSP Recovery Claims, Series LLC, a Delaware series limited liability company;

Series PMPI, a designated series of MAO-MSO Recovery II, LLC, a Delaware series limited

liability company; and MSPA Claims 1, LLC, a Florida limited liability company (collectively

"Plaintiffs"), bring this action against Actavis Elizabeth LLC, a Delaware limited liability

company; Actavis Holdco US, Inc., a Delaware corporation; Actavis Pharma, Inc., a Delaware

corporation; Akorn, Inc, a Louisiana corporation; Apotex Corp., a Delaware corporation;

Breckenridge Pharmaceutical, Inc., a Delaware corporation; Dr. Reddy's Laboratories, Inc., a New

Jersey corporation; Epic Pharma, LLC, a Delaware limited liability company; Fougera

Pharmaceuticals Inc., a New York corporation; Glenmark Pharmaceuticals Inc., USA, a Delaware

corporation; Heritage Pharmaceuticals Inc., a Delaware corporation; Hi-Tech Pharmaceutical Co.,

Inc., a Delaware corporation; Impax Laboratories, LLC, a Delaware limited liability company; Lannett Company, Inc., a Delaware corporation; Lupin Pharmaceuticals, Inc., a Delaware corporation; Morton Grove Pharmaceuticals, Inc., a Delaware corporation; Mylan Inc., a Pennsylvania corporation; Mylan Pharmaceuticals, Inc., a West Virginia corporation; Mylan N.V., a Dutch company; Par Pharmaceuticals, Inc., a New York corporation; Par Pharmaceutical Companies, Inc., Inc., a Delaware corporation; Perrigo Company plc, an Irish corporation; Perrigo New York, Inc., a Delaware corporation; Sandoz Inc., a Colorado corporation; Sun Pharmaceuticals Industries, Inc., a Michigan corporation; Taro Pharmaceuticals Industries Ltd., an Israeli company, Taro Pharmaceuticals USA, Inc., a New York corporation; Teligent, Inc., a Delaware corporation; Teva Pharmaceuticals USA, Inc., a Delaware corporation; Upsher-Smith Laboratories, LLC, a Minnesota corporation; West-Ward Pharmaceuticals Corp., a Delaware corporation; Wockhardt USA LLC, , a Delaware limited liability company; Zydus Pharmaceuticals (USA) Inc., a New Jersey corporation (collectively "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are assignees of recovery rights originally held by Medicare Advantage Plans, including Medicare Advantage Organizations, Health Maintenance Organizations, Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, providing Medicare benefits to their beneficiaries. (These entities are generally referred to herein as "MA Plans"). Plaintiffs bring this action to seek redress for Defendants' overarching conspiracy to artificially inflate and maintain prices and reduce competition in the generic pharmaceutical industry throughout the United States.

2.       Generic drugs are pharmaceutically equivalent to the referenced brand-name drug in dosage, form, route of administration, strength or concentration, and amount of active

ingredient. The only real difference between the brand-name drug and generic drug is price. Generic drugs can save (and have saved) consumers and third-party payers, such as Plaintiffs' Assignors, tens of billions of dollars annually because generic drugs are less-expensive than their brand-name counterparts.

3.      On average, generics are typically around 30% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

4.      Defendants, along with other generic drug manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs specified below.

5.      Defendants orchestrated their conspiracy through secret communications and meetings, both at private and public events, like trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the Efficient Collaborative Retail Marketing organization ("ECRM"), the National Association of Chain Drug Stores ("NACDS"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), among others.

6.      As a result of the conspiracy, the prices of generic drugs skyrocketed at unprecedented rates. The price increases imposed by Defendants cannot be explained by supply shortages or any other market feature, nor were they the result of unilateral business decisions.

Instead, the significant increases in prices were the result of an illegal agreement among Defendants to fix prices.

7.      In 2016, the Government Accountability Office ("GAO") issued a report in which they examined price trends for generic drugs and the factors that affect prices.[1] The report looked at the extent to which generic drugs under Medicare Part D experienced an "extraordinary price increase."[2] The GAO Report found that 300 established generic drugs had at least one "extraordinary price increase" between the first quarter of 2010 and the first quarter of 2015.

8.      Generic manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. However, the actual reasons for the price increases are due to illegal collusion among the generic drug manufacturers. Prices of many generic pharmaceuticals were and remain artificially inflated through collusive bid rigging and market allocation agreements designed to prevent price wars from occurring when key competitive opportunities arise in the marketplace.

9.      Defendants' anticompetitive scheme falls within two categories with the overarching goal being to avoid price erosion, maintaining inflated prices, and increasing prices for targeted profits without triggering a "fight to the bottom" among existing competitors.

10.     First, Defendants would communicate with each other to determine and agree on how much market share and which customers each conspirator was entitled to. The agreement was implemented by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful. This scheme reduced or eliminated competition for a particular

---

[1] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) (the "GAO Report").

[2] "Extraordinary price increase" is defined as an increase of 100% or more.

drug thus allowing Defendants to maintain artificially supracompetitive prices in these markets throughout the United States.

11.     Second, competitors in a particular market agreed to collectively raise and/or maintain prices for a particular generic drug.

12.     Defendants knew their conduct was unlawful. The conspirators limited their communications to in-person meetings or by cell phone, in an attempt to avoid creating a record of their illegal conduct. When communications were in writing, Defendants took overt and calculated steps to destroy evidence of those communications.

13.     The conduct alleged in this Complaint is the subject of numerous ongoing federal and state investigations.

14.     In July 2014, the State of Connecticut initiated an investigation into the suspicious price increases of certain generic pharmaceuticals and eventually was joined by the Attorneys General of 47 states, Washington D.C., and Puerto Rico in filing suit alleging agreements to fix the price of 15 drugs. *State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 2:17-cv-03768-CMR, ECF No. 14 (E.D. Pa.) (the "First AG Complaint"). The Attorneys General filed a new complaint on May 10, 2019 alleging price-fixing allegations for over 50 generic drugs. *State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 2:19-cv-2407-CMR, ECF No. 1 (E.D.Pa.) (the "Second AG Complaint").

15.     On December 12 and 13, 2016, the United States Department of Justice ("DOJ") filed criminal Information's against Jeffrey Glazer and Jason Malek, the respective former Chief

Executive Officer and President of Heritage Pharmaceuticals, Inc. ("Heritage"). The two executives pled guilty to participating in a conspiracy to fix prices of Doxycycline and Glyburide.[3]

16.     Plaintiffs' Assignors bear the brunt of Defendants' illegal conduct. Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic drugs.

17.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1,3) and state antitrust and consumer protection laws.

## THE SUBJECT DRUGS

18.     Plaintiffs' Assignors have purchased, in substantial quantities, the drugs described below during the relevant time period. Plaintiffs' Assignors paid grossly inflated prices for these drugs due to the alleged price-fixing conspiracy.

19.     Albuterol Sulfate (collectively "Albuterol") is a bronchodilator that targets the B-2 receptor of the lungs to relax muscles in the airways and increase airflow to the lungs. Albuterol is available in many forms, including as a tablet.[4]

20.     Amitriptyline Hydrochloride ("Amitriptyline") is a tricyclic antidepressant. Recognized as an "Essential Medicine" by the World Health Organization ("WHO"),[5] it is used to treat symptoms of depression. Amitriptyline is available as a tablet.

---

[3] Plaintiffs previously filed suit in the District of Connecticut alleging price-fixing allegations against the manufacturers of Doxycycline and Glyburide. *MSPA Claims 1, LLC et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, No. 3:17-cv-144-VLB. The case was transferred into *In re: Generic Pharmaceuticals Pricing Litigation Antitrust Litigation*, MDL No. 2724.

[4] The specific forms at issue for each of the Subject Drugs is listed in **Exhibit A**.

[5] According to the WHO, "Essential medicines are those that satisfy the priority health care needs of the population. They are selected with due regard to public health relevance, evidence on efficacy and safety, and comparative cost-effectiveness. Essential medicines are intended to be available within the context of functioning health systems at all times in adequate amounts, in the

21.     Baclofen is a muscle relaxant and anti-spastic agent. It is typically used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness. It is also used to treat muscle spasms in people with spinal injury or disease. Baclofen is available as a tablet.

22.     Benazepril Hydrochlorothiazide ("Benazepril") is an angiotensin converting enzyme ("ACE") inhibitor. It is used to treat hypertension (high blood pressure). Benazepril is available as a tablet.

23.     Clobetasol Propionate ("Clobetasol") is a steroid and anti-inflammatory agent. It is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis. Clobetasol is one of the most prescribed dermatological drugs in the United States. Clobetasol is available in many forms including, cream, ointment, gel, solution, and emollient cream.

24.     Clomipramine Hydrochloride ("Clomipramine") is a tricyclic antidepressant. It is used to treat symptoms of obsessive-compulsive disorder. It is included on the WHO's list of Essential Medicines. Clomipramine is available as a tablet.

25.     Desonide is a corticosteroid anti-inflammatory used to treat skin disorders including eczema, psoriasis, and dermatitis. It is a low-potency medication and, therefore, is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids. Desonide is available as a cream and ointment.

---

appropriate dosage forms, with assured quality and adequate information, and at a price the individual and the community can afford." *Essential medicines*, WORLD HEALTH ORGANIZATION, https://www.who.int/topics/essential_medicines/en/ (last visited July 22, 2019).

26.     Digoxin is a cardiotonic glycoside. It is used to treat heart failure and atrial fibrillation (irregular and/or rapid heart rate). It is included on the WHO's list of Essential Medicines. Digoxin is available as a tablet.

27.     Divalproex Sodium Extended Release ("Divalproex") is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches. It works by restoring the balance of neurotransmitters in the brain. Divalproex is available as a tablet.

28.     Econazole Nitrate ("Econazole") is an antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections. Econazole is available as a cream.

29.     Fluocinonide is a topical glucocorticoid used to treat psoriasis and eczema. Among other things, Fluocinonide reduces the swelling, itching, and redness that can occur in these types of skin irritations. Fluocinonide is available in many forms, including cream, ointment, gel, and emollient cream.

30.     Levothyroxine Sodium ("Levothyroxine") is a manufactured, synthetic form of the thyroid hormone, thyroxine. It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone. It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism). Levothyroxine is included on the WHO's list of Essential Medicines. Over 120 million prescriptions are written per year for Levothyroxine in the United States, treating 15% of the population over the age of 55. Levothyroxine is available as a tablet.

31.     Lidocaine is a local anesthetic agent. It is used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures. It is sold in several formulations and combinations, including Lidocaine-Prilocaine. ("Lidocaine-Prilocaine").

32.     Pravastatin Sodium ("Pravastatin") is an HMG CoA reductase inhibitor (known as a statin). It is used to lower cholesterol and triglycerides in the blood. Pravastatin is one of the most prescribed drugs in the United States. Pravastatin is available as a tablet.

33.     Propranolol Hydrochloride ("Propranolol") is a beta-blocker used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina (chest pain caused by reduced blood flow to the heart). Propranolol is included on the WHO's list of Essential Medicines. Propranolol is available as an extended release ("ER") capsule, a tablet, an oral liquid solution, and an injection.

34.     Ursodiol is a naturally occurring bile acid that is manufactured and sold as a prescription medication to dissolve gallstones made of cholesterol in patients whose gallbladders do not need to be removed or where surgery is not an option. It is also used to prevent formation of gallstones and to treat primary biliary cirrhosis (an autoimmune disease in which the bile ducts in the liver are destroyed). Ursodiol can also be used to prevent organ rejection in liver transplant patients. Ursodiol is available as a capsule and tablet.

35.     Albuterol, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Econazole, Fluocinonide, Levothyroxine, Lidocaine-Prilocaine, Pravastatin, Propranolol, and Ursodiol are collectively referred to as "Subject Drugs."

10

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 & 26, and under 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

37.     This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States, including in this District, sold and distributed one or more Subject Drugs throughout the United States, including in this District, may be found in the United States, including in this District, engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

38.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22. Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this District. Plaintiffs' assignor, ConnectiCare, Inc., is a Connecticut corporation with its principal place of business in Farmington, Connecticut. ConnectiCare purchased one or more of the Subject Drugs.

40.     Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United

States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this district.

## PARTIES

### I.   PLAINTIFFS

41.    Plaintiff MSP Recovery Claims, Series LLC, is a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Rd., 10th Floor, Coral Gables, FL 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' beneficiaries for which Defendants are liable.[6]

42.    Plaintiff Series PMPI, a designated series of MAO-MSO Recovery II, LLC, is a Delaware series limited liability company with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' beneficiaries for which Defendants are liable.

43.    Plaintiff MSPA Claims 1, LLC is a Florida limited liability company with its principal place of business at 2701 S. Le Jeune Rd. 10th Floor, Coral Gables, FL 33134. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' beneficiaries for which Defendants are liable.

---

[6] Plaintiff MSP Recovery Claims, Series, LLC has established various specific Series for which it is the exclusive owner. The specific Series identify the Assignors assigning to Plaintiff. All specific Series form a part of Plaintiff and are owned by Plaintiff. Plaintiff owns and controls any and all Series interest and all claims and rights transferred from any Assignor and seek relief for each Assignor who made payments for the Subject Drugs for which Defendants are liable.

44.     Plaintiffs' Assignors provide(d) health benefits to their enrollees, who reside in numerous locations in the United States. As third-party payers of pharmaceutical claims for their enrollees, Plaintiffs' Assignors are end-payers of the Subject Drugs and were thereby injured as a result of Defendants' unlawful behavior. Plaintiffs' analysis of their Assignors' data confirms that their Assignors have indirectly purchased and/or provided reimbursement for the Subject Drugs during the relevant time period in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia, and Puerto Rico.

## II.    DEFENDANTS

45.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly owned subsidiary of Defendant Actavis Holdco US, Inc. and is a research and development and manufacturing entity for the Actavis generic operations.

46.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc. merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceuticals Industries Ltd. ("Teva Israel"), the Israel parent company of Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), purchased Allergan's generics business, which included

Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly formed Actavis Holdco. Actavis Holdco is a wholly owned subsidiary of Teva Israel.

47.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for the generic products Teva Israel acquired from Allergan.

48.     Actavis Elizabeth, Actavis Holdco, and Actavis Pharma are collectively referred to herein as "Actavis." During the relevant time period, Actavis participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Clobetasol, Desonide, Fluocinonide, Propranolol, and Ursodiol.

49.     Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech Pharmaceutical Co., Inc. During the relevant time period, Akorn participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Clobetasol and Lidocaine-Prilocaine.

50.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the relevant time period, Apotex participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Pravastatin.

51.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. During the relevant time

period, Breckenridge participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Propranolol.

52.     Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. Dr. Reddy's is a wholly owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. During the relevant time period, Dr. Reddy's participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Divalproex.

53.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the relevant time period, Epic participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Ursodiol.

54.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. In July 2012, Fougera was acquired by Defendant Sandoz, Inc., the generics division of Novartis AG ("Novartis"). During the relevant time period, Fougera participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol, Desonide, and Lidocaine-Prilocaine.

55.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark"), f/k/a Glenmark Generics Inc., USA is a Delaware corporation with its principal place of business in Mahwah, New Jersey. During the relevant time period, Glenmark participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Pravastatin.

56.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly owned subsidiary of Emcure Pharmaceuticals, an Indian company with its principal place of business in Pune, India. During the relevant time period, Heritage participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Propranolol.

57.     Defendant Hi-Tech Pharmaceutical Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech is a wholly owned subsidiary of Defendant Akorn. During the relevant time period, Hi-Tech participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol and Lidocaine-Prilocaine.

58.     Defendant Impax Laboratories, LLC, f/k/a Impax Laboratories, Inc., ("Impax") is a Delaware limited liability corporation with its principal place of business in Hayward, California. During the relevant time period, Impax participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Digoxin and Lidocaine-Prilocaine.

59.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. During the relevant time period, Lannett participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Baclofen, Digoxin, Levothyroxine, and Ursodiol.

60.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly owned subsidiary of

Lupin Limited, an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Lupin participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Pravastatin.

61.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly owned subsidiary of Wockhardt, Ltd., an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Morton Grove participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol.

62.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc.

63.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

64.     Defendant Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendants Mylan Pharmaceuticals, Inc.

65.     Mylan Inc., Mylan Pharmaceuticals, Inc. and Mylan N.V. are collectively referred to herein as "Mylan." During the relevant time period, Mylan participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Albuterol, Amitriptyline, Benazepril, Clomipramine, Digoxin, Divalproex, Levothyroxine, and Propranolol.

17

66.     Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York.

67.     Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical Companies, Inc. is the immediate parent company of Par Pharmaceutical, Inc.

68.     Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. ("Par") are collectively referred to herein as "Par." Both Par Defendants are wholly owned subsidiaries of Endo International plc ("Endo") is an Irish company with global headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. In August 2014, Endo's subsidiary Generics International (US), Inc. d/b/a Qualitest Pharmaceuticals, acquired DAVA Pharmaceuticals, Inc. ("DAVA"). In September 2015, Endo completed the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Endo's subsidiary Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc. Par is thus the successor in interest to both DAVA and Qualitest.

69.     During the relevant time period, Par participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Amitriptyline, Baclofen, Digoxin, Divalproex, and Propranolol.

70.     Defendant Perrigo Company plc is an Irish corporation with its principal place of business in Dublin, Ireland. Perrigo Company plc's North American base of operations is in Allergan, Michigan.

71.     Defendant Perrigo New York, Inc. is a Delaware corporation with its principal place of business in Bronx, New York. Perrigo New York, Inc. is a wholly owned subsidiary of Perrigo Company plc.

72.     Perrigo Company plc and Perrigo New York, Inc. are collectively referred to herein as "Perrigo." During the relevant time period, Perrigo participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol, Desonide, and Econazole.

73.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is the generic division of Novartis and Sandoz acquired Fougera in 2012. During the relevant time period, Sandoz participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Amitriptyline, Benazepril, Clobetasol, Clomipramine, Desonide, Fluocinonide, Levothyroxine, and Lidocaine-Prilocaine.

74.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority share of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name of Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual

and Caraco are collectively referred to herein as "Sun." During the relevant time period, Sun participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Albuterol.

75.     Defendant Taro Pharmaceuticals Industries Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel. During the relevant time, Sun Pharmaceutical Industries Ltd. owned a large majority share of Taro Pharmaceuticals Industries Ltd.

76.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business in Hawthorne, New York. Its immediate parent is Defendant Taro Pharmaceuticals Industries Ltd.

77.     Defendants Taro Pharmaceuticals Industries Ltd. and Taro Pharmaceuticals USA, Inc. are collectively referred to herein as "Taro." During the relevant time period, Taro participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol, Clomipramine, Desonide, Econazole, and Fluocinonide.

78.     Defendant Teligent, Inc. ("Telegent") f/k/a IGI Laboratories, Inc. is a Delaware corporation with its principal place of business in Buena, New Jersey. During the relevant time period, Teligent participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Econazole.

79.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva, Israel. During the relevant time period, Teva participated in the alleged

conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Baclofen, Fluocinonide, Pravastatin, and Propranolol.

80.     Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. During the relevant time period, Upsher-Smith participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Baclofen and Propranolol.

81.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. During the relevant time period, West-Ward participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Digoxin.

82.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Wockhardt is a wholly owned subsidiary of Defendant Morton Grove. During the relevant time period, Wockhardt participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol.

83.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is a wholly owned subsidiary of Cadila Healthcare, an Indian company with its principal place of business in Ahmedabad, India. During the relevant time period, Zydus participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Divalproex and Pravastatin.

84.     All references to Defendants or any of them individually also includes their officers, managers, agents, employees, and representatives.

85.     Defendants Mylan and Sun are collectively referred to as the "Albuterol Defendants."

86.     Defendants Mylan, Par, and Sandoz are collectively referred to as the "Amitriptyline Defendants."

87.     Defendants Lannett, Par, Teva, and Upsher-Smith are collectively referred to as the "Baclofen Defendants."

88.     Defendants Mylan and Sandoz are collectively referred to as the "Benazepril Defendants."

89.     Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt are collectively referred to as the "Clobetasol Defendants."

90.     Defendants Mylan, Sandoz, and Taro are collectively referred to as the "Clomipramine Defendants."

91.     Defendants Actavis, Fougera, Perrigo, Sandoz, and Taro are collectively referred to as the "Desonide Defendants."

92.     Defendants Impax, Lannett, Mylan, Par, and West-Ward are collectively referred to as the "Digoxin Defendants."

93.     Defendants Dr. Reddy's, Mylan, Par, and Zydus are collectively referred to as the "Divalproex Defendants."

94.     Defendants Perrigo, Taro, and Teligent are collectively referred to as the "Econazole Defendants."

95.     Defendants Actavis, Sandoz, Tao, and Teva are collectively referred to as the "Fluocinonide Defendants."

96.     Defendants Lannett, Mylan, and Sandoz are collectively referred to as the "Levothyroxine Defendants."

97.     Defendants Akorn, Fougera, Hi-Tech, Impax, and Sandoz are collectively referred to as the "Lidocaine-Prilocaine Defendants."

98.     Defendants Apotex, Glenmark, Lupin, Sandoz, Teva and Zydus are collectively referred to as the "Pravastatin Defendants."

99.     Defendants Actavis, Breckenridge, and Upsher-Smith are collectively referred to as the "Propranolol Capsule Defendants." Defendants Actavis, Heritage, Mylan, Par, and Teva are collectively referred to as the "Propranolol Tablet Defendants." Propranolol Capsule Defendants and Propranolol Tablet Defendants are collectively referred to as the "Propranolol Defendants."

100.    Defendants Actavis, Epic, and Lannett are collectively referred to as the "Ursodiol Defendants."

## III.    CO-CONSPIRATORS

101.    Various other persons, firms, entities, and corporations not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

102.    The true names of additional co-conspirators are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

103.   At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

104.   The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

105.   The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendants' or co-conspirator's affairs.

## STANDING

106.   Plaintiffs' Assignors administer Medicare benefits for Medicare beneficiaries under Medicare Part C and Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

107.   Although Plaintiffs seek recovery on behalf of each and every one of its Assignors who paid inflated prices for the Subject Drugs, one representative assignment for each Plaintiff is alleged in detail in the Appendix to establish standing.[7] The assignments are valid and binding

---

[7] At the time of filing the additional Assignors include: 7th Avenue Medical Plaza, Inc., Accountable Care Options, LLC, Alianza Profesional de Cuidado Medico, Inc., Arse, Inc., Avmed, Inc., Blue Cross & Blue Shield of Rhode Island, Broward Primary Partners, LLC, Choice One Medical Group, LLC, Clinica Las Mercedes, Centro Medico Salinas, Inc., Corporacion Medica Oriental, Emblem Health Services Company, LLC, Fallon Community Health Plan, Inc., Family

contracts. A copy of each representative assignment is attached hereto as **Exhibits B-D** and explained in more detail in the Appendix.[8]

108.    At all material times hereto, Assignors provided Medicare benefits to Enrollees, including payment for the Enrollees' prescriptions for the Subject Drugs. Attached hereto as **Exhibit E** is a non-exhaustive list of instances wherein Assignors paid for the Subject Drugs for their Enrollees.[9] An explanation of the column headers in **Exhibit E** is as follows:

   a.   "MSP Mrd ID," is a unique internal number code, Plaintiffs use in place of the patient's name to comply with HIPAA;

   b.   "MSP Member ID" is the code Plaintiffs use to identify which assignor made the payment. For instance, of the representative assignors identified in this Complaint, the MSP Member ID code for Interamerican Medical Center Group, LLC is IMC; Preferred Medical Plan, Inc.'s MSP Member ID is PMPI; and ConnectiCare, Inc.'s MSP Member ID is CONC;

   c.   "NDC" is the unique product identifier used in the United States for drugs intended for human use;

   d.   "MSP DOS" is the date of service;

   e.   "MSP Paid Amount Value" is the paid amount value provided by the assignor;

---

Medicine Group, Inc., Family Physicians Group d/b/a Family Physicians of Winter Park, Inc., Health Alliance Medical Plans, Inc., Healthcare Alliance Group, Inc., Health Care Advisor Services, Inc., Hygea Health Holdings, Inc., Med-Caribe CSP, Medical Consultants Management, LLC, Medical IPA of the Palm Beaches, Inc., Medicos Aliados del Noreste, Inc. a/k/a Grupo Medico Aliado de Noreste, Millenium Medical Health Group, Inc., Network Health, Inc., Palm Beach Primary Care Assoicates, Inc., Physician H.M.O., Inc., Physician Access Urgent Care Group, LLC, Policlinica General de Coamo C.S.P., Policlinicas Medicas Asociadas, Inc., Ponce Advance Medical Group, P.S.C., Premier Care Partners, LLC, Professional Health Choice, Inc., Preferred Primary Care, LLC, Primary Physicians Medical Service, LLC, Quality Medical Care, Inc., Risk Watchers, Inc., SE Primary Care Services, CSP, Southern Health Care Group, Inc., SummaCare, Inc., Suncoast Medical Network 2, Inc., Suncoast Provider Network, Inc., Transatlantic Healthcare, LLC, Trinity Physicians, LLC, University Health Care MSO, Inc., Vidamax Medical Center for St. Jude Medical Group Corp., Verimed IPA, LLC.

[8] Plaintiffs have redacted confidential business information from the assignment agreements.

[9] **Exhibit E** lists the instances of payment for Interamerican Medical Center Group, LLC (IMC), Preferred Medical Plan, Inc. (PMPI), and ConnectiCare, Inc. (CONC).  Plaintiffs will produce the instances of payment for the additional assignors in discovery.

f. "MSP Billed Amount Value" is the billed amount value provided by the assignor. This column has zeros because the assignor did not maintain such information or did not provide MSP with this information;

g. "NPI Source" is the standard unique health identifier for health care providers adopted by the Secretary of Health and Human Services in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA). All covered entities under HIPAA are required by regulation to use NPIs to identify health care providers in standard HIPAA transactions. An NPI number is required for all providers or institutions in order to bill through CMS1500 forms or UB04 forms. NPI information is publicly available through NPPES NPI Registry maintained by CMS;

h. "City" and "state" are the primary practice addresses associated with the NPI number listed in the "NPI Source" column. This information is sourced from NPPES NPI Registry maintained by CMS;

i. "Selected taxonomy code" is the selected taxonomy code as reflected on the NPPES NPI Registry as maintained by CMS; and

j. "Selected taxonomy description" is the selected taxonomy description as reflected on the NPPES NPI Registry maintained by CMS.

## REGULATORY BACKGROUND

### I.   MEDICARE PRESCRIPTION DRUG BENEFITS

109.   Plaintiffs are assignees of Medicare prescription drug coverage providers (MA Plans and related entities) that provide benefits to thousands of individual beneficiaries.

110.   In 1965, Congress enacted the Medicare Act with the purpose of establishing a federally funded health insurance program for the elderly and disabled.

111.   The Medicare Act consists of five parts—Parts A, B, C, D and E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare. *See* 42 U.S.C. §§ 1395c to 1395i-5; §§ 1395-j to 1395-w. Part C outlines the Medicare Advantage program, wherein Medicare beneficiaries may elect to use private insurers, such as Plaintiffs' Assignors, to provide Medicare benefits. 42 U.S.C. §§ 1395 w-21-29. Part D provides prescription

drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395w101-151, 1395x, 1395y.

112.    Medicare prescription drug coverage is an optional benefit. To obtain prescription drug coverage a beneficiary must join a plan approved by Medicare that offers Medicare drug coverage. Beneficiaries may either enroll in: (1) a Medicare Prescription Drug Plan (Medicare Part D only); or (2) an MA Plan (Part C and Part D).

113.    Medicare Prescription Drug Plans are used for prescription drug coverage by Medicare beneficiaries that have traditional Medicare (Parts A and B). Medicare beneficiaries that have Part C benefits receive prescription drug coverage through their MA Plan.

114.    Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2019, the limit on out-of-pocket costs is $5,100.00.[10] After that, the MA Plan pays most of the costs for the drug throughout the remainder of the year.

115.    MA Plans may require a deductible be met prior to paying for drug coverage. In 2019, the maximum deductible a beneficiary can be charged is $415.00.[11] During the deductible stage, the beneficiary pays all costs for their prescriptions.

116.    Once the deductible is met, the initial coverage period begins. During this period, the beneficiary pays a portion of the drug's cost and the MA Plan pays the remainder. The amount paid by the beneficiary will be either a copayment or coinsurance. A copayment is a set amount for all drugs based on what tier the drug falls into on the MA Plan's drug formulary (e.g., $50 for

---

[10] *Catastrophic Coverage*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage (last visited July 22, 2019).

[11] *Yearly Deductible for Drug Plans*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/yearly-deductible-for-drug-plans (last visited July 22, 2019).

brand-name drugs on Tier 1, $25 for brand-name drugs on Tier 2, $10 for generic drugs on Tier 3). With coinsurance, a beneficiary will pay a percentage of the cost (e.g., 25%) of the drug's cost.

117.   Most Part D plans have a coverage gap called the "Donut Hole" wherein there is a temporary limit on what the Part D plan will cover. The coverage gap begins after the beneficiary and MA Plan have paid a certain amount for covered drugs. In 2019, once the cost has reached $3,820.00 spent on prescriptions, a beneficiary will enter the Donut Hole.[12]

118.   During the Donut Hole, the beneficiary pays 25% of the price for brand-name drugs and the MA Plan pays 75%. For generic drugs, the MA Plan pays 63% of the price and beneficiary pays 37%.[13]

119.   Once the beneficiary and MA Plan have spent $5,100.00, the beneficiary is out of the Donut Hole. Once out of the Donut Hole, the beneficiary automatically gets "catastrophic coverage." This means the beneficiary only pays their copayment or coinsurance amount for the rest of the year.

---

[12] *Costs in the Coverage Gap*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/costs-in-the-coverage-gap (last visited July 22, 2019).
[13] *Id*.

### Medicare Part D Coverage & Costs[14]



## II.    THE HATCH-WAXMAN ACT

120.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984), which was intended to encourage and facilitate competition from lower-priced generic drugs (which would reduce healthcare costs), while also providing further incentives for pharmaceutical companies to invest in new drug development (by allowing for extensions to market exclusivity).

121.    To promote price competition, the law established a new regulatory approval process for generic products to help ensure that generic drugs became available more quickly following patent expiration. To gain approval of a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA")

---

[14]    *Part    D    Coverage    &    Costs,* UNITEDHEALTHCARE, https://www.medicaremadeclear.com/basics/medicare-coverage-and-costs/medicare-part-d    (last visited July 22, 2019).

showing that the drug is safe and effective for its intended use. Developing a new drug and obtaining approval can take years and cost tens or hundreds of millions of dollars.

122.    Under the Hatch-Waxman Act, a manufacturer of a generic version of an FDA approved drug may file an abbreviated new drug application ("ANDA"), which allows the generic manufacturer to rely upon the studies submitted by the brand-name manufacturer in connection with the original NDA to prove that the generic version of the drug is safe and effective. This allows the generic manufacturer to avoid conducting costly and duplicative clinical trials.

123.    The Hatch-Waxman Act has succeeded in both of its goals. Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to nearly 90% of prescriptions filled.

## THE GENERIC DRUG MARKET

## I.    THE IMPORTANCE OF GENERIC DRUGS

124.    The only material difference between generic drugs and their brand-name counterparts is the price. On average, generics are typically around 30% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

125.    Once a generic equivalent becomes available, an event sometimes referred to as the "patent cliff" occurs whereby the brand-name manufacturer sees a significant drop in profits. Upon entry into the market, the generic quickly captures sales of the corresponding brand-name drug, often capturing 80% or more of the brand's sales within the first six months. In a recent study, the FTC found that on average, within a year of generic entry, generics had captured 90% of

corresponding brand-name drug sales and (with multiple generics on the market) prices had dropped 85%.[15]

126.   Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[16]

127.   A similar study done by the FDA found that between 1999 and 2004, entry of a second generic reduces the average generic price to nearly half of the brand-name price, and entry of additional generics reduced prices to 20% of the brand-name price – in other words, an 80% discount.[17]

128.   All fifty states and the District of Columbia have drug substitution laws, which either permit or require pharmacists to dispense a therapeutically equivalent, lower-cost generic drug ("AB-rated generic") in place of a brand-name drug unless the prescribing physician expressly directs that the prescription must be dispensed as written. This practice facilitates price competition at the pharmacy and results in dramatically reduced drug costs for patients and the health care system after generic entry, while still ensuring that patients receive the same therapeutic benefits.

---

[15] FED. TRADE COMM'N, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS: A FEDERAL TRADE COMMISSION STAFF STUDY 8 (Jan. 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last visited July 22, 2019).

[16] See e.g. Patricia Danzon & Li-Wei Chao, Does Regulation Drive Out Competition in Pharmaceutical Market?, J.L. & ECON. 43(2):311-57, (Oct. 2010); Richard Frank, The Ongoing Regulation of Generic Drugs, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

[17] Generic Competition and Drug Prices, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/about-fda/center-drug-evaluation-and-research/generic-competition-and-drug-prices (last updated Nov. 20, 2017).

129.     Generic competition allows third-party payers, like Plaintiffs' Assignors, to purchase generic versions of brand-name drugs at substantially lower prices.

## II.     PRICING IN THE GENERIC DRUG MARKET

130.     In simple terms, the generic pharmaceutical supply chain is as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a copay or coinsurance) if they are insured. The insured consumer's health plans, such as Plaintiffs' Assignors, then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by intermediaries known as Pharmacy Benefit Managers ("PBMs").

131.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription … drugs."[18] "The NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies. NACACs are calculated as a single national average …"[19] Thus, NADAC is one way to track general price trends in the marketplace.

---

[18] *Methodology for Calculating the National Average Drug Acquisition Costs (NADAC) for Medicaid Covered Outpatient Drugs,* CENTERS FOR MEDICARE & MEDICAID SERVICES 5, (Nov. 2013),          https://data.medicaid.gov/api/views/a4y5-998d/files/97a8d110-e14b-4bb7-a22b-7a2bd8c8679f?download=true&filename=NADAC%20Methodology.pdf (last visited July 22, 2019).

[19] *Id*. at 15.

132.    While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks – like Wholesale Acquisition Cost ("WAC") – for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturers' reported list prices, which are sometimes subject to discounts.

133.    After the WAC is established, the "average wholesale price" ("AWP"), or the list price, is established by the manufacturer or a company that publishes a price compendium.

134.    The AWP is used by some public and private third-party payers as a basis for reimbursement (e.g., AWP minus 5 or 25 percent) and it often serves as the base price for negotiations between manufacturers and private sector purchasers of drugs.

135.    The AWP is used by Plaintiffs' Assignors and all Part D sponsors to calculate payment amounts.

136.    There is also the "average sales price" ("ASP"), which is the weighted average of all non-Federal sales to wholesaler distributors net of chargebacks, discounts, rebates, and other benefits tied to the purchase of a drug, whether it is paid to the wholesaler or retailer. The ASP is the basis for reimbursement for products covered under Medicare Part B.

137.    The Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs that it sells nationwide. Competitors for pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market. At all times relevant to this Complaint, every Defendant's portfolio remained broad, and was marketed to customers in virtually every state across the United States.

138.    Defendants' business plans and strategies for their broad portfolios focus on the nationwide supply and demand chain that funnels their products through various purchasers, including Plaintiffs' Assignors, in order to reach consumer populations in every state.

## A.    Customer Incentives to Increase Prices

139.    Some of the largest buyers[20] that purchase from generic manufacturers benefit when prices are higher. For example, in McKesson's 2014 10-K filing, the company reported the following:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby *we benefit when the manufacturers increase their prices* as we sell our existing inventory at the new higher prices. *For these manufacturers, a reduction in the frequency and magnitude of price increases*, as well as restrictions in the amount of inventory available to us, *could have a material adverse impact on our gross profit margin.*[21]

In that same filing, McKesson also reported that "The business' practice is to pass on to customers published price changes from suppliers."[22]

140.    Similarly, in Cardinal's 2014 10-K filing, the company reported that:

> Gross Margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit. Prices for generic pharmaceuticals generally decline over time. But at times, *some generic*

---

[20]    These buyers include the largest wholesalers and distributors of generic drugs, AmerisourceBergen Corporation ("ABC"), Cardinal Health Inc. ("Cardinal"), H.D. Smith, LLC ("Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris").

[21]    *Annual Report (Form 10-K)*, MCKESSON CORPORATION at 9 (May 13, 2014), https://investor.mckesson.com/sites/mckesson.investorhq.businesswire.com/files/report/file/MCK_10K_3_31_2014_FINAL.pdf (last visited July 22, 2019) (emphasis added).

[22]    *Id*. at 33.

> *products experience price appreciation, which positively impacts our margins.*[23]

141.    ABC's Annual Summary 2014 and Annual Report 2014 make very similar observations:

> Our results of operations continue to be subject to the risks and uncertainties of inflation in branded and generic pharmaceutical prices and deflation in generic pharmaceutical prices.
>
> Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them. Arrangements with a small number of branded manufacturers continue to be solely inflation-based. As a result, our gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. *If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.* In addition, generic pharmaceuticals are also subject to price deflation. *If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.*[24]

142.    The generic manufacturers are keenly aware that their largest customers benefit from their price increases. In fact, many of the generic drug manufacturers regularly tout these price increases in their discussions with customers. As just one example, when Teva met with large customer Red Oak (a joint venture between Cardinal and CVS) in December 2014, it boasted that during its August 28, 2014 price increase it had been able to increase twenty different product families, resulting in an estimated $29 million price increase value to the customer.

---

[23]    *Annual Report (Form 10-K)*, CARDINAL HEALTH INC., at 6-7 (Aug. 13, 2014), ://d1lge852tjjqow.cloudfront.net/CIK-0000721371/002928a6-efcf-4a53-90d0-44475be46180.pdf (last visited July 22, 2019) (emphasis added).

[24]*Annual Report (Form 10-K)*, AMERISOURCEBERGEN CORPORATION, at 8 (Nov. 25, 2014). http://investor.amerisourcebergen.com/static-files/432a3225-53cb-4bf2-ba10-6e904103cfe6 (last visited July 22, 2019) (emphasis added).

## III.  SUSCEPTIBILITY FOR COLLUSION

143.  The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

144.  Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. There are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases. Factors showing that a market is susceptible to collusion include:

    a.  **High level of industry concentration**: A small number of competitors control roughly 100% of the market for each of the Subject Drugs.

    b.  **Sufficient numbers to drive competition**: While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers was large enough that prices should have remained at their historical, near marginal cost levels.

    c.  **High barriers to entry**: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

    d.  **High inelasticity of demand and lack of substitutes**: Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, one of the Subject Drugs is the only effective treatment.

    e.  **Commoditized market**: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another.

f.  **Absence of departures from the market**: There were no departures from the market during the relevant time period that could explain the drastic price increases.

g.  **Absence of non-conspiring competitors**: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2013 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h.  **Opportunities for contact and communication among competitors**: Defendants participate in the committees and events of the GPhA, HDMA, ECRM, NACDS, MMCAP, and other industry groups, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

i.  **Size of price increases**: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists seeking to test price boundaries need to take a measured approach. But here the increase are not 5% or 10% jumps – they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

j.  **Reimbursement of generic drugs**: The generic market has institutional features that would inhibit non-collusive, parallel price increases. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## FACTUAL ALLEGATIONS

### I.  FEDERAL AND STATE INVESTIGATIONS INTO THE PRICE-FIXING CONSPIRACY

145.   Defendants' and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the DOJ Antitrust Division, the United States Senate, the United States House of Representatives, and Attorneys General of 47 states, the District of Columbia, and Puerto Rico (the "State AGs").

146.     The DOJ's and State AG's investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.     Congress Launched an Investigation into Generic Price Hikes

147.     In January 2014, the NCPA urged the Senate HELP Committee and the United States House Energy and Commerce Committee to hold hearings on significant spikes in generic pharmaceutical pricing, citing surveys and data from community pharmacists. The NCPA surveyed over one thousand pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

148.     On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of HELP and Representative Elijah E. Cummings, who was then the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Endo, Heritage, Lannett, Mylan, Par, Sun, and Teva, requesting information about the escalating prices of generic drugs.[25]

149.     Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening

---

[25] *Congress Investigating Why Generic Drug Prices Are Skyrocketing*, Press Release, U.S. Senator Bernie Sanders (Oct. 2, 2014), https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last visited July 22, 2019).

illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[26]

150.    On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[27] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs from 2005 to 2014 to "determine the extent to which the quarterly AMPs [average manufacturer prices] exceeded the specified inflation factor."[28]

151.    In August 2016, the GAO issued GAO-16-706 (the "GAO Report"), a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more.[29] Among the drugs with extraordinary price increases were 14 of the Subject Drugs: Albuterol Sulfate, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Econazole, Fluocinonide, Lidocaine-Prilocaine, Pravastatin, and Ursodiol.[30]

---

[26] *Id.*

[27] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file (last visited July 22, 2019).

[28] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file (last visited July 22, 2019).

[29] GAO Report at 12.

[30] *Id.* at Appx. III.

### B.     The DOJ Investigates Criminal Generic Drug Collusion

152.     The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry and empaneled a grand jury on or around November 3, 2014.

153.     The DOJ initially focused on Glyburide and Doxycycline. However, news reports, court filings, and other public statements corroborate the sweeping nature of the DOJ's investigation. Reportedly, the DOJ believes price-fixing between generic pharmaceutical manufacturers is widespread and its investigation spans "more than a dozen companies and about two dozen drugs."[31]

154.     The DOJ first charged two Heritage executives, Jeffrey Glazer and Jason Malek, with criminal counts related to price collusion for generic Doxycycline and Glyburide. *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508 (E.D. Pa.).

155.     On January 9, 2017, Glazer and Malek pled guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices, rig bids, and engage in market and customer allocation concerning Doxycycline and Glyburide.

156.     Defendants Actavis, Dr. Reddy's, Fougera (through Sandoz), Impax, Lannett, Mylan, Par, Sandoz, Sun, Taro, and Teva have admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Defendants Perrigo and Mylan. Finally, upon information and belief, the DOJ has granted conditional amnesty to Heritage.[32] Under DOJ Guidelines, for the DOJ to grant a company conditional amnesty, the amnesty applicant must

---

[31] Joshua Sisco, *DOJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf (last visited July 22, 2019).

[32] Upon information and belief, Heritage is participating in the DOJ's leniency program.

confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant.

157.   Information disclosed by some Defendants evidence the broad scope of the conspiracy investigated by the DOJ.

158.   For example, in a quarterly reported filed with the Securities and Exchange Commission ("SEC"), Lannett disclosed that on November 3, 2014, its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[33] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[34]

159.   In February 2016, Mylan disclosed in an annual report filed with the SEC that it received a DOJ subpoena related to Doxycycline,[35] and disclosed in a quarterly report in November 2016 that it had received subpoenas relating to Propranolol and the non-Subject Drugs, Cidofovir,

---

[33]   *Quarterly Report (Form 10-Q)*, LANNETT COMPANY, INC., at 16 (Nov. 6, 2014) https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm (last visited July 22, 2019).

[34]   *Id.*

[35]   *Annual Report (Form 10-K)*, MYLAN INC., at 160 (Feb. 16, 2016), http://investor.mylan.com/static-files/fa02fb29-d27c-4a9d-824b-be0481bdf98c (last visited July 22, 2019).

Glipizide-metformin, and Verapamil.[36] In the same report, Mylan also disclosed that the DOJ executed search warrants in connection with the investigation.[37]

160.    Novartis, the parent company of Sandoz and Fougera disclosed that "[i]n March 2016, Sandoz Inc. received a subpoena from the Antitrust Division of the DOJ requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera) and related communications with competitors. Sandoz Inc. is cooperating with this investigation which it believes to be part of a broader inquiry into industry practice."[38]

161.    On December 5, 2014, Defendant Par received a subpoena from the DOJ Antitrust Division regarding its communications with competitors concerning Digoxin and Doxycycline.[39]

162.    On May 2, 2017, Perrigo announced that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the DOJ Antitrust Division related to drug pricing in the pharmaceutical industry. As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."[40]

[36] *Quarterly Report (Form 10-Q)*, MYLAN INC., at 58 (Nov. 9, 2016), http://investor.mylan.com/static-files/79a74f61-9a6c-411b-801a-4dd005e70ad5 (last visited July 22, 2019).

[37] *Id.*

[38] *Annual Report*, NOVARTIS, at 217 (2016), https://www.novartis.com/sites/www.novartis.com/files/novartis-annual-report-2016-en.pdf (last visited July 22, 2019).

[39] *Annual Report (Form 10-K)*, PAR PHARMACEUTICAL COMPANIES, INC., at 37 (Mar. 12, 2015), https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm (last visited July 22, 2019).

[40] *Perrigo Discloses Investigation*, Press Release, PERRIGO (May 2, 2017), https://investor.perrigo.com/2017-05-02-Perrigo-Discloses-Investigation (last visited July 22, 2019).

163.    In a Form 6-K filed with the SEC, Taro Israel stated that on September 8, 2016, Taro "as well as two senior officers in its commercial team, received grand jury subpoenas" from the DOJ Antitrust Division "seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[41]

164.    On June 21, 2016, Defendant Teva received a subpoena from the DOJ Antitrust Division "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. [Defendant] Actavis [at this time a subsidiary of Teva Israel] received a similar subpoena in June 2015."[42]

165.    The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-md-2724 (E.D. Pa.). For example, in an action related to Propranolol, the DOJ intervened and requested a stay of discovery, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case."[43]

166.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market,

---

[41] *Report of Foreign Private Issuer (Form 6-K)*, TARO PHARMACEUTICAL INDUSTRIES LTD., (Sept. 9, 2016), https://seekingalpha.com/filing/3221934 (last visited July 22, 2019).

[42] *Report of Foreign Private Issuer (Form 6-K)*, TEVA PHARMACEUTICAL INDUSTRIES LTD., at 33 (Nov. 15, 2016), https://www.sec.gov/Archives/edgar/data/818686/000119312516768849/d284188d6k.htm (last visited July 22, 2019).

[43] Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF No. 112 (S.D.N.Y. Feb. 21, 2017).

however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[44]

**C.    State Attorneys General Launch Investigations into Generic Drug Price Hikes**

167.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Connecticut along with twenty other states ("State AGs") filed suit on December 15, 2016. Although the State AGs' first complaint focused on Doxycycline and Glyburide, it also alleged that the State AGs uncovered a wide-ranging series of conspiracies implicating numerous different generic drugs and manufacturers. Connecticut's Attorney General, George Jepsen, noted that while the lawsuit focused on the actions of Heritage, "we have evidence of widespread participation in illegal conspiracies across the generic drug industry."[45]

168.    New York's Attorney General similarly reported that the State AGs investigation "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[46]

169.    The State AGs filed an Amended Complaint on June 18, 2018, broadening the case to include fifteen drugs. Connecticut Attorney General, George Jepsen stated that "[t]he issues

---

[44] *Division Update Spring 2017*, DEP'T OF JUSTICE, (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products (last visited July 22, 2019).

[45] Mark Pazniokas, *Connecticut leads 20 states alleging price-fixing in generic drugs*, THE CONN. MIRROR (Dec. 15, 2016), https://ctmirror.org/2016/12/15/connecticut-leads-20-states-alleging-price-fixing-in-generic-drugs/ (last visited July 22, 2019).

[46] *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies*, Press Release, NEW YORK OFFICE OF THE ATT'Y GEN., (Dec. 15, 2016), https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage (last visited July 22, 2019).

we're investigating go way beyond the two drugs and six companies. Way beyond … We're learning new things every day."[47]

170.   The amended complaint included the State AGs of 47 states, the District of Columbia, and Puerto Rico, asserting claims against 18 companies, including Defendants Heritage, Teva, Mylan, Actavis, Lannett, Par, and Sandoz.

171.   On May 10, 2019, Connecticut and 43 other states and Puerto Rico filed suit against 20 companies, and co-conspirator individuals, including Defendants Actavis, Apotex, Breckenridge, Dr. Reddy's, Glenmark, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt and Zydus alleging a conspiracy to fix prices on more than 100 drugs, including Subject Drugs, Baclofen, Benazepril, Clomipramine, Fluocinonide, Levothyroxine, Pravastatin, and Propranolol ("Second AG Complaint").

172.   Connecticut's Attorney General, William Tong, stated:

> We have hard evidence that shows the generic drug industry perpetrated a multi-billion dollar fraud on the American people. We have emails, text messages, telephone records, and former company insiders that we believe will prove a multi-year conspiracy to fix prices and divide market share for huge numbers of generic drugs.[48]

173.   The DOJ's and the State AGs' investigations of alleged price-fixing and other unlawful collusive conduct in the generic drug industry are ongoing.

---

[47] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, THE DAILY BEAST, (Dec. 21, 2016 1:02 AM), https://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices (last visited July 22, 2019).

[48] Mark Pazniokas, *Tong ups stakes and profile of drug price-fixing investigation*, THE CONN. MIRROR (May 12, 2019), https://ctmirror.org/2019/05/12/tong-ups-stakes-and-profile-of-drug-price-fixing-investigation/ (last visited July 22, 2019).

## II.    OPPORTUNITIES FOR COLLUSION

174.    At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the intended and actual effect of causing Plaintiffs' Assignors to pay artificially inflated prices at supracompetitive prices.

175.    The Defendants ensured that all competitors were adhering to the collective scheme by communicating at (1) trade association meetings and conferences; (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) individual, private communications between and among Defendants' employees through use of the telephone, electronic messaging, and similar means.

### A.    Trade Association and Customer Conferences

176.    Many of Defendants largest customers, including but not limited to (a) large wholesalers and distributors like ABC, Cardinal, HD Smith, McKesson and Morris; (b) Group Purchasing Organizations ("GPOs"); and (c) other large drug purchasers like pharmacies and supermarket chains, hold multi-day conferences throughout the year in various locations throughout the United States. Generic manufacturers are invited to attend.

177.    Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the NACDS, HDMA, GPhA, ECRM, and MMCAP. A summary of Defendants' trade association attendance and opportunities to conspire is attached as **Exhibit F**.

178.    At these various conferences and trade shows, sales representatives and executives from the generic drug manufacturers, including Defendants, interact with each other and discuss their respective business and customers. Many of these conferences and trade shows include

organized recreational and social events such as golf outings, lunches, cocktail parties, and dinners that provide ample opportunities to meet competitors. Defendants use these opportunities to discuss and share competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

179.    The Policy and Regulatory Report, an intelligence-gathering and data analytics firm reported that the DOJ's investigation into generic drug manufacturers includes trade associations and industry conferences as "one potential avenue for facilitating the collusion between salespeople at different generic producers."[49] For example, between February 20, 2013 and December 20, 2013, there were at least 44 different tradeshows and customer conferences where Defendants had the opportunity to meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

180.    Defendants used these trade association meetings and industry conferences to facilitate conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs.

### i.    NACDS

181.    The NACDS represents traditional drug stores, supermarkets and mass merchants with pharmacies. One of the primary objectives for NACDS is to "bring together diverse retailers and suppliers through an integrated calendar of annual events …"[50]

---

[49] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA, (Aug. 7, 2015, 11:41 AM), https://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain (last visited July 22, 2019).

[50]    *Mission*, NATIONAL ASSOCIATION OF CHAIN DRUG STORES, https://www.nacds.org/about/mission/ (last visited July 22, 2019).

182.    The NACDS also allows pharmaceutical suppliers to be members.[51] Upon information and belief, at various times relevant to this Complaint, Defendants Akorn, Apotex, Breckenridge, Dr. Reddy's, Epic, Glenmark, Heritage, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Taro, Teligent, Teva, Upsher-Smith, Wockhardt, and Zydus were NACDS members.

### ii.    HDMA

183.    The HDMA (now the Healthcare Distribution Alliance) is a national trade association that represents "primary pharmaceutical distributors."[52] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

184.    Upon information and belief, at various times relevant to this Complaint, Akorn, Apotex, Breckenridge, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, Zydus were HDMA members.

### iii.    GPhA

185.    The GPhA (now called Association for Accessible Medicines ("AAM")) is a trade association representing manufacturers and distributors of generic pharmaceuticals. "As manufacturers of 9 out of every 10 prescriptions dispensed in the U.S., members … form an integral, and powerful, part of the healthcare system."[53]

186.    The GPhA holds regular conferences at which its members meet to discuss various issues affecting the pharmaceutical industry.

---

[51] *Membership Benefits*, NATIONAL ASSOCIATION OF CHAIN DRUG STORES, https://www.nacds.org/membership/benefits/ (last visited July 22, 2019).

[52] *About*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.hda.org/about (last visited July 22, 2019).

[53] *About the Association*, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.accessiblemeds.org/about?_ga=2.37361568.1233148939.1563400283-2085195620.1562694660 (last visited July 22, 2019).

187.    Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus are regular members and have been since 2013.

188.    Executives from Defendants Actavis, Apotex, Fougera, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013.

### iv.    ECRM

189.    The Efficient Collaborative Retail Marketing organization ("ECRM") hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[54]  It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss business opportunities, review contracting strategies, and future business planning activities."[55]

### v.    MMCAP

190.    MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services."[56] Members receive access to full range of pharmaceuticals and healthcare products and services.

---

[54] *Company Overview of Efficient Collaborative Retail Marketing Company, LLC*, BLOOMBERG, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=106996762 (last updated July 19, 2019, 2:50 PM).

[55] The Health System/Institutional Pharmacy Program, ECRM, https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals (last visited July 22, 2019).

[56] MMCAP, http://www.mmd.admin.state.mn.us/MMCAP/Default.aspx (last visited July 23, 2019).

### B.    Industry Dinners and Private Meetings

191.    In addition to the frequent trade association meetings and industry conferences, senior executives and sales representatives of the Defendants congregated in smaller, more limited groups, which allowed them to discuss their competitors and competitively sensitive information.

192.    Many Defendants are headquartered near each other, providing them with easy and frequent access to one another. For example, Defendants Actavis, Breckenridge, Dr. Reddy's, Fougera, Glenmark, Heritage, Hi-Tech, Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, and Zydus are all located in the New York/New Jersey/Pennsylvania area.

193.    High level executives of many generic manufacturers get together periodically for "industry dinners." In January 2014, as many generic prices were increasing, at least 13 high-ranking male executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, including at least executives from Defendants Actavis, Dr. Reddy's, Lannett and Sun, among others, met at a steakhouse in Bridgewater, New Jersey to discuss their ongoing conspiracy.[57]

194.    At the "industry dinners" one company will typically pay for all attendees. In a December 2013 group email, a high-ranking executive for Defendant Dr. Reddy's joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded: "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [a generic drug manufacturer] picked up the last bill…PS…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."[58]

---

[57] First AG Complaint at ¶ 83.

[58] *Id.* at ¶ 84.

195.    Generic drug sales representatives also regularly attended "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information.[59]

196.    Many "Women in the Industry" dinners were organized by a salesperson from Defendant Heritage, Anne Sather, who resides in Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. Out of town representatives were also aware of these dinners and were included when in the area. In November 2014, a salesperson from Defendant Lannett sent Sather a text message, asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" Sather responded: "There is an Xmas [sic] party at Tanya's house on Dec. 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."[60]

197.    Dinners were occasionally planned around visits of out of town competitors. For example, in organizing a dinner Sather stated:

> Sorry if the meeting/dinner invite is a little short notice, but [Katherine Neely, a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry 100 – we can recap all our findings from NACDS over a martini or glass of wine! :) Plus the food is super Yummy![61]

198.    Several Girls' Night Out events were held in 2015, including at the ECRM conference in February (involving Defendants Dr. Reddy's, Heritage, Lannett, and Teva, among

---

[59] *Id.* at ¶ 85.

[60] *Id.* at ¶ 86.

[61] *Id.* at ¶ 87.

others), in Baltimore in May (involving Defendants Dr. Reddy's, Heritage, Teva, and Zydus, among others), and in August (involving Defendants Dr. Reddy's and Heritage, among others).[62]

### C.     Personal Telephone Calls, Emails and Text Message Communications

199.    The State AGs investigation uncovered an overarching conspiracy wherein Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.[63]

200.    Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Plaintiffs' Assignors.[64]

201.    As set forth in the State AGs' Complaints, based on telephone records obtained during their investigation, representatives of several of the Defendants with pricing responsibility had frequent telephone calls with representatives of their competitors, including Defendants. For example, between July 1, 2013 and July 30, 2014, executives at Heritage, had at least 375 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, Sun, Teva, and Zydus.[65] Between July 1, 2013 and July 30, 2014, executives at Teva had at least 1,373 contacts with Defendants at Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Lannett, Mylan, Par, Sandoz, Sun, and Zydus.[66] Between January 1, 2014 and December 31, 2014,

---

[62] *Id.* at ¶ 88.
[63] *Id*. at ¶¶ 89-109.
[64] *Id.*
[65] *Id*. at ¶ 94.
[66] *Id*. at ¶ 95.

52

Teva executives had at least 887 contacts with Defendants Actavis, Glenmark, Lupin, Sandoz, Taro, and Zydus.[67]

202.    For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice Present Malek when she worked at AmerisourceBergen, which was a Heritage customer that Malek managed. When Patel moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As detailed below, Patel orchestrated a number of price increases between 2013 to present.

203.    Malek and Patel's relationship was valued and accepted by Malek's supervisors. For example, in April 2014, Malek and Glazer (Heritage) met with the CEO and President of Emcure ("Emcure executives"), Heritage's parent company, to discuss potential price increases for several drugs. Malek told the Emcure executives about his Teva contact, Patel. Malek who had been discussing price increases for certain drugs since 2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocations. The Emcure executives approved of this strategy to coordinate prices and allocate customers with Teva.

## III.    THE OVERARCHING CONSPIRACY

204.    The overarching agreement to fix prices is widespread across the generic drug industry and, upon information and belief, is broader than the Subject Drugs and Defendants named here. Each conspiracy described herein is part of a larger overarching conspiracy. This larger conspiracy was reinforced through phone calls and text messages between Defendants to discuss their "fair share" of the market and the desire to maintain or raise prices with respect to specific drugs. These types of communications occurred between Defendants with great frequency.

---

[67] Second AG Complaint at ¶ 121.

205.    Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry. Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further supracompetitive price increases.

206.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendants and Subject Drugs named in this Complaint. Plaintiffs focus here on the roles of these named Defendants and their participation in, and agreement with, this overarching conspiracy to increase prices for the Subject Drugs.

207.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013, there were at least 44 different tradeshows or customer conferences where the Defendants had the opportunity to meet in person. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

208.    Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to 50% of the

market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth enters, each expects 25%, and so on, as additional competitors enter the market.

209. When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.

210. Although these parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in each given year. The share objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

211. This scheme to minimize competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is followed even in the absence of direct communications between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

212. The "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. In today's generic drug market, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a

cover bid. The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supracompetitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

213.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.

214.    These rules about "fair share" apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Instead, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

215.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible" and is spoken to by other competitors.

216.    "Fair share" and other similar terminology has become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs.

217.    Interdependence among Defendants and other generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

218.    This interdependence between Defendants and other generic manufacturers is further demonstrated by companies sharing sensitive information with competitors as a matter of course. This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

219.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.

## IV.    DEFENDANTS SIGNAL TO COMPETITIORS THEIR INTENT TO SET AND MAINTAIN SUPRACOMPETITIVE PRICES

220.    public statements and admissions contained in their investor communications indicate they realized record revenues between 2013 and the present and signaled to competitors a commitment to increasing generic drug prices to supracompetitive levels.

221.    On an October 29, 2013 Actavis earnings call, Actavis Pharma Director and President Sigurdur Olafsson stated "[b]ut there's opportunities to take pricing increases, and that is what has changed since maybe five years ago when there wasn't an opportunity."

222.    In Fiscal Year 2014 (ending Dec. 31, 2014), Defendant Akorn reported a revenue increase of 75% or $237.3 million (from $317.7 million in 2013 to $555 million in 2014) and gross profits increased by 52% or $89.5 million (from $171.9 million in 2013 to $261.4 million in 2014).

223.    On Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai commented: "we are seeing lot [sic] of price increases that are happening in the generic space and it affects some of our products as well. So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago."

224.    Akorn's 2015 Annual Report stated "[o]ur gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014. Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014 … primarily due to the effect of price changes …"[68]

225.    Upon information and belief, in or about May 2016, Akorn told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

226.    In August 2016, Akorn's CFO, Duane Portwood, stated on a Q2 earnings call that "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter. The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

---

[68] *Annual Report (Form 10-K)*, AKORN, INC., at 41 (May 9, 2016) http://investors.akorn.com/static-files/ab09b732-3442-43a5-aa50-3f495d1ec24e (last visited July 23, 2019).

227.   On Endo's (Par's parent) February 28, 2014 earnings call, Endo's CFO Suketu Upadhyay commented:

> [O]ur US generic pharmaceuticals business remained a source of strong organic growth in 2014. We believe the base of Qualitest products will continue to experience low-double digit revenue growth. That growth is primarily driven by an increase in demand for products but it also the result of selected pricing opportunities within the higher barrier to entry categories.

228.   During Endo's May 1, 2014 earnings call, CEO Rjiv De Silva stated that Endo's generic business, Par was performing strongly in part because "we have been able to take advantage of some pricing opportunities."

229.   In Endo's Q4 2014 earnings call on March 2, 2015, De Silva stated, "In 2015, we expect strong double-digit revenue growth for U.S. generics, as a result of consistent volume growth supplemented by recent pricing opportunities."

230.   During Hi-Tech's March 8, 2013 earnings call, Hi-Tech Chairman and CEO David Seltzer commented:

> So we happen to have – a number one, we happen to be doing a significant amount of topicals than – compared to several years back. So we have Clobetasol items that we pretty much brought all in-house on the marketing side. We have our generic EMLA. We have licensed in a couple of Lidocaine products that are doing very well for us. So we have capacity. ... I think everybody knows and understands that there's been some significant price changes in that market over the last couple of years.

231.   Impax' President of its Global Pharmaceuticals Division Carole Ben-Maimon stated on a February 20, 2014 earnings call that "the [digoxin] market has been pretty stable ... [w]e're pretty comfortable that what we have done is rational and will result in ongoing profitability for that product." By February 20, 2014, the average price of generic Digoxin had skyrocketed from its pre-conspiracy price levels and stabilized at a near 600% increase. Ben-Maimon further stated:

Obviously, we can't really talk about, for competitive reasons, about specific products with specific prices. But as you've seen across the industry, pricing has improved and the ability to take some price increases has clearly been available. Obviously, we're really careful and we want to make sure that we do that in a very rational way so that we make sure that the price – that what we're doing sticks and that we actually do make more money in the long run. But we're pretty confident that what we did through towards the end – throughout the end of last year and the beginning of this year will result in more profitability from many other products that we have been able to take some price on.

232.    On February 7, 2013 Lannett's CEO Arthur Bedrosian stated in an earnings call:

I could just say that we're very capable of raising prices and we tend to sometimes lead the market. We see opportunities to raise a price, we take it. We don't sit back and wait for someone else to do it. So you might say we're a little more aggressive in the pricing arena. I'd just rather not focus on which products they were, which could negatively impact us and send the wrong message to my competitors who might think they can get my customers away be lowering the price.

233.    On a September 10, 2013 earnings call, Bedrosian stated:

We're not a price follower. We tend to be price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as sales vice president is to increase profit margins for the company. And he's the first step in that process. I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople. And he's done a good job there. With 1 or 2 exceptions, we've tended to lead in the way of price increases. We believe that these prices are important. We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does. I am finding a climate out there has changed dramatically and I see more price increases coming from our competing – competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors will follow suit. If they don't, that's their issue. But our plan is to raise prices on any product that we think we can or we haven't raised a price.

234.    On that same call, Bedrosian was asked for a reaction to a competitor's recent and significant price increase on Levothyroxine. Bedrosian joked "[y]ou mean after I sent them the thank you note," repeatedly adding that he was "grateful" for the price hike:

> I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well … So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful … [t]his particular one that was done by a competitor was – isn't price [indiscernible] by any – just like they do any of the price increases, we don't necessarily see the benefits right away because most of the contracts that are in place usually give the customer a buy-in period. So if you're going to raise a price on them, which is generally not the case, they have an opportunity to place an extra order. So we don't really see the benefit for usually, at least one full quarter, let's say. Because there's a 60-day buy in. So I would probably be better able to answer this when we do our guidance for our first quarter sometime in November.

235.    On that same call, another investor asked Bedrosian whether he has any "expectations for any new [Levothyroxine] competitors?" Bedrosian noted that two possible competitors "were in wings … [b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace." Bedrosian continued, "[w]e're seeing more responsibility on the part of all our competitors," adding that because of costs in the industry he "suspect[s] you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace."

236.    At the time of this call, and for several months before and after, the price of Levothyroxine saw an approximately 100% price increase. Bedrosian commented on the durability of the price increases on a November 7, 2013 earnings call:

> I don't really see anything significant on the horizon that could cause us any pain, quite frankly. We're still conservatively run. We're still careful how we spend money. We still realize we're in a commodity business. While we're enjoying the success of the company, it's not getting to our heads in anyway.

237.    On the same call, Lannett's CFO Martin P. Galvin signaled that these were just the "earlier days of the increase," which Bedrosian explained meant that the "price increases that are going on in the industry [are] going to stick for all the companies."

238.    On February 6, 2014, both Bedrosian and Galvan confirmed that the price increases were driving growth at Lannett. Galvan reported that "[w]e do believe strongly that there's sustainability in some of the price increases[.]" On May 7, 2014, Bedrosian discussed the 50% price increase of Levothyroxine as part of Lannett's "selective price increases."

239.    On November 4, 2014, Bedrosian described one of Lannett's "rational" competitors as one that would not do "anything crazy" such as "just going out and try to grab market share." He continued:

> So, from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.
>
> So it's really a combination of those things. So I don't think Levo and Digoxin are the only products that would sit here and tell you I could raise prices on, because I believe any of the products in our product line, including products that we may have just gotten approved have those same opportunities underlying them. We look at the market and sometimes we're the first ones to raise a price, sometimes we're not. But we look at everything in line as a potential product to have a price increased on.

240.    On the same call, Bedrosian replied to a question about Lannett's continued price increases on Levothyroxine. He remarked that "[i]n the case of Levo, we're already at 75% of the innovative brand," and noted that Lannett could stay at the price for the foreseeable future.

241.    On a February 4, 2015 earnings call, Bedrosian explained:

> If you're saying that the price increases that we've had in place, are they sustainable, and are they maintaining? My answer would be yes, they continue to hold up.
>
> As far as whether we talked about any increases for this year, we don't usually give guidance for that. We predict what our revenues will be for the year. We're not seeing any declines, generally speaking, on the price increase products. So, they continue to, let's say, level off at their new pricing.

242.    Later, on the same call, Bedrosian stated:

So, I'm expecting these pricings to really sustain themselves to continue. I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%. It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices.

We don't see that kind of behavior sustainable, and we don't see it going further into the future. I think you're going to find more capital pricing, more – I'll say less competition, in a sense. You won't have price wars. You are still going to have competition, because there's a lot of generic companies in the market. I just don't see the prices eroding like they did in the past.

243.    On August 25, 2015, Bedrosian again signaled continuing price increases, because they have been "sustainable" and because "it's a more rational market we're in."

244.    Drug price increases contributed to $157.3 million of revenue in 2015 for Lannett. Its sales volume only changed by 5%, but its sales prices changed by 54%. Deutsche Bank estimates that price increases for Levothyroxine and Ursodiol accounted for half of Lannett's revenue in fiscal 2015.[69]

245.    On August 23, 2016, Bedrosian summarized that price competition "usually doesn't get you the results you want. So, I think a lot of people have learned that lesson by now." He described a problem that "some of the dumber newer companies [that] continue to go down that path" of competing on price. Bedrosian equated experience and expertise with price gouging. Bedrosian also claimed that "occasional" competitors who attempted to compete on price were fortunately "maturing in the market and realizing they need to make a profit as well."

246.    On October 27, 2015, Lupin's CEO Vinita Gupta stated during an earnings call:

My sense that most of our competitors have similar challenges that they have had a lot of competitive pressures, they have had a lot of margin

---

[69] *Annual Report (Form 10-K)*, LANNETT COMPANY, INC. at 31 (Aug. 27, 2015), https://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005   110k.htm (last visited September 19, 2019).

pressures coming out of consolidation and because of the fact that companies have been lacking meaningful product approvals, I think the majority when I look a some of our peers in the industry, all of them talk about similar challenges. So one would think that our competitors or peers would be rationale [sic] and be strategic in the way they price products.

247.    On an October 25, 2012 earnings call, Mylan's CEO Heather Bresch stated that "[y]ou've heard me quarter after quarter coming and saying we weren't going to chase the bottom, that there's been irrational behavior and that we would continue to hold steady and control what we can control."

248.    On a February 27, 2013 earnings call, Mylan's CFP John Sheehan stated:

2013 will yet be another strong year for Mylan. In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available. In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

249.    Then, on May 2, 2013, Bresch stated "[f]rom my perspective, we see the generic industry alive and well. We still see a lot of runway room here in the United States." On an earnings call one year later on May 1, 2014 Bresch stated "[w]e continue to see stability really across our entire generic line on pricing."

250.    On an August 7, 2014 earnings call, Bresch stated:

As far as pricing, look, I think that, that stability in our North American – that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year. We've seen North America continue to maximize opportunities.

251.    On an October 30, 2015 earnings call, Bresch stated:

With respect to gross margin, I guess I would start by pointing out that, since 2010, our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year-of 55%.

So the gross margins have been sustained. They have steadily increased over the last five, six years … It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

252.    On that same call, Bresch stated "[l]ook, I would say as far as price increases, we've had a very consistent approach. We have absolutely had opportunities around generic pricing."

253.    On February 10, 2016, Bresch stated in an earnings call that she believed Mylan had been a "very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

254.    On August 8, 2016, Par's President Paul Campanelli commented that "typically you want to just be very careful about trying to go after too much share. You just have got to take a balanced approach."

255.    On February 7, 2015, Perrigo Company plc's Chairman and CEO Joseph C. Papa stated during an earnings call that, "[o]n the question of pricing … I will say the Rx side does have, as I sit here today, the greatest upside." Papa also noted that Perrigo "achieved record results, growing sales 12% with an adjusted opening margin of 46%." On the same call, industry analyst Gregg Gilbert from Deutsche Bank commented, "[o]bviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years." In response, Papa affirmed the continued enhanced pricing trend: "[t]he next year we're going to look at Rx and raise those prices."

256.    In its annual 10-K filing with the SEC, Perrigo Company plc reported a 36% increase in gross profits in its prescription pharmaceuticals business from June 2014 to June 2015 ($361.5 million in fiscal year 2013 to $489.9 million in 2014), as well as an increase of $74 million in net sales, naming the launch of Clobetasol Propionate 0.05% Spray as one of the primary causes."

257.    Sandoz similarly boasted of increased profits since 2013 and emphasized the importance of the U.S. market in their bottom line. On April 23, 2015, Novartis CEO Joseph Jimenez stated that Sandoz had "strong financial results" and the "U.S. was up 13% ... driven by … our Fougera dermatology business."

258.    On July 21, 2015, Jimenez stated that, "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division's increased focus on core markets, particularly the U.S., which is up 23%."

259.    On November 14, 2013, Sun's Managing Director Dilip Shanghvi commented on an earnings call "price increases [are] becoming kind of more widespread than what it used to be historically, so clearly there would be some impact going forward."

260.    In November 2014, Taro Israel's CEO, Kal Sundaram, said on a Q2 2014 earnings call, "[n]et sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release, we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130-basis points expansion in our gross margins of 79%.

261.    In May 2013, on a Q4 earnings call, Sun Pharmaceutical Industries' (parent of Defendants Sun and Taro) Whole time Director, Sudhir Valia, confirmed Sun experienced no rising manufacturing or related costs that might account for the price increases: "[m]aterial cost, as a percentage of the net sales is 18% which is lower as compared to the previous year."[70] Likewise, in a November 2013 earnings call, Valia confirmed that material costs were "similar to Q2 last year."

---

[70] *Q4 earnings call*, SUN PHARMA (May 28, 2013), http://www.sunpharma.com/Media/Press-Releases/FY13%20Q4%20Earnings%20Call%20Transcript.pdf (last visited September 19, 2019).

262.    In September 2016, a Sun Pharmaceutical Industries analyst report credited Clobetasol price increases for the Company's success. Harith Ahamed and Krishna Kiran Konduri of Spark Capital Advisors noted:

> **Significant price increases across Taro's portfolio**: Price increases across in derma portfolio has been a key driver for Taro's strong performance in recent years. For instance, Clobetasol propionate, Taro's top product, accounting for [approximately] 11% of sales in FY16, has witnessed price increases of >12x between 2013 and 2015. Sustainability of Taro's price increase-driven performance has been a key concern for investors of [Sun Pharmaceutical Industries Ltd.].

263.    In September 2016, *The Economic Times* reported that "[w]hile Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases."[71]

264.    On an October 29, 2013 earnings call, Teligent's President and CEO Jason Grenfell-Gardner noted that "there are certainly some markets there which had seen price appreciation. And that's a trend that's been happening throughout the topical market in various ways. … We hope at this point that the trend will continue."

265.    On an October 24, 2014 earnings call, Grenfell-Gardner announced that Teligent's 2014 year-to-date sales increased 123% "driven partially … from significant price increases for core products in portfolio."

266.    On February 6, 2014, Teva Pharmaceutical Industries Ltd.'s President and CEO Eyal Desheh stated in an earnings call that "our U.S. generic business [Defendant Teva] is

---

[71] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike*, THE ECON. TIMES (Sept. 13, 2016, 7:46 AM), https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms (last visited September 19, 2019).

definitely the most profitable part with gross margin of about 50%. Deshah went on to comment that the "U.S. generic business is highly profitable."

267.    On October 29, 2015, Teva Pharmaceutical Industries Ltd.'s President and CEO of the Global Generic Medicines Group Sigurdur Olafsson stated during an earnings call that the "pricing environment has been quite favorable for generics versus six years ago."

268.    On an October 31, 2013 earnings call, Executive Director of Cadila (Zydus' parent), Ganesh Nayak noted "[t]his quarter, the major growth has come from price improvement and not actually from new product." Cadila's Chairman and Managing Director Pankaj Patel then commented:

> Up to last quarter, we were [seeing] pricing pressure, but now we see that, on selective products we are able to actually up the price. So it is the kind of a mixed scenario at this moment. We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically – products with low margins – to increase prices. So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

## V.    INDUSTRY ANALYSTS SUSPECT COLLUSION

269.    Industry analysts agree that generic price increases are consistent with a price-fixing conspiracy. For example, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[72]

---

[72] Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming*?, WALL ST. J., (Apr. 22, 2015, 3:07 PM), https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/ (last visited September 19, 2019).

270.    According to one study, since 2013, approximately 1 in 19 generic drugs sold in

the United States have experienced major price increases that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law
> firms to bring litigation against companies, reported "anomalous pricing
> patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016. It
> identified 90 medicines whose prices rose at least 250 percent over the
> three-year period and were increased by at least two drug companies around
> the same time, even though there was no obvious market reason for the
> increases. The average price jump among the 90 drugs was 1,350 percent,
> Fideres found. "I don't think the public or even the politicians in the U.S.
> have any idea just how widespread and extreme the phenomenon is," said
> Alberto Thomas, one of Fideres' founders.[73]

271.    A January 2014 survey of 1,000 members of the NCPA found that more than 75%

of pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices

spiking by 600% to 1,000% in some instances.[74]

272.    Pennsylvania physicians, acting through the Pennsylvania Medical Society, called

on state and federal governments to investigate surging generic prices, believing anticompetitive

conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug
> Shortages and immediate past president of the Pennsylvania Society of
> Anesthesiologists, surging prices have hit hundreds of mainstay generics,
> including anesthetics, chemotherapeutic agents, antibiotics, and nutritional
> intravenous solutions. He believes the surging prices are a result of anti-
> competitive behavior.[75]

---

[73] Liam Vaughn and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, BLOOMBERG (Dec. 22, 2016, 12:13 PM), https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds (last visited September 19, 2019).

[74] *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say*, Press Release, NATIONAL COMMUNITY PHARMACISTS ASSOCIATION (January 8, 2014), https://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say (last visited September 19, 2019).

[75] *Rising Generic Drug Costs Have Physicians Raising Red Flags*, Press Release, PENNSYLVANIA MEDICAL SOCIETY (Feb. 5, 2016, 11:39 AM), https://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html (last visited September 19, 2019).

## VII.  THERE IS NO JUSTIFICATION FOR THE EXTRAORDINARY PRICE INCREASES OF THE SUBJECT DRUGS

273.     At all relevant times, there were no significant increases in the costs of making any of the Subject Drugs, no significant decrease in supply, and no significant increase in demand.[76] Despite this, Defendants implemented extraordinary price increases on each of the Subject Drugs. Such increases would not have been possible absent the existence of a price-fixing agreement.

274.     The FDA Safety and Innovation Act of 2012 requires that drug manufacturers report drug shortages.[77] Any drug shortages or supply disruptions reported to the FDA by any of the Defendants with respect to any of the Subject Drugs were temporary (unless that Defendant discontinued manufacturing the drug in furtherance of the conspiracy as set forth below), and, at all times, alternative suppliers with respect to that drug were available, as recorded in the American Society of Health-System Pharmacists' archives of its Current Drug Shortage Bulletins.

## VIII.  ALLEGATIONS SPECIFIC TO EACH OF THE SUBJECT DRUGS

### A.     Albuterol

275.     The Albuterol market is mature, as the drug has been available in the United States since 1989.

276.     At all relevant times, Albuterol Defendants Mylan and Sun have dominated, and continue to dominate, the market for Albuterol.

277.     Prior to 2013, the effective prices of Albuterol were stable.

---

[76] In a case alleging similar facts regarding the conspiracy to fix prices of generic Propranolol against the same Propranolol Defendants here, Judge Jed S. Rakoff held that Defendants failed to show any drug shortage sufficient to render allegations of price-fixing implausible. *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 722 (S.D.N.Y. 2017).

[77] Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

278.    Upon information and belief, around March 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Albuterol Period"), Albuterol Defendants suddenly and dramatically increased the price of Albuterol largely in unison.

279.    WAC data shows that the Albuterol Defendants increased Albuterol tablet prices largely in unison by the following amounts:

| Product | Defendant | NDC | Old WAC[78] | New WAC | Date of Increase | Percentage of Increase[79] |
|---------|-----------|-----|---------|---------|------------------|-----------------------------|
| 2 mg, 100 ct | Mylan | 0378-0255-01 | $0.13 | $5.88 | 3/6/2013 | 4,423% |
| 2 mg, 100 ct | Sun | 53489-176-01 | $0.13 | $4.70 | 4/15/2013 | 3,515% |
| 2 mg, 500 ct | Mylan | 0378-0255-05 | $0.13 | $5.88 | 3/6/2013 | 4,423% |
| 2 mg, 500 ct | Sun | 53489-176-51 | $0.12 | $4.70 | 4/15/2013 | 3,817% |
| 4 mg, 100 ct | Mylan | 0378-0572-01 | $0.19 | $5.88 | 3/6/2013 | 2,995% |
| 4 mg, 100 ct | Sun | 53489-177-01 | $0.19 | $4.70 | 4/15/2013 | 2,374% |
| 4 mg, 500 ct | Mylan | 0378-0572-05 | $0.18 | $5.88 | 3/6/2013 | 3,167% |
| 4 mg, 500 ct | Sun | 53489-177-05 | $0.18 | $4.70 | 4/15/2013 | 2,511% |

280.    NADAC data shows a sharp price increase following a period of extremely stable prices:

---

[78] All WAC prices are rounded to the nearest cent.

[79] All percentages are rounded to the nearest whole number.





281.    In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Albuterol saw between October 2013 and April 2014. The letters to Defendants Mylan and Sun, depicted the following price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage Increase: |
|------|--------------|-----------------------------|------------------------------|----------------------|
| Albuterol | 2 mg, 100 ct | $11 | $434 | 4,014% |
| Albuterol | 4 mg, 100 ct | $15 | $420 | 2.966% |

282.    The GAO Report identified Albuterol as having experienced an "extraordinary price increase" in 2013-2014.[80]

283.    Defendants had numerous opportunities to coordinate their price increases. All Albuterol Defendants attended the February 20-22, 2013, GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices for Albuterol increased dramatically. *See* **Exhibit F.**

284.    This agreement between the Albuterol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Albuterol than they otherwise would have absent the Defendants' anticompetitive conduct.

### B.    Amitriptyline

285.    The Amitriptyline market is mature, as the drug has been available in the United States since 1961. At all relevant times, there has been more than one manufacturer of Amitriptyline in the marketplace.

286.    At all relevant times, Amitriptyline Defendants Mylan, Par, and Sandoz have dominated, and continue to dominate, the market for Amitriptyline.

287.    Prior to 2014, the effective prices of Amitriptyline were stable.

288.    Upon information and belief, around May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Amitriptyline Period"), Amitriptyline Defendants suddenly and dramatically increased the price of Amitriptyline largely in unison.

---

[80] GAO Report at 34.

289.    WAC data shows that the Amitriptyline Defendants increased Amitriptyline 50 mg tablet prices largely in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC[81] | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 0781-1488-01 | $0.05 | $0.57 | 5/23/14 | 1,040% |
| 1,000 ct | Sandoz | 0781-1487-10 | $0.05 | $0.48 | 5/23/14 | 860% |
| 100 ct | Mylan | 0378-2650-01 | $0.05 | $0.57 | 7/16/2014 | 1,040% |
| 1,000 ct | Mylan | 0378-2650-10 | $0.05 | $0.57 | 7/16/2014 | 1,040% |
| 100 ct | Parr | 0603-2214-21 | * | $0.57 | 9/26/2014 | |
| 1,000 ct | Parr | 0603-2214-32 | * | $0.48 | 9/26/2014 | |

290.    According to NADAC data, the average market prices for Amitriptyline remained stable prior to June 2014 but rose dramatically and remained artificially inflated thereafter. The charts and tables below show the average price increases for the various doses of Amitriptyline tablets.

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|
| 10 mg | 0.0673 | 0.13938 | 8/20/2014 | 107% |
| 25 mg | 0.01702 | 0.13169 | 7/23/2014 | 674% |
| 25 mg | 0.13169 | 0.27165 | 7/30/14 | 106% |
| 50 mg | 0.02242 | 0.45975 | 7/16/14 | 1,951% |
| 75 mg | 0.03706 | 0.26083 | 7/23/2014 | 604% |
| 75 mg | 0.26083 | 0.81889 | 7/30/2014 | 214% |
| 100 mg | 0.04179 | 0.31607 | 6/18/2014 | 656% |
| 100 mg | 0.31607 | 1.11198 | 7/30/2014 | 252% |
| 150 mg | 0.08515 | 1.66111 | 7/16/2014 | 1,851% |

---

[81] Asterisks reflect periods where there were no WAC data available.





291.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. For example, The *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[82] The *Boston Globe* similarly reported, in November of the same year, "[t]he cost of the antidepressant drug

---

[82] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES (May 12, 2015) https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de (last visited July 23, 2019).

amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[83]

292.    The GAO Report identified Amitriptyline as having experienced an "extraordinary price increase" in 2014-2015.[84]

293.    Defendants had numerous opportunities to coordinate their price increases. All Amitriptyline Defendants attended the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York and the (ii) April 26-29, 2014 NACDS 2014 Annual Meeting in Scottsdale, Arizona. Shortly thereafter, the average prices for Amitriptyline increased dramatically. *See* **Exhibit F.**

294.    This agreement between the Amitriptyline Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Amitriptyline than they otherwise would have absent the Defendants' anticompetitive conduct.

### C.    Baclofen

295.    The Baclofen market is mature, as the drug has been available in the United States since 1977. At all relevant times, there have been at least three manufacturers of Baclofen in the market.

296.    At all relevant times, Baclofen Defendants Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

---

[83] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, Bos. GLOBE (Nov. 6, 2015, 1:53 pm), https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html (last visited July 23, 2019).

[84] GAO Report at 34.

i.      **Customer and Market Allocation Agreement between Teva and Lannett**

297.    Teva and Lannett had communications in 2014 regarding Lannett entering the Baclofen market. In June 2014, Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply. In an internal e-mail sent to sales staff, a senior sales executive at Lannett, stated: "Baclofen launch in four weeks, need market intelligence. We can only take a 10% market share." At that time, Teva had a large market share in relation to the existing competitors in the market. [85]

298.    On June 12, 2014 a Director of National Accounts at Lannett, Tracy Sullivan, contacted Teva's Director of Strategic Customer Marketing, Nisha Patel to ask for some information on "industry news."[86]

299.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." That same day Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back and they spoke for more than three minutes. After speaking, Patel sent another text message to Sullivan, stating "Thank you!!" Sullivan responded: "No prob!"[87]

300.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower

---

[85] Second AG Complaint at ¶ 495.

[86] *Id.* at ¶ 497-498.

[87] *Id.* at ¶ 499.

price to maintain the account). Even though the new manufacturer's price was only slightly lower than Teva's price, Teva declined to bid. Defendant Patel specifically agreed with the decision to concede, stating "I believe this is Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."[88]

### ii.   Price Increase

301.   Prior to 2014, the effective prices of Baclofen were stable.

302.   Upon information and belief, around February 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Baclofen Period"), Baclofen Defendants suddenly and dramatically increased the price of Baclofen largely in unison.

303.   Effective February 21, 2014, Defendant Upsher-Smith took a significant price increase on Baclofen, ranging from 350%-420% of the WAC price, depending on the formulation. Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith and Upsher-Smith was considering whether to exit the market or significantly raise the price.

304.   WAC data confirms that Baclofen Defendants Teva and Upsher-Smith both imposed dramatic price increases for Baclofen 20mg largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 0832-1025-00 | $0.10 | $0.49 | 2/21/14 | 390% |
| 1,000 ct | Upsher-Smith | 0832-1025-10 | $0.10 | $0.49 | 2/21/14 | 390% |
| 100 ct | Teva | 0172-4097-60 | $0.10 | $0.49 | 4/15/14 | 390% |
| 1,000 ct | Teva | 0172-4097-80 | $0.09 | $0.49 | 4/15/14 | 444% |

305.   Although WAC data is unavailable for Par, upon information and belief, Par implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

---

[88] *Id.* at ¶ 500.

306.     Upon information and belief, when Lannett entered the market it had the same WAC as Teva.[89]

307.     According to NADAC data, the average market prices for Baclofen remained stable prior to April 2014 but rose dramatically and remained artificially inflated thereafter. The charts and tables below show the average price increases for the various doses of Baclofen tablets.

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 10 mg  | 0.03863   | 0.28447   | 4/23/2014        | 637%                   |
| 20 mg  | 0.07053   | 0.14863   | 5/21/2014        | 111%                   |
| 20 mg  | 0.14863   | 0.32549   | 6/25/2014        | 119%                   |



308.     The GAO Report identified Baclofen as having "experienced an extraordinary price increase" in 2014-2015.[90]

309.     Defendants had numerous opportunities to coordinate their price increases. All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii)

[89] *Id.* at ¶ 501.
[90] GAO Report at 35.

February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices for Baclofen increased dramatically. *See* **Exhibit F.**

310.    This agreement between the Baclofen Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Baclofen than they otherwise would have absent the Defendants' anticompetitive conduct.

    **D.**    **Benazepril**

311.    The Benazepril market is mature, as the drug has been available in the United States since 2004. At all relevant times, there has been more than one manufacturer of Benazepril on the market.

312.    At all relevant times, Benazepril Defendants Mylan and Sandoz have dominated, and continue to dominate, the market for Benazepril.

    **i.**    **Communications Between Sandoz and Defendants on Price Increases**

313.    In July 2013, Sandoz finalized its plan to re-launch Benazepril. However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.[91]

314.    On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal" stating: [b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was

---

[91] Second AG Complaint at ¶ 1003.

confirmed that Sandoz was waiting for confirmation of a Mylan price increase before re-entering the market.[92]

315.    On July 16, 2013, a Sandoz employee, CW-4, spoke with Mylan's Vice President of National Accounts, Jim Nesta, regarding Mylan's price increases. CW-4 sent an email to her colleagues with the list of drugs Mylan was to increase. The list did not include Benazepril. Another Sandoz employee, CW-1, forwarded the email to Armando Kellum, Sandoz's Vice President, Contracting and Business Analytics, stating "[s]ee [CW-4's] note below for Mylan increase. … I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then emailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."[93]

316.    Between July 18, 2013 and July 19, 2013, CW-4 and Nesta spoke at least 5 times during which they discussed Benazepril.[94]

317.    On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the email, CW-1 states: "Mylan is also in there. Be on the lookout for…Benazepril/hctz."[95]

318.    One week later, on August 9, 2013, Mylan increased WAC pricing for Benazepril. On August 20, 2013 Sandoz re-entered the Benazepril market and matched Mylan's WAC pricing.[96]

### ii.    Price Increases

319.    Prior to 2013, the effective prices of Benazepril were stable.

---

[92] *Id.* at ¶ 1004.

[93] *Id.* at ¶ 1005.

[94] *Id.* at ¶ 1006.

[95] *Id.* at ¶ 1007.

[96] *Id.* at ¶¶ 1008-1009.

320.    Upon information and belief, around August 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Benazepril Period"), Benazepril Defendants suddenly and dramatically increased the price of Benazepril largely in unison.

321.    WAC data confirms that Defendants Mylan and Sandoz both imposed dramatic price increases for Benazepril largely in unison, by the following amounts:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 0378-4775-01 | $0.38 | $1.65 | 8/9/2013 | 334% |
| 20 ct | Sandoz | 0185-0277-01 | $0.32 | $1.62 | 8/20/2013 | 406% |

322.    According to NADAC data, the average market prices for Benazepril remained stable prior to August 2014 but rose dramatically and remained artificially inflated thereafter. The charts and tables below show the average price increases for the various doses of Benazepril tablets.







323.    The GAO Report also noted an "extraordinary price increase" for Benazepril in 2013-2014.[97]

324.    Prices across the market rose more than 300% for Benazepril, according to data compiled by the Healthcare Sully Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

---

[97] GAO Report at 35.

| Dosage | Package Size | Oct. 2013 | July 2014 | Percentage Price Increase |
|---|---|---|---|---|
| 12.5-20 mg | 100 ct | $34 | $149 | 338% |
| 20-25 mg | 100 ct | $34 | $149 | 338% |
| 5-6.25 mg | 100 ct | $34 | $149 | 338% |

325.    This price increase occurred after the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Key executives from Defendants Mylan and Sandoz attended both. *See* **Exhibit F**.

326.    This agreement between the Benazepril Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Benazepril than they otherwise would have absent the Defendants' anticompetitive conduct.

### E.    Clobetasol

327.    The Clobetasol market is mature, as the drug has been available in the United States since 1985. Generic Clobetasol has been available since 1994. At all relevant times, there has been more than one manufacturer of Clobetasol in the market.

328.    In 2009, there were approximately ten Clobetasol manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, further consolidating the market. By 2014, many Clobetasol manufacturers exited the market, including Teva and Glenmark.

329.    Since May 2014, Clobetasol Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrgio, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetastol.

330.    Prior to 2014, the effective prices of Clobetasol were stable.

331.   Upon information and belief, around June 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clobetasol Period"), Clobetasol Defendants suddenly and dramatically increased the price of Clobetasol largely in unison.

332.   WAC data depicted below confirms that Defendants Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol 0.5% cream largely in unison by the following amounts:

| Cream | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|-------|-----------|---------|---------|------------------|---------------------|
| 15 g | Taro | $0.38 | $6.84 | 6/3/2014 | 1,700% |
| 30 g | Taro | $0.33 | $6.84 | 6/3/2014 | 1,973% |
| 45 g | Taro | $0.33 | $6.84 | 6/3/2014 | 1,973% |
| 60 g | Taro | $0.32 | $6.12 | 6/3/2014 | 1,813% |
| 15 g | Sandoz | $0.73 | $6.84 | 7/18/2014 | 837% |
| 30 g | Sandoz | $0.50 | $6.84 | 7/18/2014 | 1,268% |
| 45 g | Sandoz | $0.59 | $6.84 | 7/18/2014 | 1,059% |
| 60 g | Sandoz | $0.50 | $6.12 | 7/18/2014 | 1,124% |
| 15 g | Hi-Tech | $0.37 | $6.84 | 8/9/2014 | 1,749% |
| 30 g | Hi-Tech | $0.32 | $6.84 | 8/9/2014 | 2,038% |
| 45 g | Hi-Tech | $0.31 | $6.84 | 8/9/2014 | 2,038% |
| 60 g | Hi-Tech | $0.29 | $6.12 | 8/9/2014 | 2,010% |

333.   Although WAC data is not available for Fougera, Morton Grove, Perrigo, or Wockhardt, upon information and belief, they implemented simultaneous and identical price increases in their Clobetasol products.

334.   According to NADAC data, the average market prices for Clobetasol remained stable prior to September 2014 but rose dramatically and remained artificially inflated thereafter. The charts and tables below show the average price increases for the various doses of Clobetasol tablets.

**Clobetasol 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.33658 | 4.35367 | 9/10/2014 | 1,194% |
| 30 g | 0.26547 | 4.41669 | 9/10/2014 | 1,564% |
| 45 g | 0.27867 | 4.4281 | 9/10/2014 | 1,489% |
| 60 g | 0.25296 | 4.02663 | 9/10/2014 | 1,492% |



**Clobetasol 0.05% Ointment**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.33115 | 6.46213 | 9/10/2014 | 1,851% |
| 30 g | 0.268 | 5.19472 | 9/10/2014 | 1,838% |
| 45 g | 0.28101 | 5.4797 | 9/10/2014 | 1,850% |
| 60 g | 0.27465 | 4.9769 | 9/10/2014 | 1,712% |



**Clobetasol 0.05% Gel**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.5168 | 5.57714 | 9/10/2014 | 979% |
| 30 g | 0.36877 | 5.11025 | 9/10/2014 | 1,286% |
| 60 g | 0.26027 | 5.37913 | 9/10/2014 | 1,967% |



**Clobetasol 0.05% Solution**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 25 mL | 0.31442 | 1.83274 | 9/10/2014 | 483% |
| 50 mL | 0.20524 | 2.6761 | 9/10/2014 | 1,204% |



**Clobetasol Emollient 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.3696 | 2.5664 | 9/10/2014 | 594% |
| 30 g | 0.31167 | 2.20963 | 9/10/2014 | 609% |
| 60g | 0.24396 | 2.47265 | 9/10/2014 | 914% |



335.    Actavis entered the Clobetasol market in March 2015 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers.

| 0.05% Cream | WAC | Date Entered the Market |
|-------------|-----|-------------------------|
| 15 g | $6.84 | 3/10/2015 |
| 30 g | $6.84 | 3/10/2015 |
| 45 g | $6.84 | 3/10/2015 |
| 60 g | $6.12 | 3/10/2015 |

336.    Even today Actavis' prices are far above Defendants' pre-conspiracy prices, as evidenced in the tables below:

| Clobetasol Treatment | NADAC Data In 2015[98] | NADAC Data as of 7/10/2019 | Clobetasol Pre-Conspiracy Price as of 8/3/2014 |
|---|---|---|---|
| Cream 15 g | 4.03891 | 1.05575 | 0.33658 |
| Cream 30 g | 3.96949 | 0.85705 | 0.26547 |
| Cream 45 g | 3.96769 | 0.90841 | 0.27867 |
| Cream 60 g | 3.51509 | 0.81938 | 0.25296 |
| Solution 25 mL | 1.79577 | 0.78353 | 0.31442 |
| Solution 50 mL | 2.003 | 0.68703 | 0.20524 |

337.    Upon information and belief, Actavis contacted the other Clobetasol Defendants well before March 2015 and explained its intention of market entry. The Defendants then colluded to allocate market share and set supracompetitive prices. This agreement prevented Actavis' entry from eroding the artificial equilibrium the Defendants conspiratorially created.

338.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

339.    For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300. The same exact medication we got day one. Next day, it's an increase of three thousand percent."[99]

340.    Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.44 (or 6,766%) in 2014 for a 45-gram tube of Clobetasol cream.[100]

---

[98] Data for Actavis' Clobetasol cream is from August 2015; data for Actavis' Clobetasol solution is from November 2015.

[99] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?,* CBS CHICAGO (Oct. 31, 2014, 10:17 PM), https://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/ (last visited July 24, 2019).

[100] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, KAISER HEALTH NEWS (Nov. 20, 2014), https://khn.org/news/hospitals-and-pharmacies-grapple-with-rising-drug-prices/ (last visited July 24, 2019).

341.    Express Scripts, one of the largest PBMs in the United States, compiles its own price index for generic drugs and included Clobetasol in the top four most significant price increases for 2014[101] and in the top ten for 2015.[102]

342.    An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol's price spiked 1,496% to $4.15 per gram. A spokesperson from Akorn said that the company increased the price of clobetasol "[f]ollowing price increases by others in the highly competitive market."[103]

343.    The GAO Report identified Clobetasol as having experienced an "extraordinary price increase" in 2014-2015.[104]

344.    Defendants had numerous opportunities to coordinate their price increases. Key pricing executives from at least Actavis, Sandoz, Taro and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 3-4, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland. *See* **Exhibit F**.

345.    This agreement between the Clobetasol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Clobetasol than they otherwise would have absent the Defendants' anticompetitive conduct.

---

[101]    *The Reality Behind Generic Drug Inflation*, EXPRESS SCRIPTS (Dec. 30, 2014), https://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation (last visited July 24, 2019).

[102]    2014 Drug Trend Report, EXPRESS SCRIPTS (March 2016), available for download at https://lab.express-scripts.com/lab/drug-trend-report/previous-reports (last visited July 24, 2019).

[103]    McCluskey, *supra* note 74.

[104]    GAO Report at 37.

F.     **Clomipramine**

346.    The market for Clomipramine is mature, as the drug has been available in the United States since 1990, and generic versions have been on the market since 1996. At all relevant times, there has been more than one manufacturer of Clomipramine in the market.

347.    At all relevant times, Defendants Mylan, Sandoz, and Taro have dominated, and continue to dominate, the market for Clomipramine.

i.     **Communications Between Defendants on Price Increase & Customer Allocation**

348.    Taro led a price increase on Clomipramine on May 1, 2013. The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.[105]

349.    In the weeks leading up to the Taro price increase on Clomipramine, Ara Aprahamian, Taro's Vice President of Sales, spoke several times with Sandoz employee, CW-3, and M.A., a national account manager at Mylan. At the same time, a Sandoz employee, CW-4, was also speaking with D.S., a senior sales and national account executive at Taro. During these conversations, Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine. Between April 2, 2013 and April 30, 2013 there were at least 23 calls between the Defendants.[106]

350.    As part of the agreement to increase the price of Clomipramine and not steal each other's customers, Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix emailed Sandoz stating that it had received a price increase letter from Taro regarding several products, including Clomipramine. Publix asked if Sandoz wanted to bid for their business.  Armando Kellum, Sandoz's Vice President, Contracting

---

[105] Second AG Complaint at ¶ 1032.
[106] *Id.* at ¶ 1033.

and Business Analytics emailed CW-4 stating "I'm not inclined to do anything here as there may be opportunities for us. We can blame supply if these are in fact opps for us."[107]

351.    Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market. On May 1, 2013, Rite Aid emailed Sandoz asking for a bid on Clomipramine. Kellum responded: "I want to raise price and perhaps pick up share here if possible. [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to access supply etc. …"[108]

352.    On May 2, 2013 and May 3, 2013, CW-3 at Sandoz spoke several times with Aprahamian at Taro and Kellum at Sandoz. On May 3, 2013, CW-4 of Sandoz emailed Kellum regarding an upcoming call with Rite Aid stating: "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible. … like we don't already know the cat's out of the bag."[109]

353.    Ultimately, Sandoz was awarded Rite Aid's business for Clomipramine. When Rite Aid notified Taro, Aprahamian forwarded the email to M.P, Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."[110]

354.    Mylan was the next to increase price on Clomipramine. On May 16, 2013, Mylan increased to the same WAC per unit as Taro. In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts. Between May 8, 2013 and May 17, 2013 there were at least 16 calls between Mylan, Taro, and Sandoz.[111]

---

[107] *Id.* at ¶ 1035.

[108] *Id.* at ¶ 1036.

[109] *Id.* at ¶ 1037.

[110] *Id.* at ¶ 1038.

[111] *Id.* at ¶ 1039.

355.    On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine and asked Taro to bid for their business. Aprahamian responded that he was "[n]ot inclined to take on new business. Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to over react [sic] to this product. Not sure how long Mylan is out."[112]

356.    On July 16, 2013, CW-4 of Sandoz sent an email identifying Clomipramine as a Mylan price increase product. By this time, Sandoz knew that Mylan had increased its price on this product.[113]

357.    On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing its price for Clomipramine. Aprahamian forwarded the notice to M.P. stating: "FYI, Sandoz is in the market (and adjusted price to match ours) now with product as expected. Don't want to alert the reps as they could overreact. They did take Rite Aid as you know. Will see what happens from here."[114]

358.    On July 22, 2013, Sandoz increased its WAC pricing to match that of Taro and Mylan.[115]

359.    In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a number of drugs, including Clomipramine. Sandoz responded that they increased prices only after Mylan and Taro increased and that they learned about the increase through the pricing services "Analysource" (First Databank) and Prospectorrx (Gold Standard). As is clear from the allegations

---

[112] *Id.* at ¶ 1040.

[113] *Id.* at ¶ 1041.

[114] *Id.* at ¶ 1042.

[115] *Id.* at ¶ 1043.

above, this statement was a lie. In reality Sandoz had raised its prices after coordinating increases with Taro and Mylan in advance.[116]

ii.    **Price Increase**

360.    Prior to 2013, the effective prices of Clomipramine were stable.

361.    Upon information and belief, around May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clomipramine Period"), Clomipramine Defendants suddenly and dramatically increased the price of Clomipramine largely in unison.

362.    According to Red Book data,[117] the AWP for Clomipramine 50 mg increased by the following amounts:

| Defendant | Old AWP | New AWP | Post-increase date | Percentage Increase |
|---|---|---|---|---|
| Mylan | $1.172 | $11.242 | May 2013 | 859% |
| Sandoz | $1.065 | $11.242 | July 2013 | 956% |
| Taro | $1.103 | $11.242 | May 2013 | 919% |

363.    Upon information and belief, NADAC price data demonstrates that the average market price per unit for Clomipramine (50 mg) increased from $0.31 in April 2013 to $9.03 in July 2013, representing a more than 2,800% increase.

364.    WAC data confirms that Defendants Mylan, Sandoz, and Taro all increased their Clomipramine prices largely in unison by the following amounts:

---

[116] *Id.* at ¶¶ 1048-49.

[117] The RED BOOK database provides prices and descriptions for over 300,000 prescription and over-the-counter pharmaceuticals, chemicals used for compounding and medical devices and supplies. IBM MICROMEDEX RED BOOK, https://www.ibm.com/us-en/marketplace/micromedex-red-book (last visited July 22, 2019).

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Taro | 51672-4011-06 | $0.25 | $8.99 | 5/1/2013 | 3,496% |
| 90 ct | Taro | 51672-4011-05 | $0.25 | $8.99 | 5/1/2013 | 3,496% |
| 100 ct | Mylan | 0378-3025-01 | $0.30 | $8.99 | 5/16/2013 | 2,897% |
| 100 ct | Sandoz | 0781-2027-01 | $0.31 | $8.99 | 7/22/2013 | 2,800% |

365.    Prices for various dosages of Clomipramine increased by as much as 2,000% in one year, according to the 2016 GAO Report.[118]

366.    In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

367.    This agreement between the Clomipramine Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Clomipramine than they otherwise would have absent the Defendants' anticompetitive conduct.

### G.    Desonide

368.    The Desonide market is mature, as both the ointment and cream form have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

369.    Consolidation in the Desonide market occurred in the years leading up to Defendants' price increases. For instance, in July 2012, Sandoz completed its acquisition of Fougera Pharmaceuticals, making Fougera the world's top manufacturer of generic dermatology medications.

---

[118] GAO Report at 14.

370.    At all times relevant, Desonide Defendants Actavis, Fougera, Perrigo, Sandoz, and Taro have dominated, and continue to dominate, the market for Desonide.

371.    Prior to May 2013, the effective prices of Desonide remained stable.

372.    Upon information and belief, around May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Desonide Period"), Desonide Defendants suddenly and dramatically increased the price of Desonide largely in unison.

373.    Between July 11 and July 18, 2013, the average NADAC price for Desonide 0.05% cream increased by 442% and the average NADAC price for Desonide 0.05% ointment rose 390%.

374.    NADAC data shows that the average market price of Desonide remained stable prior to May 2013, but rose dramatically and remained artificially high after July 2013, as depicted in certain forms and dosages below.





375.    WAC data confirms that Perrigo, Taro, and Sandoz all increased their prices in Desonide ointment in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 g | Taro | 51672-1280-1 | $0.84 | $3.21 | 5/1/2013 | 282% |
| 60 g | Taro | 51672-1280-3 | $0.53 | $3.21 | 5/1/2013 | 505% |
| 15 g | Perrigo | 45802-423-35 | $1.30 | $3.21 | 5/21/2013 | 147% |
| 60 g | Perrigo | 45802-423-37 | $0.31 | $3.21 | 5/21/2013 | 935% |
| 15 g | Sandoz | 0168-0309-15 | * | $3.21 | 1/17/2014 | |
| 60 g | Sandoz | 0168-0309-15 | * | $3.21 | 1/17/2014 | |

376.    Although WAC data is not available for Fougera, upon information and belief, they implemented similar price increases, largely in unison for their generic Desonide products.

377.    Actavis entered the Desonide market in August 2013 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers. Upon information and belief, Actavis contacted the other Desonide Defendants well before August 2013 and explained its intention of market entry. Defendants then colluded to allocate market share and set supracompetitive prices. This agreement prevented Actavis' entry from eroding the artificial equilibrium the Defendants conspiratorially created.

378.   The GAO Report identified Desonide 0.05% cream and ointment as having experienced an "extraordinary price increase" in 2011-2012 and 2013-2014.[119]

379.   News reports and testimonials from physicians corroborate these dramatic, immediate, market-wide price increases. For example, dermatologist Alan Rockoff reported in Dermatology News in February 2015:

> Then this week it happened again. I prescribed hydrocortisone valerate 0.2% for a groin rash. The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him $52.70 out of pocket.
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $32.50. And desonide – generic desonide – would cost $111.70. For a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?[120]

380.   Defendants had numerous opportunities to coordinate their price increases. Shortly before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz, and Taro attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5 2013 GPhA CMC Workshop. *See* **Exhibit F**.

381.   This agreement between the Desonide Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably retain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Desonide than they otherwise would have absent the Defendants' anticompetitive conduct.

---

[119] *Id.* at 37.

[120] Alan Rockoff, M.D., *The high price of desonide*, DERMATOLOGY NEWS (Feb. 3, 2015), https://www.mdedge.com/dermatology/article/96892/high-price-desonide (last visited July 23, 2019).

H.      **Digoxin**

382.    The Digoxin market is mature, as the drug was first approved by the FDA in 1975, and forms of it have been on the market in the United States since prior to the passage of the Federal Food, Drug, and Cosmetic Act in 1938. Variants of the drug, which is derived from the Digitalis lanata plant, have been used since the 18th century.

383.    At all relevant times, there has been more than on manufacturer of Digoxin in the market. In late 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin. Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015.

384.    At all relevant times, Defendants Impax, Lannett, Mylan, Par, and West-Ward have dominated, and continue to dominate, the market for Digoxin.

385.    Prior to 2013, effective prices for Digoxin were stable.

386.    Upon information and belief, around October 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Digoxin Period"), Digoxin Defendants suddenly and dramatically increased the price of Digoxin largely in unison.

387.    The dramatic price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015, respectively. Pricing for 0.125 mg (125 mcg) and 0.250 mg (250 mcg) tablets of Digoxin increased by roughly tenfold, from $0.11 per tablet in October 2012 to between $1.06 and $1.10 per tablet by June 2014.

388.    WAC and AWP data for 0.25 mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the October 2013 price increase. This chart was submitted by

Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the

University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.



389.    NADAC data shows that average market prices for Digoxin rose dramatically and

remained artificially high after October 2013, as depicted below:





390.   WAC data for Digoxin further reflects the price increases that began in October 2013.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 0.125 mg, 100 ct. | Lannett | 00527-1324-01 | $0.14 | $1.19 | 10/16/2013 | 750% |
| 0.125 mg, 100 ct. | Impax | 00115-9811-01 | $0.14 | $1.19 | 10/22/2013 | 750% |
| 0.125 mg, 100 ct. | Par | 49884-0514-01 | * | $1.19 | 1/17/2014 | |
| 0.125 mg, 100 ct. | West-Ward | 00143-1240-01 | $0.16 | $1.19 | 4/14/2014 | 644% |
| 0.125 mg, 100 ct. | Mylan | 00378-6155-01 | * | $1.19 | 11/17/2014 | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 0.125 mg, 1,000 ct. | Lannett | 00527-1324-10 | $0.12 | $0.99 | 10/16/2013 | 725% |
| 0.125 mg, 1,000 ct. | Impax | 00115-9811-03 | $0.12 | $0.99 | 10/22/2013 | 725% |
| 0.125 mg, 1,000 ct. | Par | 49884-0514-10 | * | $0.99 | 1/17/2014 | |
| 0.125 mg, 1,000 ct. | West-Ward | 00143-1240-10 | $0.13 | $0.99 | 4/14/2014 | 662% |
| 0.125 mg, 1,000 ct.. | Mylan | 00378-6155-10 | * | $0.99 | 11/17/2014 | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 0.25 mg, 100 ct. | Lannett | 00527-1325-01 | $0.14 | $1.19 | 10/16/2013 | 750% |
| 0.25 mg, 100 ct. | Impax | 00115-9822-01 | $0.14 | $1.19 | 10/22/2013 | 750% |
| 0.25 mg, 100 ct. | Par | 49884-0494-01 | * | $1.19 | 1/17/2014 | |
| 0.25 mg, 100 ct. | West-Ward | 00143-1241-01 | $0.16 | $1.19 | 4/14/2014 | 644% |
| 0.25 mg, 100 ct. | Mylan | 00378-6156-01 | * | $1.19 | 11/17/2014 | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 0.25 mg, 1,000 ct. | Lannett | 00527-1325-10 | $0.12 | $0.99 | 10/16/2013 | 725% |
| 0.25 mg, 1,000 ct. | Impax | 00115-9822-03 | $0.12 | $0.99 | 10/22/2013 | 725% |
| 0.25 mg, 1,000 ct. | Par | 49884-0494-10 | * | $0.99 | 1/17/2014 | |
| 0.25 mg, 1,000 ct. | West-Ward | 00143-1241-10 | $0.13 | $0.99 | 4/14/2014 | 662% |
| 0.25 mg, 1,000 ct. | Mylan | 00378-6156-10 | * | $0.99 | 11/17/2014 | |

391.    As these tables show, WAC for Defendants' various dosages of Digoxin are highly coordinated. Lannett and Impax implemented extraordinary price increases on the heels of each other, and West-Ward joined the increase approximately six months later. When Par and Mylan joined the market, instead of competing on price in order to gain market share, they priced their products the same as Lannett, Impax, and West-Ward. Even today, Defendants' prices for generic Digoxin remain above competitive levels. These supracompetitive prices could not have been sustained absent Defendants' agreement to fix prices.

392.   The GAO Report identified Digoxin has having experienced an "extraordinary price increase" in 2013-2014.[121]

393.   The steep Digoxin price hikes have had a catastrophic effect on consumers. According to a December 2013 report:

> Bill Drilling, an owner of a pharmacy in Sioux City, Iowa, apologizes as he rings up a customer's three-month supply of the heart medicine Digoxin. The total is $113.12 – almost 10 times the cost for the same prescription in August. Digoxin isn't a new miracle drug. … "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down," Drilling says. …
>
> "This is starting to create hardship," he says. Many of his customers fall into what is known as the Medicare "doughnut hole," a coverage gap in which patients pay 47.5 percent of branded-drug costs and 79 percent of generic's price. Russ Clifford, a retired music teacher, learned Digoxin's cost had jumped more than fourfold when he picked up his 30-day supply in mid-November. Clifford and his wife have had to dip into savings to pay their rising pharmaceutical bills.[122]

394.   These massive price increases adversely affected patients' ability to purchase Digoxin medications. An independent pharmacist described the hardship caused by Digoxin price increases with this anecdote offered at the Senate Hearing:

> A recent example from my own experience is the price of Digoxin – a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he had the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him. The patient called all around to try to get the medicine at the old lower price, but to no avail.[123]

---

[121] GAO Report at 38.

[122] Alan Katz, *Surprise! Generic-Drug Prices Spike*, BLOOMBERG (Dec. 12, 2013, 7:11 PM), https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise (last visited July 24, 2019).

[123] *Why Are Some Generic Drugs Skyrocketing in Price?*, HEARING BEFORE THE SUBCOMMITTEE ON PRIMARY HEALTH AND AGING OF THE COMMITTEE ON HEALTH, EDUC., LABOR AND PENSIONS COMMITTEE (113th Congress) at 38-39 (Nov. 20, 2014),

395.    Defendants had ample opportunity to coordinate their pricing agreements. Shortly before the price increase, key executives from at least Impax, Lannett, Mylan, and Par attended the October 28-30, 2013 GPhA Fall Technical Conference. *See* **Exhibit F**.

396.    This agreement between the Digoxin Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Digoxin than they otherwise would have absent the Defendants' anticompetitive conduct.

I.    **Divalproex**

397.    The Divalproex market is mature, as variants of it have been in use for more than a century, and generic versions have been available in the United States since 2008. At all relevant times, there has been more than one manufacturer of Divalproex in the market.

398.    At all relevant times, Defendants Dr. Reddy's, Mylan, Par, and Zydus have dominated, and continue to dominate, the market for Divalproex.

399.    Prior to 2013, effective prices for Divalproex were stable.

400.    Upon information and belief, around June 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Divalproex Period"), Divalproex Defendants suddenly and dramatically increased the price of Divalproex largely in unison.

401.    NADAC data shows that average market prices of Divalproex remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted below.

---

https://www.govinfo.gov/content/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf   (last visited July 24, 2019).





402.   WAC pricing confirms the dramatic increases in Defendants' Divalproex pricing.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 250 mg 100 ct | Mylan | 00378-0472-01 | $0.60 | $1.96 | 6/14/2013 | 227% |
| 250 mg 500 ct | Mylan | 00378-0472-05 | $0.57 | $1.96 | 6/14/2013 | 244% |
| 250 mg 90 ct | Mylan | 00378-0472-77 | $1.34 | $1.96 | 6/14/2013 | 46% |
| 250 mg 100 ct | Par | 10370-0510-10 | $0.60 | $1.96 | 6/26/2013 | 227% |
| 250 mg 500 ct | Par | 10370-0510-50 | $0.57 | $1.96 | 6/26/2013 | 244% |
| 250 mg 100 ct | Dr. Reddy's | 55111-0533-01 | * | $1.96 | 8/19/2013 | |
| 250 mg 500 ct | Dr. Reddy's | 55111-0533-05 | * | $1.96 | 8/19/2013 | |
| 250 mg 100 ct | Zydus | 68382-0314-01 | * | $1.96 | 8/14/2013 | |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 mg 100 ct | Mylan | 00378-0473-01 | $0.74 | $3.26 | 6/14/2013 | 341% |
| 500 mg 500 ct | Mylan | 00378-04723-05 | $0.71 | $3.26 | 6/14/2013 | 359% |
| 500 mg 90 ct | Mylan | 00378-0473-77 | $2.36 | $3.26 | 6/14/2013 | 38% |
| 500 mg 100 ct | Par | 10370-0511-10 | $0.74 | $3.26 | 6/26/2013 | 341% |
| 500 mg 500 ct | Par | 10370-0511-50 | $0.71 | $3.26 | 6/26/2013 | 359% |
| 500 mg 100 ct | Dr. Reddy's | 55111-0534-01 | * | $3.26 | 8/19/2013 | |
| 500 mg 500 ct | Dr. Reddy's | 55111-0534-05 | * | $3.26 | 8/19/2013 | |
| 500 mg 100 ct | Zydus | 68382-0315-01 | * | $3.26 | 8/14/2013 | |
| 500 mg 500 ct | Zydus | 68382-0315-05 | * | $3.26 | 8/14/2013 | |

403.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex cost $122.99 in May of 2013. By August 2013, they skyrocketed to

$1,629.95, an increase of 1,225%. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[124]

404.     The GAO Report noted an "extraordinary price increase" for Divalproex in 2013-2014.[125]

405.     Defendants had numerous opportunities to coordinate their price increases and market share agreements. The June 2013 price increases by Mylan and Par coincided with Defendants' attendance at the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, and the HDMA Business Leadership Conference on June 2-5, 2013. Similarly, Dr. Reddy's and Zydus' respective market entries and decisions to price at Mylan's and Par's levels coincided with Defendants' attendance at the NADCS Total Store Expo on August 10-13, 2013. *See* **Exhibit F**.

406.     This agreement between the Divalproex Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Divalproex than they otherwise would have absent the Defendants' anticompetitive conduct.

**J.     Econazole**

407.     The Econazole market is mature, as the drug has been available in the United States since 2002.

408.     At all relevant times, Econazole Defendants Perrigo, Taro, and Teligent have dominated, and continue to dominate, the market for Econazole.

---

[124] Rob Low, *Rising Cost of Generic Drugs Set to Shock Consumers*, FOX4 (Aug. 14, 2013, 5:23 PM),  https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/ (last visited July 24, 2019)
[125] GAO Report at 38.

409.    Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth treatment.

410.    Prior to 2013, the effective prices for Econazole were stable.

411.    Upon information and belief, around July 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Econazole Period"), Econazole Defendants suddenly and dramatically increased the price of Econazole largely in unison.

412.    WAC data confirms that Defendants Perrigo, Taro, and Teligent all increased their prices in Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15 g | Perrigo | 45802-466-35 | $0.79 | $5.80 | 7/24/2014 | 634% |
| 30 g | Perrigo | 45802-466-11 | $0.69 | $5.80 | 7/24/2014 | 741% |
| 85 g | Perrigo | 45802-466-53 | $0.50 | $4.09 | 7/24/201 | 718% |
| 15 g | Teligent | 52565-022-15 | $0.82 | $5.80 | 9/1/2014 | 607% |
| 30 g | Teligent | 52565-022-30 | $0.72 | $5.80 | 9/1/2014 | 706% |
| 85 g | Teligent | 52565-022-85 | $0.52 | $4.09 | 9/1/2014 | 687% |
| 15 g | Taro | 51672-1303-1 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30 g | Taro | 51672-1303-3 | $0.59 | $5.80 | 11/18/2014 | 883% |
| 85 g | Taro | 51672-1303-8 | $0.42 | $4.09 | 11/18/2014 | 874% |

413.    NADAC data shows that the average market prices for Econazole remained stable prior to June 2014, but rose dramatically in July, then remained artificially high after October 2014, as depicted in certain forms and dosages below.



414.    The GAO Report identified Econazole as having an "extraordinary price increase" in 2014-2015.[126]

415.    No supply shortages or other market events can explain the Econazole price increases. The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

416.    On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC. Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with Perrigo and Taro. Particularly, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

417.    When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price. Here, rather than compete, when a Defendant raised its price, the market remained stable, indicating a conspiracy.

---

[126] *Id.*

418.     Significant price increases shortly followed or occurred at about the time of the following trade conferences: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, Maryland; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22-25, 2015 ECRM Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, Florida. Key executives from Defendants Perrigo, Sandoz, Taro, and Teligent all attended. *See* **Exhibit F**.

419.     Prior to 2012, Teligent focused its business on contract manufacturing. But in late 2012 it sought to enter the market for numerous topical generic products. By September 2013, Teligent had 12 ANDAs pending. Teligent currently manufactures 20 topical generics covered by 33 ANDAs. For seventeen of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo. This situation in particular lends itself to the Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium.

420.     This agreement between the Econazole Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Econazole than they otherwise would have absent the Defendants' anticompetitive conduct.

**K.     Fluocinonide**

421.     The Fluocinonide market is mature, as the drug has been available in the United States since 1984.

422.     At all relevant times, Fluocinonide Defendants Actavis, Sandoz, Taro, and Teva have dominated, and continue to dominate, the market for Fluocinonide.

i.      **Communications Between Defendants on Fluocinonide Price Increase**

423.    Teva initially coordinated with Taro and Sandoz to increase the price of Fluocinonide 0.05% cream, 0.05% emollient-based cream, 0.05% gel, and 0.05% ointment in July 2013.

424.    Prior to Teva's July 3, 2013 price increase, Nisha Patel, Teva's Director of Strategic Customer Marketing, spoke with Ara Aprahamian, Taro's Vice President, Sales & Marketing multiple times regarding the Fluocinonide price increases. The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.[127]

425.    The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices on all four Fluocinonide formulations on June 3, 2014.[128]

426.    Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for a round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August 2014.[129]

427.    On May 14, 2014, Patel and Aprahamian exchanged eight text messages and had one phone conversation.[130]

428.    Subsequent to the May 14 communications, Patel directed a colleague to create a list of future price increase candidates. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro – including the four formulations of Fluocinonide – with the notation "Follow/Urgent" listed as the reason for

---

[127] Second AG Complaint at ¶ 830.

[128] *Id.* at ¶ 831.

[129] *Id.* at ¶ 832.

[130] *Id.* at ¶ 833.

the increase, *even though Taro had not yet increased its price on these drugs or notified its customers that it would be doing so*.[131]

429.    On June 3, 2014 – the day the Taro increase took effect – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for the opportunity. The CVS representative offered to move a significant amount of business from Taro to Teva, stating: "[o]pportunity knocks." The email was forwarded to Patel, who responded: "I suspect a price increase. … and we would likely follow." Of course, Patel already knew the bid request was due to a price increase, because she had previously spoken to Taro's Aprahamian in May and included Fluocinonide on her list of price increases with the notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could quickly follow with their own price increase.[132]

430.    Patel began investigating the price points by exchanging five text messages with Aprahamian. Following the text messages, she reported that she had "[c]onfirmed that Taro increased," but was "still working on intel." Another Teva employee suggested it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations. He asked Patel to provide guidance. Patel responded, making it clear she had been talking to Aprahamian not only about Fluocinonide but, other drugs as well:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high quality competitor. It's just a matter of who the others are.)

---

[131] *Id.* at ¶ 834.

[132] *Id.* at ¶ 835.

Shortly after sending that email, Patel called Aprahamian.[133]

431.    First thing the next morning – June 4, 2014 – Patel exchanged two more text messages and spoke on the phone for more than twenty-five minutes with Aprahamian. Following these conversations, Patel emailed a colleague, in which she made it clear that she had intel but did not want to put anything in writing:

> Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd like to discuss further. I have additional intel (I can discuss with you) that will be useful.
>
> We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share.[134]

432.    That same day, Teva received a bid from Walmart. Patel made it clear that Teva would "play nice in the sandbox" with Taro:

> (Please consider the Taro alert items.) Based on quality of competitor, the intention of being responsible in the market, and market share below is my commentary:
>
> 1. Gel: WAC issue. I estimate that WM [Walmart] nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
> 2. Ointment: Should not pursue. We have reasonable share.
> 3. Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

After further discussion, Teva decided not to bid on any of the Walmart business.[135]

433.    On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained from Taro's Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes

---

[133] *Id.* at ¶ 837.

[134] *Id.* at ¶ 838.

[135] *Id.* at ¶ 839.

of trade (i.e. wholesalers, chain drug stores, mail-order pharmacies, and group purchasing organizations). Prior to sending that "intel" Patel had spoken to Aprahamian on June 17 for fifteen minutes and June 19 for fourteen minutes. The contract price points obtained by Patel were not publicly available.[136]

434.    At this time, Sandoz was a competitor on two Fluocinonide formulations – ointment and gel – but was only actively marketing the gel. Between June 17, 2014 and June 20, 2014, Taro's Aprahamian had seven phone calls with Sandoz employee, CW-3. During one of the phone calls on June 20, Aprahamian dictated to CW-3 the specific Taro contract price points for each of the same classes of trade that he had provided to Teva's Patel. Based on the history and pattern of practice between CW-3 and Aprahamian (see above re: Clomipramine), it was understood that Sandoz would follow the Taro price increase.[137]

435.    The Teva price increases went into effect on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Patel spoke to her contact at Sandoz – CW-1 – several times, including at least seven phone calls. During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.[138]

436.    During this same time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream but had yet to gain any significant market share due to supply problems. Leading up to Actavis entering the market, Actavis, Taro, and Teva were communicating

---

[136] *Id.* at ¶ 840.

[137] *Id.* at ¶ 841.

[138] *Id.* at ¶ 842.

frequently. Between December 13, 2014 and December 18, 2014 there were at least eighteen phone calls between Actavis and competitors Teva and Taro.[139]

437.    Nonetheless, Actavis still followed Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro.

### ii.    Price Increase

438.    Prior to June 2014, the effective prices for Fluocinonide were stable.

439.    Upon information and belief, around June 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Fluocinonide Period"), Fluocinonide Defendants suddenly and dramatically increased the price of Fluocinonide largely in unison.

440.    WAC data illustrates Taro and Teva's identical WAC price changes on June 3, 2014 and July 1, 2014, respectively.

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15 g | Taro | $0.79 | $2.43 | 6/3/2014 | 208% |
| 30 g | Taro | $0.56 | $2.43 | 6/3/2014 | 334% |
| 60 g | Taro | $0.39 | $2.43 | 6/3/2014 | 523% |
| 15 g | Teva | $0.79 | $2.43 | 7/1/2014 | 208% |
| 30 g | Teva | $0.56 | $2.43 | 7/1/2014 | 334% |
| 60 g | Teva | $0.39 | $2.43 | 7/1/2014 | 523% |

441.    According to NADAC data, the average market prices for Fluocinonide remained stable prior to August 2014 but rose dramatically and remained artificially inflated thereafter. The charts and tables below show the average price increases for the various doses of Fluocinonide tablets.

---

[139] *Id.* at ¶ 845.

**Fluocinonide 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.74086 | 1.65196 | 8/20/2014 | 123% |
| 30 g | 0.52141 | 1.61352 | 8/20/2014 | 209% |
| 60 g | 0.37029 | 1.42319 | 8/20/2014 | 284% |



**Fluocinonide 0.05% Ointment**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 1.2108 | 2.554 | 8/20/2014 | 111% |
| 30 g | 0.78538 | 2.44041 | 8/20/2014 | 210% |
| 60 g | 0.59659 | 1.9948 | 8/20/2014 | 234% |



116

**Fluocinonide Emollient 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 0.919 | 1.55634 | 8/20/2014 | 69% |
| 30 g | 0.5995 | 1.795 | 8/20/2014 | 199% |
| 60 g | 0.42707 | 1.45117 | 8/20/2014 | 240% |



**Fluocinonide 0.05% Gel**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 g | 1.16749 | 1.98267 | 8/20/2014 | 70% |
| 30 g | 1.19417 | 1.78605 | 8/20/2014 | 50% |
| 60 g | 0.78302 | 1.60736 | 8/20/2014 | 105% |



442.     In October 10, 2014, Sandoz following the price increase by the Taro and Teva, increased its WAC pricing on the Fluocinonide gel by 491%. Sandoz ceased sales of Fluocinonide ointment by September 2014.

443.     Actavis' price increase on Fluocinonide cream became effective on December 9, 2014 when they raised their WAC prices to match those of Teva and Taro.

444.     This agreement between the Fluocinonide Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Fluocinonide than they otherwise would have absent the Defendants' anticompetitive conduct.

## L.     Levothyroxine

445.     The Levothyroxine is mature, as the drug has been available in the United States since 1955. Generic versions have been available since 2004.

446.     At all relevant times, there have been at least three manufacturers of Levothyroxine. Since approximately December 2010, Levothyroxine Defendants Lannett, Mylan, and Sandoz have dominated the market with nearly 100% share.

### i.     Communications Between Defendants on Levothyroxine Price Increase

447.     In 2013 and 2014, Lannett, Mylan, and Sandoz coordinated to significantly raise the price of Levothyroxine. Mylan's Vice President of National Accounts, Jim Nesta, spearheaded discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In additional to communicating directly with CW-4, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Teva. Notably, Levothyroxine was not a drug sold by Teva.[140]

---

[140] *Id.* at ¶ 1014.

448.     Mylan increased their prices on several drugs, including Levothyroxine, on January 4, 2014. The day before the increase, Nesta and his contact at Teva spoke at least four times by phone. The next morning, the Teva contact spoke twice with Armando Kellum, Sandoz's Vice President, Contracting and Business Analytics.[141]

449.     Shortly after speaking with the Teva contact, Kellum sent an internal email stating, among other things, that he '[j]ust heard from a customer that … Mylan took a significant price increase on Levothyroxine" and Kellum advised his team to "please be cautious" on this product. Kellum's information came from the Teva contact not a "customer." [142]

450.     That same morning, K.S. of Lannett called Nesta. Then on January 10, 2013, Nesta returned the call to K.S. That same day, McKesson emailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan look [sic] a large price increase."[143]

451.     On January 14, 2013, Lannett raised its WAC pricing to match Mylan's. Notably after these phone calls, Nesta would not speak again with K.S. from Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.[144]

452.     On July 16, 2013, CW-4 spoke with Nesta and sent an email identifying the Mylan price increases. This list included Levothyroxine and noted that Lannett had followed.[145]

---

[141] *Id.* at ¶ 1015.

[142] *Id.* at ¶ 1016.

[143] *Id.* at ¶ 1017.

[144] *Id.* at ¶ 1018.

[145] *Id.* at ¶ 1019.

453.    On August 6, 2013, Nesta called CW-4 twice. A few minutes after the second call, Nesta called K.S. at Lannett. Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.[146]

454.    On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal email that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to the email stating, "[t]his is correct based on my info as well."[147]

455.    Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.[148]

456.    On August 14, 2013, S.G. sent an email to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 responded: "[w]e just noticed that as well."[149]

457.    On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating: "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us. …"

---

[146] *Id.* at ¶ 1020.

[147] *Id.* at ¶ 1021.

[148] *Id.* at ¶ 1022.

[149] *Id.* at ¶ 1023.

On September 12, 2013, Lannett declined the opportunity to bid and blamed supply issues, stating: "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."[150]

458.    During a September 20, 2013 earnings call, Lannett's CEO was asked for his reaction to Mylan's Levothyroxine increase. He responded:

> You mean after I sent them a thank you note? I'm just kidding. … I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. … So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.[151]

459.    On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.[152]

460.    Defendants Mylan, Lannett, and Sandoz further agreed to raise the price of Levothyroxine in April/May 2014.[153]

461.    Consistent with the 2013 increase, Mylan was the first to raise WAC pricing on April 25, 2014. In the two days leading up to the increase, Nesta of Mylan and K.S. of Lannett spoke at least four times by phone.[154]

462.    On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine – P.C., a sourcing manager at Cardinal, sent a text message to a Lannett employee stating: "[n]ot sure if you knew already … Mylan increasing levos." The Lannett employee responded: "[t]hanks for the heads up … We heard 55% on contract price, can you confirm?" P.C. replied: "[y]es ~50-

---

[150] *Id.* at ¶ 1024.

[151] *Id.* at ¶ 1025.

[152] *Id.* at ¶ 1026.

[153] *Id.* at ¶ 1027.

[154] *Id.* at ¶ 1028.

55%." The Lannett employee had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Mylan's Nesta only days prior.[155]

463.    Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched Mylan and Lannett's WAC pricing.[156]

### ii.    Price Increase

464.    Prior to 2013, the effective prices of Levothyroxine were stable.

465.    Upon information and belief, around August 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Levothyroxine Period"), Levothyroxine Defendants suddenly and dramatically increased the price of Levothyroxine largely in unison.

466.    WAC data for Levothyroxine's 50 mcg tablet demonstrates that Lannett, Mylan, and Sandoz all implemented significant price increases in virtual lock step, first in August and September 2013, then again in April and May 2014:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct | Mylan | 0378-1803-10 | $0.18 | $0.27 | 8/9/2013 | 50% |
| 100 ct | Lannett | 0527-1342-01 | $0.18 | $0.27 | 8/14/2013 | 50% |
| 1,000 ct | Lannett | 0527-1342-10 | $0.18 | $0.27 | 8/14/2013 | 50% |
| 90 ct | Sandoz | 0781-5181-92 | $0.12 | $0.27 | 9/13/2013 | 125% |
| 1,000 ct | Sandoz | 0781-5181-10 | $0.12 | $0.27 | 9/13/2013 | 125% |
| 1,000 ct | Mylan | 0378-1803-10 | $0.27 | $0.41 | 4/25/2013 | 52% |
| 100 ct | Lannett | 0527-1342-01 | $0.27 | $0.41 | 4/28/2013 | 52% |
| 1,000 ct | Lannett | 0527-1342-10 | $0.27 | $0.41 | 4/28/2013 | 52% |
| 90 ct | Sandoz | 0781-5181-92 | $0.27 | $0.41 | 5/23/2014 | 52% |
| 1,000 ct | Sandoz | 0781-5181-10 | $0.27 | $0.41 | 5/23/2014 | 52% |

---

[155] *Id.* at ¶ 1029.

[156] *Id.* at ¶ 1030.

467.    The below NADAC data[157] shows the average market price increase for various dosages of Levothyroxine between November 2013 and August 2014:

| Dosage | 11/28/2013 NADAC | 8/20/2014 NADAC | Percentage of Increase |
|---|---|---|---|
| 25 mcg | 0.19346 | 0.34262 | 77% |
| 50 mcg | 0.22681 | 0.38441 | 69% |
| 75 mcg | 0.25029 | 0.42067 | 68% |
| 88 mcg | 0.25546 | 0.44153 | 73% |
| 100 mcg | 0.26215 | 0.44575 | 70% |
| 112 mcg | 0.31389 | 0.51975 | 66% |
| 125 mcg | 0.30482 | 0.52688 | 73% |
| 150 mcg | 0.31058 | 0.53083 | 71% |
| 175 mcg | 0.36448 | 0.64925 | 78% |
| 200 mcg | 0.35133 | 0.64696 | 84% |



---

[157] NADAC data is available only for the time period between November 28, 2013 and present.



468.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[158]

469.    In 2015, patients complained of a dramatic price increase for their Levothyroxine medication. One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[159] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[160]

---

[158] *Why Are Some Generic Drugs Skyrocketing in Price?*, *supra* note 115 at 12, 38.

[159] Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS (Mar. 29, 2015, 5:51 PM), https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/ (last visited July 24, 2019).

[160] Sean Kirby, Dee J. Hall & Bridgit Bowden, *Prices of Lifesaving Drugs Skyrocketing*, WIS. CTR. FOR INVESTIGATIVE JOURNALISM (Nov. 28, 2016, 10:16 AM), available at https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/ (last visited July 24, 2019).

470.     This agreement between the Levothyroxine Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Levothyroxine than they otherwise would have absent the Defendants' anticompetitive conduct.

**M.     Lidocaine-Prilocaine**

471.     The Lidocaine-Prilocaine market is mature, as the drug has been available in the United States since 1948.

472.     At all relevant times, Lidocaine-Prilocaine Defendants Akorn, Fougera, Hi-Tech, Impax, and Sandoz have dominated, and continue to dominate, the market for Lidocaine-Prilocaine.

473.     Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

474.     Upon information and belief, around May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Lidocaine-Prilocaine Period"), Lidocaine-Prilocaine Defendants suddenly and dramatically increased the price of Lidocaine-Prilocaine largely in unison.

475.     According to NADAC data, the average market prices for Lidocaine-Prilocaine increased dramatically between November 2013 and January 2015.

| 11/28/2013 NADAC | 1/28/2015 NADAC | Percentage Increase |
|---|---|---|
| 0.45997 | 1.20078 | 161% |



476.     Prices for other forms of Lidocaine-Prilocaine also experienced price increases. The GAO Report noted an "extraordinary price increase" for Lidocaine-Prilocaine 5% ointment between 2012-2013 and another "extraordinary price increase" for Lidocaine-Prilocaine-Hydrochloride 3% cream in 2011-2012.[161]

477.     These price increases occurred following the (i) February 19-21, 2014, GPhA Annual Meeting in Orlando, Florida, which at least representatives from Defendants Hi-Tech, Impax, and Sandoz attended. *See* **Exhibit F**.

478.     This agreement between the Lidocaine-Prilocaine Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Lidocaine-Prilocaine than they otherwise would have absent the Defendants' anticompetitive conduct.

---

[161] GAO Report at 41.

N.      **Pravastatin**

479.    The Pravastatin market is mature, as the drug has been available in the United States since 1991. Generic versions have been available since 1996. At all relevant times there has been more than one manufacturer of Pravastatin in the market.

480.    At all relevant times, Pravastatin Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus have dominated, and continue to dominate, the market for Pravastatin.

i.      **Communications Between Defendants on Price Increases**

481.    As early as May 2, 2013, Teva's Director of Strategic Customer Marketing, Nisha Patel, engaged in discussions regarding the price increases of Pravastatin with CW-5, a senior executive at Glenmark. As Patel was preparing her list of price increase candidates, she informed a colleague that she expected to have some "priority items" to add to the list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a several drugs, including Pravastatin. Shortly after the call, Patel sent an email to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list. In all Patel spoke with CW-5 four times on May 2, 2013.[162]

482.    As of May 2013, the market for Pravastatin included five competitors: Glenmark, Teva, Lupin, Zydus and Apotex. The number of competitors made it difficult to coordinate a price increase. A price increase would require significant coordination and communication. Teva was able to reach a sufficient level of comfort and substantially raise prices by communicating and reaching an agreement with each of its competitors.[163]

---

[162] Second AG Complaint at ¶ 681.

[163] *Id.* at ¶¶ 682-683.

483.    On May 3, 2013, Kevin Green, Teva's Director of National Accounts, spoke to M.K., a senior executive at Zydus twice. Over the next several weeks, Green communicated numerous times with M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.[164]

484.    On May 6 and 7, 2013, Patel communicated with David Berthold, Lupin's Vice President of Sales at least three times. Patel communicated with J.C., a national account executive at Glenmark, at least five times.[165]

485.    During one or more of her calls with J.C. and/or CW-5 at Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the increases became public – and documented those price points in her price increase spreadsheet.[166]

486.    By May 8, 2013, Teva executives understood that Glenmark would be leading the Pravastatin price increase and were comfortable enough that one marketing executive at Teva indicated in an email to Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."[167]

487.    On May 15, 2013, the day before Glenmark's increase became effective, a Teva executive sent an email to the pricing team stating that "Nisha [Patel] would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin. The Teva executive concluded: "[i]n the event you are reviewing these

---

[164] *Id.* at ¶ 684.

[165] *Id.* at ¶ 685.

[166] *Id.*

[167] *Id.* at ¶ 686.

products for any request, please make her aware and *as a group we can discuss where to price based on market intelligence she has collected*."[168]

488.    That same day, Glenmark notified its customers that it would substantially increase the price of Pravastatin, effective May 16, 2013.[169]

489.    Between May 15, 2013 and May 16, 2013 there was a flurry of communications between competitors. Teva's Green spoke with Zydus executives at least four times. Patel spoke with CW-5 at Glenmark once and Berthold at Lupin seven times.[170]

490.    As of May 16, 2013, Patel was still considering raising Teva's prices for Pravastatin. She was concerned that Zydus would not follow a price increase, stating: "I have asked to get Zydus' ability to supply on this. If it's not so great, I would like to add back to the increase list." Patel later indicated that "[t]he only threat was Zydus. Just waiting to hear on their ability to supply."[171]

491.    On May 16, 2016, Patel's supervisor, K.G., sent an internal email to several colleagues, including Patel, stating: "I think we need to understand additional competitor ability to take on additional share and pricing actions. The volume is huge for us. It would be nice to try to increase price, but we do not really want to lose a lot of share on this product." In response, David Rekenthaler, Teva's Vice President, Sales US Generics, indicated that he was comfortable with the price increase but did not want to put his reasoning in writing.[172]

---

[168] *Id.* at ¶ 687.

[169] *Id.* at ¶ 688.

[170] *Id.* at ¶ 689.

[171] *Id.* at ¶ 690.

[172] *Id.* at ¶ 692.

492.    On May 17, 2016, Patel continued to coordinate the price increase with executives at Glenmark and Lupin. For example, Patel called Berthold at Lupin. While on the phone with Berthold, CW-5 of Glenmark called Patel and left a voicemail. Immediately, after getting off the phone with Berthold, Patel called CW-5 back.[173]

493.    By this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20 to 24, 2014, Patel spoke to B.H., a senior sales executive at Apotex, at least five times, during which Apotex agreed to raise its price for Pravastatin.[174]

494.    But Patel was still hesitant to include Pravastatin on her price increase list until Apotex actually increased its price. For example, when she sent out her "Immediate PI [price increase]" spreadsheet to her supervisor on May 24, 2013, Pravastatin was not on the list.[175]

495.    On May 28, 2013, Apotex raised its price for Pravastatin. That same day Teva's Green exchanged six text messages with K.R. at Zydus. The next day, Patel added Pravastatin to Teva's price increase list.[176]

496.    The day after the Apotex price increase, Green spoke with K.R. at Zydus two more times and exchanged four text messages. Zydus quickly followed with a price increase of its own on June 14, 2013.[177]

497.    Between June 11 and 13, 2014, Teva's Green spoke with K.R. at Zydus by phone or text message at least eleven times.[178]

---

[173] *Id.* at ¶ 693.

[174] *Id.* at ¶ 694.

[175] *Id.* at ¶ 695.

[176] *Id.* at ¶ 696.

[177] *Id.* at ¶ 697.

[178] *Id.* at ¶ 698.

498.     Teva followed Glenmark, Apotex, and Zydus with a significant price increase on August 9, 2013.

499.     When Patel sent her "Price Increase Overview" to her supervisor on August 7, 2013, two days before Teva's price increase, she included some information regarding Lupin, specifically that Lupin was "waiting on Teva" before implementing their own increase.[179]

500.     Lupin increased its price for Pravastatin on August 28, 2013.[180]

        **ii.      Price Increases**

501.     Prior to 2013, effective prices of Pravastatin were stable.

502.     Upon information and belief, around May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Pravastatin Period"), Pravastatin Defendants suddenly and dramatically increased the price of Pravastatin largely in unison.

503.     As depicted in the charts below, NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter.

---

[179] *Id.* at ¶ 700.
[180] *Id.* at ¶ 702.









504.    WAC pricing, depicted below, confirms that Defendants Apotex, Lupin, Teva, and

Zydus all increased their Pravastatin prices substantially and largely in unison.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 10 mg 90 ct | Zydus | 68382-070-16 | $0.17 | $0.48 | 6/14/2013 | 182% |
| 10 mg 500 ct | Zydus | 68382-070-05 | $0.15 | $0.48 | 6/14/2013 | 220% |
| 10 mg 90 ct | Teva | 0093-0771-98 | $0.17 | $0.48 | 8/9/2013 | 182% |
| 10 mg 1,000 ct | Teva | 0093-0771-10 | $0.15 | $0.48 | 8/9/2013 | 220% |
| 10 mg 90 ct | Lupin | 68180-485-09 | $0.17 | $0.48 | 8/28/2013 | 182% |
| 10 mg 500 ct | Lupin | 68180-485-02 | $0.15 | $0.48 | 8/28/2013 | 220% |
| 10 mg 90 ct | Apotex | 60505-0168-09 | $0.26 | $0.56 | 5/28/2013 | 115% |
| 10 mg 500 ct | Apotex | 60505-0168-05 | $0.26 | $0.56 | 5/28/2013 | 115% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 mg 90 ct | Zydus | 68382-071-16 | $0.19 | $0.49 | 6/14/2013 | 158% |
| 20 mg 500 ct | Zydus | 68382-071-05 | $0.18 | $0.49 | 6/14/2013 | 172% |
| 20 mg 90 ct | Teva | 0093-7201-98 | $0.19 | $0.49 | 8/9/2013 | 158% |
| 20 mg 1,000 ct | Teva | 0093-7201-10 | $0.18 | $0.49 | 8/9/2013 | 172% |
| 20 mg 90 ct | Lupin | 68180-486-09 | $0.19 | $0.49 | 8/28/2013 | 158% |
| 20 mg 500 ct | Lupin | 68180-486-02 | $0.18 | $0.49 | 8/28/2013 | 172% |
| 20 mg 90 ct | Apotex | 60505-0169-09 | $0.26 | $0.57 | 5/28/2013 | 119% |
| 20 mg 1,000 ct | Apotex | 60505-0169-07 | $0.26 | $0.57 | 5/28/2013 | 119% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 40 mg 90 ct | Zydus | 68382-072-16 | $0.24 | $0.72 | 6/14/2013 | 200% |
| 40 mg 500 ct | Zydus | 68382-072-05 | $0.22 | $0.72 | 6/14/2013 | 227% |
| 40 mg 90 ct | Teva | 0093-7202-98 | $0.24 | $0.72 | 8/9/2013 | 200% |
| 40 mg 1,000 ct | Teva | 0093-7202-10 | $0.22 | $0.72 | 8/9/2013 | 227% |
| 40 mg 90 ct | Lupin | 68180-487-09 | $0.24 | $0.72 | 8/28/2013 | 200% |
| 40 mg 500 ct | Lupin | 68180-487-02 | $0.22 | $0.72 | 8/28/2013 | 227% |
| 40 mg 90 ct | Apotex | 60505-0170-09 | $0.38 | $0.84 | 5/28/2013 | 121% |
| 40 mg 1,000 ct | Apotex | 60505-0170-07 | $0.38 | $0.84 | 5/28/2013 | 121% |
| 40 mg 9,000 ct | Apotex | 60505-0170-08 | $0.38 | $0.84 | 5/31/2013 | 121% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 80 mg 90 ct | Zydus | 68382-073-16 | $0.38 | $0.72 | 6/14/2013 | 89% |
| 80 mg 500 ct | Zydus | 68382-073-05 | $0.30 | $0.72 | 6/14/2013 | 140% |
| 80 mg 90 ct | Teva | 0093-7270-98 | $0.38 | $0.72 | 8/9/2013 | 89% |
| 80 mg 1,000 ct | Teva | 0093-7270-10 | $0.36 | $0.72 | 8/9/2013 | 100% |
| 80 mg 90 ct | Lupin | 68180-488-09 | $0.38 | $0.72 | 8/28/2013 | 89% |
| 80 mg 500 ct | Lupin | 68180-488-02 | $0.36 | $0.72 | 8/28/2013 | 100% |
| 80 mg 90 ct | Apotex | 60505-1323-09 | $0.38 | $0.84 | 5/28/2013 | 121% |

505. The GAO Report noted an "extraordinary price increase for Pravastatin between 2013-2014. [181]

506. Sandoz entered the Pravastatin market in early 2014 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers.

507. Upon information and belief, Sandoz contacted the other Pravastatin Defendants well before 2014 and explained its intention of market entry. The Defendants then colluded to allocate market share and set supracompetitive prices. This agreement prevented Sandoz's entry from eroding the artificial equilibrium the Defendants conspiratorially created.

508. Prices continued to increase after August 2014. In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Pravastatin saw between October 2013 and April 2014. The letters depicted the following price increases during that six-month period:[182]

---

[181] GAO Report at 43.

[182] The letters are available at https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage Increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20 mg, 1,000ct | $77 | $368 | 477% |
| Pravastatin Sodium | 40 mg, 1,000 ct | $114 | $540 | 528% |
| Pravastatin Sodium | 10 mg, 500 ct | $27 | $196 | 573% |
| Pravastatin Sodium | 80 mg, 500 ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10 mg, 90 ct | $6 | $34 | 420% |
| Pravastatin Sodium | 20 mg, 90 ct | $7 | $35 | 446% |
| Pravastatin Sodium | 40 mg, 90 ct | $9 | $51 | 473% |
| Pravastatin Sodium | 80 mg, 90 ct | $14 | $52 | 334% |

509.     Pravastatin Defendants had numerous opportunities to coordinate their price increases and market share agreements. Key executives from all Pravastatin Defendants attended the October 1-3, 2012 GPhA Fall Technical Conference in Bethesda, Maryland, February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida, and the June 4-5,2013 GPhA CMC Workshop in Bethesda, Maryland. *See* **Exhibit F**.

510.     According to a November 2014 report by the New York Times, a three-month supply of generic Pravastatin costs $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[183]

511.     This agreement between the Pravastatin Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Pravastatin than they otherwise would have absent the Defendants' anticompetitive conduct.

**O.     Propranolol**

512.     The Propranolol market is mature, as the drug has been available in the United States since at least 1968. Generic propranolol has been available since 2007. At all relevant times

---

[183] Elizabeth Rosenthal, *Lawmakers Look for Ways to Provide relief for Rising Cost of Generic Drugs*, N.Y. TIMES (Nov. 24, 2014), https://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-rising-cost-of-generic-drugs.html (last visited July 25, 2019).

there have been at least manufacturers of Propranolol in both the capsule and tablet forms in the market.

513.   Propranolol Defendants Actavis, Breckinridge, and Upsher-Smith dominated the market for Propranolol capsules and tablets. Defendants Actavis, Heritage, Mylan, Par, and Teva, dominate the market for Propranolol tablets.

514.   The Propranolol price-fixing conspiracy was executed in two overlapping groups of Defendants in two phases. First, on or around December 2013, Propranolol Capsule Defendants colluded to increase the prices on multiple dosage levels of Propranolol capsules. Next, on or around February 2015, Propranolol Tablet Defendants colluded to increase the prices of multiple dosages of Propranolol tablets.

### i.   Communications Between Defendants on 2015 Tablet Price Increases

515.   On January 15, 2015, Actavis sent a notice to its customers informing them of a significant price increase to its WAC and Suggested Wholesale Price ("SWP") for Propranolol. The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.[184]

516.   In the days before Actavis sent notice to its customers, Marc Falkin, Actavis' Vice President, Marketing, Pricing and Contracts and David Rekenthaler, Teva's Vice President, Sales US Generics, spoke at least four times.[185]

517.   On the day before Actavis sent the price increase notice, Rekenthaler coordinated the price increase with Falkin and Mylan's Vice President of National Accounts, Jim Nesta, through several phone calls.[186]

---

[184] *Id.* at ¶ 894.

[185] *Id.* at ¶ 895.

[186] *Id.* at ¶ 896.

518.    On January 16, 2015, more than a month before Actavis' price increases were disclosed to the public, Rekenthaler forwarded Teva's price increase list to his colleague Nisha Patel. Propranolol was on the list and the explanation for the increase was listed as "[f]ollow competitior – Actavis."[187]

519.    Teva raised its pricing for Propranolol on January 28, 2015, before the Actavis price increase even became effective.[188]

520.    When Actavis' price increase became effective on February 17, 2015, Rekenthaler and Falkin continued to discuss pricing. For example, on February 16, 2015, Rekenthaler and Falkin spoke twice. Rekenthaler then spoke to Nesta twice on February 18 and February 19, 2015.[189]

521.    Mylan followed the Teva and Actavis price increases for Propranolol with a price increase on July 10, 2015.

ii.    **Price Increases**

522.    Prior to 2013, the effective prices of Propranolol remained stable.

523.    Upon information and belief, around November 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Propranolol Period"), Propranolol Defendants suddenly and dramatically increased the price of Propranolol largely in unison.

524.    Propranolol Capsule Defendants increased prices on Propranolol capsules between December 2013 and October 2014.

---

[187] *Id.* at ¶ 897.

[188] *Id.* at ¶ 898.

[189] *Id.* at ¶ 899.

138

525.    According to NADAC data, Propranolol capsules saw the following average price increases:

| Dosage | Nov. 28, 2013 NADAC | July 23, 2014 NADAC | Percentage Increase |
|--------|---------------------|---------------------|---------------------|
| 60 mg | 0.62453 | 1.63185 | 161% |
| 80 mg | 0.73633 | 1.91623 | 160% |
| 120 mg | 0.93663 | 2.38831 | 155% |
| 160 mg | 1.154 | 2.76681 | 140% |



526.    These price increases followed the October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland, which representatives from Actavis, Breckinridge, and Upsher-Smith attended. *See* **Exhibit F**.

527.    Propranolol Tablet Defendants all increased prices on Propranolol tablets between February 2015 and February 2016.

528.    According to NADAC data, Propranolol capsules saw the following average price increases:

| Dosage | Feb. 4, 2015 NADAC | Feb. 3, 2016 NADAC | Percentage Increase |
|--------|--------------------|--------------------|---------------------|
| 10 mg | 0.02456 | 0.20829 | 748% |
| 20 mg | 0.02603 | 0.27548 | 958% |
| 40 mg | 0.03187 | 0.36877 | 1,057% |
| 80 mg | 0.04821 | 0.47579 | 887% |



529.    Medicaid reimbursement data also confirms that the Propranolol Defendants all increased their prices abruptly and largely in unison. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol capsules.





530.    The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol tablets.





531.    This agreement between the Propranolol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Propranolol than they otherwise would have absent the Defendants' anticompetitive conduct.

**P.    Ursodiol**

532.    The Ursodiol market is mature, as the drug has been available in the United States since 1987. Generic versions have been available since at least 2000. At all relevant times, there has been more than one manufacturer of Ursodiol in the market.

533.    At all relevant times, Ursodiol Defendants Actavis, Epic, and Lannett have dominated, and continue to dominate, the Ursodiol market.

534.    Prior to 2014, the effective prices for Ursodiol were stable.

535.    Upon information and belief, around May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Ursodiol

Period"), Ursodiol Defendants suddenly and dramatically increased the price of Ursodiol largely in unison.

536.    Specific WAC pricing confirms that Defendants Actavis, Epic, and Lannett all increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------|-----------|-----|---------|---------|------------------|---------------------|
| 300 mg | Lannett | 0527-1326-01 | * | $5.11 | 5/1/2014 | |
| 300 mg | Epic | 42806-503-01 | $0.45 | $5.10 | 5/6/2014 | 1,033% |
| 300 mg | Actavis | 0591-3159-01 | $0.77 | $5.11 | 6/24/2014 | 562% |

537.    According to NADAC data, Ursodiol capsules saw the following average price increases between November 2013 and September 2014:

| Nov. 28, 2013 WAC | September 17, 2014 WAC | Percentage Increase |
|-------------------|------------------------|---------------------|
| 0.28028 | 4.73353 | 1,588% |



538.    These price increases followed the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida, which representatives from Actavis, Epic, and Lannett attended. *See* **Exhibit F**.

539.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In November 2014, patient Barbara Heller

reported that her three-month prescription for Ursodiol increased from $94.50 to $1,212.30 between refills.[190]

540.    The GAO Report identified Ursodiol as having experienced an "extraordinary price increase" in 2014-2015.[191] These price increases impacted multiple dosages of Ursodiol.

541.    This agreement between the Ursodiol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market. This conspiracy led Plaintiffs' Assignors to pay more for Ursodiol than they otherwise would have absent the Defendants' anticompetitive conduct.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

542.    Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one or more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

543.    Between at least 2013 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills, and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

544.    Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

---

[190] Jonathan Lapook, *Why some generic drug prices are skyrocketing*, CBS NEWS (Nov. 12, 2014, 7:52 PM), https://www.cbsnews.com/news/generic-drug-prices-skyrocketing/ (last visited July 25, 2019).

[191] GAO Report at 45.

545.    Defendants and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

546.    The conspiracy alleged herein has directly and substantially affected interstate commerce. Defendants deprived Plaintiffs' Assignors and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

547.    Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

**MARKET EFFECTS**

548.    The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the Subject Drugs identified herein and have directly resulted in an increase in consumer prices for the Subject Drugs.

549.    By unreasonably and illegally restraining competition for the Subject Drugs, Defendants have deprived the Plaintiffs' Assignors the benefits of competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve and protect.

550.    As a direct and proximate result of the unlawful conduct alleged herein, Plaintiffs' Assignors were not and are not able to purchase or pay reimbursements for purchases of the Subject Drugs at prices determined by a market unhindered by the impact of Defendants' anticompetitive

behavior. Instead, they have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property, *inter alia*, they have paid more and continue to pay more for the Subject Drugs identified herein than they would have paid in an otherwise competitive market.

## TOLLING AND FRAUDULENT CONCEALMENT

551.    The claims asserted in this Complaint have been tolled as a matter of law by: (1) the pendency of various class actions, as to which Plaintiffs' Assignors are putative class members, alleging price-fixing of the Subject Drugs by Defendants, or some subset of them, and (2) the federal criminal antitrust proceedings alleged above, pursuant to 15 U.S.C. § 16(i).

552.    In addition, Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

553.    As alleged in the AG Complaint, Heritage executives took affirmative steps to conceal and destroy evidence of their wrongdoing. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 454-462 of the AG Complaint, which are incorporated by reference.

554.    As alleged in the Second AG Complaint, Teva executives took affirmative steps to conceal their wrongdoing. These steps included instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, lying about the sources of their information in emails, deleting text messages from their telephones, as alleged in paragraphs 1122-1128 of the Second AG Complaint, which are incorporated by reference.

555. Moreover, Defendant Apotex destroyed an entire custodial file for one of its key employees (a senior sales executive), after the Attorneys General requested it through an investigatory subpoena in July 2017.[192]

556. Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recorded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

557. Plaintiffs' Assignors acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Plaintiffs' Assignors did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before filing this Complaint, nor were Plaintiff's Assignors aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

## **CONTINUING VIOLATIONS**

558. This Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs can recover for damages that they suffered during any applicable limitations period.

---

[192] Second AG Complaint at ¶ 1129.

## DEFENDANTS' ANTITRUST VIOLATIONS

559.    At all relevant times, as set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix prices for the Subject Drugs.

560.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of the Subject Drugs sold in the United States. These activities included the following:

   a. Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations and communications with co-conspirators to discuss the sales and pricing of the Subject Drugs in the United States;

   b. Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for the Subject Drugs sold in the United States;

   c. Agreeing during those meetings, conversations, and communications to allocate customers for the Subject Drugs sold in the United States;

   d. Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for the Subject Drugs sold in the United States;

   e. Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

   f. Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

   g. Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

561.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

562.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs' Assignors indirectly purchased the Subject Drugs at inflated and supracompetitive prices.

563.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of the various states enumerated below.

564.    As a result of Defendants' unlawful conduct, Plaintiffs' Assignors have been injured in their business and property in that they have paid more for the Subject Drugs than they would have paid in a competitive market.

565.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, this institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to the end-payers such as Plaintiffs' Assignors. Wholesalers and retailers passed on the inflated prices of the Subject Drugs to Plaintiffs' Assignors. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs' Assignors who were equally denied the opportunity to purchase less expensive versions of the Subject Drugs.

566.    The unlawful contract, combination, and conspiracy has had the following effects, among others:

        a.  Price competition in the market for the Subject Drugs has been artificially restrained;

b. Prices for the Subject Drugs sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c. End-payer purchasers, such as Plaintiffs' Assignors, of the Subject Drugs sold by Defendants have been deprived of the benefit of free and open competition in the market for the Subject Drugs.

## CAUSES OF ACTION

### COUNT I
### Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3

567.   Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

568.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). This conspiracy was *per se* unlawful price-fixing.

569.   Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for the Subject Drugs, thereby creating anticompetitive effects.

570.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing the Subject Drug prices throughout the United States.

571.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for the Subject Drugs.

572.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and

conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

573. Defendants' conspiracy had the following effects, among others:

    a. Price competition in the market for the Subject Drugs has been restrained, suppressed, and/or eliminated in the United States;

    b. Prices for the Subject Drugs provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    c. Plaintiffs' Assignors who purchased the Subject Drugs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

574. As a result of Defendants' unlawful conduct, Plaintiffs' Assignors have been harmed by being forced to pay inflated, supracompetitive prices for the Subject Drugs.

575. Plaintiffs' Assignors have been injured and will continue to be injured in their business and property by paying more for the Subject Drugs than they would have paid and will pay in the absence of the conspiracy.

576. Plaintiffs are entitled to an injunction against Defendants under 15 U.S.C. § 26, preventing and restraining the continuing violations alleged herein.

**COUNT II**
**Violations of State Antitrust Statutes**

577. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

578. Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of the Subject Drugs, which resulted in unreasonable restraint of trade and commerce and in violation of various state antitrust statutes, as set forth below.

579. The contract, combination, or conspiracy consisted of an agreement among the

Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anticompetitive prices for the Subject Drugs in the United States.

580. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        a. Participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price the Subject Drugs at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs' Assignors with respect to the Subject Drugs provided in the United States; and

        b. Participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

581. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for the Subject Drugs. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs' Assignors have been injured in their business and property and are threatened with further injury.

582. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct came at the expense and detriment of Plaintiffs' Assignors and consumers.

583. Defendants' anticompetitive conduct described above was knowing, willful and constituted violations or flagrant violations of state antitrust statutes as described below.

584. Accordingly, Plaintiffs' Assignors, who paid for prescriptions of the Subject Drugs in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

**Alabama**
**(Ala. Code § 6-5-60)**

585.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ala. Code § 6-5-60.

586.    Ala. Code § 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."

587.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Alabama; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Alabama; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Alabama.

588.    Defendants knew or should have known that their conduct was in violation of Ala. Code § 6-5-60.

589.    Defendants' illegal conduct substantially affected Alabama commerce and consumers.

590.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Alabama.

591.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

592.    Accordingly, Plaintiffs seek all forms of relief available under Ala. Code § 6-5-60.

## Arizona Uniform Antitrust Act
### (Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*)

593.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.* ("Arizona Uniform Antitrust Act").

594.     Plaintiffs and Defendants are "persons" within the meaning of Ariz. Rev. Stat. Ann. § 44-1401.

595.     The Arizona Uniform Antitrust Act makes "a contract, combination or conspiracy between two or more persons in restraint of ... trade or commerce" illegal. Ariz. Rev. Stat. Ann. § 44-1402.

596.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Arizona; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Arizona; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Arizona.

597.     Defendants knew or should have known that their conduct was in violation of the Arizona Uniform Antitrust Act.

598.     Defendants' illegal conduct substantially affected Arizona commerce and consumers.

599.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Arizona.

600.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and

unfair prices paid for the Subject Drugs as described herein.

601.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General pursuant to Ariz. Rev. Stat. Ann. § 44-1415.

602.    Accordingly, Plaintiffs seek all forms of relief available under the Arizona Arizona Uniform Antitrust Act, Ariz. Rev. Stat. Ann. §- 44-1415, *et seq*.

### California Cartwright Act
### (Cal. Bus. & Prof. Code §§ 16700, *et seq*.)

603.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.* ("The Cartwright Act").

604.    Plaintiffs and Defendants are "persons" within the meaning of Cal. Bus. & Prof. Code § 16702.

605.    The Cartwright Act prohibits a combination of two or more persons "(a) [t]o create or carry out restrictions in trade or commerce ... (e) to make or enter or execute or carry out any contracts, complications or agreements of any kind of description, by which they ... (2) [a]gree in any manner to keep the price of such article, commodity ... at a fixed or graduated fixture; (3) [e]stablish or settle the price of any article, commotity ... between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves ... " Cal. Bus. & Prof. Code § 16720.

606.    Defendants' contracts, combinations, and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of California; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of California; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid

supracompetitive prices for the Subject Drugs, including in the State of California.

607.    Defendants knew or should have known that their conduct was in violation of The Cartwright Act.

608.    Defendants' illegal conduct substantially affected California commerce and consumers.

609.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of California.

610.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

611.    Accordingly, Plaintiffs seek all forms of relief available under The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

### District of Columbia
### (D.C. Code Ann. §§ 24-4501, *et seq.*)

612.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 24-4501, *et seq.*

613.    Plaintiffs and Defendants are "persons" within the meaning of D.C. Code Ann. § 28-4501.

614.    D.C. Code Ann. § 28-4503 makes "every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce" illegal.

615.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the District of Columbia; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs' Assignors have been

156

deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject drugs, including in the District of Columbia.

616.    Defendants knew or should have known that their conduct was in violation of D.C. Code Ann. §§ 24-4501, *et seq.*

617.    Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

618.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the District of Columbia.

619.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

620.    Accordingly, Plaintiffs seek all forms of relief available under D.C. Code Ann. §§ 24-4501, *et seq.*

### Hawaii
### (Haw. Rev. Stat. §§ 480-1, *et seq.*)

621.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

622.    Plaintiffs and Defendants are "persons" within the meaning of Haw. Rev. Stat. § 480-1.

623.    Haw. Rev. Stat. § 480-4 declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade" illegal. Such acts include efforts to "(1) fix, control, or maintain the price of any commodity" Haw. Rev. Stat. § 480-4.

624.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the

State of Hawaii; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Hawaii; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Hawaii.

625.    Defendants knew or should have known that their conduct was in violatoin of Haw. Rev. Stat. §§ 480-1, *et seq.*

626.    Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

627.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in Hawaii.

628.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

629.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General pursuant to Haw. Rev. Stat. Ann. § 480-13(a)(1).

630.    Accordingly, Plaintiffs seek all forms of relief available under Haw. Rev. Stat. §§ 480-1, *et seq.*

## Illinois Antitrust Act
### (740 Ill. Comp. Stat. 10/, *et seq.*)

631.    Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 740 Ill. Comp. Stat. 10/, *et seq.* ("Illinois Antitrust Act").

632.    Plaintiffs and Defendants are "persons" within the meaning of 740 Ill. Comp. Stat. 10/4.

633.     The Illinois Antitrust Act makes "any contract with" or "conspiracy with" another person who is a competitor for the purpose of or with the effect of "fixing, controlling, or maintaining the price" of a commodity illegal. *Id.*

634.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Illinois; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Illinois; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Illinois.

635.     Defendants knew or should have known that their conduct was in violation of the Illinois Antitrust Act.

636.     Defendants' illegal conduct substantially affected Illinois commerce and consumers.

637.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Illinois.

638.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

639.     Accordingly, Plaintiffs seek all forms of relief available under the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/, *et seq.*

### Iowa Competition Law
### (Iowa Code §§ 553.1, *et seq.*)

640.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* ("Iowa Competition

Law").

641.    Plaintiffs and Defendants are "persons" within the meaning of Iowa Code § 553.3.

642.    Iowa Competition Law states that "a contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code 553.4

643.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Iowa; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Iowa.

644.    Defendants knew or should have known that their conduct was in violation of Iowa Competition Law.

645.    Defendants' illegal conduct substantially affected Iowa commerce and consumers.

646.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Iowa.

647.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

648.    Accordingly, Plaintiffs seek all forms of relief available under Iowa Competition Law, Iowa Code §§ 553.1, *et seq*.

## Kansas Restraint of Trade Act
### (Kan. Stat. Ann. §§ 50-101, *et seq.*)

649.    Defendants have intentionally and unlawfully engaged in a contract, combination

or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* ("Kansas RTA").

650.    Plaintiffs and Defendants are "persons" within the meaning of Kan. Stat. Ann. § 50-161.

651.    The Kansas RTA makes "trusts, combinations and agreements in restraint of trade and free competition" unlawful. Kan. Stat. Ann. § 50-112. Additionally, "all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the ... sale of articles imported into this state ... are against public policy, unlawful, and void". *Id.*

652.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Kansas; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Kansas; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Kansas.

653.    Defendants knew or should have known that their conduct was in violation of the Kansas RTA.

654.    Defendants' illegal conduct substantially affected Kansas commerce and consumers.

655.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Kansas.

656.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and

unfair prices paid for the Subject Drugs as described herein.

657.    Accordingly, Plaintiffs seek all forms of relief available under the Kansas RTA, Kan. Stat. Ann. §§ 50-101, *et seq.*

## Maine
### (Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et seq.*)

658.    Defendants have intentionally and unlawfully engaged in a contract, combination, and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et seq.*

659.    Me. Rev. Stat. Ann. tit. 10 §§ 1102 makes "every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce" illegal. Me. Rev. Stat. Ann. tit. 10 §§ 1101.

660.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Maine; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Maine; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Maine.

661.    Defendants knew or should have known that their conduct was in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

662.    Defendants' illegal conduct substantially affected Maine commerce and consumers.

663.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Maine.

664.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and

162

unfair prices paid for the Subject Drugs as described herein.

665.     Accordingly, Plaintiffs seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

**Maryland Antitrust Act**
**(Md. Code Ann., Com. Law §§ 11-201, *et seq.*)**

666.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Md. Code Ann., Com. Law §§ 11-201, *et seq.* ("Maryland Antitrust Act").

667.     Plaintiffs are Defendants "persons" within the meaning of Md. Code Ann., Com. Law § 11-201.

668.     The Maryland Antitrust Act prohibits unreasonable restraint of trade "by contract, combination, or conspiracy." Md. Code Ann., Com. Law § 11-204.

669.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Maryland; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Maryland; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Maryland.

670.     Defendants knew or should have known that their conduct was in violation of Md. Code Ann., Com. Law §§ 11-201, *et seq.*

671.     Defendants' illegal conduct substantially affected Maryland commerce and consumers.

672.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Maryland.

673.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

674.     Accordingly, Plaintiffs seek all forms of relief available under Md. Code Ann., Com. Law §§ 11-201, *et seq.*

**Michigan Antitrust Reform Act**
**(Mich. Comp. Laws Ann. §§ 445.771, *et seq.*)**

675.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.* ("Michigan ARA").

676.     Plaintiffs and Defendants are "persons" within the meaning of Mich. Comp. Laws Ann. § 445.771.

677.     The Michigan ARA makes "a contract, combination, or conspiracy between 2 or more persons in restraint of ... trade or commerce in a relevant market" unlawful. Mich. Comp. Laws Ann. § 445.772.

678.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Michigan; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Michigan; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Michigan.

679.     Defendants knew or should have known that their conduct was in violation of the Michigan ARA.

680.     Defendants' illegal conduct substantially affected Michigan commerce and

consumers.

681.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Michigan.

682.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

683.    Accordingly, Plaintiffs seek all forms of relief available under the Michigan ARA, Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

<u>**Minnesota Antitrust Law of 1971**</u>
**(Minn. Stat. §§ 325D.49, *et seq*.)**

684.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Minn. Stat. Ann. §§ 325D.49, *et seq.* ("Minnesota Antitrust Law").

685.    Plaintiffs and Defendants are "persons" within the meaning of Minn. Stat. Ann. § 325D.50.

686.    The Minnesota Antitrust Law makes "a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce" unlawful. Minn. Stat. Ann. § 325D.51. Any contract, combination, or conspiracy with the purpose or effect of "affecting, fixing, controlling or maintaining the market price, or fee of any commodity or service" or "affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity … for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service" is unlawful. Minn. Stat. Ann. § 325D.53.

687.    Defendants' contracts, combinations and conspiracy had the following effects: (1)

price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Minnesota; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Minnesota; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Minnesota.

688.    Defendants knew or should have known that their conduct was in violation of the Minnesota Antitrust Law.

689.    Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

690.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Minnesota.

691.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

692.    Accordingly, Plaintiffs seek all forms of relief available under the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.*

**<u>Mississippi</u>**
**(Miss. Code Ann. §§ 75-21-1, *et seq.*)**

693.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

694.    Miss. Code Ann. § 75-21-3 declares trusts are unlawful, which includes "any combination, contract, understanding, or agreement, express or implied" that would be inimical to public welfare and the effect of which would be restraint of trade and/or any "increase … on the price of a commodity." Miss. Code Ann. §§ 75-21-1.

166

695.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Mississippi; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Mississippi; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Mississippi.

696.    Defendants knew or should have known that their conduct was in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

697.    Defendants' illegal conduct substantially affected Mississippi commerce and consumers.

698.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Mississippi.

699.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

700.    Accordingly, Plaintiffs seek all forms of relief available under Miss. Code Ann. §§ 75-21-1, *et seq.*

**Nebraska Junkin Act**
**(Neb. Rev. Stat. §§ 59-801, *et seq*.)**

701.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq.* ("Junkin Act").

702.    Plaintiffs and Defendants are "persons" within the meaning of Neb. Rev. Stat. § 59-822.

703.    The Junkin Act makes "every contract, combination in the form of trust or

167

otherwise, or conspiracy in restraint of trade or commerce" illegal. Neb. Rev. Stat. § 59-801.

704. Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Nebraska; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Nebraska.

705. Defendants knew or should have known that their conduct was in violation of the Junkin Act.

706. Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

707. Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Nebraska.

708. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

709. Accordingly, Plaintiffs seek all forms of relief available under the Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq.*

**Nevada Unfair Trade Practices Act**
**(Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*)**

710. Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* ("Nevada UTPA").

711. The Nevada UTPA prohibits "price fixing, which consists of raising, depressing,

fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.

712.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Nevada; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Nevada; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Nevada.

713.    Defendants knew or should have known that their conduct was in violation of the Nevada UTPA.

714.    Defendants' illegal conduct substantially affected Nevada commerce and consumers.

715.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Nevada.

716.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

717.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General pursuant to Nev. Rev. Stat. Ann. § 598A.210(3).

718.    Accordingly, Plaintiffs seek all forms of relief available under the Nevada UTPA, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

## New Hampshire
### (N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*)

719.    Defendants have intentionally and unlawfully engaged in a contract, combination,

or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq*.

720.   Plaintiffs and Defendants are "persons" within the meaning of N.H. Rev. Stat. Ann § 356:1.

721.   N.H. Rev. Stat. Ann § 356:3 makes "every contract, combination, or conspiracy in restraint of trade" unlawful.  N.H. Rev. Stat. Ann § 356:2.

722.   Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of New Hampshire; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of New Hampshire.

723.   Defendants knew or should have known that their conduct was in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq*.

724.   Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

725.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of New Hampshire.

726.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

727.   Accordingly, Plaintiffs seek all forms of relief available under N.H. Rev. Stat. Ann §§ 356:1, *et seq*.

## New Mexico Antitrust Act
### (N.M. Stat. Ann. §§ 57-1-1, *et seq.*)

728.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.* ("New Mexico Antitrust Act").

729.     Plaintiffs and Defendants are "persons" within the meaning of N.M. Stat. Ann. § 57-1-1.2.

730.     The New Mexico Antitrust Act makes "every contract, agreement, combination or conspiracy of trade or commerce" illegal. N.M. Stat. Ann. § 57-1-1.

731.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of New Mexico; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of New Mexico.

732.     Defendants knew or should have known that their conduct was in violation of the New Mexico Antitrust Act.

733.     Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

734.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of New Mexico.

735.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

171

736.    Accordingly, Plaintiffs seek all forms of relief available under the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et. seq.*

## New York Donnelly Act
### (N.Y. Gen Bus. Laws §§ 340, *et seq.*)

737.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.* ("Donnelly Act").

738.    The Donnelly Act declares "every contract, agreement, arrangement or combination" where "competition or the free exercise of any activity … may be restrained" illegal. N.Y. Gen. Bus. Law § 340(1).

739.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of New York; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of New York; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of New York.

740.    Defendants knew or should have known that their conduct was in violation of the Donnelly Act.

741.    Defendants' illegal conduct substantially affected New York commerce and consumers.

742.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of New York.

743.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and

172

unfair prices paid for the Subject Drugs as described herein.

744.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General pursuant to N.Y. Gen. Bus. Law §340(5).

745.    Accordingly, Plaintiffs seek all forms of relief available under the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*

**North Carolina**
**(N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*)**

746.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

747.    N.C. Gen. Stat. Ann. § 75-2.1 makes "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. N.C. Gen. Stat. Ann. § 75-1.

748.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of North Carolina; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of North Carolina.

749.    Defendants knew or should have known that their conduct was in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

750.    Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

751.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of North Carolina.

752.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

753.    Accordingly, Plaintiffs seek all forms of relief available under N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

## North Dakota Uniform State Antitrust Act
### (N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.*)

754.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.* ("North Dakota USAA").

755.    Plaintiffs and Defendants are "persons" within the meaning of N.D. Cent. Code Ann. § 51-08.1-01(1).

756.    North Dakota's USAA makes a "contract, combination, or conspiracy between two or more persons in restraint of ... trade or commerce in a relevant market" unlawful. N.D. Cent. Code. Ann. § 51-08.1-02.

757.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of North Dakota; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of North Dakota; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject drugs, including in the State of North Dakota.

758.    Defendants knew or should have known that their conduct was in violation of N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.*

759.    Defendants' illegal conduct substantially affected North Dakota commerce and

consumers.

760.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of North Dakota.

761.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

762.    Accordingly, Plaintiffs seek all forms of relief available under North Dakota's USAA, N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.*

**Oregon**
**(Ore. Rev. Stat. §§ 646.705, *et seq.*)**

763.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

764.    Ore. Rev. Stat. § 646.730 makes "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Ore. Rev. Stat. § 646.725.

765.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Oregon; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Oregon; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Oregon.

766.    Defendants knew or should have known that their conduct was in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

767.    Defendants' illegal conduct substantially affected Oregon commerce and consumers.

768.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Oregon.

769.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

770.     Accordingly, Plaintiffs seek all forms of relief available under Ore. Rev. Stat. §§ 646.705, *et seq.*

## Puerto Rico
### (P.R. Laws Ann. tit 10 §§ 257, *et seq.*)

771.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq*.

772.     Plaintiffs and Defendants are "persons" within the meaning of P.R. Laws Ann. tit 10 § 257.

773.     P.R. Laws Ann. tit 10 § 260 makes "every contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce" illegal. P.R. Laws Ann. tit 10 § 258.

774.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout Puerto Rico; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in Puerto Rico.

775.     Defendants knew or should have known that their conduct was in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq*.

176

776.     Defendants' illegal conduct substantially affected Puerto Rico commerce and consumers.

777.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in Puerto Rico.

778.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

779.     Accordingly, Plaintiffs seek all forms of relief available under P.R. Laws Ann. tit 10 §§ 257, *et seq*.

## Rhode Island Antitrus Act
### (R.I. Gen. Laws §§ 6-36-1, *et seq.*)

780.     Defendants have intentionally and unlawfully engaged in a contract,combination, or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.* ("Rhode Island Antitrust Act").

781.     Plaintiffs and Defendants are "persons" within the meaning of R.I. Gen. Laws § 6-36-3.

782.     The Rhode Island Antitrust Act makes "every contract, combination, or conspiracy in restraint of ... trade or commerce" unlawful. R.I. Gen. Laws § 6-36-4.

783.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Rhode Island; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Rhode Island.

784.     Defendants knew or should have known that their conduct was in violation of the Rhode Island Antitrust Act.

785.     Defendants' illegal conduct substantially affected Rhode Island commerce and consumers.

786.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Rhode Island.

787.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

788.     Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General pursuant to R.I. Gen. Laws Ann. § 6-36-21.

789.     Accordingly, Plaintiffs seek all forms of relief available under the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.*

## South Dakota
### (S.D. Codified Laws §§ 37-1-1, *et seq.*)

790.     Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

791.     Plaintiffs and Defendants are "persons" within the meaning of S.D Codified Laws § 37-1-3.1.

792.     S.D. Codified Laws § 37-1-3.2. makes "a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce" unlawful. S.D. Codified Laws § 37-1-3.1.

793.     Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the

State of South Dakota; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of South Dakota; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of South Dakota.

794.    Defendants knew or should have known that their conduct was in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

795.    Defendants' illegal conduct substantially affected South Dakota commerce and consumers.

796.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of South Dakota.

797.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

798.    Accordingly, Plaintiffs seek all forms of relief available under S.D. Codified Laws §§ 37-1-1, *et seq.*

## Tennessee
### (Tenn. Code Ann. §§ 47-25-101, *et seq.*)

799.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

800.    Tenn. Code Ann. § 47-25-101 declares "all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition" against public policy, unlawful, and void.

801.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the

State of Tennessee; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Tennessee; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Tennessee.

802.    Defendants knew or should have known that their conduct was in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

803.    Defendants' illegal conduct substantially affected Tennessee commerce and consumers.

804.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Tennessee.

805.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

806.    Accordingly, Plaintiffs seek all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq.*

## Vermont
## (Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*)

807.    Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

808.    Vt. Stat. Ann. tit. 9 § 2453 makes "unfair methods of competition in commerce" unlawful.

809.    Defendants' combinations, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Vermont; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized

at artificially high levels throughout the State of Vermont; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Vermont.

810.   Defendants knew or should have known that their conduct was in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

811.   Defendants' illegal conduct substantially affected Vermont commerce and consumers.

812.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Vermont.

813.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

814.   Accordingly, Plaintiffs seek all forms of relief available under Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

## West Virginia Antitrust Act
### (W. Va. Code Ann. §§ 47-18-1, *et seq.*)

815.   Defendants have intentionally and unlawfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of W. Va. Code Ann. §§ 47-18-1, *et seq.* ("West Virginia Antitrust Act").

816.   Plaintiffs and Defendants are "persons" within the meaning of W. Va. Code Ann. § 47-18-2.

817.   The West Virginia Antitrust Act makes "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" unlawful. W. Va. Code Ann § 47-18-3(a).

818.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of West Virginia; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of West Virginia.

819.    Defendants knew or should have known that their conduct was in violation of the West Virginia Antitrust Act.

820.    Defendants' illegal conduct substantially affected West Virginia commerce and consumers.

821.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of West Virginia.

822.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

823.    Accordingly, Plaintiffs seek all forms of relief available under the West Virginia Antitrust Act, W. Va. Code Ann. §§ 47-18-1, *et seq*.

## Wisconsin
### (Wis. Stat. Ann. §§ 133.01, *et seq*.)

824.    Defendants have intentionally and unlawfully engaged in a contract,combination, or conspiracy in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

825.    Plaintiffs and Defendants are "persons" within the meaning of Wis. Stat. Ann. § 133.02.

826.    Wis. Stat. Ann. § 133.03 makes "every contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce" illegal. *Id.*

827.    Defendants' contracts, combinations and conspiracy had the following effects: (1) price competition for the Subject Drugs was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) the Subject Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Wisconsin; (3) Plaintiffs' Assignors have been deprived of the benefit of free and open competition; and (4) Plaintiffs' Assignors paid supracompetitive prices for the Subject Drugs, including in the State of Wisconsin.

828.    Defendants knew or should have known that their conduct was in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

829.    Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

830.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Wisconsin.

831.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs as described herein.

832.    Accordingly, Plaintiffs seek all forms of relief available under Wis. Stat. Ann. §§ 133.01, *et seq*.

## COUNT III
### Violations of State Consumer Protection Laws

833.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

834.    Defendants engaged in continuing unfair, false, unconscionable, or deceptive acts or practices with respect to the sale of the Subject Drugs, in violation of various state consumer

protection statutes, as set forth below.

835.    The unfair, false, unconscionable, or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anticompetitive prices for the Subject Drugs in the United States. Moreover, Defendants concealed their agreements from Plaintiffs' Assignors, consumers, and the public.

836.    Defendants' anticompetitive conduct described above was knowing, willful and constituted flagrant violations of several state consumer protection statutes as described below.

837.    Plaintiffs' Assignors have been injured in their business and property due to Defendants' unfair, false, unconscionable, or deceptive acts or practices. Plaintiffs' Assignors have paid more for the Subject Drugs than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anticompetitive conduct and came at the expense and detriment of Plaintiffs' Assignors.

838.    Plaintiffs' Assignors purchase or reimburse the cost of the Subject Drugs for their Enrollees' personal, family, or household use. The Assignors do not, nor have they ever, purchased the Subject Drugs for resale or any other commercial use.

839.    Accordingly, Plaintiffs' Assignors, who paid for prescriptions of the Subject Drugs in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

### Alaska Unfair Trade Practices and Consumer Protection Laws
**(Alaska Stat. §§ 45.50.471, *et seq.*)**

840.    Defendants have willingly and knowingly engaged in unfair methods of

competition and unfair and deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471, *et seq.* ("Alaska UTPCPA").

841.    Plaintiffs are "consumers" within the meaning of the Alaska UTPCPA. Alaska Stat. § 45.50.561(4).

842.    Defendants' Subject Drugs are "goods or services" within the meaning of Alaska Stat. § 45.50.561(9).

843.    The Alaska UTPCPA declares "unfair methods of competition and unfair or deceptive acts or practices" unlawful. Alaska Stat. § 45.50.471. Under the UTPCPA, unfair methods of competition and unfair or deceptive acts or practices includes, but is not limited to, "engaging in any other conduct creating a likelihood of confusion or of misunderstanding that misleads, deceives, or damages a buyer or a competitior in connection with the sale or advertisement of goods or services; ... using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others repy upon the concealment, suppression, or omission ..." Alaska Stat. § 45.50.471(b).

844.    Defendants' conduct constitutes both "unfair methods of competition" and "unfair deceptive acts or practices" under the Alaska UTPCPA.

845.    Defendants knew or should have known that their conduct was in violation of the Alaska UTPCPA.

846.    Defendants' illegal conduct substantially affected Alaska commerce and consumers.

847.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or

practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

848.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Alaska.

849.     Defendants' deception, including their affirmative misrepresentations and omissions concerning the prices of the Subject Drugs misled purchasers acting reasonably under the circumstances to believe that they were purchasing the Subject Drugs at prices set by a free and fair market.

850.     Accordingly, Plaintiffs seek all forms of relief available under the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471, *et seq*.

**Arkansas Deceptive Trade Practices Act**
**(Ark. Code §§ 4-88-101, *et seq*.)**

851.     Defendants have willingly and knowingly engaged in deceptive and unconscionable trade practices in violation of Ark. Code §§ 4-88-101, *et seq*. ("Alaska UTPCPA").

852.     Plaintiffs and Defendants are "persons" within the meaning of the Arkansas DTPA. Ark. Code Ann. § 4-88-102(5).

853.     Defendants' Subject Drugs described herein constitute "goods" within the meaning of Ark. Code § 4-88- 102(4).

854.     The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which includes, but is not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade. The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) physical infirmity; (B) ignorance; . . . or (E) a similar factor." The statute further bars, in connection with the sale or advertisement of any goods,

"(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." Ark. Code. § 4-88-107(a); (a)(8), (a)(10); § 4-88-108.

855.    Defendants' conduct constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

856.    Defendants knew or should have known that their conduct was in violation of the Arkansas DTPA.

857.    Plaintiffs' Assignors relied upon the Defendants' material misrepresentations and omissions regarding the Subject Drugs' prices and as such were misled to believe that they were purchasing the Subject Drugs at prices set by a free and fair market.

858.    Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

859.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

860.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Arkansas.

861.    Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will, and/or acted with reckless indifference to the interests of others.

862.    Accordingly, Plaintiffs seek all forms of relief available under the Arkansas DTPA, Ark. Code §§ 4-88-101, *et seq.*

### Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a, *et seq.*)

863.    Defendants have willingly and knowingly engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of Conn. Gen. Stat. §§ 42-110a, *et seq.* ("Connecticut UTPA").

864.    Plaintiffs and Defendants are "persons" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(3).

865.    Defendants' conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

866.    The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

867.    Defendants' conduct constitutes both "unfair methods of competition" and "unfair or deceptive" acts in violation of the Connecticut UTPA.

868.    Defendants knew or should have known that their conduct was in violation of the Connecticut UTPA.

869.    Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

870.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

871.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Connecticut.

872.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. Ann. §42-110(g).

873.    Accordingly, Plaintiffs seek all forms of relief available under the Connecticut UTPA, Conn. Gen. Stat. §§ 42-110a, *et seq*.

### Delaware Consumer Fraud Act
### (Del. Code Ann. tit. 6, §§ 2511, *et seq*.)

874.    Defendants have willingly and knowingly engaged in unfair or deceptive acts or practices in violation of Del. Code Ann. tit 6 §§ 2511, *et seq*. ("Delaware CFA").

875.    Plaintiffs and Defendants are "persons" within the meaning of Del. Code Ann. tit. 6, § 2511(7).

876.    Defendants' Subject Drugs are "merchandise" within the meaning of Del. Code Ann. tit. 6, § 2511(6).

877.    The Delaware CFA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." Del. Code Ann. tit. 6, § 2513(a).

878.    Defendants' conduct constitutes "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission" under the Delaware CPA.

879.    Defendants knew or should have known that their conduct was in violation of the Delaware CFA.

880.    Defendants' illegal conduct substantially affected Delaware commerce and consumers.

881.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

882.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Delaware.

883.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. See, e.g., *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).

884.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## Delaware Uniform Deceptive Trade Practices Act
### (Del. Code Ann. tit. 6, §§ 2531, *et seq.*)

885.    Defendants have willingly and knowingly engaged in unfair or deceptive acts or practices in violation of Del. Code Ann. tit 6, §§ 2531, *et seq*. ("Delaware UDTPA").

886.    Plaintiffs and Defendants are "persons" within the meaning of Del. Code. Ann. tit. 6, § 2531.

887.    The Delaware UDTPA prohibits deceptive trade practices, which includes, but is not limited to, engaging in conduct which "creates a likelihood of confusion or misunderstanding." Del. Code Ann. tit. 6, § 2532.

888.    Defendants' conduct constitutes "create[ing] a likelihood of confusion or misunderstanding" under the Delaware UDTPA.

889.    Defendants knew or should have known that their conduct was in violation of the Delaware UDTPA.

890.    Defendants' illegal conduct substantially affected Delaware commerce and consumers.

891.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

892.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Delaware.

893.    Accordingly, Plaintiffs seek all forms of relief available under the Delaware UDTPA, Del. Code Ann. tit 6, §§ 2531, *et seq*.

### Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201, *et seq*.)

894.    Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*. ("FDUTPA").

895.    Plaintiffs are "interested persons" and "consumers" within the meaning of Fla. Stat. § 501.203(6)-(7).

896.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

897.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204(1).

898.    Defendants' conduct constitutes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

899.    Defendants knew or should have known that their conduct was in violation of FDUTPA.

900.    Defendants' illegal conduct substantially affected Florida commerce and consumers.

901.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

902.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of the Subject Drugs in the State of Florida.

903.    Accordingly, Plaintiffs seek all forms of relief available under FDUTPA, Fla. Stat. §§ 501.201, *et seq*.

### Idaho Consumer Protection Act
### (Idaho Code Ann. §§ 48-601, *et seq*.)

904.    Defendants have willingly and knowingly engaged in unfair methods of competition and unfair and deceptive acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq*. ("Idaho CPA").

905.    Plaintiffs and Defendants are "persons" within the meaning of Idaho Code Ann. § 48-602(1).

906.    Defendants' acts or practices as set forth above occurred in the conduct of "trade"

or "commerce" under Idaho Code Ann. § 48-602(2).

907.    Defendants' Subject Drugs are "goods" under Idaho Code Ann. § 48-602(6).

908.    The Idaho CPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," which include "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." Idaho Code § 48-603.

909.    Defendants' conduct constitutes both "unfair mtnods of competition" and "unfair or deceptive acts or practices" under the Idaho CPA.

910.    Defendants knew or should have known that their conduct was in violation of the Idaho CPA.

911.    Defendants' illegal conduct substantially affected Idaho commerce and consumers.

912.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

913.    Plaintiffs' analysis of its Assignors data identified one or more purchases of the Subject Drugs in the State of Idaho.

914.    Accordingly, Plaintiffs seek all forms of relief available under the Idaho CPA, Idaho Code Ann. §§ 48-601, *et seq.*

### Indiana Deceptive Consumer Sales Act
### (Ind. Code §§ 24-5-0.5-1, *et seq.*)

915.    Defendants have willingly and knowingly engaged unfair, abusive, or deceptive acts, omissions, or practices in violation of Ind. Code §§ 24-5-0.5-1, *et seq.* ("Indiana DCSA").

916.    Plaintiffs and Defendants are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2).

917.    Defendants are also "suppliers" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

918.    Plaintiffs' purchases of the Subject Drugs described herein are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

919.    The Indiana DCSA prohibits a supplier from committing "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3.

920.    Defendants' conduct constitutes an "incurable deceptive act" within the meaning of Ind. Code § 24-5-0.5-2(8).

921.    Defendants knew or should have known that their conduct was in violation of the Indiana DCSA.

922.    Defendants' illegal conduct substantially affected Indiana commerce and consumers.

923.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

924.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Indiana.

925.    Accordingly, Plaintiffs seek all forms of relief available under the Indiana DCSA,

194

Ind. Code §§ 24-5-0.5-1, *et seq*.

## Massachusetts Regulation of Business Practice & Consumer Protection Act
### (Mass. Gen. Laws ch. 93A, §§ 1, *et seq*.)

926.    Defendants have willingly and knowingly engaged in unfair methods of competition and unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 1, *et seq*. ("Massachusetts CPA").

927.    Plaintiffs and Defendants are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

928.    Defendants engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

929.    The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. ch. 93A, § 2(a).

930.    Defendants' conduct constitutes both unfair methods of competition and unfair or deceptive acts under the Massachusetts CPA.

931.    Defendants knew or should have known that their conduct was in violation of the Massachusetts CPA.

932.    Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

933.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

934.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the

195

Subject Drugs in the State of Massachusetts.

935.    Accordingly, Plaintiffs seek all forms of relief available under the Massachusetts CPA, Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*

### Michigan Consumer Protection Act
### (Mich. Comp. Laws §§ 445.903, *et seq*.)

936.    Defendants have willingly and knowingly engaged in unfair, unconscionable, or deceptive acts or practices in violation of Mich. Comp. Laws §§ 445.903, *et seq*., ("Michigan CPA").

937.    Plaintiffs and Defendants are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

938.    Defendants engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(d) and (g).

939.    The Michigan CPA specifically prohibits "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws § 445.903(z).

940.    The Michigan CPA also prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" including, but not limited to: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

941.    Defendants' conduct constitutes "unfair, unconscionable, or deceptive acts or practices" in violation of the Michigan CPA.

942.    Defendants knew or should have known that their conduct was in violation of the Michigan CPA.

943.    Defendants' illegal conduct substantially affected Michigan commerce and consumers.

944.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

945.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Michigan.

946.    Accordingly, Plaintiffs seek all forms of relief available under the Michigan CPA, Mich. Comp. Laws §§ 445.903, *et seq*.

### Minnesota Private Attorney General Statute & Consumer Fraud Act
**(Minn. Stat. § 8.31 and Minn. Stat. §§ 325F.68, *et seq*.)**

947.    Defendants have willingly and knowingly engaged in false or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68, *et seq*. ("Minnesota CFA").

948.    Plaintiffs and Defendants are "persons" within the meaning of Minn. Stat. § 325F.68(2).

949.    Defendants' Subject Drugs are "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

950.    The Minnesota CFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice,

197

with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby[.]" Minn. Stat. § 325F.69(1).

951.    Defendants' conduct constitutes "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection" in violation of the Minnesota CFA.

952.    Defendants knew or should have known that their conduct was in violation of the Minnesota CFA.

953.    Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

954.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

955.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Minnesota.

956.    Accordingly, Plaintiffs seek all forms of relief available under the Minnesota CFA, Minn. Stat. §§ 325F.68, *et seq*. and the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31(3)(a).

957.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## Minnesota Uniform Deceptive Trade Practices Act
### (Minn. Stat. §§ 325D.43, *et seq*.)

958.    Defendants have willingly and knowingly engaged in deceptive trade practices in

198

violation of Minn. Stat. §§ 325D.43, *et seq.* ("Minnesota DTPA").

959.    The Minnesota DTPA prohibits deceptive trade practices, including the following enumerated actions, "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

960.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Minnesota DTPA.

961.    Defendants knew or should have known that their conduct was in violation of the Minnesota DTPA.

962.    Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

963.    Plaintiffs and the public suffered, and continue to suffer, injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased prices of the Subject Drugs as described herein.

964.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of the Subject Drugs in the State of Minnesota.

965.    Accordingly, Plaintiffs seek all forms of relief available under the Minnesota DTPA, Minn. Stat. Ann. §§ 325D.43, *et seq*.

## Nebraska Consumer Protection Act
### (Neb. Rev. Stat. Ann. §§ 59-1601, *et seq.*)

966.    Defendants have willingly and knowingly engaged in unfair methods of competition and unfair and deceptive acts or practices in violation of Neb. Rev. Stat. Ann. §§ 59-1601, *et seq*. ("Nebraska CPA").

967.    Plaintiffs and Defendants are "persons" within the meaning of Neb. Rev. Stat. Ann. § 59-1601(1).

968.    Defendants' actions occurred in the conduct of "trade or commerce" as defined under Neb. Rev. Stat. Ann. § 59-1601(2).

969.    The Nebraska CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Neb. Rev. Stat. Ann. § 59-1602.

970.    Defendants' conduct constitutes both "unfair methods of competition" and "unfair or deceptive acts or practices" in violation of the Nebraska CPA.

971.    Defendants knew or should have known that their conduct was in violation of the Nebraska CPA.

972.    Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

973.    Plaintiffs and the suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

974.    Defendants' conduct injured Plaintiffs' Assignors and the public at large as described herein.

975.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Nebraska.

976.    Accordingly, Plaintiffs seek all forms of relief available under the Nebraska CPA, Neb. Rev. Stat. Ann. §§ 59-1601, *et seq*.

**Nevada Deceptive Trade Practices Act**
**(Nev. Rev. Stat. §§ 598.0903, *et seq*. and Nev. Rev. Stat. § 41.600)**

977.    Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq*. ("Nevada DTPA").

978.    The Nevada DTPA prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of, or amounts of price reductions." Nev. Rev. Stat. § 598.0915.

979.    Moreover, the deceptive trade practices listed in § 598.0915, *et seq*. are in "addition to and do not limit the types of unfair trade practices actionable at common law or defined as such in other statutes of this State." Nev. Rev. Stat. Ann. § 598.0953(2).

980.    Defendants knew or should have known that their conduct was in violation of the Nevada DTPA.

981.    Defendants' illegal conduct substantially affected Nevada commerce and consumers.

982.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

983.    Plaintiffs analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Nevada.

984.    Accordingly, Plaintiffs seek all forms of relief available under the Nevada DTPA, Nev. Rev. Stat. § 41.600.

## New Hampshire Consumer Protection Act
### (N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*)

985.    Defendants have willingly and knowingly engaged in unfair methods of competition and unfair and deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.* ("New Hampshire CPA").

986.    Plaintiffs and Defendants are "persons" under N.H. Rev. Stat. Ann. § 358-A:1.

987.    Defendants' actions occurred in the conduct of "trade or commerce" as defined under N.H. Rev. Stat. Ann. § 358-A:1.

988.    The New Hampshire CPA declares "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce" unlawful. Unfair methods of competition or unfair or deceptive acts include, but are not limited to, making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions. N.H. Rev. Stat. Ann. § 358-A:2.

989.    Defendants' conduct constitutes "unfair methods of competition" and "unfair or deceptive acts or practices" in violation of the New Hampshire CPA.

990.    Defendants knew or should have known that their conduct was in violation of the New Hampshire CPA.

991.    Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

992.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

993.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the

Subject Drugs in the State of New Hampshire.

994.     Accordingly, Plaintiffs seek all forms of relief available under the New Hampshire

CPA, N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

### New Mexico Unfair Trade Practices Act
### (N.M. Stat. Ann. §§ 57-12-1, *et seq*.)

995.     Defendants have willingly and knowingly engaged in unfair and deceptive acts or

practices or unconscionable trade practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq*.

("New Mexico UTPA").

996.     Plaintiffs and Defendants are "persons" within the meaning of N.M. Stat. Ann. §

57-12-2.

997.     Defendants' actions occurred in the conduct of "trade or commerce" as defined

under N.M. Stat. Ann. § 57-12-2.

998.     The New Mexico makes "unfair or deceptive trade practices and unconscionable

trade practices in the conduct of any trade or commerce" unlawful. N.M. Stat. Ann. § 57-12-3.

999.     The New Mexico UTPA makes unlawful "a false or misleading oral or written

statement, visual description or other representation of any kind knowingly made in connection

with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the

person's trade or commerce, that may, tends to or does deceive or mislead any person," including,

but not limited to: "making false or misleading statements of fact concerning the price of goods or

services, the prices of competitors or one's own price at a past or future time or the reasons for,

existence of or amounts of price reduction;" and "using exaggeration, innuendo or ambiguity as to

a material fact or failing to state a material fact if doing so deceives or tends to deceive." N.M.

Stat. Ann. § 57-12-2(D).

1000.   Defendants' conduct constitutes "unfair or deceptive" and "unconscionable" trade

practices in violation of the New Mexico UTPA.

1001.   Defendants knew or should have known that their conduct was in violation of the New Mexico UTPA.

1002.   Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

1003.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1004.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of New Mexico.

1005.   Accordingly, Plaintiffs seek all forms of relief available under the New Mexico UTPA, N.M. Stat. Ann. §§ 57-12-1, *et seq.*

## New York General Business Law
### (N.Y. Gen. Bus. Law § 349, *et seq.*)

1006.   Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* ("New York GBL").

1007.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

1008.   Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

1009.   Defendants knew or should have known that their conduct was in violation of the New York GBL.

1010.   Defendants' illegal conduct substantially affected New York commerce and

consumers.

1011.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1012.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of New York.

1013.   Accordingly, Plaintiffs seek all forms of relief available under the New York GBL, N.Y. Gen. Bus. Law § 349, *et seq*.

## North Dakota Unlawful Sales or Advertising Practices Law
### (N.D. Cent. Code §§ 51-15-01, *et seq*.)

1014.   Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq*. ("North Dakota USAPL").

1015.   Plaintiffs and Defendants are "persons" within the meaning of N.D. Cent. Code 51-15-01.

1016.   Defendants' Subject Drugs are "merchandise" under the North Dakota CPL, for which Defendants conducted "advertisement" and which they offered for "sale," as those terms are defined in the law. N.D. Cent. Code § 51-15-01.

1017.   North Dakota USAPL prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby[.]" N.D. Cent. Code § 51-15-02.

1018.   Defendants' conduct constitutes "deceptive acts" and "unconscionable conduct" in

violation of the North Dakota USAPL.

1019.   Defendants knew or should have known that their conduct was in violation of the North Dakota USAPL.

1020.   Defendants' illegal conduct substantially affected North Dakota commerce and consumers.

1021.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1022.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of North Dakota.

1023.   Plaintiffs seek an injunction to protect the public from further violations of the North Dakota USAPL by Defendants.

1024.   Accordingly, Plaintiffs seek all forms of relief available under the North Dakota USAPL, N.D. Cent. Code §§ 51-15-01, *et seq.*

### Ohio Deceptive Trade Practices Act
**(Ohio Rev. Code §§ 4165.01, *et seq.*)**

1025.   Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Ohio Rev. Code §§ 4165.01, *et seq.* ("Ohio DTPA").

1026.   Plaintiffs and Defendants are "persons" within the meaning of the Ohio Rev. Code § 4165.01(D).

1027.   Defendants' conduct was done in "the course of [their] business" within the meaning of Ohio Rev. Code § 4165.02(A).

1028.   The Ohio DTPA provides that a "person engages in a deceptive trade practice when,

in the course of the person's business, vocation, or occupation," the person "makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions." Ohio Rev. Code § 4165.02(A).

1029.   Defendants' conduct constitutes "deceptive representations" and caused confusion or misunderstanding in violation of the Ohio DTPA.

1030.   Defendants knew or should have known that their conduct was in violation of the Ohio DTPA.

1031.   Defendants' illegal conduct substantially affected Ohio commerce and consumers.

1032.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1033.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Ohio.

1034.   Accordingly, Plaintiffs seek all forms of relief available under the Ohio DTPA, Ohio Rev. Code §§ 4165.01, *et seq*.

### Pennsylvania Unfair Trade and Consumer Protection Law
### (73 Pa. Stat. §§ 201-1, *et seq*.)

1035.   Defendants have willingly and knowingly engaged in unfair and deceptive acts or practices in violation of 73 Pa. Stat. §§ 201-1, *et seq*., ("Pennsylvania UTPA").

1036.   Plaintiffs and Defendants are "persons" within the meaning of 73 Pa. Stat. § 201-2(2).

1037.   Defendants are engaged in "trade or commerce" within the meaning of 73 Pa. Stat. § 201-2(3).

1038.   The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201-2(4).

1039.   Defendants' conduct constitutes "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

1040.   Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

1041.   Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

1042.   Plaintiffs' Assignors relied upon the Defendants' material misrepresentations and omissions regarding the Subject Drugs' prices and as such were misled to believe that they were purchasing the Subject Drugs at prices set by a free and fair market.

1043.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1044.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Pennsylvania.

1045.   Accordingly, Plaintiffs seek all forms of relief available under the Pennsylvania UTPA, 73 Pa. Stat. §§ 201-1, *et seq*.

## South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-5-10, *et seq.*)

1046.   Defendants have willingly and knowingly engaged in unfair methods of competition and unfair and deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*. ("South Carolina UTPA").

1047.   Plaintiffs and Defendants are "person[s]" under S.C. Code Ann. § 39-5-10(a).

1048.   Defendants engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

1049.   The South Carolina UTPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann. § 39-5-20.

1050.   Defendants' conduct constitutes "unfair methods of competition" and "unfair or deceptive acts or practices" in violation of the South Carolina UTPA.

1051.   Defendants knew or should have known that their conduct was in violation of the South Carolina UTPA.

1052.   Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

1053.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1054.   Accordingly, Plaintiffs seek all forms of relief available under the South Carolina UTPA, S.C. Code Ann. §§ 39-5-10, *et seq*.

**South Dakota Deceptive Trade Practices and Consumer Protection Law**
**(S.D. Codified Laws § 37-24-1, *et seq.*)**

1055.   Defendants have willingly and knowingly engaged in unfair and deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*. ("South Dakota CPL").

1056.   Plaintiffs and Defendants are "persons" within the meaning of S.D. Codified Laws § 37-24-1.

1057.   Defendants' Subject Drugs are "merchandise" within the meaning of S.D. Codified Laws § 37-24-1.

1058.   The South Dakota CPL broadly prohibits, amont other things, knowingly acting, using, or employing any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby. S.D. Codified Laws § 37-24-6.

1059.   Defendants' conduct constitutes "deceptive acts or practices" in violation of the South Dakota CPL.

1060.   Defendants knew or should have known that their conduct was in violation of the South Dakota CPL.

1061.   Defendants' illegal conduct substantially affected South Dakota commerce and consumers.

1062.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1063.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of South Dakota.

1064.   Accordingly, Plaintiffs seek all forms of relief available under the South Dakota CPL, S.D. Codified Laws § 37-24-1, *et seq*.

### Tennessee Consumer Protection Act
### (Tenn. Code Ann. §§ 47-18-101, *et seq*.)

1065.   Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*., ("Tennessee CPA").

1066.   Plaintiffs and Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(13).

1067.   Defendants engaged in "trade or commerce" as defined by the Tennessee CPA. Tenn. Code Ann. § 47-18-103(19).

1068.   Defendants' Subject Drugs are "goods" within the meaning of the Tennessee CPA. Tenn. Code Ann. § 47-18-103(7).

1069.   The Tennessee CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." Tenn. Code Ann. § 47-18-104.

1070.   Defendants' conduct constitutes "unfair or deceptive acts" in violation of the Tennessee CPA.

1071.   Defendants knew or should have known that their conduct was in violation of the Tennessee CPA.

1072.   Defendants' illegal conduct substantially affected Tennessee commerce and consumers.

1073.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1074.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Tennessee.

1075.   Accordingly, Plaintiffs seek all forms of relief available under the Tennessee CPA, Tenn. Code Ann. §§ 47-18-101, *et seq*.

### Virginia Consumer Protection Act of 1977
### (Va. Code Ann. §§ 59.1-196, *et seq.*)

1076.   Defendants have willingly and knowingly engaged in fraudulent acts or practices in violation of Va. Code Ann. §§ 59.1-196, *et seq.*, ("Virginia CPA").

1077.   Plaintiffs and Defendants are "persons" within the meaning of Va. Code Ann. § 59.1-198.

1078.   Defendants are "suppliers" within the meaning of Va. Code Ann. § 59.1-198.

1079.   Defendants' Subject Drugs are "goods" within the meaning of Va. Code Ann. § 59.1-198.

1080.   Plaintiffs' Assignors' payments for the Subject Drugs are "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

1081.   The Virginia CPA makes unlawful "fraudulent acts or practices." Fraudulent acts or practices include, among other things, using any form of deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code Ann. § 59.1-200(A).

1082.   Defendants' conduct constitutes "fraudulent acts" in violation of the Virginia CPA.

1083.   Defendants knew or should have known that their conduct was in violation of the Virginia CPA.

1084.   Defendants' illegal conduct substantially affected Virginia commerce and consumers.

1085.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1086.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Virginia.

1087.   Accordingly, Plaintiffs seek all forms of relief available under the Virginia CPA, Va. Code Ann. §§ 59.1-196, *et seq.*

### Wisconsin Deceptive Trade Practices Act
#### (Wis. Stat. § 100.18)

1088.   Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Wis. Stat. § 100.18. ("Wisconsin DTPA").

1089.   Plaintiffs are "the public" within the meaning of Wis. Stat. § 100.18(1).

1090.   Plaintiffs are "persons" within the meaning of Wis. Stat. § 100.18(1).

1091.   Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1092.   The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1093.   Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

1094.   Defendants knew or should have known that their conduct was in violation of the Wisconsin DTPA.

1095.   Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

1096.   Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased and unfair prices paid for the Subject Drugs described herein.

1097.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Drugs in the State of Wisconsin.

1098.   No business relationship, contractual or otherwise, existed or exists between Plaintiffs' Assignors and Defendants.

1099.   Accordingly, Plaintiffs seek all forms of relief available under the under the Wisconsin DTPA, Wis. Stat. § 100.18.

## COUNT IV
## Unjust Enrichment

1100.   Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

1101.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the following states and territories: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

1102.   Defendants have unlawfully benefited from their sales of the Subject Drugs because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged Plaintiffs' Assignors, who purchased the Subject Drugs at prices that were more than they would have been but for Defendants' unlawful actions.

1103.   Defendants' financial benefits resulting from their unlawful and inequitable acts are tracebale to overpayments by Plaintiffs' Assignors.

1104.   Plaintiffs' Assignors have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs' Assignors.

1105.   Defendants have been enriched by revenue resulting from unlawful overcharges for the Subject Drugs while Plaintiffs' Assignors have been impoverished by the overcharges they paid for the Subject Drugs imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' Assignors impoverishment are connected.

1106.   There is no justitication for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs' Assignors, because Plaintiffs' Assignors paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1107.   Plaintiffs' Assignors did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1108.   The benefits conferred upon Defendants were not gratuitous, in that they

constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of the Subject Drugs.

1109.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of the Subject Drugs are ascertainable by review of sales records.

1110.  It would be futile for Plaintiffs to seek a remedy from any party with whom Plaintiffs' Assignors have privity of contract. Defendants have paid no consideration to any person for any of the unlawful benefits they received indirectly from Plaintiffs' Assignors with respect to Defendants' sales of the Subject Drugs.

1111.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artifically inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful practices.

1112.  The financial benefits derived by Defendants rightfully belong to Plaintiffs, because Plaintiffs' Assignors paid supracompetitive prices, inuring to the benefit of Defendants.

1113.  It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the overcharges for the Subject Drugs from Defendants' unlawful, unfair, deceptive and unconscionable methods, acts, and trade practices alleged in the Complaint.

1114.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs' Assignors. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as the prices of the Subject Drugs remain inflated above pre-conspiracy levels.

1115.  Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs all unlawful or inequitable proceeds they received from their sales of the Subject Drugs.

1116.  A constructive trust should be imposed upon all unlawful or inequitable sums

received by Defendants traceable to indirect purcahses for the Subject Drugs by Plaintiffs' Assignors. Plaintiffs have no adequate remedy at law.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this cause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a. Enter a judgment against Defendants for the violations alleged herein;

b. Award to Plaintiffs actual damages incurred as a result of the wrongful acts complained of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

c. Award statutory damages set forth herein under the statutory claims alleged;

d. Award Plaintiffs the costs of this action, including reasonable attorneys' fees;

e. Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED:   December 16, 2019                 Respectfully submitted by,


                                            */s/ Christopher L. Coffin*
                                            Christopher L. Coffin (CT #30759)
                                            Tracy L. Turner (to be admitted *pro hac vice*)
                                            Anna K. Higgins (to be admitted *pro hac vice*)
                                            PENDLEY, BAUDIN & COFFIN, LLP
                                            1100 Poydras Street, Suite 2505
                                            New Orleans, LA 70163
                                            Phone: (504) 355-0086
                                            Fax: (504) 355-0089
                                            ccoffin@pbclawfirm.com
                                            tturner@pbclawfirm.com
                                            ahiggins@pbclawfirm.com
                                            ***Attorneys for Plaintiffs***

## APPENDIX

A1.     On 5/3/2016, Preferred Medical Plan, Inc. entered into an assignment with MSP Recovery LLC. Said assignment included the following language "[c]lent hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 8/8/2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc. Said assignment included the following language "[a]signer, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under New York law. Consideration was given

between each party in executing these assignments.

A2.    On 3/20/18, ConnectiCare, Inc. entered into an assignment with MSP Recovery, LLC and Series 15-08-157, a designated series of MSP Recovery Claims, Series LLC. Said assignment included the following language "Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable. This Assignment includes all of Assignor's right, title and interest in and to the Assignor's any legal or equitable actions, rights, causes of action or lawsuits of any nature whatsoever, arising out of or in connection with the Assigned Medicare Recovery Claims." The "Assigned Medicare Recovery Claims" are claims "related to Medicare Health Care Services that were rendered and paid for by Assignor during the six (6) year period beginning September 29, 2011 and ending September 29, 2017" excluding "Medicare Recovery Claims that can be asserted against Assignor's members, enrollees, and/or contracted providers, and excluding Medicare Recovery Claims that, as of the Effective Date, have been assigned to and/or are being pursued by other recovery vendors." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. On 4/4/2018, MSP Recovery, LLC entered into an assignment with Series 15-09-157, a

219

series of MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from ConnectiCare, Inc. Said assignment included the following language "Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to … Assignee, and its successors and assigns, any and all of Assignor's right, title ownership and interest in and to all assigned Subject Medicare Recovery Claims, inclusive of any and all claim(s), causes of action, proceeds, products and distributions of any kind, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment Agreement and in connection with the assigned Subject Medicare Recovery Claims and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the assigned Subject Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable as such terms are defined in the March 20, 2018 Assignment Agreement, irrespective of when the claims were vested." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law. Consideration was given between each party in executing these assignments.

A3.    On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind

the respective parties. The assignment was entered under Florida law. On 2/20/2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC)." Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.