**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE** |
| MSP RECOVERY CLAIMS, SERIES LLC; SERIES PMPI, a designated series of MAO-MSO RECOVERY II, LLC; and MSPA CLAIMS 1, LLC;<br><br>Plaintiffs,<br><br>vs.<br><br>ACTAVIS ELIZABETH, LLC; ACTAVIS HOLDCO U.S., INC.; ACTAVIS PHARMA, INC.; ALVOGEN INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; APOTEX CORP.; ASCEND LABORATORIES, LLC; AUROBINDO PHARMA USA., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; BRECKENRIDGE PHARMACEUTICALS, INC.; CAMBER PHARMACEUTICALS, INC.; CITRON PHARMA, LLC; DR. REDDY'S LABORATORIES, INC.; EPIC PHARMA, LLC; FOUGERA PHARMACEUTICALS INC.; GENERICS BIDCO I, LLC; GLENMARK PHARMACEUTICALS INC., USA; GREENSTONE LLC; G&W LABORATORIES, INC.; HERITAGE PHARMACEUTICALS, INC.; HIKMA LABS, INC.; HIKMA PHARMACEUTICALS USA, INC.; IMPAX LABORATORIES, LLC; JUBILANT CADISTA PHARMACEUTICALS, INC.; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MORTON GROVE PHARMACEUTICALS, INC.; MYLAN INC.; | No. 2:20-cv-00231-CMR<br><br>DEMAND FOR JURY TRIAL |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

MYLAN PHARMACEUTICALS, INC.,
OCEANSIDE PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL, INC.;
PERRIGO NEW YORK, INC;
PFIZER, INC.;
SANDOZ INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT INC.;
TEVA PHARMACEUTICALS USA, INC.;
UPSHER-SMITH LABORATORIES, LLC;
WEST-WARD COLUMBUS, INC.;
WOCKHARDT USA LLC; and
ZYDUS PHARMACEUTICALS (USA), INC.

                    Defendants.

## FIRST AMENDED COMPLAINT

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

COMPLAINT ........................................................................................................................... 1

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 8

THE PARTIES.......................................................................................................................... 9

    I.       PLAINTIFFS ......................................................................................................... 9

    II.      DEFENDANTS ..................................................................................................... 10

          A.       Actavis Defendants ................................................................................... 10

          B.       Alvogen.................................................................................................... 11

          C.       Amneal Defendants .................................................................................. 11

          D.       Apotex ..................................................................................................... 12

          E.       Ascend..................................................................................................... 12

          F.       Aurobindo ................................................................................................ 12

          G.       Bausch/Valeant Defendants ..................................................................... 12

          H.       Breckenridge ........................................................................................... 13

          I.       Cadista.................................................................................................... 13

          J.       Camber .................................................................................................... 13

          K.       Citron ...................................................................................................... 14

          L.       Dr. Reddy's ............................................................................................ 14

          M.       Epic ........................................................................................................ 14

          N.       Glenmark ................................................................................................ 14

          O.       Greenstone/Pfizer Defendants ................................................................. 15

          P.       G&W ........................................................................................................ 20

          Q.       Heritage ................................................................................................... 20

          R.       Impax ...................................................................................................... 20

          S.       Lannett .................................................................................................... 21

          T.       Lupin ...................................................................................................... 21

          U.       Mylan Defendants ................................................................................... 21

          V.       Par Defendants ........................................................................................ 22

          W.       Perrigo .................................................................................................... 22

          Y.       Sandoz Defendants.................................................................................. 22

          Z.       Sun ......................................................................................................... 23

          AA.     Taro ........................................................................................................ 24

          BB.     Teligent .................................................................................................. 24

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

|  | CC. | Teva | 24 |
|  | DD. | Upsher-Smith | 24 |
|  | EE. | West-Ward Defendants | 25 |
|  | FF. | Wockhardt Defendants | 25 |
|  | GG. | Zydus | 26 |
| III. | | CO-CONSPIRATORS | 26 |
|  | A. | Akorn | 26 |
|  | B. | Rising | 27 |
|  | C. | Mallinckrodt | 27 |
|  | D. | Unknown Generic Manufacturer Co-Conspirators | 28 |

THE SUBJECT DRUGS .......................................................................................... 29

STANDING .......................................................................................................... 36

REGULATORY AND ECONOMIC BACKGROUND ..................................... 38

| I. | THE HATCH-WAXMAN ACT | 38 |
| II. | THE IMPORTANCE OF GENERIC DRUGS | 39 |
| III. | PRICING IN THE GENERIC DRUG MARKET | 41 |
|  | A.   Customer Incentives to Increase Prices | 43 |
| IV. | THE MARKET FOR GENERIC DRUGS IS HIGHLY SUSCEPTIBLE TO COLLUSION | 45 |

FACTUAL ALLEGATIONS ............................................................................... 47

| I. | GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY | 47 |
|  | A.   Congress Launched an Investigation into Generic Price Hikes | 47 |
|  | B.   The DOJ Investigates Criminal Generic Drug Collusion | 49 |
|  | C.   State Attorneys General Launch Investigations into Generic Drug Price Hikes | 53 |
| II. | THE COZY NATURE OF THE INDUSTRY AND OPPORTUNITIES FOR COLLUSION | 57 |
|  | A.   Trade Association and Customer Conferences | 58 |
|  |      1.   National Association of Chain Drug Stores | 59 |
|  |      2.   Healthcare Distribution Management Association | 60 |
|  |      3.   Generic Pharmaceutical Association | 61 |
|  |      4.   Efficient Collaborative Retail Marketing | 62 |
|  |      5.   Minnesota Multistate Contracting Pharmacy Alliance | 62 |
|  | B.   Industry Dinners and Private Meetings | 63 |
|  | C.   Personal Telephone Calls, Emails and Text Message Communications | 66 |
|  | D.   Individual Relationships | 66 |

ii

|  |  | 1. | Ara Aprahamian | 67 |
|  |  | 2. | David Berthold | 68 |
|  |  | 3. | Mitchell Blashinsky | 69 |
|  |  | 4. | Douglas Boothe | 70 |
|  |  | 5. | Jim Brown | 70 |
|  |  | 6. | Maureen Cavanaugh | 71 |
|  |  | 7. | Marc Falkin | 72 |
|  |  | 8. | Jim Grauso | 73 |
|  |  | 9. | Kevin Green | 75 |
|  |  | 10. | Walter Kaczmarek | 77 |
|  |  | 11. | Armando Kellum | 78 |
|  |  | 12. | Jill Nailor | 78 |
|  |  | 13. | James Nesta | 80 |
|  |  | 14. | Kurt Orlofski | 80 |
|  |  | 15. | Konstantin Ostaficiuk | 81 |
|  |  | 16. | Nisha Patel | 82 |
|  |  | 17. | Mike Perfetto | 83 |
|  |  | 18. | David Rekenthaler | 84 |
|  |  | 19. | Rick Rogerson | 85 |
|  |  | 20. | Tracy Sullivan | 86 |
|  |  | 21. | Erika Vogel-Baylor | 87 |
|  |  | 22. | John Wesolowski | 87 |

| III. | THE OVERARCHING CONSPIRACY BETWEEN GENERIC DRUG MANUFACTURERS – PLAYING NICE IN THE SANDBOX | 88 |
|  | A. | Generic Drug Price Spikes Since 2013 | 111 |
| IV. | THE CONSPIRACY: HERITAGE-RELATED CONDUCT | 112 |
|  | A. | Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion | 114 |
|  |  | 1. Nimodipine | 114 |
|  |  | a) The Heritage/Sun Agreement | 114 |
|  |  | b) The Heritage/Ascend Agreement | 117 |
|  |  | 2. Zoledronic Acid | 119 |
|  |  | 3. Meprobamate | 122 |
|  |  | 4. Hydralazine HCL | 123 |
|  | B. | Agreements to Fix Price – 2014 Price Increases | 124 |
|  |  | 1. Acetazolamide ER | 128 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

|  | 2. | Fosinopril HCTZ | 131 |
|  | 3. | Glipizide-Metformin | 133 |
|  | 4. | Leflunomide | 134 |
|  | 5. | Methimazole | 137 |
|  | 6. | Nystatin | 137 |
|  |  | a) Nystatin Cream | 137 |
|  |  | b) Nystatin Tablets | 140 |
|  | 7. | Paromomycin | 143 |
|  | 8. | Theophylline ER | 144 |
|  | 9. | Verapamil | 148 |

V. THE CONSPIRACY: TEVA-RELATED CONDUCT ... 151

A. Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors ... 151

   1. April 2013: Teva Hires Nisha Patel ... 152

   2. Ranking "Quality of Competitors" to Identify Price Increase Candidates ... 155

      a) The "High Quality" Competitor Relationships ... 157

      b) Mylan (+3) ... 157

      c) Watson/Actavis (+3) ... 158

      d) Sandoz (+3) ... 159

      e) Glenmark (+3) ... 160

      f) Taro (+2) ... 160

      g) Lupin (+2) ... 161

B. Price Increase Hiatus ... 161

C. New Relationships Emerge ... 162

D. Competitors Become "High Quality" After Successfully Colluding with Teva ... 163

E. Quality Competitors Collude With Each Other, Sandoz/Mylan ... 163

F. Commitment to the Overarching Conspiracy ... 164

G. Low Quality Competitors Comply with the Overarching Conspiracy ... 165

H. Teva and its Executives Knowingly Violated the Antitrust Laws ... 166

VI. THE OVERARCHING CONSPIRACY AS LED BY TEVA WITH RESPECT TO THE SUBJECT DRUGS ... 169

A. Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion ... 169

   1. Teva/Mylan ... 170

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

|  | a) | Fenofibrate ..................................................................... 170 |
|  | b) | Clonidine TTS ................................................................ 173 |
|  | c) | Tolterodine Extended Release ("ER") .......................... 178 |
|  | d) | Capecitabine .................................................................. 183 |
| 2. | | Teva/Sandoz ............................................................................. 186 |
|  | a) | Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa) ..................................................... 186 |
|  | b) | Temozolomide ............................................................... 187 |
|  | c) | Tobramycin .................................................................... 191 |
|  | d) | Dexmethylphenidate HCL ER ....................................... 193 |
| 3. | | Teva/Lupin ............................................................................... 196 |
|  | a) | Lamivudine/Zidovudine (Combivir) .............................. 196 |
|  | b) | Irbesartan ....................................................................... 199 |
|  | c) | Drospirenone and Ethinyl Estradiol (Ocella) ................ 200 |
|  | d) | Norethindrone and Ethinyl Estradiol (Balziva) ............ 203 |
| 4. | | Teva/Greenstone ...................................................................... 204 |
|  | a) | Oxaprozin ...................................................................... 204 |
|  | b) | Tolterodine Tartrate ...................................................... 208 |
|  | c) | Piroxicam ....................................................................... 210 |
|  | d) | Cabergoline .................................................................... 212 |
| 5. | | Teva/Actavis ............................................................................ 213 |
|  | a) | Amphetamine/Dextroamphetamine ER .......................... 213 |
|  | b) | Amphetamine/Dextroamphetamine IR ........................... 215 |
|  | c) | Dextroamphetamine Sulfate ER ..................................... 215 |
|  | d) | Clonidine TTS ................................................................ 216 |
|  | e) | Budesonide Inhalation ................................................... 218 |
|  | f) | Celecoxib ....................................................................... 219 |
| 6. | | Teva/Par ................................................................................... 220 |
|  | a) | Omega-3-Acid Ethyl Esters ........................................... 220 |
|  | b) | Entecavir ........................................................................ 223 |
|  | c) | Budesonide DR ............................................................... 225 |
| 7. | | Teva/Taro ................................................................................. 226 |
|  | a) | Enalapril Maleate ........................................................... 226 |
|  | b) | Nortriptyline HCL .......................................................... 230 |
| 8. | | Teva/Zydus ............................................................................... 234 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a) Fenofibrate ....................................................... 234

b) Paricalcitol ...................................................... 238

c) Niacin ER ........................................................ 241

d) Etodolac ER ..................................................... 244

9. Teva/Glenmark ......................................................... 246

a) Moexipril HCL ................................................. 246

b) Desogestrel/Ethinyl Estradiol (Kariva) ................... 248

c) Gabapentin ...................................................... 249

10. Teva/Lannett ............................................................ 250

a) Baclofen ......................................................... 250

11. Teva/Amneal ........................................................... 253

a) Norethindrone Acetate ...................................... 253

12. Teva/Dr. Reddy's ..................................................... 254

a) Oxaprozin ....................................................... 254

b) Paricalcitol ...................................................... 256

13. Mylan/Sandoz .......................................................... 261

a) Valsartan HCTZ ............................................... 261

B. Taking the Overarching Conspiracy to a New Level: Price Fixing
(2012-2015) ....................................................................... 263

1. July 31, 2012 Price Increase ...................................... 264

a) Nadolol ........................................................... 265

b) Labetalol HCL .................................................. 268

c) Nitrofurantoin MAC .......................................... 269

2. February – April 2013: Increasing Prices Before A New
Competitor Enters the Market: Budesonide Inhalation
Suspension ............................................................ 269

3. May 13, 2013 Price Increase – Tizanidine .................... 271

4. May 24, 2013 First List of Price Increases ................... 273

a) Glenmark ......................................................... 275

b) Sandoz ............................................................ 278

c) Taro ............................................................... 281

5. July 3, 2013 Price Increases ...................................... 282

a) Upsher-Smith .................................................... 283

b) Mylan ............................................................. 284

c) Sandoz ............................................................ 288

6. July 19, 2013 Price Increase – Enalapril Maleate .......... 290

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

7.   August 9, 2013 Price Increases .................................................... 295

    a)   Mylan ................................................................................ 298

    b)   Pravastatin ........................................................................ 301

    c)   Etodolac ............................................................................ 311

8.   July 2013 – January 2014: Competitors Seek to "Follow" Price Increases ........................................................................................ 315

    a)   Haloperidol and Trifluoperazine ...................................... 317

    b)   Benazepril HCTZ .............................................................. 319

    c)   Levothyroxine ................................................................... 323

    d)   Clomipramine HCL ........................................................... 329

9.   March 7, 2014: Price Increases and Overarching Conspiracy Converge (Niacin ER) .................................................................... 335

10.  April 4, 2014 Price Increases .................................................... 338

    a)   Cephalexin ........................................................................ 343

    b)   Azithromycin and Medroxyprogesterone ........................ 345

    c)   Clarithromycin ER ............................................................ 348

    d)   Ketoconazole .................................................................... 351

    e)   Estradiol/Norethindrone Acetate and Cyproheptadine HCL .................................................................................... 354

    f)   Diflunisal .......................................................................... 356

    g)   Ethosuximide ................................................................... 357

11.  Impact of April 4, 2014 Price Increases to Teva ....................... 358

12.  April 15, 2014 Price Increase (Baclofen) .................................. 360

13.  July 1, 2014 Price Increase (Fluocinonide) ............................... 363

14.  August 28, 2014 Price Increases ................................................ 373

    a)   Enalapril Maleate ............................................................. 375

    b)   Prochlorperazine .............................................................. 375

    c)   Mylan ................................................................................ 376

    d)   Taro ................................................................................... 379

    e)   Zydus ................................................................................. 383

15.  January 28, 2015 Price Increase ................................................ 384

    a)   Propranolol HCL tablets .................................................. 385

    b)   Ciprofloxacin HCL and Glimepiride ............................... 390

    c)   Griseofulvin ...................................................................... 392

C.   COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCCESSFULLY COLLUDING WITH TEVA ............................... 393

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1.      Apotex .......................................................................................... 393

2.      Zydus ............................................................................................ 394

3.      Heritage ........................................................................................ 395

4.      Lupin ............................................................................................. 396

5.      Par ................................................................................................. 397

6.      Greenstone .................................................................................... 398

7.      Amneal ......................................................................................... 399

8.      Rising ............................................................................................ 401

9.      Breckenridge ................................................................................ 402

10.     Glenmark ...................................................................................... 404

11.     Camber .......................................................................................... 405

VII.    THE OVERARCHING CONSPIRACY AS TO THE TOPICAL SUBJECT
DRUGS .................................................................................................................... 410

A.      Generic Topical Products – An Overview ............................................ 410

B.      The Early Days – Collusion From 2009 to Early 2012 ....................... 412

1.      Fougera/Perrigo/Taro ................................................................. 412

2.      Actavis and Taro/Perrigo ........................................................... 414

3.      Sandoz/Taro ................................................................................ 415

a)      Carbamazepine ER Tablets ............................................ 416

b)      Imiquimod Cream ........................................................... 418

i.      Perrigo Entry (April 2010) .................................. 419

ii.     Sandoz Entry (February 2011) ............................. 423

iii.    Taro Entry (July 2011) ......................................... 426

c)      Triamcinolone Acetonide Cream and Ointment ............ 432

d)      Adapalene Cream ............................................................ 433

e)      Betamethasone Dipropionate Lotion .............................. 438

f)      Clotrimazole Betamethasone Dipropionate Cream and
Lotion .............................................................................. 440

i.      March and April 2011 – Actavis Raises Prices and
Fougera and Taro Follow ..................................... 440

ii.     Taro Increases Prices on CBD Cream in April 2012
While Actavis and Fougera Play Nice in the
Sandbox ................................................................ 444

iii.    Fougera and Taro Raise CBD Lotion Prices in
Late 2012/Early 2013 ........................................... 445

g)      Fluocinonide Solution ..................................................... 447

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

i. Fougera Raises Prices in May 2011 and Taro Follows.............................................. 447

ii. Fougera Raises Prices in February 2012 and Taro Follows ........................................ 449

h) Erythromycin Base/Ethyl Alcohol Solution ................... 451

i) Nystatin Ointment ......................................................... 459

4. G&W and Its Relationships ......................................................... 465

a) G&W/Fougera.................................................................. 465

i. Metronidazole Cream and Lotion ....................... 467

ii. Calcipotriene Solution ......................................... 472

iii. Fluocinolone Acetonide Cream & Ointment ...... 473

iv. Betamethasone Valerate Lotion.......................... 477

v. Metronidazole .75% Gel ...................................... 480

b) G&W/Glenmark............................................................... 487

i. Ciclopirox Cream – April 2012 .......................... 488

5. Additional Collusive Relationships ............................................. 494

a) Lidocaine Ointment ....................................................... 494

C. Focus on Price Increases Intensifies – Collusion from Late 2012 – 2016.................................................................................... 497

1. Shifts in the Market Foster Collusion ......................................... 497

a) Post-Fougera Acquisition Sandoz Sales Executives Feel Pressure to Demonstrate Their Value ............................. 498

b) Key Relationships Emerge and Existing Relationships Strengthen ...................................................................... 499

i. Sandoz/Taro ......................................................... 499

(1) CW-3's Relationship with Aprahamian and H.M. of Taro ............................................ 499

(2) CW-4's Relationship with D.S. of Taro.. 502

ii. CW-3's Relationship with T.P. of Perrigo.......... 504

iii. Perfetto's Relationship with Boothe of Perrigo.. 505

c) Sandoz Management Knew of, and Encouraged, the Collusion with Competitors ........................................... 505

2. Taro Emerges as a Leader Among Generic Topical Manufacturers ............................................................................. 507

a) Increased Focus on Fair Share and Price Increases ....... 507

i. Setting the Stage for Future Collusion – Aprahamian and CW-3 Collude on Products

ix

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Where Sandoz and Actavis Competed................ 512

(1)      Desonide Lotion...................................... 513

(2)      Ciclopirox Shampoo .............................. 516

(3)      Betamethasone Valerate Ointment ......... 519

ii.     Aprahamian Moves to Taro and Immediately
        Begins Colluding with CW-3 on Products on
        Which Sandoz and Taro Overlap ....................... 522

(1)      Nystatin Triamcinolone Cream and
         Ointment ................................................. 522

(2)      Fluocinonide Ointment ........................... 532

(3)      Lidocaine Ointment ................................ 535

iii.    Aprahamian and Perfetto Orchestrate and Lead
        Price Increases on a Number of Key Products in
        May 2013 .......................................................... 539

(1)      Aprahamian and Perfetto Communicate and
         Coordinate with Their Competitors in
         Advance of the May 2013 Price
         Increases.................................................. 540

(2)      Taro's Competitors Uniformly Declined to
         Bid on Taro Customers and Followed the
         May 2013 Increases ................................ 546

iv.     Building Upon Early Successes – Taro's Continued
        Collusion Over the Ensuing Years...................... 551

(1)      Alclometasone Dipropionate Ointment .. 552

(2)      Fluocinonide Solution............................. 555

(3)      Taro's August 2013 Price Increase ......... 558

(4)      Triamcinolone Acetonide Paste ............. 560

(5)      Acetazolamide Tablets............................ 561

(6)      Desonide Ointment ................................. 568

(7)      Taro's June 2014 Price Increases............ 574

         a.    Carbamazepine ER Tablets and
               Clobetasol Propionate ..................... 580

         b.    Hydrocortisone Valerate Cream ...... 589

         c.    Phenytoin Sodium ER Capsules....... 590

(8)      Econazole Nitrate Cream ....................... 594

(9)      Fluocinonide .1% Cream ....................... 597

(10)     Metronidazole 1% Gel ............................ 603

(11)     Clotrimazole 1% Cream........................... 606

x

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    (12) Ketoconazole Cream and Fluocinonide Gel............................................... 609

      a. Ketoconazole Cream ........................ 610

      b. Fluocinonide Gel.............................. 614

3. Sandoz and Its Other Relationships ............................. 617

 a) Collusion Between Sandoz and Perrigo.......................... 619

  i. Bromocriptine Mesylate Tablets......................... 619

  ii. Adapalene Cream................................................. 626

  iii. Calcipotriene Betamethasone Dipropionate Ointment ............................................................. 631

  iv. Tacrolimus Ointment ........................................... 638

  v. Methazolamide Tablets........................................ 642

 (b) Collusion Between Sandoz and Glenmark ..................... 645

  i. Fluticasone Propionate Lotion (60 ml) .............. 645

  ii. Desoximetasone Ointment ................................... 653

    (1) Sandoz Entry (September 2012) ............. 654

    (2) Glenmark Entry (September 2013)......... 656

 (c) Collusion Between Sandoz and Aurobindo ................... 659

  i. Oxacillin Sodium and Nafcillin Sodium Injectable Vials .................................................... 660

  ii. Cefpodoxime Proxetil Oral Suspension and Tablets................................................................. 662

  iii. Pioglitazone HCL Metformin HCL Tablets ....... 667

 (d) Collusion Between Sandoz and Rising ........................... 673

  i. Griseofulvin Microsize Tablets........................... 673

 (e) Collusion Between Sandoz and Mallinckrodt................ 681

  i. Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets..................... 681

 (f) Sandoz's Collusion with Greenstone ............................. 687

  i. Clindamycin Phosphate ...................................... 688

    (1) The First Coordinated Price Increase (60 ml solution – Fougera and Greenstone) ....... 688

    (2) The Second Coordinated Increase (October 2012 – All Formulations – Sandoz and Greenstone) ............................................. 691

xi

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(3) New Entrants on Clindamycin Phosphate Solution – Perrigo and Taro – Do Not Significantly Erode Pricing .................... 696

(4) The Third Coordinated Price Increase (2014 – All Formulations Except Solution – Sandoz and Greenstone) ........................ 705

ii. Latanoprost Drops ................................................ 707

iii. Eplerenone Tablets .............................................. 714

4. G&W and Its Other Relationships ............................................. 715

(a) Collusion Between G&W and Perrigo ........................... 718

i. Halobetasol Propionate Cream and Ointment ..... 719

(1) The First Coordinated Price Increase – September 2012 ...................................... 719

(2) The Second Coordinated Price Increase – March/April 2013 .................................... 721

(3) Sandoz Launches Halobetasol Propionate Cream .................................................... 722

(4) Taro Launches Halobetasol Propionate Cream and Ointment ............................... 728

ii. Prochlorperazine Maleate Suppositories ............. 731

iii. Ciclopirox Solution .............................................. 733

iv. Hydrocortisone Acetate Suppositories (Anucort HC) ...................................................... 738

(b) Collusion Between G&W and Actavis ........................... 744

i. Promethazine HCL Suppositories ...................... 744

(c) Collusion Between G&W and Glenmark ...................... 752

i. Ciclopirox Cream and Mometasone Furoate ...... 753

(d) Collusion Between G&W and Lupin ............................. 758

i. Ethambutol HCL Tablets ................................... 759

VIII. ADDITIONAL DRUG ALLEGATIONS ........................................ 763

A. Albuterol Sulfate .......................................................... 763

B. Allopurinol .................................................................. 765

C. Amantadine HCL .......................................................... 768

D. Amitriptyline ............................................................... 769

E. Atenolol Chlorthalidone ................................................. 772

F. Atropine Sulfate ........................................................... 773

G. Balsalazide Disodium .................................................... 774

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

H.    Butorphanol Tartrate ................................................................ 775

I.    Captopril .................................................................................. 776

J.    Cefuroxime Axetil .................................................................... 778

K.    Chlorpromazine HCL ............................................................... 780

L.    Cholestyramine ........................................................................ 781

M.    Digoxin ..................................................................................... 782

N.    Diphenoxylate Atropine ........................................................... 787

O.    Divalproex Sodium ER ............................................................. 788

P.    Exemestane ............................................................................... 792

Q.    Isosorbide Dinitrate.................................................................. 793

R.    Lidocaine-Prilocaine ............................................................... 794

S.    Metformin ER (F) ..................................................................... 795

T.    Methadone HCL........................................................................ 796

U.    Methylprednisolone ................................................................. 797

V.    Metronidazole Vaginal Cream ................................................. 799

W.    Naproxen Sodium ..................................................................... 799

X.    Oxycodone HCL ....................................................................... 800

Y.    Oxycodone/Acetaminophen...................................................... 802

Z.    Permethrin ................................................................................ 803

AA.    Perphenazine ............................................................................ 805

BB.    Pilocarpine HCL ....................................................................... 807

CC.    Potassium Chloride ................................................................... 808

DD.    Prednisolone Acetate ................................................................ 810

EE.    Prednisone ................................................................................ 811

FF.    Propranolol HCL Capsules ...................................................... 813

GG.    Spironolactone HCTZ ............................................................... 814

HH.    Timolol Maleate ....................................................................... 816

II.    Trazadone HCL......................................................................... 817

JJ.    Triamterene HCTZ.................................................................... 818

KK.    Ursodiol..................................................................................... 820

IX.    DEFENDANTS' PROFITABILITY INCREASES AS A RESULT OF
COLLUSIVE CONDUCT .................................................................... 821

A.    Teva's Profitability Increases Dramatically............................. 822

B.    Taro and Perrigo's Profits Increased Over 1300% From 2008 to Early
2016............................................................................................ 822

1.    Taro ................................................................................. 822

xiii

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2.   Perrigo ........................................................................................ 824

C.   Other Defendants' Revenues and Profits Also Multiply From 2008 to Early 2016 ............................................................................................. 825

X.   PRICE INCREASES SLOW DRAMATICALLY AFTER GOVERNMENT INVESTIGATIONS COMMENCE ................................................................. 826

CONCIOUSNESS OF GUILT ........................................................................... 828

SPOLIATION OF EVIDENCE ........................................................................... 830

OBSTRUCTION OF JUSTICE .......................................................................... 831

PLAINTIFFS' ASSIGNORS' PURCHASES AND ANTITRUST INJURY ........................... 833

INTERSTATE AND INTRASTATE TRADE AND COMMERCE ................................... 833

MARKET EFFECTS ....................................................................................... 834

TOLLING AND FRAUDULENT CONCEALMENT ................................................... 835

CONTINUING VIOLATIONS ............................................................................ 836

CAUSES OF ACTION ..................................................................................... 836

JURY DEMAND ............................................................................................ 904

PRAYER FOR RELIEF ................................................................................... 905

APPENDIX .................................................................................................. 906

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## COMPLAINT

Plaintiffs, MSP Recovery Claims, Series LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC, and MSPA Claims 1, LLC, (collectively, "Plaintiffs"), bring this action against Actavis Elizabeth, LLC, Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Alvogen Inc., Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals, LLC, Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Bausch Health Americas, Inc., Bausch Health US LLC, Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories, Inc., Epic Pharma, LLC, Fougera Pharmaceuticals Inc., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, Greenstone LLC, G&W Laboratories, Inc., Heritage Pharmaceuticals, Inc., Hikma Labs, Inc., Hikma Pharmaceuticals USA, Inc., Impax Laboratories, LLC, Jubilant Cadista Pharmaceuticals, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Morton Grove Pharmaceuticals, Inc., Mylan Inc., Mylan Pharmaceuticals, Inc.,  Oceanside Pharmaceuticals, Inc., Par Pharmaceutical, Inc., Perrigo New York, Inc., Pfizer, Inc., Sandoz Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent Inc., Teva Pharmaceuticals USA, Inc., Upsher-Smith Laboratories, LLC, West-Ward Columbus, Inc., Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc., (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are assignees of recovery rights originally held by Medicare Advantage Plans, including Medicare Advantage Organizations, Health Maintenance Organizations, Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, providing Medicare benefits to their enrollees. (These entities are generally referred to herein as "MA Plans" or "Plaintiffs' Assignors"). Plaintiffs bring this action

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to seek redress for Defendants' overarching conspiracy to artificially inflate and maintain prices and reduce competition in the generic pharmaceutical industry throughout the United States.

2.     Generic drugs are pharmaceutically equivalent to the referenced brand-name drug in dosage, form, route of administration, strength or concentration, and amount of active ingredient. The only real difference between the brand-name drug and generic drug is price. Generic drugs can save (and have saved) consumers and third-party payers, such as Plaintiffs' Assignors, tens of billions of dollars annually because generic drugs are less-expensive than their brand-name counterparts.

3.     On average, generics are typically around 30% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors in the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

4.     Defendants, along with other generic drug manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs specified below (the "Subject Drugs").

5.     The conspiracy, which infected the entire generic marketplace, was designed to invade detection. Pursuant to a "fair share" scheme, Defendants predetermined market share, fixed prices, and rigged bids on the Subject Drugs, as well as additional drugs. This fair share understanding was often referred to by Defendants as the "rules of engagement" for the generic drug industry and permeated every segment of the industry. The modus operandi was to avoid competition among generic manufacturers that would normally result in significant price erosion

and significant savings for purchasers, particularly third-party payors – like Plaintiffs' Assignors – responsible for paying the bulk of the prescription drug costs in the United States. This overarching conspiracy, effectuated by a series of drug-specific conspiracies, thwarted competition across the generic drug industry.

6.      Predictably, the results of the conspiracy were severe. The prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%, like for example: Nadolol (2,762%), Doxazosin Mesylate (1053%), Fluconazole (1,570%), Leflunomide (1,300%), and Oxybutynin Chloride (between 1,100 and 1,500 %).

7.      These prices are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs, including: Acetazolamide, Albuterol Sulfate, Alclometasone Dipropionate, Amitriptyline HCL, Amiloride HCL/HCTZ, Baclofen, Benazepril HCTZ, Betamethasone Dipropionate, Betamethasone Valerate, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Chlorpromazine Hydrochloride, Ciclopirox, Clarithromycin ER, Clindamycin Phosphate, Clobetasol Propionate, Clomipramine HCL, Clotrimazole, Dextroamphetamine Sulfate, Desonide, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Econazole Nitrate, Enalapril Maleate, Erythromycin, Ethosuximide, Etodolac, Fluconazole, Fluocinolone, Fluocinonide, Fluoxetine HCL, Halobetasol, Haloperidol, Hydrocortisone Valerate, Ketoconazole, Labetalol HCL, Lidocaine, Methazolamide, Methotrexate, Methylphenidate HCL, Metronidazole, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Phenytoin Sodium ER, Piroxicam, Pravastatin, Prazosin HCL, Prochlorperazine, Promethazine HCL, Ranitidine HCL,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Theophylline ER, Tobramycin, Triamcinolone, Trifluoperazine HCL, and Ursodiol.[1] The GAO Report identified that each of these drugs experienced an extraordinary price increase (an increase of 100% or more) at least once between 2010 and 2015.

8.     By 2012, Heritage Pharmaceuticals Inc. ("Heritage"), Teva Pharmaceuticals USA Inc. ("Teva"), and their co-conspirators embarked on one of the most egregious and massive price-fixing conspiracies in the history of the United States. They leveraged the culture of cronyism in the generic drug industry to avoid price erosion, increase prices for targeted products, and maintain artificially-inflated prices across their respective product portfolios without triggering a "fight to the bottom" among competitors. These conspiracies are part of a large, overarching conspiracy and understanding of how the generic manufacturers fix prices and allocate markets to suppress competition.

9.     As one example of this conspiracy, Teva selected a core group of "High Quality" conspirators that it had existing conspiratorial relationships with, and targeted drugs that Teva and the High Quality competitors overlapped on for price increases. Teva and the High Quality competitors understood they would lead and follow each other's price increases and did so frequently and successfully.

10.    At the peak of the collusive activity involving Teva, during a nineteen-month period from July 2013 through January 2015, Teva significantly raised prices on dozens of different generic drugs. Teva colluded with High Quality conspirators on most of them.

---

[1] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report"), available for download at https://www.gao.gov/assets/680/679022.pdf (last visited September 1, 2020).

4

11.     Between 2009 and 2016 – collusion was also rampant among manufacturers of generic topical products. Topical products include any drug that is administered by means of contact, most often with an external body surface, including creams, lotions, gels, ointments, and solutions. Manufacturers of generic topical products typically face higher barriers to entry because technical hurdles associated with demonstrating bioequivalence to branded products are more time consuming and expensive, and manufacturing costs are high compared to other types of generic drugs.

12.     The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical market, creating an environment that is ripe for collusion. Many topical products have only two or three competitors. As a result, the sales and pricing executives at these companies know each other well and have used those business and personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

13.     The larger and more prominent topical manufacturers – including Taro Pharmaceuticals USA Inc., Perrigo New York Inc., Fougera Pharmaceuticals Inc., and Sandoz, Inc. – had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases. In order to maintain these unlawful agreements, the competitors stayed in nearly constant communication.

14.     While price increases for topical products began in 2009, the size and frequency of the increases grew exponentially in 2013 and 2014. During that time period, the prices of hundreds of generic drugs skyrocketed without explanation, sparking outrage from politicians, payers, and consumers across the country. Generic manufacturers argued publicly that the significant price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

increases were due to a myriad of lawful factors, such as industry consolidation, FDA-mandated plan closures, or elimination of unprofitable generic drug product lines.

15.     Defendants routinely and systematically communicated with one another to determine and agree on how much market share, and which customers, each conspirator was entitled to. They effectuated their market allocation by either refusing to bid for particular customers or providing outrageously high cover bids. This created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

16.     Defendants understood and acted upon an underlying code of conduct widespread in the generic drug industry: any time a competitor enters a particular drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. While different drugs may involve different competitors, this understanding remains constant and is the backbone of the industry-wide conspiracy.

17.     The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

18.     This industry-wide data is consistent with the substantial price increases Plaintiffs' Assignors suffered for the Subject Drugs.

19.     As a result of the conspiracy, the prices of generic drugs skyrocketed at unprecedented rates. The price increases imposed by Defendants cannot be explained by supply

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

shortages or any other market feature, nor were they the result of unilateral business decisions. Instead, the significant increases in prices were the result of an illegal agreement among Defendants to fix prices.

20.     Defendants knew their conduct was unlawful. The conspirators limited their communications to in-person meetings or by cell phone, in an attempt to avoid creating a record of their illegal conduct. When communications were in writing, Defendants took overt and calculated steps to destroy evidence of those communications.

21.     Executives and others at the highest levels in many of Defendant companies, including among others, Ara Aprahamian, David Berthold, Mitchell Blashinsky, Douglas Boothe, James (Jim) Brown, Maureen Cavanaugh, Tracy Sullivan DiValerio, Marc Falkin, James (Jim) Grauso, Kevin Green, Walter Kaczmarek, Armando Kellum, Robin Hatosy, Rajiv Malek, Satish Mehta, Jill Nailor, James (Jim) Nesta, Kurt Orlofski, Konstantin (Kon) Ostaficiuk, Nisha Patel, Mike Perfetto, David Rekenthaler, and Richard (Rick) Rogerson, Erika Vogel-Baylor, and John Wesolowski conceived, directed, and ultimately benefitted from these schemes.

22.     This scheme to fix and maintain prices, allocate markets, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein. As a result of the conspiracy, Plaintiffs' Assignors paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

23.     Plaintiffs seek treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 & 26, and under 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

25.     This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States, including in this District, sold and distributed one or more Subject Drugs throughout the United States, including in this District, may be found in the United States, including in this District, engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 22. Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District. Plaintiffs' Assignor, ConnectiCare, Inc., ("ConnectiCare") is a Connecticut corporation with its principal place of business in Farmington, Connecticut. ConnectiCare purchased one or more of the Subject Drugs.

28.     Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this district.

## THE PARTIES

### I.    PLAINTIFFS

29.    Plaintiff MSP Recovery Claims, Series LLC is a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Rd., 10th Floor, Coral Gables, FL 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' enrollees for which Defendants are liable.[2]

30.    Plaintiff Series PMPI, a designated series of MAO-MSO Recovery II, LLC, is a Delaware series limited liability company with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' enrollees for which Defendants are liable.

31.    Plaintiff MSPA Claims 1, LLC is a Florida limited liability company with its principal place of business at 2701 S. Le Jeune Rd. 10th Floor, Coral Gables, FL 33134. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of payments for the Subject Drugs made on behalf of the Assignors' enrollees for which Defendants are liable.

---

[2] Plaintiff MSP Recovery Claims, Series, LLC has established various specific Series for which it is the exclusive owner. The specific Series identify the Assignors assigning to Plaintiff. All specific Series form a part of Plaintiff and are owned by Plaintiff. Plaintiff owns and controls any and all Series interest and all claims and rights transferred from any Assignor and seeks relief for each Assignor who made payments for the Subject Drugs for which Defendants are liable.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

32.     Plaintiffs' Assignors provide(d) health benefits to their enrollees, who reside in numerous locations in the United States. As third-party payers of pharmaceutical claims for their enrollees, Plaintiffs' Assignors are end-payers of the Subject Drugs and were thereby injured as a result of Defendants' unlawful behavior. Plaintiffs' analysis of their Assignors' data confirms that their Assignors have indirectly purchased and/or provided reimbursement for the Subject Drugs during the relevant time period throughout the United States.

## II.    DEFENDANTS

### A.    Actavis Defendants

33.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly owned subsidiary of Defendant Actavis Holdco U.S., Inc. and is a research and development and manufacturing entity for the Actavis generic operations.

34.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth and Actavis Pharma, Inc. merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceuticals Industries Ltd. ("Teva Israel"), the Israel parent company of Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly formed Actavis Holdco. Actavis Holdco is a wholly owned subsidiary of Teva Israel.

35.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly owned subsidiary of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Actavis Holdco and is a principal operating company in the U.S. for the generic products Teva Israel acquired from Allergan. It manufactures, markets, and/or distributes generic pharmaceuticals.

36.     Unless addressed individually, Actavis Elizabeth, Actavis Holdco, and Actavis Pharma are collectively referred to herein as "Actavis." During the relevant time period, Actavis participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### B.     Alvogen

37.     Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Actavis. During the relevant time period, Alvogen participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### C.     Amneal Defendants

38.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a Delaware corporation with a principal place of business in Bridgewater, New Jersey.

39.     Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

40.     Unless addressed individually, Amneal Inc. and Amneal LLC are collectively referred to herein as "Amneal." During the relevant time period, Amneal participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### D.      Apotex

41.      Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the relevant time period, Apotex participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### E.      Ascend

42.      Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Alkem Labs, an Indian pharmaceutical company. During the relevant time period, Ascend participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### F.      Aurobindo

43.      Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. During the relevant time period, Aurobindo participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### G.      Bausch/Valeant Defendants

44.      Defendant Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International, Inc. ("Bausch Health Americas") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

45.      Defendant Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC ("Bausch Health US") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

46.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a wholly-owned subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

47.     Unless addressed individually, Bausch Health Americas, Bausch Health US, and Oceanside are collectively referred to herein as "Valeant" or "Bausch/Valeant." During the relevant time period, Valeant participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**H.     Breckenridge**

48.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. During the relevant time period, Breckenridge participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**I.     Cadista**

49.     Defendant Jubilant Cadista Pharmaceuticals Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. During the relevant time period, Cadista participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**J.     Camber**

50.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. During the relevant time period, Camber participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

13

**K.     Citron**

51.      Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. During the relevant time period, Citron participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**L.     Dr. Reddy's**

52.      Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. Dr. Reddy's is a wholly owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. During the relevant time period, Dr. Reddy's participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**M.     Epic**

53.      Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the relevant time period, Epic participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States.

**N.     Glenmark**

54.      Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark"), f/k/a Glenmark Generics Inc., USA is a Delaware corporation with its principal place of business in Mahwah, New Jersey. During the relevant time period, Glenmark participated in the alleged conspiracy, and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### O.      Greenstone/Pfizer Defendants

55.     Defendant Greenstone LLC ("Greenstone") is a limited liability company with its principal place of business in North Peapack, New Jersey. Greenstone is a wholly-owned subsidiary of Defendant Pfizer, Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. During the relevant time period, Greenstone participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

56.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone. During the relevant time period, Pfizer participated in and directed the business activities of Greenstone.

57.     Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone." During the relevant time period, Greenstone participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

58.     Throughout this Complaint, all references to Defendant Greenstone apply equally to Defendant Pfizer. Indeed, the two companies operate in many important respects as a single functioning entity, without regard to corporate formalities. Pfizer is the sole owner and shareholder of Greenstone but treats Greenstone as its generic division or an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities including Greenstone's marketing and sale of generic drugs. Both companies share the same office space at Pfizer's Peapack, New Jersey campus. They also share common officers, managerial and supervisory personnel, and other employees.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

59.     Pfizer performs many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to: (1) financial and sales analysis, (2) business technology, (3) customer service, (4) legal, (5) intellectual property, (6) supply chain, (7) human resources and (8) employee benefits. Importantly, Greenstone – which as of 2017 was the 15th largest generic manufacturer in the country with annual gross sales of over one billion dollars – does not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department – all critical functions for a legitimate business operation. All of those functions are performed by Pfizer.

60.     Most – if not all – of Greenstone's "employees" are actually employed by Pfizer. The two primary individuals identified throughout this Complaint as having conspired with competitors on behalf of Greenstone – Jill Nailor and Robin Hatosy – are Pfizer employees. They are paid directly by Pfizer, and Pfizer is listed as their employer in W-2 Wage and Tax Statements submitted to the United States government. In their communications internally and with customers and competitors, both Nailor and Hatosy regularly used email addresses that ended with Pfizer's email domain: "@pfizer.com." This is the case for most if not all of Greenstone's "employees." Nailor and Hatosy also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries. They were reimbursed and/or compensated by Pfizer through its accounts payable system for membership in industry trade associations; they used Pfizer cell phones and/or iPads; and they used Pfizer teleconference and WebEx services to conduct their work.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

61.     Jill Nailor received regular performance evaluations directly from Pfizer, called ███████████████████████████████████ and participated in a program called ████████ ████████████████████████████.

62.     During all times relevant to this Complaint, Greenstone has not had its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Commercial Officer or any Vice Presidents. The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee that reports directly to higher-level executives at Pfizer.

63.     During all times relevant to this Complaint, Pfizer has operated with multiple business units, one of which was always responsible for overseeing the marketing and sale of "established" products, including the generic drugs sold by Greenstone. The name of this business unit has changed over time. As of 2014, it was called the Global Established Pharmaceuticals Division ("GEP"). Today, it is referred to as "Pfizer Essential Health" ("PEH"). Within Pfizer, Greenstone has operated as part of GEP and/or PEH, and Greenstone "employees" (often referred to as ██████████████████ were all included in Pfizer's organizational charts – demonstrating that Greenstone was acting as an internal division within Pfizer rather than as a separate company. For example, as of 2017, Jill Nailor and other Greenstone executives were prominently identified as PEH employees in certain Pfizer organizational charts.

64.     Similarly, as of 2014 these same individuals were considered part of GEP. In an April 2014 presentation to Greenstone customers at the NACDS Annual Conference in Scottsdale, Arizona, Jill Nailor gave what she referred to as a ████████████████████████ where she discussed the new streamlined organization of Pfizer and Greenstone. Specifically, Nailor told customers that the General Manager of Greenstone – Jim Cannon – was now only three levels

17

away from the CEO of Pfizer within the overall Pfizer corporate structure. She showed customers the organizational structure of Pfizer, which included both Jim Cannon (General Manager of Greenstone) and herself as reports within the Pfizer corporate hierarchy.

65.     Even Greenstone's own separate organizational charts, to the extent they exist, include all Pfizer employees, the Pfizer trademarked logo and brand name, and refer to the ████████████████ of individuals who perform many important business functions for the company.

66.     Greenstone also promotes itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials.

67.     On that same page, Greenstone touts that the authorized generic drugs it sells "are manufactured to the same standards and at the same facilities as Pfizer brand-name drugs" and that they "carry the legacy of the brand-name products' years of clinical research, data and patient and physician experience." Greenstone has consistently advertised its connection with Pfizer in order to strategically capitalize on Pfizer's brand recognition and respect, for purposes of increasing its own sales.

68.     In carrying out its business, Greenstone's internal training and marketing documents regularly carry Pfizer's trademarked logo and brand name. This includes internal "Greenstone" presentations relating solely to generic drugs and issues specific to the generic pharmaceutical industry.

69.     Because Greenstone operates as part of Pfizer, Pfizer is directly involved in the generics business and extensively evaluates generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone. Greenstone and Pfizer management regularly coordinate on strategy, and communicate about concepts such as "fair share,"

"responsible pricing" and following other competitors' price increases in particular generic drug markets. For example, in a PEH presentation in January 2017 relating to Greenstone, a dual Pfizer/Greenstone employee explained the strategy behind the "fair share" concept and indicated that Greenstone should ███████ those drugs where Greenstone had less than fair share, and simply maintain market share in those markets that were ███████████.

70.     Pfizer employees also work directly with the FDA on Greenstone's behalf to obtain approval for the drugs that Greenstone sells.

71.     Greenstone also relies on Pfizer for cost and pricing strategy. For new products in particular, Pfizer's Global Supply unit ("PGS") makes the budget, defines the costs of goods sold, and then conveys that information to Greenstone without significant feedback. PGS is also heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.

72.     Pfizer performs all financial analyses, sales reports, revenue projections, and other finance functions for Greenstone. Since at least January 2013, these tasks have been performed by Pfizer's Director of Business Finance, G.C. In his LinkedIn profile, G.C. lists his employer as Pfizer, and includes within his responsibilities that he is the "Finance Lead" for Greenstone – a "business unit" of Pfizer that sells generic pharmaceuticals in the U.S. and Puerto Rico.

73.     Greenstone does not have its own separate IT infrastructure, and Pfizer provides access to its bid-tracking software and other business tools so that Greenstone can keep track of its operations, including but not limited to budget, supply, pricing, molecules sold, competition, market share, and financial performance generally.

74.     In every important respect, including financially, Pfizer directly controls the decision-making of Greenstone. Greenstone does not even have the authority to implement its own price increases without first obtaining the approval of Pfizer. This includes the price increases

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

discussed below. Not only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer.  For example, in a ███████████ presentation to the President of PEH in May 2017, Greenstone indicated that, for price increases specifically, it must "███████████████████

75.    For these reasons, although technically Greenstone is a separately incorporated entity, it is separate in name only. Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or Robin Hatosy, are actions taken, directed and/or controlled by Defendant Pfizer.

**P.     G&W**

76.    G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. During the relevant time period, G&W participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**Q.     Heritage**

77.    Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly owned subsidiary of Emcure Pharmaceuticals, an Indian company with its principal place of business in Pune, India. During the relevant time period, Heritage participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**R.     Impax**

78.    Defendant Impax Laboratories, LLC, f/k/a Impax Pharmaceuticals, Inc., ("Impax") is a Delaware limited liability corporation with its principal place of business in Hayward,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

California. During the relevant time period, Impax participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States.

**S.      Lannett**

79.      Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. During the relevant time period, Lannett participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**T.      Lupin**

80.      Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Lupin participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**U.      Mylan Defendants**

81.      Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc.

82.      Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

83.      Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." During the relevant time period, Mylan participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## V.     Par Defendants

84.     Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York.

85.     Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware limited liability company with its principal place of business in Huntsville, Alabama. Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

86.     PPI and Generics Bidco are wholly-owned subsidiaries of Endo Internal plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters in Malvern, Pennsylvania. PPI and Generic Bidco collectively do business as Par Pharmaceutical.

87.     Unless addressed individually, PPI and Generics Bidco are collectively referred to herein as "Par." During the relevant time period, Par participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

## W.     Perrigo

88.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Bronx, New York; Perrigo New York is a wholly owned subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. During the relevant time period, Perrigo participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

## Y.     Sandoz Defendants

89.     Defendant Sandoz, Inc. ("Sandoz Inc.") is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Switzerland.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

90.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. In July 2012, Fougera is a wholly owned subsidiary of Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its U.S.-based generic pharmaceutical business.

91.     Unless addressed individually, Sandoz Inc. and Fougera are collectively referred to as "Sandoz" or "Sandoz/Fougera." During the relevant time period, Sandoz participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**Z.     Sun**

92.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories Ltd. Since 2011, Sun has been a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority share of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name of Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the relevant time period, Sun participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### AA.    Taro

93.    Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharma.  During the relevant time period, Taro participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### BB.    Teligent

94.    Defendant Teligent Inc. ("Teligent") f/k/a IGI Laboratories, Inc. is a Delaware corporation with its principal place of business in Buena, New Jersey. During the relevant time period, Teligent participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States.

### CC.    Teva

95.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva, Israel. During the relevant time period, Teva participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

### DD.    Upsher-Smith

96.    Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. During the relevant time period, Upsher-Smith participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### EE.   West-Ward Defendants

97.     Defendant West-Ward Columbus, Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

98.     Defendant Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp. ("Hikma Pharmaceuticals") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

99.     Defendant Hikma Labs, Inc. f/k/a Roxane Laboratories, Inc. ("Hikma Labs") is a Nevada corporation with its principal place of business in Eatontown, New Jersey.

100.    During the relevant time period, West-Ward Columbus, Hikma Pharmaceuticals, and Hikma Labs are collectively referred to herein as "West-Ward." West-Ward participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States.

### FF.   Wockhardt Defendants

101.    Defendant Wockhardt USA LLC ("Wockhardt USA") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Morton Grove Pharmaceuticals, Inc.

102.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly owned subsidiary of Wockhardt, Ltd., an Indian company with its principal place of business in Mumbai, India.

103.    Unless address individually, Wockhardt USA and Morton Grove are collectively referred to herein as "Wockhardt." Wockhardt participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs.

25

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### GG.    Zydus

104.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is a wholly owned subsidiary of Cadila Healthcare, an Indian company with its principal place of business in Ahmedabad, India. During the relevant time period, Zydus participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

105.    When an allegation of the Complaint refers to any representation, act, or transaction of Defendants, or any agent, employee, or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents, or representatives, of Defendants acted within the scope of their actual or apparent authority, and performed such representations, acts, or transmissions on behalf of Defendants.

## III.    CO-CONSPIRATORS

### A.    Akorn

106.    Non-Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. Akorn filed for bankruptcy in 2020. Akorn is the parent company of Hi-Tech Pharmacal Co., Inc. and VersaPharm, Inc. During the relevant time period, Akorn participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

107.    Non-Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech is a wholly owned subsidiary of Akorn. During the relevant time period, Hi-Tech participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

108.    Non-Defendant VersaPharm, Inc. ("VersaPharm") is a Georgia corporation with its principal place of business in Marietta, Georgia. VersaPharm is a wholly owned subsidiary of Akorn. During the relevant time period, VersaPharm participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

**B.      Rising**

109.    Non-Defendant Rising Pharmaceuticals Inc. ("Rising") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. Rising is a wholly-owned subsidiary of Aceto Corp., which filed for bankruptcy in 2019. On December 3, 2019, the Department of Justice announced that Rising had entered into a deferred prosecution agreement in connection with Rising's participation in a conspiracy to suppress and eliminate competition by agreeing to allocate customers for and to stabilize, maintain, and fix prices of Benazepril HCTZ sold in the United States.

**C.      Mallinckrodt**

110.    Non-Defendant Mallinckrodt plc is an Irish public limited company with its principal place of business in Stained-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc filed for bankruptcy in 2020. Mallinckrodt plc is the parent company of Mallinckrodt Inc. Inc. and Mallinckrodt LLC. During the relevant time period, Mallinckrodt plc participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

111.    Non-Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri. Mallinckrodt Inc. is a wholly owned subsidiary of Mallinckrodt plc. During the relevant time period, Mallinckrodt Inc. participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

112.     Non-Defendant Mallinckrodt LLC is a Delaware corporation with its principal place of business in Hazelwood, Missouri. During the relevant time period, Mallinckrodt LLC participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

113.     Mallinckrodt Inc. and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt."

### D.     Unknown Generic Manufacturer Co-Conspirators

114.     Various other persons, firms, entities, and corporations not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

115.     The true names of additional co-conspirators are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

116.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

117.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

118.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents,

28

employees, or representatives while actively engaged in the management, direction, or control of such Defendants' or co-conspirator's affairs.

## THE SUBJECT DRUGS

119.    Plaintiffs' Assignors have purchased, in substantial quantities, the Subject Drugs listed below in Table 1 during the relevant time period. Plaintiffs' Assignors paid grossly inflated prices for the Subject Drugs due to the alleged price-fixing conspiracy.

## TABLE 1

| Drug | Formulations | Defendants |
|---|---|---|
| Acetazolamide | Tablets<br>ER capsules | Tabs: Lannett, Taro<br>Caps: Heritage, Teva, Zydus |
| Adapalene | Cream<br>Gel | Cream: Perrigo, Sandoz<br>Gel: Glenmark, Taro, Teva |
| Albuterol Sulfate | Tablets | Mylan, Sun |
| Alclometasone Dipropionate | Cream<br>Ointment | Glenmark, Sandoz, Taro |
| Allopurinol | Tablets | Actavis, Dr. Reddy's, Mylan, Par |
| Amantadine HCL | Capsules | Lannett, Sandoz, Upsher-Smith, |
| Amiloride HCL/HCTZ | Tablets | Mylan, Teva |
| Amitriptyline HCL | Tablets | Mylan, Par, Sandoz |
| Ammonium Lactate | Cream<br>Lotion | Actavis, Perrigo, Taro |
| Amoxicillin/Clavulanate | Chewable Tablets | Sandoz, Teva |
| Amphetamine/Dextroamphetamine (aka Mixed Amphetamine salts) | IR tablets<br>ER capsules | IR: Actavis, Aurobindo, Teva<br>ER: Actavis, Teva |
| Atenolol Chlorthalidone | Tablets | Actavis, Mylan |
| Atropine Sulfate | Ophthalmic Solution | Sandoz, Valeant |
| Azithromycin | Oral Suspension | Greenstone, Teva |
| Baclofen | Tablets | Lannett, Par, Teva, Upsher-Smith |
| Balsalazide Disodium | Capsules | Apotex, West-Ward |
| Benazepril HCTZ | Tablets | Mylan, Sandoz |
| Betamethasone Dipropionate | Cream<br>Lotion<br>Ointment | Cream: Actavis, Sandoz, Taro<br>Lotion: Perrigo, Sandoz, Taro<br>Ointment: Actavis, Sandoz |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|------|-------------|-----------|
| Betamethasone Valerate | Cream<br>Lotion<br>Ointment | Cream: Sandoz, Taro<br>Lotion: G&W, Sandoz<br>Ointment: Actavis, Sandoz |
| Bethanechol chloride | Tablets | Amneal, Teva |
| Bromocriptine Mesylate | Tablets | Mylan, Perrigo, Sandoz |
| Budesonide | Inhalation<br>DR capsules | Inhalation: Actavis, Sandoz, Teva<br>DR: Mylan, Par, Teva |
| Bumetanide | Tablets | Sandoz, Teva |
| Buspirone HCL | Tablets | Actavis, Mylan, Teva |
| Butorphanol Tartrate | Nasal spray | Apotex, Mylan, West-Ward, |
| Cabergoline | Tablets | Greenstone, Teva |
| Calcipotriene | Solution | G&W, Sandoz |
| Calcipotriene Betamethasone Dipropionate | Ointment | Perrigo, Sandoz |
| Capecitabine | Tablets | Mylan, Teva |
| Captopril | Tablets | Mylan, West-Ward, Wockhardt |
| Carbamazepine | Chewable tablets<br>Tablets<br>ER tablets | Chewable: Taro, Teva<br>Tabs: Apotex, Taro, Teva<br>ER: Sandoz, Taro |
| Cefdinir | Capsules<br>Oral suspension | Lupin, Sandoz, Teva |
| Cefpodoxime Proxetil | Oral suspension<br>Tablets | Aurobindo, Sandoz |
| Cefprozil | Tablets | Lupin, Sandoz, Teva |
| Cefuroxime Axetil | Tablets | Aurobindo, Citron, Lupin |
| Celecoxib | Capsules | Actavis, Teva |
| Cephalexin | Oral Suspension | Lupin, Teva |
| Chlorpromazine HCL | Tablets | Mylan, Sandoz, Upsher-Smith |
| Cholestyramine | Powder<br>Solid | Par, Sandoz, Upsher-Smith |
| Ciclopirox | Cream<br>Shampoo<br>Solution | Cream: Glenmark, G&W, Perrigo<br>Shampoo: Actavis, Perrigo, Sandoz, Taro<br>Solution: G&W, Perrigo, Sandoz |
| Cimetidine | Tablets | Mylan, Teva |
| Ciprofloxacin HCL | Tablets | Actavis, Dr. Reddy's, Teva |
| Clarithromycin | ER Tablets | Actavis, Teva, Zydus |
| Clemastine Fumarate | Tablets | Sandoz, Teva |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|---|---|---|
| Clindamycin Phosphate | Cream<br>Gel<br>Lotion<br>Solution | Cream, Gel, & Lotion:<br>Greenstone, Sandoz<br>Solution: Greenstone, Perrigo,<br>Sandoz, Taro |
| Clobetasol Propionate | Cream<br>Emollient cream<br>Gel<br>Ointment<br>Solution | Cream & Ointment: Actavis,<br>Sandoz, Taro<br>E. Cream & Gel: Perrigo,<br>Sandoz, Taro<br>Solution: Actavis, Sandoz,<br>Taro, Wockhardt |
| Clomipramine | Capsules | Mylan, Sandoz, Taro |
| Clonidine TTS | Patch | Actavis, Mylan, Teva |
| Clotrimazole | Cream<br>Solution | Cream: Sandoz, Taro<br>Solution: Taro, Teva |
| Clotrimazole Betamethasone Dipropionate | Cream<br>Lotion | Cream: Actavis, Sandoz, Taro<br>Lotion: Sandoz, Taro |
| Cyproheptadine HCL | Tablets | Breckenridge, Teva |
| Desmopressin HCL | Tablets | Actavis, Teva |
| Desogestrel/Ethinyl Estradiol (Kariva) | Tablets | Glenmark, Teva |
| Desonide | Cream<br>Lotion<br>Ointment | Cream: Actavis, Perrigo, Taro<br>Lotion: Actavis, Sandoz<br>Ointment: Perrigo, Sandoz,<br>Taro |
| Desoximetasone | Ointment | Glenmark, Perrigo, Sandoz |
| Dexmethylphenidate HCL | Capsules | Sandoz, Par, Teva |
| Dextroamphetamine Sulfate ER | Capsules<br>Tablets | Caps: Aurobindo, Teva<br>Tabs: Actavis, Impax, Teva |
| Diclofenac Potassium | Tablets | Mylan, Sandoz, Teva |
| Dicloxacillin Sodium | Capsules | Sandoz, Teva |
| Diflunisal | Tablets | Teva |
| Digoxin | Tablets | Impax, Lannett, Mylan, Par,<br>Sun, West-Ward |
| Diltiazem HCL | Tablets | Mylan, Teva |
| Diphenoxylate Atropine | Tablets | Greenstone, Mylan |
| Disopyramide Phosphate | Capsules | Actavis, Teva |
| Divalproex Sodium ER | Tablets | Dr. Reddy's, Mylan, Par, Zydus |
| Doxazosin Mesylate | Tablets | Apotex, Greenstone, Mylan,<br>Par, Teva |
| Drospirenone and Ethinyl Estradiol (Ocella) | Tablets | Actavis, Lupin, Teva |
| Econazole Nitrate | Cream | Perrigo, Sandoz, Taro, Teligent |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|---|---|---|
| Enalapril Maleate | Tablets | Mylan, Taro, Teva, Valeant, Wockhardt |
| Entecavir | Tablets | Par, Teva |
| Epitol | Tablets | Apotex, Taro, Teva |
| Eplerenone | Tablets | Greenstone, Sandoz |
| Erythromycin Base/ Ethyl Solution | Solution | Perrigo, Sandoz, Wockhardt |
| Estazolam | Tablets | Actavis, Teva |
| Estradiol | Tablets | Actavis, Mylan, Teva |
| Estradiol/Norethindrone Acetate (Mimvey) | Tablets | Breckenridge, Teva |
| Ethambutol HCL | Tablets | G&W, Lupin |
| Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa) | Tablets | Sandoz, Teva |
| Ethinyl Estradiol and Norethindrone (Balziva) | Tablets | Lupin, Teva |
| Ethosuximide | Capsules Solution | Teva |
| Etodolac | Capsules ER Tablets Tablets | Caps: Teva ER: Taro, Teva, Zydus Tabs: Sandoz, Teva |
| Exemestane | Tablets | Alvogen, Greenstone, West-Ward |
| Fenofibrate | Tablets | Lupin, Mylan, Teva, Zydus |
| Fluconazole | Tablets | Glenmark, Greenstone, Teva |
| Fluocinolone Acetate | Cream Ointment | Cream: G&W, Sandoz, Teligent Ointment: G&W, Sandoz, Taro, Teligent |
| Fluocinonide | Cream (.05%, .1%) Emollient Cream Gel Ointment Solution | .05%: Actavis, Sandoz, Taro, Teva .1%: Glenmark, Perrigo, Sandoz, Taro, Valeant E. Cream: Sandoz, Taro, Teva Gel: G&W, Sandoz, Taro, Teva Ointment: Sandoz, Taro, Teva Solution: Actavis, Sandoz, Taro |
| Fluoxetine HCL | Tablets | Mylan, Par, Teva |
| Flurbiprofen | Tablets | Mylan, Teva |
| Flutamide | Capsules | Actavis, Par, Teva |
| Fluticasone Propionate | Lotion | Glenmark, Perrigo, Sandoz |
| Fluvastatin Sodium | Capsules | Mylan, Teva |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|------|--------------|------------|
| Fosinopril HCTZ | Tablets | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Gabapentin | Tablets | Glenmark, Teva |
| Glimepiride | Tablets | Dr. Reddy's, Teva |
| Glipizide-Metformin | Tablets | Heritage, Mylan, Teva |
| Griseofulvin Microsize | Tablets | Tabs: Sandoz |
|  | Suspension | Susp: Actavis, Teva |
| Halobetasol Propionate | Cream | G&W, Perrigo, Sandoz, Taro |
|  | Ointment |  |
| Haloperidol | Tablets | Mylan, Sandoz, Zydus |
| Hydralazine HCL | Tablets | Heritage |
| Hydrocortisone Acetate | Suppository | G&W, Perrigo |
| Hydrocortisone Valerate | Cream | Perrigo, Taro |
| Hydroxyurea | Capsules | Par, Teva |
| Hydroxyzine Pamoate | Capsules | Actavis, Sandoz, Teva |
| Imiquimod | Cream | Perrigo, Sandoz, Taro |
| Irbesartan | Tablets | Lupin, Teva |
| Isoniazid | Tablets | Sandoz, Teva |
| Isosorbide Dinitrate | Tablets | Par, Sandoz, West-Ward |
| Ketoconazole | Cream | Cream: G&W, Sandoz, Taro, Teva |
|  | Tablets | Tabs: Mylan, Taro, Teva |
| Ketoprofen | Capsules | Mylan, Teva |
| Ketorolac Tromethamine | Tablets | Mylan, Teva |
| Labetalol HCL | Tablets | Actavis, Alvogen, Par, Sandoz, Teva |
| Lamivudine/Zidovudine (Combivir) | Tablets | Aurobindo, Camber, Lupin, Teva |
| Latanoprost | Ophthalmic solution | Greenstone, Sandoz, Valeant |
| Leflunomide | Tablets | Apotex, Heritage, Teva |
| Levothyroxine Sodium | Tablets | Lannett, Mylan, Sandoz |
| Lidocaine HCL | Ointment | Sandoz, Taro |
| Lidocaine-Prilocaine | Cream | Impax, Sandoz |
| Loperamide HCL | Capsules | Mylan, Teva |
| Medroxyprogesterone | Tablets | Greenstone, Teva |
| Meprobamate | Tablets | Dr. Reddy's, Heritage |
| Metformin ER (F) | Tablets | Actavis, Lupin |
| Methadone HCL | Tablets | West-Ward |
| Methazolamide | Tablets | Perrigo, Sandoz |
| Methimazole | Tablets | Heritage, Par |
| Methotrexate | Tablets | Mylan, Teva |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|---|---|---|
| Methylphenidate | ER Tablets<br>Tablets | ER: Sandoz<br>Tabs: Actavis, Impax, Par, Sandoz, Sun |
| Methylprednisolone | Tablets | Breckenridge, Cadista, Greenstone, Par, Sandoz |
| Metronidazole | Cream<br>Gel (.75%, 1%)<br>Lotion<br>Vaginal Cream | Cream: Actavis, G&W, Sandoz<br>.75%: G&W, Sandoz, Taro<br>1%: Sandoz, Taro<br>Lotion: Actavis, Sandoz<br>V. Cream: Sandoz, Valeant |
| Moexipril HCL | Tablets | Glenmark, Teva |
| Moexipril HCL/HCTZ | Tablets | Glenmark, Teva |
| Mometasone Furoate | Cream<br>Ointment<br>Solution | Glenmark, G&W |
| Nabumetone | Tablets | Actavis, Glenmark, Sandoz, Taro |
| Nadolol | Tablets | Mylan, Sandoz, Taro |
| Nafcillin Sodium | Injectable Vials | Aurobindo, Sandoz |
| Naproxen | Tablets | Amneal, Glenmark |
| Niacin | ER Tablets | Lupin, Teva, Zydus |
| Nimodipine | Capsules | Ascend, Heritage, Sun |
| Nitrofurantoin MAC | Capsules | Alvogen, Mylan, Teva |
| Norethindrone Acetate | Tablets | Amneal, Glenmark, Teva |
| Nortriptyline HCL | Capsules | Actavis, Taro, Teva |
| Nystatin | Cream<br>Ointment<br>Tablets | Cream: Actavis, Par, Perrigo, Sandoz, Taro<br>Ointment: Actavis, Perrigo, Sandoz<br>Tabs: Heritage, Sun, Teva |
| Nystatin Triamcinolone | Cream<br>Ointment | Sandoz, Taro |
| Omega-3-Acid Ethyl Esters | Capsules | Apotex, Par, Teva |
| Oxacillin Sodium | Injectable Vials | Aurobindo, Sandoz |
| Oxaprozin | Tablets | Dr. Reddy's, Greenstone, Sandoz, Teva |
| Oxybutynin Chloride | Tablets | Teva, Upsher-Smith |
| Oxycodone HCL | Tablets | Actavis, Par, Sun |
| Oxycodone/Acetaminophen | Tablets | Actavis, Alvogen, Amneal, Aurobindo, Par |
| Paricalcitol | Capsules | Dr. Reddy's, Teva, Zydus |
| Paromomycin | Capsules | Heritage, Sun |

PUBLIC VERSION<br>REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|---|---|---|
| Penicillin VK | Tablets | Aurobindo, Greenstone, Sandoz, Teva |
| Pentoxifylline | Tablets | Apotex, Mylan, Teva |
| Permethrin | Cream | Actavis, Mylan, Perrigo |
| Perphenazine | Tablets | Par, Sandoz |
| Phenytoin Sodium | Capsules | Amneal, Mylan, Sun, Taro |
| Pilocarpine HCL | Tablets | Actavis, Impax, Lannett |
| Pioglitazone HCL Metformin | Tablets | Aurobindo, Mylan, Sandoz, Teva |
| Piroxicam | Capsules | Greenstone, Teva |
| Potassium Chloride | Tablets | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus, |
| Pravastatin Sodium | Tablets | Apotex, Glenmark, Lupin, Teva, Zydus |
| Prazosin HCL | Capsules | Mylan, Teva |
| Prednisolone Acetate | Ophthalmic suspension | Greenstone, Sandoz |
| Prednisone | Tablets | Actavis, Cadista, Par, West-Ward |
| Prochlorperazine Maleate | Suppository Tablets | Supp: G&W, Perrigo Tabs: Mylan, Sandoz, Teva |
| Promethazine HCL | Suppository | Actavis, G&W, Perrigo |
| Propranolol HCL | Capsules Tablets | Caps: Actavis, Breckenridge, Upsher-Smith Tabs: Actavis, Heritage, Mylan, Par, Teva |
| Raloxifene HCL | Tablets | Camber, Teva |
| Ranitidine HCL | Tablets | Amneal, Glenmark, Sandoz, Teva |
| Spironolactone HCTZ | Tablets | Greenstone, Mylan, Sun |
| Tacrolimus | Ointment | Perrigo, Sandoz |
| Tamoxifen Citrate | Tablets | Actavis, Mylan, Teva |
| Temozolomide | Capsules | Sandoz, Teva |
| Terconazole | Cream | Actavis, Sandoz, Taro |
| Theophylline | ER Tablets | Heritage, Teva |
| Timolol Maleate | Ophthalmic gel | Sandoz, Valeant |
| Tizanidine | Tablets | Dr. Reddy's, Mylan, Sandoz |
| Tobramycin | Solution | Sandoz, Teva |
| Tolmetin Sodium | Capsules | Mylan, Teva |
| Tolterodine | Tablets ER Tablets | Tabs: Greenstone, Teva ER: Mylan, Teva |
| Topiramate | Sprinkle Capsules | Actavis, Teva, Zydus |
| Trazodone HCL | Tablets | Apotex, Par, Sun, Teva |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Drug | Formulations | Defendants |
|------|-------------|-----------|
| Triamcinolone Acetate | Cream<br>Ointment<br>Paste | Cream & Ointment: Par, Perrigo, Sandoz, Taro<br>Paste: Taro |
| Triamterene HCTZ | Capsules<br>Tablets | Caps: Lannett, Mylan, Sandoz<br>Tabs: Actavis, Apotex, Mylan, Sandoz |
| Trifluoperazine HCL | Tablets | Mylan, Sandoz |
| Ursodiol | Capsules | Actavis, Epic, Lannett |
| Valsartan HCTZ | Tablets | Mylan, Sandoz |
| Verapamil | Tablets | Actavis, Heritage, Mylan |
| Warfarin Sodium | Tablets | Taro, Teva, Zydus |
| Zoledronic Acid | Injection | Dr. Reddy's, Heritage |

## **STANDING**

120.    Plaintiffs' Assignors administer Medicare benefits for Medicare beneficiaries under Medicare Part C and Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

121.    Although Plaintiffs seek recovery on behalf of each and every one of its Assignors who paid inflated prices for the Subject Drugs, one representative assignment for each Plaintiff is alleged in detail in the Appendix to establish standing.[3] The assignments are valid and binding

---

[3] At the time of filing the additional Assignors include: 7th Avenue Medical Plaza, Inc., Accountable Care Options, LLC, Alianza De Medicos Del Sureste, Inc., Alianza Profesional de Cuidado Medico, Inc., Armor Correctional Health Services, Inc., Arse, Inc., Aspire Health Plan, Avmed, Inc., Blue Cross & Blue Shield of Rhode Island, Broward Primary Partners, LLC, Centro de Medicina Familiar del Norte, Inc., Centro Medico Salinas, Inc., Centros de Medicina Primaria Advantage del Norte, Inc., Centros Medicos Unidos del Oeste, Inc., Choice One Medical Group, LLC, Clinica Las Mercedes, Community Health Providers, Inc., Corporacion Medica Oriental, Doctor's Medical Center, Inc., Emblem Health Services Company, LLC, Fallon Community Health Plan, Inc., Family Medicine Group, Inc., EmblemHealth Services Company, LLC, Fallon Community Health Plan, Inc., Family Medicine Group, Inc., Family Physicians Group d/b/a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

contracts. A copy of each representative assignment is attached hereto as **Exhibits A-C** and explained in more detail in the Appendix.[4]

122.     During the relevant time period, Plaintiffs' Assignors purchased and paid, not for resale, for some or all of the purchase price for the Subject Drugs manufactured by Defendants. Plaintiffs' Assignors made such payments and/or reimbursements throughout the United States, thereby suffering injury to their business and property.

123.     During the relevant time period, Plaintiffs' Assignors paid and reimbursed more for the Subject Drugs than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate the markets and customers for the Subject Drugs. As a result of the alleged conspiracy, Plaintiffs' Assignors were injured in their business or property by reason of the violations of law alleged herein. Plaintiffs' Assignors intend to continue purchasing and/or reimbursing for the Subject Drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

---

Family Physicians of Winter Park, Inc., First Medical Health Plan, Inc., Grupo Advantage del Oeste, Inc., Grupo Cuidado Geriatrico Integral, Inc., Grupo Medicina Dirigida de Coamo, Inc., Grupo Medico de Cayey, Inc., Grupo Medico de Orocovis, Inc., Grupo Medico G.M.B., Health Alliance Medical Plans, Inc., Health Care Advisor Services, Inc., Healthcare Alliance Group, Inc., Hygea Health Holdings, Inc., Mastec, Inc., MCCI Group Holding, LLC, Med-Caribe CSP, Medical Consultants Management, LLC, Medical IPA of the Palm Beaches, Inc., Medicos Aliados del Noreste, Inc. a/k/a Grupo Medico Aliado de Noreste, Metro Salud, Millennium Medical Health Group, Inc., MMM Holdings, LLC, Network Health, Inc., Palm Beach Primary Care Associates, Inc., Physician Access Urgent Care Group, LLC Physician H.M.O., Inc., Policlinica General de Coamo C.S.P., Policlinicas Medicas Asociadas, Inc., Ponce Advance Medical Group, P.S.C., Preferred Primary Care, LLC, Premier Care Partners, LLC, Preferred Primary Care, LLC, Primary Physicians Medical Service, LLC, Professional Health Choice, Inc., Quality Medical Care, Inc., Redes del Sureste, Inc., Risk Watchers, Inc., SE Primary Care Services, CSP, Southern Health Care Group, Inc., SummaCare, Inc., Suncoast Medical Network 2, Inc., Suncoast Provider Network, Inc., Transatlantic Healthcare, LLC, Trinity Physicians, LLC, University Health Care MSO, Inc., Verimed IPA, LLC, Vidamax Medical Center for St. Jude Medical Group Corp.

[4] Plaintiffs have redacted confidential business information from the assignment agreements.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## REGULATORY AND ECONOMIC BACKGROUND

### I.    THE HATCH-WAXMAN ACT

124.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984), which was intended to encourage and facilitate competition from lower-priced generic drugs (which would reduce healthcare costs), while also providing further incentives for pharmaceutical companies to invest in new drug development (by allowing for extensions to market exclusivity).

125.    To promote price competition, the law established a new regulatory approval process for generic products to help ensure that generic drugs became available more quickly following patent expiration. To gain approval of a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the drug is safe and effective for its intended use. Developing a new drug and obtaining approval can take years and cost tens or hundreds of millions of dollars.

126.    Under the Hatch-Waxman Act, a manufacturer of a generic version of an FDA approved drug may file an abbreviated new drug application ("ANDA"), which allows the generic manufacturer to rely upon the studies submitted by the brand-name manufacturer in connection with the original NDA to prove that the generic version of the drug is safe and effective. This allows the generic manufacturer to avoid conducting costly and duplicative clinical trials.

127.    The Hatch-Waxman Act has succeeded in both of its goals. Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to nearly 90% of prescriptions filled.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## II.    THE IMPORTANCE OF GENERIC DRUGS

128.    The only material difference between generic drugs and their brand-name counterparts is the price. On average, generics are typically around 30% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

129.    Once a generic equivalent becomes available, an event sometimes referred to as the "patent cliff" occurs whereby the brand-name manufacturer sees a significant drop in profits. Upon entry into the market, the generic quickly captures sales of the corresponding brand-name drug, often capturing 80% or more of the brand's sales within the first six months. In a recent study, the FTC found that on average, within a year of generic entry, generics had captured 90% of corresponding brand-name drug sales and (with multiple generics on the market) prices had dropped 85%.[5]

130.    Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[6]

---

[5] FED. TRADE COMM'N, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS: A FEDERAL TRADE COMMISSION STAFF STUDY (Jan. 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last visited Sept. 4, 2020).

[6] *See e.g.* Patricia Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Market?,* J.L. & ECON. 43(2):311-57, (Oct. 2010); Richard Frank, *The Ongoing Regulation of Generic Drugs*, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

131.     A similar study done by the FDA found that between 1999 and 2004, entry of a second generic reduces the average generic price to nearly half of the brand-name price, and entry of additional generics reduced prices to 20% of the brand-name price – in other words, an 80% discount.[7]

132.     All fifty states and the District of Columbia have drug substitution laws, which either permit or require pharmacists to dispense a therapeutically equivalent, lower-cost generic drug ("AB-rated generic") in place of a brand-name drug unless the prescribing physician expressly directs that the prescription must be dispensed as written. This practice facilitates price competition at the pharmacy and results in dramatically reduced drug costs for patients and the health care system after generic entry, while still ensuring that patients receive the same therapeutic benefits.

133.     According to a study commissioned by the Association for Accessible Medicines, generic drugs saved the U.S. healthcare system $293 billion in 2018 and the U.S. healthcare system has saved $2 trillion in the last decade.[8] Savings for Medicare totaled $137 billion in 2018, meaning Medicare enrollees saved an average $2,254.[9]

134.     Generic competition allows third-party payers, like Plaintiffs' Assignors, to purchase generic versions of brand-name drugs at substantially lower prices.

---

[7] *Generic Competition and Drug Prices*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/about-fda/center-drug-evaluation-and-research/generic-competition-and-drug-prices (last updated Dec. 13, 2019).

[8] Association for Accessible Medicines, 2019 GENERIC DRUG AND BIOSIMILARS ACCESS AND SAVINGS IN THE U.S. (2019), *available at* https://accessiblemeds.org/sites/default/files/2019-09/AAM-2019-Generic-Biosimilars-Access-and-Savings-US-Report-WEB.pdf (last viewed Sept. 4, 2020).

[9] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

III.     **PRICING IN THE GENERIC DRUG MARKET**

135.     In simple terms, the generic pharmaceutical supply chain is as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a copay or coinsurance) if they are insured. The insured consumer's health plans, such as Plaintiffs' Assignors, then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by intermediaries known as Pharmacy Benefit Managers ("PBMs").

136.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription … drugs."[10] "The NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies. NADACs are calculated as a single national average …"[11] Thus, NADAC is one way to track general price trends in the marketplace.

137.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report

---

[10] *Methodology for Calculating the National Average Drug Acquisition Costs (NADAC) for Medicaid Covered Outpatient Drugs,* CENTERS FOR MEDICARE & MEDICAID SERVICES, (Nov. 2013), https://data.medicaid.gov/api/views/a4y5-998d/files/97a8d110-e14b-4bb7-a22b-7a2bd8c8679f?download=true&filename=NADAC%20Methodology.pdf (last visited Sept. 4, 2020).

[11] *Id*. at 15.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benchmarks – like Wholesale Acquisition Cost ("WAC") – for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturers' reported list prices, which are sometimes subject to discounts.

138.    After the WAC is established, the "average wholesale price" ("AWP"), or the list price, is established by the manufacturer or a company that publishes a price compendium.

139.    The AWP is used by some public and private third-party payers as a basis for reimbursement (*e.g.,* AWP minus 5% or 25% percent) and it often serves as the base price for negotiations between manufacturers and private sector purchasers of drugs.

140.    The AWP is used by Plaintiffs' Assignors and all Part D sponsors to calculate payment amounts.

141.    There is also the "average sales price" ("ASP"), which is the weighted average of all non-Federal sales to wholesaler distributors net of chargebacks, discounts, rebates, and other benefits tied to the purchase of a drug, whether it is paid to the wholesaler or retailer. The ASP is the basis for reimbursement for products covered under Medicare Part B.

142.    Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs that it sells nationwide. Competitors for pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market. At all times relevant to this Complaint, every Defendant's portfolio remained broad, and was marketed to customers in virtually every state across the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

143.     Defendants' business plans and strategies for their broad portfolios focus on the nationwide supply and demand chain that funnels their products through various purchasers, including Plaintiffs' Assignors, in order to reach consumer populations in every state.

## A.     Customer Incentives to Increase Prices

144.     Some of the largest buyers[12] that purchase from generic manufacturers benefit when prices are higher. For example, in McKesson's 2014 10-K filing, the company reported the following:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby *we benefit when the manufacturers increase their prices* as we sell our existing inventory at the new higher prices. *For these manufacturers, a reduction in the frequency and magnitude of price increases*, as well as restrictions in the amount of inventory available to us, *could have a material adverse impact on our gross profit margin*.[13]

In that same filing, McKesson also reported that "The business' practice is to pass on to customers published price changes from suppliers."[14]

145.     Similarly, in Cardinal's 2014 10-K filing, the company reported that:

> Gross Margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit. Prices for generic pharmaceuticals generally decline over time. But at times, *some generic*

---

[12] These buyers include the largest wholesalers and distributors of generic drugs, AmerisourceBergen Corporation ("ABC"), Cardinal Health Inc. ("Cardinal"), H.D. Smith, LLC ("Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris").

[13] *Annual Report (Form 10-K)*, MCKESSON CORPORATION at 9 (May 14, 2014), available for download at https://investor.mckesson.com/financials/sec-filings/default.aspx (last visited Sept. 4, 2020) (emphasis added).

[14] *Id*. at 33.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

> *products experience price appreciation, which positively impacts our margins.*[15]

146.    ABC's Annual Summary 2014 and Annual Report 2014 make very similar observations:

> Our results of operations continue to be subject to the risks and uncertainties of inflation in branded and generic pharmaceutical prices and deflation in generic pharmaceutical prices.
>
> Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them. Arrangements with a small number of branded manufacturers continue to be solely inflation-based. As a result, our gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. *If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.* In addition, generic pharmaceuticals are also subject to price deflation. *If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.*[16]

147.    Other large retail customers have similar contractual provisions in their contracts with generic manufacturers that allow for potentially greater compensation when prices are higher. For example, contracts between Walgreens Boots Alliance Development GmbH, a group purchasing organization ("GPO"), and generic manufacturers contain provisions about Rebates and Administrative fees that are directly tied to "total contract sales" – a number that increases when prices increase. In other words, that GPO (and other large retail customers with similar contractual terms) may make more money when generic drug prices are higher.

---

[15]  *Annual Report (Form 10-K)*, CARDINAL HEALTH INC., at 6-7 (Aug. 13, 2014), https://d1lge852tjjqow.cloudfront.net/CIK-0000721371/002928a6-efcf-4a53-90d0-44475be46180.pdf (last visited Sept. 4, 2020) (emphasis added).

[16]*Annual Report (Form 10-K)*, AMERISOURCEBERGEN CORPORATION, at 8 (Nov. 25, 2014), available for download at https://investor.amerisourcebergen.com/financials/annual-reports/default.aspx (last visited Sept. 4, 2020) (emphasis added).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

148.   The generic manufacturers are keenly aware that their largest customers benefit from their price increases. In fact, many of the generic drug manufacturers regularly tout these price increases in their discussions with customers. As just one example, when Teva met with large customer Red Oak (a joint venture between Cardinal and CVS) in December 2014, it boasted that during its August 28, 2014 price increase it had been able to increase twenty different product families, resulting in an estimated $29 million price increase value to the customer. As D.K., a senior executive at Fougera, stated in an internal email in February 2011: ████████████ ████████████████████████

## IV.   THE MARKET FOR GENERIC DRUGS IS HIGHLY SUSCEPTIBLE TO COLLUSION

149.   The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

150.   Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. There are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases. Factors showing that a market is susceptible to collusion include:

a.  **High level of industry concentration**: A small number of competitors control roughly 100% of the market for each of the Subject Drugs. Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the Subject Drugs, there were between two and four manufacturers providing that drug for sale in the United States during the relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.  **Sufficient numbers to drive competition**: While the market for each of the Subject Drugs had a small enough number of competitors to foster

collusion, the number of sellers was large enough that prices should have remained at their historical, near marginal cost levels.

c. **High barriers to entry**: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2009. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d. **High inelasticity of demand and lack of substitutes**: Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, one of the Subject Drugs is the only effective treatment.

e. **Commoditized market**: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another.

f. **Absence of departures from the market**: There were no departures from the market during the relevant time period that could explain the drastic price increases.

g. **Absence of non-conspiring competitors**: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2009 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h. **Opportunities for contact and communication among competitors**: Defendants participate in the committees and events of the GPhA, HDMA, ECRM, NACDS, MMCAP, and other industry groups, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

i. **Size of price increases**: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists seeking to test price boundaries need to take a measured approach. But here the increases are not 5% or 10% jumps – they are of far greater magnitude.

46

A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

j. **Reimbursement of generic drugs**: The generic market has institutional features that would inhibit non-collusive, parallel price increases. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## FACTUAL ALLEGATIONS

## I.   GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

151.   Defendants' and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the Department of Justice ("DOJ") Antitrust Division, the United States Senate, the United States House of Representatives, and Attorneys General of forty-seven states, the District of Columbia, and Puerto Rico (the "State AGs").

152.   The DOJ's and State AGs' investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.   Congress Launched an Investigation into Generic Price Hikes

153.   In January 2014, the NCPA urged the Senate HELP Committee and the United States House Energy and Commerce Committee to hold hearings on significant spikes in generic pharmaceutical pricing, citing surveys and data from community pharmacists. The NCPA surveyed over one thousand pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

154.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of HELP and Representative Elijah E. Cummings, who was then the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to fourteen drug manufacturers, including Defendants Actavis, Endo, Heritage, Mylan, Par, Sun, and Teva, requesting information about the escalating prices of generic drugs.[17]

155.    Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[18]

156.    On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[19] The OIG responded to the request on April 13, 2015, advising it would

---

[17] *Congress Investigating Why Generic Drug Prices Are Skyrocketing*, Press Release, U.S. Senator Bernie Sanders (Oct. 2, 2014), https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last visited Sept. 4, 2020).

[18] *Id.*

[19] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

examine pricing for the top 200 generic drugs from 2005 to 2014 to "determine the extent to which the quarterly AMPs [average manufacturer prices] exceeded the specified inflation factor."[20]

157.    In August 2016, the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015 found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more.[21]

### B.    The DOJ Investigates Criminal Generic Drug Collusion

158.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry and empaneled a grand jury on or around November 3, 2014.

159.    The DOJ initially focused on non-Subject Drugs Glyburide and Doxycycline.[22] However, news reports, court filings, and other public statements corroborate the sweeping nature of the DOJ's investigation. Reportedly, the DOJ believes price-fixing between generic pharmaceutical manufacturers is widespread and its investigation spans "more than a dozen companies and about two dozen drugs."[23]

160.    The DOJ first charged two Heritage executives, Jeffrey Glazer and Jason Malek, with criminal counts related to price collusion for generic non-Subject Drugs Doxycycline and

---

[20] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file (last visited Sept. 4, 2020).

[21] GAO Report at 12.

[22] Plaintiffs previously filed suit in the District of Connecticut alleging price-fixing allegations against the manufacturers of Doxycycline and Glyburide. *MSPA Claims 1, LLC et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, No. 17-cv-144-VLB. The case was transferred into *In re: Generic Pharmaceuticals Pricing Litigation Antitrust Litigation*, MDL No. 2724.

[23] Joshua Sisco, *DOJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Glyburide. *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508 (E.D. Pa.).

161.    On January 9, 2017, Glazer and Malek pled guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices, rig bids, and engage in market and customer allocation concerning non-Subject Drugs Doxycycline and Glyburide.

162.    Defendants Actavis, Dr. Reddy's, Mylan, Par, Sandoz, Sun, Taro, and Teva have admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Defendant Mylan. Finally, upon information and belief, the DOJ has granted conditional amnesty to Heritage.[24] Under DOJ Guidelines, for the DOJ to grant a company conditional amnesty, the amnesty applicant must confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant.

163.    Information disclosed by some Defendants evidence the broad scope of the conspiracy investigated by the DOJ.

164.    For example, in a quarterly report filed with the Securities and Exchange Commission ("SEC"), Lannett disclosed that on November 3, 2014, its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[25] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription

---

[24] Upon information and belief, Heritage is participating in the DOJ's leniency program.

[25] *Quarterly Report (Form 10-Q)*, LANNETT COMPANY, INC., at 16 (Nov. 6, 2014) https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

medications, but is not specifically directed to any particular product and is not limited to any particular time period."[26]

165.    In February 2016, Mylan disclosed in an annual report filed with the SEC that it received a DOJ subpoena related to non-Subject Drug Doxycycline,[27] and disclosed in a quarterly report in November 2016 that it had received subpoenas relating to Subject Drugs – Glipizide-metformin, Propranolol, and Verapamil – and non-Subject Drug – Cidofovir.[28] In the same report, Mylan also disclosed that the DOJ executed search warrants in connection with the investigation.[29]

166.    Novartis, the parent company of Sandoz disclosed that "[i]n March 2016, Sandoz Inc. received a subpoena from the Antitrust Division of the DOJ requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera) and related communications with competitors. Sandoz Inc. is cooperating with this investigation which it believes to be part of a broader inquiry into industry practice."[30]

---

[26] *Id.*

[27] *Annual Report (Form 10-K)*, MYLAN INC., at 160 (Feb. 16, 2016), http://investor.mylan.com/static-files/fa02fb29-d27c-4a9d-824b-be0481bdf98c (last visited Sept. 4, 2020).

[28] *Quarterly Report (Form 10-Q)*, MYLAN INC., at 58 (Nov. 9, 2016), http://investor.mylan.com/static-files/79a74f61-9a6c-411b-801a-4dd005e70ad5 (last visited Sept. 4, 2020).

[29] *Id.*

[30] *Annual Report*, NOVARTIS, at 217 (2016), https://www.novartis.com/sites/www.novartis.com/files/novartis-annual-report-2016-en.pdf (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

167.    On December 5, 2014, Defendant Par received a subpoena from the DOJ Antitrust Division regarding its communications with competitors concerning Digoxin and non-Subject Doxycycline.[31]

168.    In a Form 6-K filed with the SEC, Taro Israel stated that on September 8, 2016, Taro "as well as two senior officers in its commercial team, received grand jury subpoenas" from the DOJ Antitrust Division "seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[32]

169.    On June 21, 2016, Defendant Teva received a subpoena from the DOJ Antitrust Division "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. [Defendant] Actavis [at this time a subsidiary of Teva Israel] received a similar subpoena in June 2015."[33]

170.    The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-md-2724 (E.D. Pa.). For example, in an action related to Subject Drug Propranolol, the DOJ intervened and requested a stay of discovery, stating that "the reason for the

---

[31] *Annual Report (Form 10-K)*, PAR PHARMACEUTICAL COMPANIES, INC., at 37 (Mar. 12, 2015), https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm (last visited Sept. 4, 2020).

[32] *Report of Foreign Private Issuer (Form 6-K)*, TARO PHARMACEUTICAL INDUSTRIES LTD., (Sept. 9, 2016), https://seekingalpha.com/filing/3221934 (last visited Sept. 4, 2020).

[33] *Report of Foreign Private Issuer (Form 6-K)*, TEVA PHARMACEUTICAL INDUSTRIES LTD., at 33 (Nov. 15, 2016), https://www.sec.gov/Archives/edgar/data/818686/000119312516768849/d284188d6k.htm (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case."[34]

171.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[35]

**C.     State Attorneys General Launch Investigations into Generic Drug Price Hikes**

172.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Connecticut along with twenty other states ("State AGs") filed suit on December 15, 2016. Although the State AGs' first complaint focused on Doxycycline and Glyburide, it also alleged that the State AGs uncovered a wide-ranging series of conspiracies implicating numerous different generic drugs and manufacturers. Connecticut's Attorney General, George Jepsen, noted that while the lawsuit focused on the actions of Heritage, "we have evidence of widespread participation in illegal conspiracies across the generic drug industry."[36]

---

[34] Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF No. 112 (S.D.N.Y. Feb. 21, 2017).

[35] *Division Update Spring 2017*, DEP'T OF JUSTICE, (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products (last visited Sept. 4, 2020).

[36] Mark Pazniokas, *Connecticut leads 20 states alleging price-fixing in generic drugs*, THE CONN. MIRROR (Dec. 15, 2016), https://ctmirror.org/2016/12/15/connecticut-leads-20-states-alleging-price-fixing-in-generic-drugs/ (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

173.    New York's Attorney General similarly reported that the State AGs' investigation "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[37]

174.    The State AGs filed an Amended Complaint on June 18, 2018, broadening the case to include fifteen drugs. Connecticut Attorney General, George Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond … We're learning new things every day."[38]

175.    The amended complaint included the State AGs of forty-seven states, the District of Columbia, and Puerto Rico, asserting claims against eighteen companies, including Defendants Heritage, Teva, Mylan, Actavis, Par, and Sandoz.

176.    On May 10, 2019, the State AGs filed a new complaint focusing on a conspiratorial web Teva constructed with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("Second AG Complaint"), most of which are Subject Drugs in this Complaint. The allegations in the Second AG Complaint were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry; (2) and industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers,

---

[37] *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies*, Press Release, NEW YORK OFFICE OF THE ATT'Y GEN., (Dec. 15, 2016), https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage (last visited Sept. 4, 2020).

[38] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, THE DAILY BEAST, (Dec. 21, 2016 1:02 AM), https://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged …"[39]

177.    On June 10, 2020, the State AGs filed another complaint focusing on a collusion between Sandoz, Taro, Perrigo and other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 80 generic drug products ("Third AG Complaint"), most of which are Subject Drugs in this Complaint.

178.    During the course of their investigation, the State AGs obtained cooperation from a number of individuals. The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout the Second and Third AG Complaint and this Complaint. Some of those cooperating witnesses include:

      a.  A former senior pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

      b.  A former sales and marketing executive at Rising and senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

      c.  A former sales executive at Fougera, and then senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

      d.  A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

      e.  A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5];

---

[39] Second AG Complaint at ¶ 4. The State AGs detail their extensive investigation in the Second and Third AG Complaints. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when." Second AG Complaint ¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

f.   A former senior sales executive at Fougera and Aurobindo during the time period relevant to this Complaint [referred to herein as CW-6]; and

g.   Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage.

179.   Teva has, at all times relevant to this Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions. Although the State AGs do not have full access to that database, they have obtained static images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports. Through its review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made a "strategic" market decision. A number of those instances are detailed throughout this Complaint.

180.   In addition, the State AGs obtained contemporaneous handwritten notes taken by CW-3 during the time period relevant to this Complaint, containing direct evidence of his collusion with several competitors. CW-3 maintained these notes in a two-volume notebook that his colleague, CW-1, referred to as the ███████████ (referred to herein as the "Notebook"). The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors. CW-3 took these notes chronologically between 2009 and 2015. In 2012 and 2013, the notes are fairly comprehensive; however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices. CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notices. CW-3 generally traveled with the Notebook and did not hide it from people, including competitors. Indeed, competitors often joked with him about his "little

black books." References to the Notebook will be discussed throughout this Complaint to support the allegations alleged herein.

## II.    THE COZY NATURE OF THE INDUSTRY AND OPPORTUNITIES FOR COLLUSION

181.    The collusion alleged herein infested the generic drug industry.

182.    At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the intended and actual effect of causing Plaintiffs' Assignors to pay artificially inflated prices at supracompetitive prices.

183.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

  a.  Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

  b.  Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs in the United States;

  c.  Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States.

  d.  Agreeing during those meetings, conversations, and communications to not compete against each other for certain customers with respect to the Subject Drugs sold in the United States.

  e.  Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

  f.  Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

> g. Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

184. The Defendants ensured that all competitors were adhering to the collective scheme by communicating at (1) trade association meetings and conferences; (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) individual, private communications between and among Defendants' employees through use of the telephone, electronic messaging, and similar means.

## A. Trade Association and Customer Conferences

185. Many of Defendants largest customers, including but not limited to (a) large wholesalers and distributors like ABC, Cardinal, HD Smith, McKesson and Morris; (b) GPOs; and (c) other large drug purchasers like pharmacies and supermarket chains, hold multi-day conferences throughout the year in various locations throughout the United States. Generic manufacturers are invited to attend.

186. Additionally, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA"), Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicine), Efficient Collaborative Retail Marketing ("ECRM"), and the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"). Between February 20, 2013 and December 20, 2014, there were at least forty-four different tradeshows or customer conferences where Defendants had the opportunity to, and actually did, meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

187. At these various conferences and trade shows, sales representatives, and executives from the generic drug manufacturers, including Defendants, interact with each other and discuss

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

their respective business and customers. Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties, and dinners that provide ample opportunities to meet competitors. Defendants use these opportunities to discuss and share competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

188.    In fact, in the Association for Accessible Medicine's Antitrust Compliance Policy Manual updated January 2018, well after litigation and investigation surrounding generic drug pricing conspiracies began, the trade association explicitly stated:

> Meetings, communications and contacts that touch on antitrust matters present special challenges. A simple example will illustrate this.  Suppose that competitors were to discuss their prices at a meeting or in a document, and that their prices increase shortly afterward. A jury might view this as evidence that their discussion led to an agreement on pricing, and thus violated the antitrust laws.

It went on to warn "[d]o not discuss any subjects that might raise antitrust concerns (including prices, market allocations, refusals to deal, and the like) unless you have received specific clearance from counsel in advance." The Association also warns members to avoid creating written records, and "avoid language that might be misinterpreted to suggest that the Association condones or is involved in anticompetitive behavior."

## 1.    National Association of Chain Drug Stores ("NACDS")

189.    NACDS "advances a pro-patient and pro-pharmacy agenda. For the ultimate benefit of the customers served by NACDS members, the mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

190.    NACDS hosts an Annual Meeting, attended only by member companies' executives, that it claims is "the industry's most prestigious gathering of its most influential

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

leaders. It is the classic 'Top-to-Top' business conference, attended by industry decision makers." It boasts that it will give companies "a unique opportunity to gain new insights into today's changing marketplace and set your course for the future," and the "opportunity to meet and discuss strategic issues with key trading partners" to "set [] the stage for profitable business."

191.    NACDS also hosts a Total Store Expo annually, which similarly boasts that it is "the industry's largest gathering of its most influential leaders. It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

192.    NACDS members include Defendants Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

### 2.    Healthcare Distribution Management Association ("HDMA")

193.    HDMA (now the Healthcare Distribution Alliance) is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[40] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

194.    Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Amneal, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Heritage, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as Allergan, now a

---

[40] *About*, HEALTHCARE DISTRIBUTION ALLIANCE, https://www.hda.org/about_(last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

division of Actavis.[41] As of May 2016, HDMA's manufacturer membership list included Amneal,

Apotex, Aurobindo, Breckenridge, Camber, Citron, Dr. Reddy's, Endo, Heritage, Lannett, Lupin,

Mylan, Par, Pfizer, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as

Allergan.[42]

### 3.    Generic Pharmaceutical Association ("GPhA")

195.    GPhA (now called Association for Accessible Medicines) is the "nation's leading

trade association for manufacturers and distributors of generic drugs…"[43] GPhA was created in

2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry

Association, the National Association of Pharmaceutical Manufacturers, and the National

Pharmaceutical Alliance. Regular members are "corporations, partnerships or other legal entities

whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose

drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3)

biosimilar/biogenetic products; or (4) DESI products."[44]

196.    GPhA's website offers members the opportunity to "participate in shaping the

policies that govern the generic industry." GPhA's "member companies supply approximately 90

percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking

opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable

---

[41] *Manufacturer Members,* HDMA,
https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org/about/mem
bership/manufacturer/manufacturer-members (last visited Sept. 4, 2020).

[42] *Manufacturer Members,* HDMA,
https://web.archive.org/web/20160502035223/http://www.healthcaredistribution.org/about/mem
bership/manufacturer/manufacturer-members (last visited Sept. 4, 2020).

[43] *Membership*, GPhA,
http://web.archive.org/web/20150413013008/http://www.gphaonline.org/about/membership/
(last visited Sept. 4, 2020).

[44] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[45]

197.    Actavis, Amneal, Apotex, Dr. Reddy's, Glenmark, Heritage, Lupin, Mylan, Par, Sandoz, Sun, Teva, Wockhardt, and Zydus are regular members of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA.

198.    Executives from Actavis, Apotex, Heritage, Lupin, Mylan, Par, Sandoz, Sun, Teva, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013.

### 4.    Efficient Collaborative Retail Marketing ("ECRM")

199.    ECRM hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently. It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss business opportunities, review contracting strategies, and future business planning activities."[46]

### 5.    Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP")

200.    MMCAP hosts various meetings and conferences throughout the year that are regularly attended by Defendants' representatives with price setting capabilities. According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities

---

[45] *Id.*

[46] The Health System/Institutional Pharmacy Program, ECRM, https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals (last visited Sept. 20, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that provide healthcare services."[47] Members receive access to a full range of pharmaceuticals and healthcare products and services.

B.     **Industry Dinners and Private Meetings**

201.     In addition to the frequent trade association meetings and industry conferences, senior executives and sales representatives of the Defendants congregated in smaller, more limited groups, which allowed them to discuss their competitors and competitively sensitive information.

202.     Many Defendants are headquartered in close proximity to one another, providing them with easy and frequent access to one another. At least forty-one different generic drug manufacturers are located in between New York, New Jersey, and Pennsylvania, including among others, Actavis, Amneal, Aurobindo, Breckenridge, Camber, Citron, Dr. Reddy's, Epic, Fougera, Glenmark, Greenstone, G&W, Heritage, Lannett, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teligent, Teva, West-Ward, Wockhardt and Zydus.

203.     High level executives of many generic manufacturers get together periodically for "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey to discuss their ongoing conspiracy. Executives from Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, Perrigo and Sun, among many other generic manufacturers, attended this particular dinner.

204.     At the industry dinners, one company is usually responsible for paying for all attendees. For example, in a group email conversation among the competitors in December 2013,

---

[47]  MMCAP, http://www.mmd.admin.state.mn.us/MMCAP/Default.aspx (last visited Sept. 4, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

one of the participants – a high-ranking executive for Defendant Dr. Reddy's – joked "[y]ou guys are still buying for Mark and I, right?" The response from another executive: "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [a generic drug manufacturer] picked up the last bill…PS…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

205.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, for example, high-level executives from Defendants Apotex, Actavis, Amneal, Lannett, Par, Teva, Wockhardt and Zydus and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night. David Rekenthaler, Vice President of U.S. Generics at Teva and a high-level executive from Apotex actually stayed together in the home of the owner of the packaging company that sponsored the event. At the conclusion of the outing, one of the executives – Konstantin Ostaficiuk, President of Camber – sent an email to other attendees, stating "[t]his is a crazy biz but I'm grateful to have friends like all of you!!!! Happy and Honored to have you all as 'fraternity brothers.'" As discussed more fully below, Rekenthaler and Ostaficiuk used this golf outing as an opportunity to negotiate Camber's anticompetitive entry into the market for two different Teva drugs.

206.    Some generic pharmaceutical sales representatives also got together regularly for what they refer to as a "Girls' Night Out" ("GNO") or alternatively "Women in the Industry" meeting or dinner. During these events, the sales representatives meet with their competitors and discuss proprietary and sensitive information.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

207.    Many "Women in the Industry" dinners were organized by A.S., a salesperson from Defendant Heritage, who resides in Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. However, out-of-town representatives were also aware of these dinners and were included when in the area. For example, in November 2014, Tracy Sullivan, Director of National Accounts at Defendant Lannett, sent A.S. a text message, asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" A.S. responded: "[t]here is an Xmas [sic] party at Tanya's house on Dec. 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."

208.    Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing the dinner:

> Sorry if the meeting/dinner invite is a little short notice, but [Katherine Neely, a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry 100 – we can recap all our findings from NACDS over a martini or glass of wine! :) Plus the food is super Yummy!

209.    Several GNO events were held in 2015, including: (1) at the ECRM conference in February (involving Defendants Citron, Dr. Reddy's, Greenstone, Heritage, Lannett, Pfizer, Teva, Upsher-Smith, Valeant, and Zydus, among others; (2) in Baltimore in May (involving Defendants Citron, Dr. Reddy's, G&W, Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference in August (involving Defendants Citron, Dr. Reddy's, Heritage, and Valeant among others).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### C.    Personal Telephone Calls, Emails and Text Message Communications

210.    Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

211.    Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Plaintiffs' Assignors.

212.    Representatives of several of the Defendants with pricing responsibility had frequent telephone calls with representatives of their competitors. Executives at Heritage had at least 513 contacts with executives from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mylan, Par, Sandoz, Sun, Teva, and Zydus. Executives at Teva had at least 1,501 contacts with competitors, including from Actavis, Apotex, Amneal, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus. Many of these contacts are described in detail below.

### D.    Individual Relationships

213.    Each of the individuals described below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlap drugs. Many of these relationships are discussed throughout this Complaint.

214.    For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel moved to Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing. As detailed below, Malek and Patel orchestrated a number of price increases between 2013–present – some led by Teva, others by Heritage.

215.     Malek and Patel's relationship was valued and accepted by Malek's supervisors. In April 2014, Malek and Glazer met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek told Mehta and Thapar about his Teva contact, Patel. Malek, who had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

216.     The following sections profile each of these individuals and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them. The charts that follow are limited to communications with employees at other Defendants and do not include communications these individuals may have had with executives at competitive companies that are not named in this Complaint.

### 1.     Ara Aprahamian

217.     Ara Aprahamian ("Aprahamian") worked at Actavis as Director, Pricing and Contracts from August 2010 through March 2013. From March 2013 through August 2018, Aprahamian was Vice President of Sales at Taro. Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the Defendants. For example, between March 2013 and October 2018, Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Greenstone, and Aurobindo. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R. (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2014 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2014 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| R.H. (Greenstone) | 4 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

### 2.    David Berthold

218.    David Berthold ("Berthold") is the Vice President of Sales at Lupin and has held

that position since June 2006. During his tenure at Lupin, Berthold has been the primary person at

the company communicating with competitors. Indeed, Berthold has relationships with individuals

at many of the Defendants. For example, between March 2011 and October 2018, Berthold

exchanged at least 4,185 phone calls and text messages with his contacts at Aurobindo, Glenmark,

Greenstone, Actavis, Wockhardt, Zydus, Camber, Teva, Breckenridge, Mylan, Sandoz, Dr.

Reddy's, Amneal, and Lannett. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| R.H. (Greenstone) | 791 | 3/9/2011 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2013 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2013 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2014 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2014 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

### 3.   Mitchell Blashinsky

219.   Mitchell Blashinsky ("Blashinsky") worked for Taro from January 2007 through May 2012 as Vice President of Marketing for Generics. From June 2012 through March 2014, Blashinsky was Vice President of Sales and Marketing at Glenmark. Beginning as early as 2011, Blashinsky took active steps to facilitate market allocation and price fixing agreements between Taro and Glenmark.

69

### 4. Douglas Boothe

220.     Douglas Boothe ("Boothe") worked at Actavis from August 2008 through December 2012 as Chief Executive Officer. From January 2013 through July 2016, Boothe served as Executive Vice President and General Manager, Pharmaceuticals at Perrigo. Beginning as early as 2012, Boothe took active steps to facilitate market allocation and price fixing agreements between Perrigo and its competitors.

### 5. Jim Brown

221.     Jim Brown ("Brown") is the Vice President of Sales at Glenmark and has held that position since November 2012. Brown was one of several Glenmark executives that conspired with competitors. Although not as prolific in his communications with competitors as some of the other individual Defendants, he did communicate when necessary to further the agreements. For example, between June 2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Camber, Zydus, Par, Apotex, and Taro. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 16 | 12/18/2013 | 2/22/2018 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

### 6.   Maureen Cavanaugh

222.    Maureen Cavanaugh ("Cavanaugh") was the Senior Vice President and Chief Commercial Officer at Teva. During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation. In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the agreements. For example, between January 2011 and August 2017, Cavanaugh exchanged at least 612 phone calls and text messages with her contacts at Actavis, Amneal, Zydus, Sandoz, Glenmark, and Greenstone. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| S.R.(1) (Amneal) | 45 | 1/18/2011 | 11/14/2012 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

### 7.   Marc Falkin

223.   Marc Falkin ("Falkin") was the Vice President of Marketing, Pricing and Contracts at Actavis until Actavis was acquired by Teva in August 2016. For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva. During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants. For example, between August 2013 and July 2016, Falkin exchanged at least 2,562 phone calls and text messages with his contacts at Zydus, Teva, Glenmark, Camber, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

### 8. Jim Grauso

224. Jim Grauso ("Grauso") worked at G&W as Vice President of Sales and Marketing from January 2010 through December 2011. Grauso was employed as a Senior Vice President of Commercial Operations at Aurobindo from December 2011 until January 2014. In February 2014, Grauso moved to Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations. Grauso regularly communicated with competitors. For example, between December 2011 and January 2014, Grauso exchanged at least 1,763 phone calls and text messages with his contacts at Lupin, Teva, Actavis, Taro, Zydus, Camber, Amneal,

Glenmark, Greenstone, Wockhardt, and Breckenridge. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

225.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo. For example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Greenstone, Camber, Dr. Reddy's, Amneal, Rising, Par, Breckenridge, Upsher-Smith, and Mylan. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2018 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 4/10/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

### 9.    Kevin Green

226.    Kevin Green ("Green") worked at Teva as the Director of National Accounts until November 2013 when he took a position with Zydus. Green is currently the Vice President of Sales at Zydus. Green developed a number of relationships with individuals at many of the Defendants. He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Green exchanged at least 1,410 phone calls and text messages with his contacts at Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Greenstone, Breckenridge, Wockhardt, and Lannett. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

227.   Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Green exchanged at least 969 phone calls and text messages with his contacts at Teva, Glenmark, Mylan, Lupin, Aurobindo, Rising, Amneal, Sandoz, Greenstone, Lannett, and Dr. Reddy's. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2014 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2013 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| R.H. (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

**10.   Walter Kaczmarek**

228.   Walter Kaczmarek ("Kaczmarek") worked at Fougera as Senior Director, National Accounts; Vice President, National Accounts; and Senior Vice President, Commercial Operations from November 2004 through November 2012. Kaczmarek worked at Mallinckrodt as Vice President – General Manager; and President, Multi-Source Pharmaceuticals from November 2013 through August 2016. Beginning at least as early as 2010, Kaczmarek took active steps to facilitate market allocation and price fixing agreements between Fougera and its competitors.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 11.    Armando Kellum

229.    Armando Kellum ("Kellum") was the Director of Pricing and Contracts at Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors. In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the agreements. For example, between May 2011 and April 2015, Kellum exchanged at least 182 phone calls and text messages with his contacts at Greenstone, Lupin, Teva, Upsher-Smith, Zydus, Actavis, Rising, Amneal, and Dr. Reddy's. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

### 12.    Jill Nailor

230.    Jill Nailor ("Nailor") has worked at Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts. Nailor directed her subordinate Hatosy, a national account executive, and others at Greenstone to fix prices and allocate customers with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competitors on overlap drugs, including with several of the Defendants. She also instructed them to avoid putting any evidence of such communications in writing.

231.    In addition, Nailor regularly communicated directly with competitors herself. For example, between August 2010 and May 2017, Nailor exchanged at least 4,439 phone calls and test messages with her contacts at Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 3769 | 8/26/2010 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2014 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 13.    James Nesta

232.    James Nesta ("Nesta") started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan. Nesta communicates regularly with his counterparts at many of the Defendants. For example, between January 2011 and February 2016, Nesta exchanged at least 5,293 phone calls and text messages with his contacts at Greenstone, Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, and Par. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| S.R.(1) (Amneal) | 1079 | 1/3/2011 | 12/17/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

### 14.    Kurt Orlofski

233.    Kurt Orlofski ("Orlofski") was the President of G&W from September 2009 through December 2016. Between January 2011 and December 2016, when he left G&W, Orlofski

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

exchanged at least 1,863 phone calls and text messages with his contacts at Lupin, Aurobindo, Amneal, Wockhardt, Taro, Glenmark, Perrigo, Fougera, Actavis, and Sandoz. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 589 | 4/4/2011 | 10/13/2016 |
| Grauso, Jim (Aurobindo) | 406 | 12/28/2011 | 1/20/2014 |
| S.R.(1) (Amneal) | 265 | 8/29/2011 | 4/8/2016 |
| M.C. (Wockhardt) | 238 | 4/19/2011 | 12/27/2016 |
| Perfetto, Mike (Taro) | 136 | 1/25/2013 | 9/1/2016 |
| Grauso, Jim (Glenmark) | 66 | 2/12/2014 | 10/27/2016 |
| S.K. (Perrigo) | 56 | 1/20/2011 | 4/24/2012 |
| Aprahamian, Ara (Taro) | 45 | 7/24/2013 | 6/10/2016 |
| Boothe, Douglas (Perrigo) | 19 | 1/25/2013 | 1/8/2015 |
| K.K. (Wockhardt) | 11 | 8/29/2011 | 8/30/2011 |
| Taro Pharmaceuticals | 11 | 3/22/2012 | 8/5/2014 |
| Kaczmarek, Walt (Fougera) | 4 | 2/8/2012 | 2/10/2012 |
| Boyer, Andy (Actavis) | 4 | 9/7/2012 | 7/22/2013 |
| D.P. (Sandoz) | 3 | 8/13/2013 | 8/13/2013 |
| Wesolowski, John (Perrigo) | 3 | 9/16/2014 | 9/16/2014 |
| CW-6 (Aurobindo) | 3 | 10/31/2012 | 5/25/2013 |
| CW-6 (Fougera) | 2 | 2/1/2012 | 2/1/2012 |
| B.S. (Taro) | 1 | 4/24/2012 | 11/15/2012 |
| C.V. (Perrigo) | 1 | 6/1/2016 | 6/1/2016 |

### 15.  Konstantin Ostaficiuk

234.   Konstantin Ostaficiuk ("Ostaficiuk") is the President of Camber and has held that position since 2009. During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors. Indeed, Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the Defendants. For example, between March 2011 and August 2017, Ostaficiuk exchanged at least 464 phone calls with his contacts at Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Rising, Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2013 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| S.R. (1) (Amneal) | 12 | 3/12/2012 | 10/25/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2015 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2011 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2013 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

### 16.   Nisha Patel

235.     Nisha Patel ("Patel") worked at Teva from April 2013 to December 2016, first as a

Director of Strategic Customer Marketing and then as a Director of National Accounts. As

discussed in great detail below, Patel was in frequent communication with her counterparts at the

Defendants to fix prices and allocate markets. For example, during her time at Teva, Patel

exchanged at least 1,240 phone calls and text messages with her contacts at Zydus, Sandoz,

Actavis, Glenmark, Greenstone, Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo,

Mylan, Amneal, Upsher-Smith, and Breckenridge. As discussed in various sections of this

Complaint, Patel also frequently communicated with competitors using Facebook Messenger,

LinkedIn messaging, and the encrypted messaging application WhatsApp. The communications

detailed in the below include only telephone calls and text messages.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| R.H. (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2014 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2016 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2016 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

**17.     Mike Perfetto**

236.     Mike Perfetto ("Perfetto") worked at Actavis from August 2003 through January 2013 as Vice President, Sales and Marketing. Beginning in January 2013, Perfetto worked for Taro as its Chief Commercial Officer. Between January 2013 and February 2016, Perfetto exchanged at least 690 phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, Greenstone, Amneal, and Lannett. These communications are detailed in the table below:

| Contact Name | Coun | Min Dat | Max Dat |
|---|---|---|---|
| Orlofski, Kurt (G&W) | 160 | 1/25/2013 | 9/1/2016 |
| Boothe, Douglas (Perrigo) | 130 | 3/5/2013 | 7/29/2016 |
| T.D. (Actavis) | 79 | 2/19/2013 | 4/14/2017 |
| Dorsey, Mike (Actavis) | 89 | 1/2/2013 | 5/12/2017 |
| Grauso, Jim (Glenmark) | 58 | 2/10/2014 | 2/3/2018 |
| Blashinsky, Mitchell (Glenmark) | 51 | 1/4/2013 | 4/29/2017 |
| M.B. (Actavis) | 31 | 2/25/2013 | 2/5/2017 |
| Grauso, Jim (Aurobindo) | 20 | 1/17/2013 | 1/16/2014 |
| M.C. (Wockhardt) | 24 | 1/9/2013 | 12/7/2017 |
| M.P. (G&W) | 18 | 7/2/2013 | 4/22/2017 |
| Falkin, Marc (Actavis) | 7 | 12/13/2013 | 1/17/2017 |
| T.G. (Ranbaxy) | 5 | 1/17/2014 | 1/30/2014 |
| M.P. (Sandoz) | 4 | 3/7/2017 | 3/8/2017 |
| Hatosy, Robin (Greenstone) | 4 | 11/21/2013 | 2/20/2017 |
| Boyer, Andy (Actavis) | 3 | 3/12/2013 | 4/30/2013 |
| Vogel-Baylor, Erika (G&W) | 2 | 3/21/2014 | 3/21/2014 |
| L.P. (Actavis) | 1 | 3/15/2013 | 3/15/2013 |
| S.R. (Amneal) | 1 | 4/7/2014 | 4/7/2014 |
| K.S. (Lannett) | 1 | 4/24/2015 | 4/24/2015 |
| M.T. (Ranbaxy) | 1 | 6/30/2016 | 6/30/2016 |
| C.V. (Perrigo) | 1 | 1/3/2014 | 1/3/2014 |

### 18.   David Rekenthaler

237.   David Rekenthaler ("Rekenthaler") was the Vice President of Sales, US Generics at Teva until April 2015. Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the Defendants. For example, between January 2011 and March 2015, Rekenthaler exchanged at least 1,044 phone calls and text messages with his contacts at Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Camber, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett, and Wockhardt. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2013 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| S.R.(1) (Amneal) | 1 | 8/6/2012 | 8/6/2012 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

### 19.   Rick Rogerson

238.   Rick Rogerson ("Rogerson") was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several Defendants. For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls and text messages with his contacts at Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus. These communications are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz) | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

## 20.   Tracy Sullivan

239.   Tracy Sullivan ("Sullivan") has been employed at Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the Defendants. For example, between March 2011 and August 2016, Sullivan exchanged at least 495 phone calls and text messages with her contacts at Zydus, Wockhardt, Camber, Teva, Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2011 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| R.H. (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 21.    Erika Vogel-Baylor

240.    Erika Vogel-Baylor ("Vogel-Baylor") has been the Vice President, Sales and Marketing at G&W since July 2011. Between July 2011 and February 2017, Vogel-Baylor exchanged at least 9,274 phone calls and text messages with her contacts at Aurobindo, Glenmark, Greenstone, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Valeant, Taro, and Mylan. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 2120 | 12/29/2011 | 1/30/2014 |
| CW-5 (Glenmark) | 2061 | 3/30/2012 | 2/21/2014 |
| Hatosy, Robin (Greenstone) | 1294 | 3/28/2012 | 4/22/2016 |
| M.M. (Wockhardt) | 1158 | 7/31/2011 | 10/22/2013 |
| K.K. (Wockhardt) | 868 | 7/29/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 692 | 2/4/2014 | 7/18/2016 |
| Rogerson, Rick (Actavis) | 438 | 8/8/2012 | 2/8/2017 |
| Berthold, David (Lupin) | 159 | 8/28/2011 | 4/16/2013 |
| CW-6 (Aurobindo) | 121 | 8/26/2012 | 5/3/2013 |
| J.P. (Amneal) | 113 | 3/26/2014 | 12/6/2016 |
| T.P. (Perrigo) | 94 | 7/8/2013 | 4/29/2016 |
| Brown, Jim (Glenmark) | 56 | 5/7/2013 | 10/2/2015 |
| S.R.(1) (Amneal) | 24 | 5/15/2012 | 5/16/2013 |
| S.K. (Wockhardt) | 16 | 9/14/2011 | 9/24/2012 |
| M.C. (Wockhardt) | 13 | 8/28/2011 | 6/13/2012 |
| CW-6 (Fougera) | 12 | 5/18/2012 | 8/7/2012 |
| B.P. (Valeant) | 9 | 11/20/2013 | 11/25/2015 |
| Aprahamian, Ara (Taro) | 6 | 3/27/2014 | 9/24/2015 |
| Aurobindo Pharma | 6 | 1/17/2012 | 6/15/2012 |
| J.K. (Aurobindo) | 6 | 6/4/2013 | 7/17/2013 |
| Glenmark Pharmaceuticals | 2 | 3/14/2014 | 9/9/2015 |
| D.I. (Glenmark) | 2 | 3/3/2014 | 3/7/2014 |
| Perfetto, Mike (Taro) | 2 | 3/21/2014 | 3/21/2014 |
| C.U. (Taro) | 1 | 1/6/2016 | 1/6/2016 |
| M.A. (Mylan) | 1 | 5/20/2014 | 5/20/2014 |

### 22.    John Wesolowski

241.    John Wesolowski ("Wesolowski") has been the Senior Vice President of Commercial Operations at Perrigo since February 2004. Beginning at least as early as 2010,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Wesolowski took active steps to facilitate market allocation and price fixing agreements between Perrigo and its competitors.

### III.   THE OVERARCHING CONSPIRACY BETWEEN GENERIC DRUG MANUFACTURERS – PLAYING NICE IN THE SANDBOX

242.    As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

243.    The overarching conspiracy among generic manufacturers – which ties together all the agreements on the Subject Drugs identified in this Complaint – is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. That term is generally understood as an approximation of how much market share each competitor is entitled to. "Fair share" is based on the number of competitors in the market, with a potential adjustment based on the timing of entry or the anticompetitive allocation of buyers amongst similar or the same competitors in another generic drug market. Once a manufacturer has achieved its "fair share," it is generally understood that it will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

244.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendants and Subject Drugs named in this Complaint. Plaintiffs focus here on the roles of these named Defendants and their participation in, and agreement with, this overarching conspiracy to increase prices for the Subject Drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

245.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013, there were at least forty-four different tradeshows or customer conferences where the Defendants had the opportunity to meet in person. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

246.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

247.    For example, from January 1, 2013 through December 31, 2013, senior sales executives, and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below. The following Table 1, which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue and therefore shows only some of the phone calls and text messages between the Defendants during that period, illustrates the frequency with which Defendants communicated with each other throughout 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

248.    Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel, and Rekenthaler of Teva speaking with competitors. Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

249.    Similarly, from January 1, 2014 through December 31, 2014, senior sales executives, and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below. The following Table, which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

250.    Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva). Many – though not all – of those communications involve the Subject Drugs that are addressed throughout this Complaint. It was not just Teva personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy, as illustrated in the graphic below:



251.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationships between, respectively, Heritage and its purported competitors and Teva and its purported competitors. However, this organization should not imply that the Complaint is solely concerned with the bilateral relationships involving Heritage and/or Teva.

252.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by

Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; and Sandoz worked with Mylan to allocate the market for Valsartan HCTZ. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

253.     Also referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth enters, each expects 25%, and so on, as additional competitors enter the market.

254.     When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example, when Heritage was preparing to launch Zoledronic Acid as the patent on the branded drug was about to expire, O'Mara (Heritage) spoke to Austin (Dr. Reddy's) to "see if he [was] willing to discuss strategy at all." After speaking with Austin, O'Mara stated that "[Austin] views it this way. If [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

255.     For example, in April 2010, Perrigo was entering the Imiquimod cream market where Fougera had been exclusive. D.K., a senior Fougera executive, sent an internal email stating that ██████████████████████████ and explained that ██████████████████████████ ███████████████████████████████████████████████████ When

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

L.B., another senior executive, questioned why Perrigo would be satisfied with 35-40% of the market, D.K. responded, ███████████████████████████████████

███████████████████████████████

256.   Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive. Patel of Teva and Berthold of Lupin spoke directly by phone and a number of times during this period, including three calls on March 24, 2014. That same day, Rekenthaler of Teva sent an internal email to Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% in a two-player market, after being the first in that market, is consistent with the overarching conspiracy.

257.   Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



258.   Taro used these principles to guide its behavior when communicating with its competitors regarding specific drugs. One example involved Lidocaine ointment – a product where

Taro was entering the market as a third entrant. In an internal launch summary from April 2013, Taro described the ███████████ as ██████████████████████████████████ ██████████████████ and stated that Taro had targeted 20-25% share and had achieved 26.3% share. Further, Taro had matched ████████████████████████████████████ which it stated was ███████████████████████████████ As was their typical practice, Taro executives spoke with their competitors – CW-3, a Sandoz senior sales executive, and E.B., a senior sales and marketing executive at Hi-Tech – in advance of Taro's entry to ensure that the company met its target market share through agreements to allocate specific customers.

259.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in each given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

260.    This common goal was stated succinctly by Aprahamian, who advised  the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." Similarly, when Glenmark was entering the market for Fluocinonide .1% cream in July 2014 and had achieved its "fair share" on the product, one Glenmark sales executive remarked to another:



To that, his colleague responded:



261.    This scheme to strangle competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is followed even in the absence of direct communications between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

262.    The "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. In today's generic drug market, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supracompetitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

263.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

264.     For example, in July 2013, a retail pharmacy customer emailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal email stating: "[n]ot inclined to take on new business … Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

265.     Similarly, in November 2014, G&W learned that Sandoz was having temporary supply problems on Fluocinolone Acetonide cream. Rather than take Sandoz's customers, G&W decided to offer them one-time buys ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████ Vogel-Baylor reasoned that G&W wanted ██████████████████████████ and that ████████████████████████████████████████████████████████ ████████

266.     When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." As D.K., a senior Fougera executive, explained in an internal email from July 2011 regarding sales of Imiquimod cream: ██████████████████████ ████████████████████████████████████████████████████

267.     These rules about "fair share" apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Instead, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

268.    For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy would be:

> On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
> Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

269.    Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

270.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014, Teva was approached by a large retail customer on behalf of Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

271.    When a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For example, in May 2013, R.T. a senior sales and marketing executive at Sandoz, sent an internal email to J.G., another Sandoz senior executive, stating: "[m]y sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation."

272.     Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. In internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

273.     Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As described more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants, which affected nearly every overlapping drug they sold. As just one example, Patel of Teva exchanged seven text messages and had two calls with Aprahamian of Taro on June 3 and 4, 2014. After a lengthy twenty-five minute call with Aprahamian on the morning of June 4, Patel sent an internal email to K.G., a Teva marketing executive, stating: "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

274.     Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible" and is spoken to by other competitors. For example, in March 2015, Upsher-Smith learned that Sandoz had submitted a bid on a product not identified in this Complaint at one of Upsher-Smith's GPO customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating: "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

275.    Defendants were always cognizant of these principles which constantly guided their behavior. For example, in October 2015, McKesson emailed Taro with the opportunity to bid on several products. L.P., a corporate account manager at Taro, sent an internal email asking: ███ ████████████████████████████████████████████████████████████████ A.L., a Taro pricing executive responded, ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

276.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and other similar terminology has become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as more set forth below. For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal email identifying forty-seven products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement.

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | ████████████████████ |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

277.    The concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers. For example, in June 2013, Dr. Reddy's was entering the market on a product not identified in the Complaint where Par had previously been exclusive. K.N., a senior account executive at Dr. Reddy's, sent an internal email reporting that: "[a GPO customer] has indicated that Par will walk away, so we have put together a proposal based on that information."

278.    Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Teva, asking them to submit a "Priority Wishlist of items to gain increased volume in the market." The customer reported to Teva that "7 of the global suppliers have created and submitted wishlists and that [the customer] will be reviewing next week and taking a look at how they can move things around. He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

279.    Similarly, in January 2014, a large retail customer emailed CW-3 at Sandoz regarding Triamcinolone Acetonide lotion stating, ███████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████

280.    In June 2013, G&W declined to bid on Halobetasol Propionate cream at a customer because G&W did not want lower ████████████████████████████ A.G., a sales executive at G&W, emailed Vogel-Baylor asking: ███████████████████████████
███████████████████████████████████████████████████████████████
███████████ Vogel-Baylor responded: ███████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

281.    Further, in January 2015, Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL/HCTZ tablets. The customer stated: "[y]es, I would like a OTB [One Time Buy]. Can you provide pricing? And yes, we should discuss an ongoing offer as well. I think you are way under your 'fair share' on this one if I remember correctly."

282.    Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising price. For example, in November 2013, S.G., a senior account executive at Sandoz, sent an internal email noting that: "[a large wholesale customer] is indicating that Glenmark and Caraco had taken a price increase on [a drug not identified in the Complaint] in June. [The customer] is asking if Sandoz will be rationalizing the market … Please advise on next steps. Our [lower] pricing is disrupting the market."

283.    The "fair share" agreement is not limited to any one market; these principles constantly inform and guide market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. "Fair share" decisions consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Or a putative competitor may decline to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug. Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs. For example, in August 2013, Sandoz created a ███████████████████████ ████████ which came ███████████████████ when Sandoz was ███████████████ ████████████████████ and was █████████████████████████████████ ███████████████████████████ The database allowed Sandoz to analyze whether taking share

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

from a competitor in one product market would cause that competitor to retaliate in another product market where the competitors overlapped. Sandoz measured the ███████████████ on whether the competitor had its ████████ in the other product markets.

284.    Indeed, Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price.

285.    There are many examples of Defendants conspiring across drug markets. As detailed below, this is most clearly illustrated by Heritage's attempt to impose industry-wide price increases simultaneously on eighteen drugs, including the following Subject Drugs: Acetazolamide ER, Fosinopril HCTZ, Glipizide-Metformin, Leflunomide, Nystatin, Paromomycin, Theophylline ER, and Verapamil. This involved reaching out to competitors as to each of the drugs to agree on price increases.

286.    Similarly, Teva implemented collusive price increases on several drugs at one time in a series of price increases detailed below and communicated with certain putative competitors as to multiple drugs as part of such wave of price increases.

287.    Defendants also conspired across drug markets to maintain their market allocation scheme. For example, in November 2013, Dr. Reddy's won the "B" slot[48] business at a large

---

[48] Some large customers contract with multiple suppliers – referring to them as a primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

wholesaler customer on a product not identified in the Complaint. Dr. Reddy's had previously won the "A" slot business at that customer because Mylan had "walked away" from the business. J.A., a senior account executive at Dr. Reddy's, sent an internal email stating: "[m]y concern here is that [Mylan] will retaliate somewhere else. I'm unsure of the $ volume, but this would pull somewhere around 4% share from Mylan, and I don't think they would take that lying down."

288.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal email, including to Kellum, stating that Sandoz had decided not to bid on drugs not identified in the Complaint at a large retail customer. CW-1 explained his reasoning as follows: "[w]e have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox." And in June 2014, Sandoz again chose not to bid at a customer on a product not identified in this Complaint out of concern that Mylan would retaliate. As CW-1 explained: "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers." As discussed more fully below, these decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and avoid competition on a number of different drugs.

289.    A similar scenario occurred in August 2015, when Taro declined to bid on Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent. Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium tablets. As C.L., an analyst at Taro, reasoned in an internal email, Zydus "could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac." As discussed more fully below, Etodolac ER and Warfarin Sodium were drugs where Taro had previously agreed with

its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014. Taro's focus on playing nice in the sandbox was merely an extension of these already-existing agreements.

290.    As these and other examples alleged below make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

291.    In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped. For example, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases. Patel explained that she had been hired by Teva to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price. CW-1 reiterated his conversation to Kellum, who understood and approved. Sandoz also had agreements with Perrigo and Taro that they would not poach each other's customers and would follow each other's price increases on overlap products.

292.    G&W had similar understandings with its key competitors Taro and Perrigo. For instance, in February 2012, Vogel-Baylor exchanged emails with her supervisor, Orlofski, regarding responding to the annual McKesson One Stop RFP. Vogel-Baylor stated that she was waiting for McKesson ████████████████████████████████████████████ ████████ Once she confirmed the incumbents, she conveyed that information to Orlofski who replied: ████████████████████████████████████████████

███████████████████████████████████████████ As discussed in more detail below, shortly thereafter, Vogel-Baylor would strike up a relationship with CW-5, a senior executive at Glenmark, and began communicating and colluding with that company in earnest as well.

293.    Further, in June 2014, Sandoz created a ████████████████████ that was specifically designed to track Sandoz's market share with respect to dermatology products. As T.O., a Sandoz marketing executive, described in an internal email: ████████████████████ ████████████████████████████████████ Similarly, in November 2015, Sandoz compiled a spreadsheet containing various product opportunities which contained comments demonstrating its agreements with certain competitors, such as: ████ ██████████████ and ██████████ or ██████████████

294.    As set forth above, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time. For example, in July 2013, Teva increased pricing on a list of twenty-one (21) different products. There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal email address before then forwarding it to CW-2's personal email address. Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a number of products that Sandoz did not even sell.

295.    It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell. For example, Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril Maleate in July 2013 (discussed more fully below). After a lengthy conversation with Patel in the midst of the price increases, Aprahamian of Taro (not in the market

for Enalapril Maleate at that time) sent an internal email, including to M.P., a senior Taro executive, stating: "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)." And Taro did move fast. By December 2013, Aprahamian spoke again with Patel, M.A., an account manager at Mylan, and M.C., a senior sales and marketing executive at Wockhardt. Taro then re-entered the Enalapril Maleate market and matched competitor pricing.

296.    As another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Green of Teva spoke five times with Nesta of Mylan. The next day, Green spoke with Kellum of Sandoz. Kellum then sent an internal email to the Sandoz team stating: "[j]ust heard from a customer that – Teva and Mylan … have raised price on Nadolol to our levels and Mylan took a significant price increase on Levothyroxine. Let's please be cautious on both these products." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

297.    Another example, in April 2013, while speaking with T.P., a sales executive at Perrigo, CW-3, a Sandoz senior sales executive, took the following notes in his Notebook concerning nine different products that Perrigo had recently increased prices on:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



CW-3 later conveyed that information to Kellum in an email stating: ███████████████ ████████████████████████████████████████████████ Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate cream. As discussed in more detail below, Sandoz would re-enter that market a few months later, in December 2013, and match competitor pricing.

298.   Similarly, in April 2013, Orlofski of G&W asked his colleague Vogel-Baylor to run a report listing ███████████████████████████ Vogel-Baylor responded: ████ ████████████████████████████████████████████████ ████ Orlofski answered: ███████████████████

299.   Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. For example, in July 2013, Sandoz was looking to implement a ████████████ that involved temporarily delisting ten products that they overlapped

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

on with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price. One product included in this strategy was Econazole Nitrate cream. As discussed more fully below, Sandoz exited the market in July 2013, Taro and Perrigo raised price in November 2014, and Sandoz re-entered the market in January 2016 at the higher price.

300.    This interdependence between generic manufacturers is further demonstrated by countless examples of companies sharing sensitive information with competitors as a matter of course. The State AGs have gathered evidence going back more than a decade of generic competitors routinely communicating and sharing information with each other about bids and pricing strategy. This includes forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

301.    As just one example, in June 2012, Grauso, then senior executive at Aurobindo, forwarded a customer's bid request for multiple products to Orlofski, his former colleague at G&W. The request included Prochlorperazine Maleate suppositories – a product that G&W manufactured, but Aurobindo did not.

302.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers. For example, in August 2010, CW-6, then a senior sales executive at Fougera, sent the following email regarding ███ ███████ to his supervisor, Kaczmarek:



303.     Before sending this email, CW-6 had spoken that same day with his contacts at several of the competitors listed, including Grauso, then a senior sales executive at G&W, T.P., a sales executive at Perrigo, D.C., a sales executive at Glenmark, M.R., a sales executive at West-Ward, and V.M., a sales executive at Core Pharma LLC. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

304.     Another example, in December 2013, Teva was negotiating new price increase language in its customer contracts and wanted some comfort that its competitors had similar language. On December 23, 2013, Rekenthaler spoke with Nesta of Mylan three times, including

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a thirteen minute call. Immediately, after hanging up the phone with Nesta after the third call, Rekenthaler sent the following email:

| From: | Dave Rekenthaler |
| --- | --- |
| Sent: | Mon 12/23/2013 10:41 AM (GMT-05:00) |
| To: | ▇▇▇▇▇▇; Maureen Cavanaugh |
| Cc: | Nisha Patel02 |
| Bcc: | |
| Subject: | RE: Proposed Price Increase Language |

Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

305. Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on Betamethasone Dipropionate lotion and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal email stating: "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded: "explain FS, (Fair Share)? Aprahamian replied:

No emails please. Phone call. ▇▇▇ let's discuss.

306. To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in emails, understanding that it could lead to significant legal exposure for both the company and the individuals involved. Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

307. To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in emails,

understanding that it could lead to significant legal exposure for both the company and the individuals involved.

308.    The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.

**A.    Generic Drug Price Spikes Since 2013**

309.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and 2014." An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

310.    These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|  | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
|  | 2010 | 3820 | 125 | 260 |
|  | 2011 | 4265 | 255 | 409 |
|  | 2012 | 4071 | 223 | 433 |
|  | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

311.    Several of the products with the largest WAC increases in 2014 include products that are subjects of this Complaint, including Econazole and various formulations of Clobetasol. For Econazole, the largest increase was taken by Perrigo, increasing its WAC by 736% in July

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2014. For Clobetasol, Hi-Tech took the largest increase on the ointment, increasing its WAC by 2,316% in August 2014.

312.    A January 2014 survey of 1,000 members of the NCPA found that more than 75% of the pharmacists surveyed reported higher prices on more than twenty-five generic drugs, with the prices spiking by 600% to 2,000% in some cases. Indeed, more than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## IV.    THE CONSPIRACY: HERITAGE-RELATED CONDUCT

313.    When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

314.    Illustrative examples of these agreements are set forth below, in most cases organized by company relationship, describing specific examples relating to many of the Subject Drugs.

315.    By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

316.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices – there

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

317.    Starting sometime in 2012 or even earlier, and continuing for years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – *i.e.*, that they would not punish a competitor for leading a price increase or steal a competitors' market share on an increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

318.    Generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

319.    Examples of specific collusive price increases on many of the Subject Drugs are set forth below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

A.     **Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion**

320.    When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

321.    The allegations immediately below focus on Heritage's conduct with respect to market entry.

1.     **Nimodipine**

a)     **The Heritage/Sun Agreement**

322.    As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market. Heritage saw Teva's departure as an opportunity to raise prices.

323.    In June 2012, Malek asked A.S. to contact Caraco to discuss raising the price of Nimodipine.

324.    A.S. subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012. On June 28, 2012, in an email titled "Caraco," A.S. wrote:

> [Sun Senior Sales Manager Susan Knoblauch] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market. She was not so much help on the pricing discussion- because she does not have much control over it. All pricing goes through [Sachdeva] and [Sachdeva] sets it. I do not know [Sachdeva] but [Knoblauch] mentioned our discussion with him so I can only hope the ground work has been set. I reiterated that we would like to see $ go up and we would be fair.

325.    Malek responded: "[t]hanks for the info. Not sure what this means 'his only concern was that they get their fair share of the market.' They are getting their fair share of the market at a price they don't need to go to is what I wanted to communicate to them."

326.    In her email response, A.S. agreed:

> That is exactly how I stated it to [Knoblauch] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key item for them. I said it is big for us and with only two players it should command more $. I'd like to see if [Knoblauch] can communicate back to [Sachdeva] and the Nimo[dipine] on the Cardinal RFP (when it gets closer to the date of the RPF) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

327.    The same day A.S. sent an analysis of the upcoming Cardinal RFP to Malek and others at Heritage. The notes section regarding Nimodipine reflected that Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the Cardinal business.

328.    Heritage and Caraco were both able to significantly raise prices to other customers as a result of this agreement.

329.    On July 20, 2012, Fleming, a Contract Analyst at Heritage, circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by A.S. In an email exchange that same day, A.S. and Malek discussed raising prices:

> A.S.: My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?
>
> Malek: I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

A.S.: I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we would still lowball the Nimo a little later if necessary.

Malek: If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line.

A.S.: If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time.

Malek: Ok, lets give it a shot. So we will increase the price, you should be tell them so they can do the same without any comp.

330.     That same day, A.S. spoke to Knoblauch. During this and other communications in the succeeding weeks, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

331.     When Malek learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

332.     Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek responded: "[g]reat feedback, time for next increase!" He later reiterated "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

333.     On May 23, 2013, A.S. again spoke with Knoblauch, who indicated that Caraco may be returning to the market for Nimodipine in June or July. A.S. immediately reported this

news to Malek: "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful. And there's a small rumor they may not come back with it. A reminder was provided about our recent changes on that item."

334.    This resulted in the following email exchange between the two:

Malek: OK…Where did you hear this from!!

A.S.: Vendor/friend [Knoblauch]

Malek: Are they raising theirs?

A.S.: They are not yet but admit it would be nice to

Malek: Well we would follow in one second……

A.S.: I did say that!

Malek: hahahahahahaha

335.    During the next year, Caraco did not return to the market. Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

**b)      The Heritage/Ascend Agreement**

336.    When the FDA approved Ascend's Nimodipine generic in early April 2014, Malek immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway had "time to catch up tomorrow afternoon or Thursday morning." Dillaway responded: "I would like to catch up."

337.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase. As discussed below, a large majority of the price increases were to be achieved through collusive efforts. During a "Price Increase Discussion" conference

117

call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine. Malek took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third market share, so that Ascend would not compete with Heritage on price.

338.   Malek took this responsibility to communicate with Ascend because he already had a relationship with Dillaway. The pair had previously met in February 2013. Malek had also been communicating frequently with Dillaway through the website LinkedIn in the weeks leading up to the April 22, 2014 "Price Increase Discussion."

339.   Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014, Malek called Dillaway and the two spoke for nineteen minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

340.   On May 9, 2014, Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek and Dillaway, Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to Ascend, the "new entrant into market."

341.   In June 2014, Malek sought to continue his conversations with Dillaway regarding Nimodipine. He emailed Dillaway on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

342. At the end of June, Heritage implemented their price increase. Heritage raised the price of Nimodipine for at least twelve customers.

343. Malek emailed Dillaway on October 29, 2014, again asking to "catch up." The two spoke by phone for ten minutes the next day. On November 4, 2014, Malek emailed Dillaway to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of communicating specifics over email, Malek and Dillaway made plans to have lunch together when Malek returned from India.

344. Two weeks later, on November 8, 2014, Malek emailed Dillaway stating: "[j]ust sent you a text. Fresh back from India. Wanted to pick up discussion. Let me know if you can chat." On November 25, 2014, Malek emailed Dillaway asking again if Dillaway "had a few minutes to connect."

345. On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse. Malek stressed that this inquiry should be kept confidential.

346. R.S. reached someone at Ascend. By January 24, 2015, Malek was able to inform his sales team that Ascend had Nimodipine in its warehouse.

347. By May 1, 2015, Ascend had fully launched Nimodipine. Instead of trying to compete with Heritage upon entry, Ascend's WAC, per tablet, was even higher than Heritage's.

348. Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

### 2. Zoledronic Acid

349. At all relevant times, Dr. Reddy's and Heritage dominated the market for Zoledronic Acid.

350.    Zoledronic Acid was marketed singularly by the brand manufacturer, Novartis, until the spring of 2013, when it came off patent. It was sold in two formulations: 4 mg and 5 mg, both injectables. Heritage initially sought only to launch the 5 mg formulation.

351.    In early 2013, Heritage received FDA approval to market Zoledronic Acid in the United States. Heritage began communicating with potential competitors before then to avoid price competition and to carve up market share.

352.    On January 21, 2013, Malek emailed O'Mara (Heritage) directing him to reach out to Dr. Reddy's, the only other competitor Malek believed would be marketing Zoledronic Acid. Malek wrote:

> Would you like to have a call with [Austin (Dr. Reddy's)] on Zoledronic. Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need to lock in our strategy.

353.    In a follow-up communication to O'Mara the next day, Malek outlined what O'Mara should ask Austin:

> OK. Here are the questions if you would.
>
> Are they going to be there day one (March 4)
>
> Have they heard of any others they say [sic] one?
>
> Are they launching the 4mg (Zometa) at risk?
>
> Have they heard of anyone else launching the 4mg at risk?
>
> What's their market share goal?

354.    Through numerous phone calls in late January 2013 between Heritage and Dr. Reddy's sales representatives, an agreement was reached to allocate the market for Zoledronic

120

Acid between Heritage and Dr. Reddy's. As O'Mara described it, "[Austin] views it this way. If they are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

355.    Communications between the two companies continued in March 2013 in preparation for Heritage's market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

356.    On March 1, O'Mara emailed Malek informing him that he had left Austin a message "to have him call me back." He added, "Did not leave anything that would incriminate me – very generic." O'Mara and Austin then spoke for almost eight minutes on March 4, 2013.

357.    The March 6 communication arose from Malek's concern that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he had hoped. Malek emailed O'Mara asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?" O'Mara's response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

358.    On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon." The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

359.    On April 19, 2013, Malek instructed his sales team not to put any collusive discussions on Zoledronic Acid or other drugs in writing to ensure the conspiracy remained hidden: "[t]eam: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

360.    Heritage and Dr. Reddy's continued to police their market allocation agreement. For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers. When Malek learned of this, he emailed M.E., "[w]hen you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied: "[h]e told me that he was going to speak to their injectable people and let them know that they should chill."

361.    For most of 2013 and 2014, the market for Zoledronic Acid remained stable with Dr. Reddy's maintaining roughly 60% share to Heritage's 40% share for the 5mg formulation.

### 3.    Meprobamate

362.    In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

363.    On March 21, 2013, Malek emailed members of this team that he is "[l]ooking to take a price increase on [mepro]. Only other competition is DRL [Dr. Reddy's]. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL and communicate to feel out?" His team confirmed that they will touch base with counterparts at Dr. Reddy's.

364.    On a call on March 22, the two companies agreed to set and increase prices on Meprobamate. The agreement was confirmed in an email later that day from a Heritage representative: "DRL is on board with price increase. I will fill you in later."

365.    On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer. The Heritage employee reported to Malek that "[d]ue to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going." Malek replied "Unless [the national

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

366.    In April 2013, Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain. Heritage then emailed the large pharmacy chain that it was increasing Meprobamate prices. The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

367.    The following month, Malek told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago. This makes the playing field for market share more even and I assume since you were looking for one more customer that you are good now. Tell him you don't think the team is going to walk from anymore share at this point."

368.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board, nearly simultaneously, as a result of their agreement, in late April 2013 and early May 2013, retrospectively.

369.    Over the next several years, the market remained highly stable, but at supracompetitive levels.

### 4.    Hydralazine HCL

370.    While not arising in the context of market entry, Heritage engaged in conduct similar to that alleged above in connection with Hydralazine HCL.

371.    Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### B.      Agreements to Fix Price – 2014 Price Increases

372.     In addition to reaching agreements with competitors to allocate markets in connection with entry of a new competitor, Heritage and the other Defendants routinely sought and obtained agreements with competitors to fix and raise prices.

373.     This was often done by "socializing" a competitor to a price increase. This involved a generic manufacturer such as Heritage reaching out to competitors to first raise the possibility of a price increase, and then obtaining an agreement to join the price increase or that the competitor would not take advantage of the proposed price increase by bidding to take the initiating manufacturer's customers. Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increase.

374.     Often, a generic manufacturer such as Heritage would identify a large group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain their agreement as described above for as many of these drugs as possible. Heritage engaged in such collusive multi-drug price increases, as set forth immediately below.

375.     In early 2014, Jason Malek held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

376.     On April 15, 2014, Malek called Nisha Patel, Teva's Director of Strategic Customer Marketing, to discuss price increases on Acetazolamide ER, Glipizide-Metformin, Leflunomide, Nystatin, Paromomycin, Theophylline, and others. On their seventeen minute conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

377.     Because Teva was already planning a price increase on Nystatin and Theophylline, Malek and Patel agreed Teva would take the lead on those increases. In subsequent months, Malek and Patel spoke several more times on Heritage's price increases and timing.

378.     On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified eighteen drugs that Heritage would target for increase. Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share. The Heritage list included Acetazolamide ER, Fosinopril HCTZ, Glipizide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline ER, and Verapamil, among others. Malek instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases. Different Heritage employees were identified as being primarily responsible for communication with different competitors.

379.     The Heritage sales team promptly began to contact their competitors. For example, A.S. communicated with several counterparts at different competitors, reaching agreements with all of them to increase prices. First, she spoke with Susan Knoblauch, Senior Sales Manager at Sun for forty-five minutes and agreed to increase prices for Nystatin and Paromomycin. Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for nine minutes, which led to an agreement to increase prices for Glipizide-Metformin and Verapamil.

380.     Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the price of Verapamil and Glipizide-Metformin. O'Mara summarized in an email to Malek and A.S. titled "Mylan": "[j]ust let me know a day before we price adjust on the three Mylan products and they will put the

word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

381.    A few days later, Malek sent an email to Heritage employee D.L. titled "bindo" referring to Aurobindo stating: "[l]et me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]" On the Heritage list, D.L. was charged with responsibility for communication on Fosinopril HCTZ, of which Aurobindo was a competitor.

382.    In addition to Teva, Malek took responsibility for reaching out to Ascend regarding Nimodipine. Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion as set forth above. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

383.    On May 8, 2014 Malek sent an email to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with plan asap.

384.    Heritage's Matt Edelson, Senior Director of Sales, responded immediately: "[s]poke with everyone and waiting in [sic] feedback on Mepro[bamate]." Malek tasked Edelson with communication with Dr. Reddy's on Meprobamate. He exchanged six text messages with Jake Austin, Director of National Accounts at Dr. Reddy's, on April 24, 2014, and then spoke with Austin on May 6, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

385.    A.S. responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." A.S. had been tasked with communicating with Actavis on Verapamil and Sun on Nystatin and Paromomycin, among others.

386.    Also, on May 8, 2014, D.L. and McMahon had a sixteen minute phone call and then an eighteen minute phone call on June 25, 2014. They spoke again for over three minutes on July 7, 2014.

387.    On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

388.    On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreements from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included: Acetazolamide ER (75% increase); Paromomycin (100% increase); Nimodipine (48% increase); Theophylline ER (150% increase); and Nystatin (95% increase).

389.    Two days later, on June 25, 2014, Malek spoke with Patel and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

390.    On June 26, 2014, A.S. sent another text message to a large wholesaler customer stating:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, … and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters.

391.    A.S. quickly followed up: "[h]ere are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, … Theo ER… 150%."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

392.    On July 1, 2014, Malek emailed the Heritage sales team:

Team:

Looks like you are making good traction with out July 1 price increase.

Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.

Please send each day until further notice or until all or [sic] accounted for.

Any questions please call me directly.

393.    In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Acetazolamide ER, Fosinopril HCTZ, Glipizide-Metformin, Leflunomide, Nimodipine, and Nystatin, among others, as set forth below.

### 1.    Acetazolamide ER

394.    As of April 2014, Heritage and Teva controlled 78% of the market for Acetazolamide ER capsules. The only other competitor was Zydus.

395.    As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high level executives at Teva, a competitor on seven of the Heritage list drugs. On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer Marketing for more than seventeen minutes to discuss increasing the price of Acetazolamide ER capsules and other drugs. Patel had already secured Heritage's agreement to support Teva's price increases on Nystatin and Theophylline. During the April 15 call, Patel agreed that if Heritage raised prices for Acetazolamide ER capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts. Malek and Patel's conversations would continue through the spring and summer to coordinate and confirm their price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

396.    After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases. Between April 16 and 17, 2014, Patel and Kevin Green, the Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide ER prices, first for approximately twenty minutes, then for twelve. They communicated frequently over the next several months, along with other Teva and Zydus executives, as outlined below.

397.    As set forth above, on April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted eighteen drugs for price increases, including Acetazolamide ER. In order to implement the price increases without losing customers, Heritage coordinated with competitors to form agreements that prevented competition.

398.    To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus' Vice President of Sales, on April 24, 2014 through LinkedIn. Malek wrote: "[h]i Kristy, I hope this email finds you doing well. I wanted to see if you have a few minutes to chat. Let me know when you are free." Ronco responded that day "[h]i Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."

399.    Heritage came to agreements with both Teva and Zydus on price increases and market share. In an internal Heritage email, Malek confirmed the Acetazolamide ER price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held by competitors. Malek previously asked A.S. to refrain from responding to large GPO customer that requested a price quote on Acetazolamide ER. In emails on May 6 and 7, 2014, Malek wrote to A.S. that he formed agreements to raise the price of Acetazolamide ER and not to compete on customers. Malek said, "[w]e have buy in from all to go up …" and Heritage agreed not to reduce its price in response to the request from the GPO customer. As Malek stated: "[w]e are going to pass [on reducing the price] and most likely are taking an increase within the next week."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

400.    Teva and Zydus also remained in close contact during this time as well. On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco.

401.    Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, A.S. attended the MMCAP National Member Conference in Bloomington, Minnesota. She used this opportunity to speak in person with a number of different competitors on pricing agreements. Executives from Teva also attended, such as Nick Gerebi, National Account Manager. On June 1-4, 2014, Heritage's A.S., Glazer, and Malek all attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others. At this conference, A.S. met in person for dinner and drinks with O'Connor and Sullivan, as well as Christopher Bihari, Director of National Accounts at Sandoz. Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

402.    During these months, Heritage avoided soliciting or bidding on Acetazolamide ER customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

403.    As set forth above, on June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide ER, which was targeted for a 75% increase. According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

404.    On June 25, 2014, Malek spoke with Patel for approximately fourteen minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

405.    On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide ER. A.S. sent a text message to a large wholesaler customer:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, … and Theophylline ER. You will see only the Paro … increases – you have those letters.

406.    She followed up with another text moments later, "[h]ere are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, … Theo ER … 150%.

407.    On July 1, 2014, Malek emailed the Heritage sales team with the subject "update – price increase" that read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

408.    By July 9, 2014, Heritage was able to raise Acetazolamide ER prices to at least seventeen customers nationwide. Heritage, Teva, and Zydus collectively implemented a successful 75% increase on prices for Acetazolamide ER.

### 2.    Fosinopril HCTZ

409.    At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated the market for Fosinopril HCTZ. By April 2014, Heritage had a 47% market share for this drug.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

410.    On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn. Heritage's Lukasiewicz spoke with McMahon (Aurobindo) on May 8, 2014 via phone. That same day, McMahon called Glenmark's Executive Vice President of Generics James Grauso, and they spoke on the phone. On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson. All of these calls were regarding price increases for Fosinopril HCTZ.

411.    That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda. Within one month, A.S. of Heritage spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

412.    After in-person meetings with Aurobindo's Gustafson and Sandoz's National Accounts Executive, Christopher Bihari, on May 14, A.S. confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed." The next day, representatives of Aurobindo and Sandoz spoke numerous times.

413.    On June 3, 2014, A.S. texted Bihari and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix. This initiated a series of communications during the summer of 2014 that included three calls between Gustafson and Bihari and five calls, and multiple texts, between Gustafson and Johnson. Gustafson would have one final call with Johnson on August 26, 2014, before going radio silent on April 8, 2015.

414.    Heritage's Lukasiewicz and Aurobindo's McMahon spoke on June 25, 2014 via phone, and again on July 7, 2014.

415.    On June 25, 2014, A.S. texted Citron's Kaitlin Alexander to find out if Citron was entering the market for non-Subject Drug Glyburide but found out that Citron was actually entering

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the market for Glyburide and Fosinopril HCTZ. A.S. informed Alexander of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz, informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via email. Strelau also told Lukasiewicz that A.S. should communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ or other price increases. The following day, Short and A.S. spoke for over twenty minutes. Their conversations continued through July and August 2014.

416.     Lukasiewicz also spoke directly with Grauso on July 18, 2014 and July 30, 2014. On July 28, 2014, Short called and texted McMahon to discuss Fosinopril HCTZ.

417.     On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers. On June 27, McMahon and Grauso spoke twice.

418.     By July 9, 2014, Heritage successfully raised prices on eighteen different customers for Fosinopril HCTZ. That same day, Citron confirmed that it was trying to match Heritage's price increases. On July 14, 2014, Strelau and Grauso spoke. The next day, Citron matched Heritage's supracompetitive prices.

419.     Sandoz also increased its pricing for Fosinopril HCTZ. By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

### 3.     Glipizide-Metformin

420.     At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

421.     On April 15, 2014, Malek discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

422.    O'Mara (Heritage) spoke to Mylan's Michael Aigner on April 23, 2014 and reached an agreement to raise prices.

423.    To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.

424.    Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call. Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin.

425.    By July 9, 2014, Heritage increased the price nationwide to twenty-seven different customers for Glipizide-Metformin. Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases. By November 2014, K.S. of Heritage reported to Malek that most of Heritage's price increases "had stuck."

### 4.    Leflunomide

426.    At all relevant times, Apotex, Heritage, and Teva dominated the market for Leflunomide. Heritage held a 61% share by April 2014.

427.    During Heritage's April 2014 "Price Increase Discussion" teleconference as described above, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase. Malek was responsible for communicating with Teva about Heritage's price increase on this drug, among others.

428.    On April 15, 2014, Malek called Patel about the drugs on his list and Patel agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage by underbidding. In the following months, Malek and Patel spoke frequently and Malek kept her informed on the strategy for price increases.

429.    Heritage's Edelson was tasked with communicating with Apotex regarding the Leflunomide price increase. On May 2, 2014, Edelson called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than thirteen minutes.

430.    Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market. On May 6, 2014, A.S. emailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???" Malek responded "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

431.    That same day, Edelson had two more phone calls with Viera. Edelson then reported to Malek that Apotex "has taken another shot at our Leflunomide. … I am waiting for a callback from VP of Apotex before we do anything." Malek replied, "[l]et's walk from leflunomide," confirming the strategy he mentioned to A.S. Beth Hamilton, Vice President of Sales at Apotex, called Edelson. They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th. Heritage and Apotex representatives thereafter held four phone calls within two days. Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

432.    In response to Malek's May 8 email to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

433.    On Heritage's May 9 call on "Price Increases," Leflunomide remained on the list of target drugs.

434.   On May 27, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson, "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for a least fifteen different customers.

435.   On June 25, 2014, Malek told Patel that Heritage would be increasing prices for several drugs sold by Teva.

436.   By July 2014, Teva began to exit the market. In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gained market share.

437.   NADAC data shows that the average market price for Leflunomide rose dramatically between June 2015 and December 2015 and remained artificially high thereafter:

| Dosage | Percentage Increase |
|---|---|
| 10 mg | 730% |
| 20 mg | 617% |

438.   NADAC data shows that the average market price of Leflunomide remained artificially high thereafter, as depicted below.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 5.   Methimazole

439.   Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares. Methimazole was among the drugs listed.

440.   Par was a competitor with Heritage on Methimazole. Neal O'Mara was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole and communicated with a counterpart at Par about price increase for Methimazole.

### 6.   Nystatin

441.   Various forms of Nystatin were already subject to market allocation and price fixing even before Heritage's 2014 price increase.

442.   During the relevant times, Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Actavis, Perrigo; and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets. [49]

### a)   Nystatin Cream

443.   Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares for Nystatin cream until these market shares suddenly stabilized in 2013. As detailed below, prices *increased* for all these Defendants, even as those with smaller market shares captured more of the market. This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

444.   As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis controlled the

---

[49] The market allocation and price fixing allegations for Nystatin ointment are discussed below in Section VII.B.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

remainder. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of the market. Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 90% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

445.     Beginning in June of 2011, Taro and Perrigo dramatically increased their prices for Nystatin cream largely in unison and Actavis, Par, and Sandoz joined these price increases as their market shares increased.

446.     In June of 2011, Taro initiated a large price increase of more than 600%. Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but – as contemplated by the overarching "fair share" agreement – market prices remained elevated and stable.

447.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

448.     In November 2011, Actavis ramped up production for Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo, and Par, also choosing to forego price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

449.     Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

450.     WAC prices for each Defendant demonstrate that Nystatin cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.



451.     AWP prices for Nystatin cream show the same trend of dramatically inflated and nearly identical prices.

452.     These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference; February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland. and June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, among others, which representatives from Actavis, Par, Perrigo, Sandoz, and Taro attended.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**b)**     **Nystatin Tablets**

453.     In 2010 and 2011, the Nystatin tablet market was split between Teva and Sun (sold at least in part through its subsidiary, Mutual). During that time, Teva held approximately 60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets.

454.     In the summer of 2012, Heritage entered the Nystatin tablet market. Rather than undercut Teva and Sun's prices to gain market share, Heritage matched Teva and Sun's prices, consistent with the "fair share" agreement they and the other Defendants maintained throughout the generics market.

455.     Sun, through its division Mutual, increased Nystatin tablet prices on April 15, 2013.

456.     As detailed below, Patel was hired by Teva in April 2013 to "run the pricing team." On July 9, Patel called Malek and they spoke for twenty-one minutes. The two spoke again on July 23 (for ten minutes), and twice on July 30, 2013 (once for more than twelve minutes).

457.     Between July 23 and July 30, 2013, A.S. (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun, for eleven minutes. Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013. On April 16, 2013 – the day after Mutual increased Nystatin tablet prices – Knoblauch called A.S. and they spoke for nearly forty minutes. The two continued to communicate throughout the summer of 2013.

458.     By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

459.     On August 1, 2013, Malek emailed O'Mara (Heritage), Edelson (Heritage), and A.S., saying "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20, 2013, Malek emailed Fleming (Heritage) and copied Glazer with the subject "PRICE

140

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

INCREASES," saying: "We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

460.    As described below, Patel was on maternity leave from August 2013 through December 2013 and decisions regarding Teva's and Heritage's Nystatin price increases were put on hold.

461.    Also, as described below, on February 7, 2014, Patel created a spreadsheet titled "PI Candidates" which included Nystatin. The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and "WAC increase likely." Patel called Malek on February 14, 2014 and the two connected the next day.

462.    Malek and Patel continued to talk throughout March and April of 2014. On a seventeen minute phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identical drugs involving Teva (at least seven drugs, including Nystatin). They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

463.    On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

464.    During the April 2014 Heritage: "Price Increase Discussion" teleconference, Malek identified Nystatin as one of the eighteen drugs targeted for a price increase. A.S. was tasked with reaching out to Sun regarding Nystatin (and other drugs). Immediately after the April call, A.S. reached out to Knoblauch. They spoke for forty-five minutes and agreed to increase prices for Nystatin (and Paromomycin). Afterward, A.S. reported to Malek and Glazer, "Caraco notified and on board." Glazer quickly responded, "[n]o emails please."

465.     On the June 23 Heritage "Price Increase Call," Nystatin was designated for a 95% price increase. Heritage's Kate Brodowski, Associate Director of National Sales, noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

466.     On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase. During the call, A.S. texted Knoblauch to update Sun on Heritage's anticipated Nystatin price increase:

> A.S.: Work news: we are raising price on Nystatin. Just letting you know. :)
>
> Knoblauch: How much
>
> A.S.: Double the price
>
> A.S.: On conf call- will call you back
>
> Knoblauch: Yes

467.     On June 25, 2014, Malek spoke to Patel again for nearly fourteen minutes, explaining Heritage would soon be increasing prices for a number of Teva's drugs.

468.     In June 2014, Heritage announced a price increase of nearly 100% on Nystatin. By July 9, 2014, Heritage successfully raised the price for at least fourteen customers nationwide.

469.     Sun implemented a similar price increase by August 2014.

470.     In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers.

471.     On July 8, a large retail customer emailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier. A Teva representative forwarded that email to Patel, asking "[a]re you aware of the below? Should we engage?" Patel responded that she was aware, and that Heritage would be "following Teva on Nystatin." She confirmed "we will not be bidding. Thanks."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

472.    NADAC data for Nystatin tablets is only available dating back to November 2013. As depicted on the chart below, the average price of Nystatin 500,000 unit oral tablets continued to increase after the first price increase implemented by Sun in April 2013 and the subsequent price increases implemented by Heritage, Sun, and Teva around April and June of 2014:



7.      **Paromomycin**

473.    At all relevant times, Heritage and Sun, through its division Caraco, dominated the Paromomycin market.

474.    In April 2014, Heritage had approximately 65% of the market. Sun had approximately 35% market share.

475.    On April 22, 2014, a Heritage representative spoke to a Sun counterpart for forty-five minutes. Shortly thereafter, the Heritage representative notified her superiors via email that Caraco was on board with price increases, to which a superior responded, "No emails please."

476.    On May 8, 2014, a Heritage employee emailed Malek, who had asked for an update on pricing agreement progress, explaining, "I made contact with all my take aways – with positive results."

477.     Heritage held another internal pricing call on May 9, 2014. Paromomycin was on the list for a price increase.

478.     On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility. The employee immediately relayed the information to Malek who responded "[n]eed price increase to go immediately. Jack it up."

479.     On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase. By July 9, 2014, Heritage successfully increased prices for over a dozen nationwide customers.

480.     Sun continued to sell the drug through January 2015, maintaining a 40% market share. Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

### 8.     Theophylline ER

481.     At all relevant times, Heritage and Teva dominated the market for Theophylline ER.

482.     Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva held nearly 100% of market share.

483.     When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices. As a result, Theophylline ER prices remained relatively stable despite the entry of a new competitor and, upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

484.     In early 2014, Teva began to consider raising the price of Theophylline ER. On February 4, 2014, Patel called Malek upon her return from maternity leave and the two spoke for over an hour the next day. On February 7, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

485.     Patel and Malek spoke numerous times in February and March 2014. They came to an agreement that Teva would lead the Theophylline ER price increase and Heritage would follow, matching Teva's pricing.

486.     Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline ER. By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

487.     On April 24, 2014, shortly after implementing the price increases, Teva received the following email with the subject line "PLIVA.com [Info] Price Gouging":[50]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

---

[50] Teva marketed and/or sold its generic Theophylline ER, at least in part through Pliva, Inc. ("PLIVA"), a wholly-owned subsidiary of Teva USA. Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

488.    A member of Teva's Government Affairs Department received the internally forwarded email and responded: "[c]an I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Patel ultimately received the correspondence and replied, "I don't have a great story. I'll take a closer look."

489.    At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline ER. On May 9, Heritage again slated Theophylline ER for a price increase. On June 23, during a Heritage "Price Change Call," Heritage targeted Theophylline ER for a 150% price increase.

490.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. On the same day, Malek and Patel spoke for fourteen minutes. Malek reported that Heritage would be sending out its price increases in the coming weeks.

491.    Heritage began sending price increase notices to customers the next day. On June 26, 2014, A.S. texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: … Theophylline ER …" She followed with another text message, "Here are the approximate/average $ increases on the other items: … Theo ER … 150%."

492.    On June 30, 2014, Patel emailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

493.    By July 9, 2014, Heritage successfully increased prices to at least twenty customers nationwide, following in lock step with Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

494.    According to the NADAC data, the average market price for generic Theophylline ER saw the following price increases between April 2014 and January 2015:

| Dosage | Old Price | New Price | Percentage Increase |
|---|---|---|---|
| 100 mg | $0.12 per unit | $0.37 per unit | 250% |
| 200 mg | $0.16 per unit | $0.40 per unit | 150% |
| 300 mg | $0.20 per unit | $ 0.35 per unit | 75% |

495.    NADAC data shows that the average market prices for Theophylline ER were stable prior to April 2014, then rose dramatically and remained artificially high thereafter.



496.    The 300 mg dosage of Theophylline ER saw an even larger price increase in 2016, increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580% increase.



### 9.  Verapamil

497.  From 2009 forward, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain share in 2013.

498.  Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80 mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120 mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

499.  In other words, in conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan. In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share. Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

500.    On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase. O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan). On an April 23, 2014 phone call, O'Mara and Aigner reached an agreement to raise prices for Verapamil (and two other drugs). O'Mara immediately sent an email to Malek, titled "Mylan," saying "[j]ust let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

501.    A.S. was responsible for communicating with Actavis about Verapamil (and another drug). Within hours of the April 22 call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and another drug).

502.    Dorsey immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy. In an April 28, 2014 internal email, an Actavis pricing manager said "[Dorsey] made mention of keeping an eye out for an increase on … Verapamil IR." Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the email.

503.    On May 6, 2014, Falkin called Nesta at Mylan. The two spoke regularly over the next several months, including a three minute call on May 7 and seven minute call on May 19. They continued to speak regularly for the next several months.

504.    In response to Malek's May 8 email to the Heritage sales team trying to finalize price increase agreements, A.S. responded: "Jason: I made contact with all my take aways –with positive results. I can resend those notes or talk with you on any details." This would have included her conversation with Actavis on Verapamil.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

505.    When Heritage had another call about "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

506.    Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

507.    Heritage announced its price increase in June 2014, and Actavis and Mylan soon followed with similar price increases.

508.    On August 20, 2014, A.S. exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and other drugs).

> Knoblauch: Have you heard anything about an Actavis price increase?
>
> A.S.: I heard they were on board with it. What item specifically?
>
> Knoblauch: I don't know. I am just hearing about an increase but no details. What product have you heard about
>
> A.S.: We were communicating on Glyburide/Metformin and Verapamil
>
> Knoblauch: We haven't touched verapamil yet

509.    NADAC data shows that average market prices for Verapamil rose dramatically, with price increases continuing throughout 2016, as depicted below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



## V. THE CONSPIRACY: TEVA-RELATED CONDUCT

### A. Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors

510. Despite Teva's initial attempt to increase its revenues through price increases in 2012 and 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability. On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things: (1) net income was down 26% compared to the prior year; (2) total sales were down 4%; and (3) generic sales declined by 7%.

511. By this time, Teva had already started to consider new options to increase its profitability, including more product price increases. Over the next several years, Teva embarked on an aggressive plan to conspire with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

1.     **April 2013: Teva Hires Nisha Patel**

512.     In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing. In that position, her job responsibilities included, among other things: (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

513.     Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had nine to ten direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases. This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

514.     Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

515.     Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

516.     Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013 – nearly three weeks before Patel started at Teva – Aprahamian, the Vice President of Sales and Marketing at

152

Taro, sent an email to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going to Teva – Hush Hush for now. …" The COO responded by saying "[m]aybe the industry will be better for it. Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva. Patel had also worked with Aprahamian several years earlier at ABC.

517.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013. Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva. For example:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

518.    Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent – and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

519.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition. On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors. In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of

Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline," and "Stallers."

520.   Patel understood – and stressed internally at Teva – that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so that competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

521.   As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

522.   Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

encrypted messaging through platforms like WhatsApp; and in-person communications. Although the State AGs have been able to obtain some of the communications, many of them have been destroyed by Patel.

523.    Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

524.    After one of her calls with CW-5 of Glenmark, Patel sent an internal email to one of her subordinates directing him to add six different Glenmark drugs to Teva's "high priority" price increase list: Adapalene gel, Nabumetone, Ranitidine HCL, Moexipril HCL, and Moexipril HCL/HCTZ. As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

        **2.    Ranking "Quality of Competitors" to Identify Price Increase Candidates**

525.    By May 6, 2013, Patel had completed her initial ranking of fifty-six different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

526.    The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

527.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for price increase (aside from a drug where Teva was exclusive) would be drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in a drug market with several "low quality" competitors would not be a good candidate due to the potential the low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

528.    Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### a)  The "High Quality" Competitor Relationships

529.   The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases. The agreements and understandings regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

### b)  Mylan (+3)

530.   Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding and deeply engrained. It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

531.   Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012. From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

532.   Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five minutes. Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often. Typically, Patel would email Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

533.     When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Rekenthaler promptly took over the role of communicating with Nesta. Starting in December 2013, through the time that Rekenthaler left Teva in April 2015, Rekenthaler spoke to Nesta 100 times. Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

534.     The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C. a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and R.P. at Mylan.

### c)     Watson/Actavis (+3)

535.     Actavis was Teva's next highest quality by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

536.     Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis. From

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

537. In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler. From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

538. Cavanaugh also had a very strong relationship with Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

### d)      Sandoz (+3)

539. Sandoz was also considered a top-quality competitor by Teva. Patel had a very strong relationship with CW-1 at Sandoz.

540. Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company. As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases. Patel explained that she had been hired at Teva to identify products where Teva could increase prices. CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

541. Green and Rekenthaler of Teva also both had very strong relationships with CW-2 who was – at that time – a senior Sandoz executive. These relationships pre-dated Patel joining Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### e)    Glenmark (+3)

542.   Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and J.C., a sales and marketing executive at Glenmark.

543.   As stated above, Patel began communicating with CW-5 even before she began her employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

544.   Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six months. After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

### f)    Taro (+2)

545.   Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian. Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

546.   Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva. From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

g)    **Lupin (+2)**

547.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel. Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold. Several of those examples are discussed below. Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

548.    From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

549.    Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave. For example, in October 2013 Lupin was preparing to increase its pricing on Cephalexin oral suspension. Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

**B.    Price Increase Hiatus**

550.    Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

551.    This slowed down Teva's plans for its next round of price increases. During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work. Patel began to return to the office on a part-time basis beginning in November 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

552.    During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

553.    As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they simply communicated through different channels. These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

554.    As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

C.    New Relationships Emerge

555.    By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "[m]ature competitors participate in price appreciation; immature competitors are starting to follow."

556.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**D.      Competitors Become "High Quality" After Successfully Colluding with Teva**

557.     A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva's conspiratorial relationships.

558.     Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis, and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period. These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co-conspirators that Teva could trust to adhere to the illegal agreements.

**E.      Quality Competitors Collude With Each Other, Sandoz/Mylan**

559.     In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market. Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped.

560.     In September 2012, CW-5 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

561.     In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

would follow each other's price increases: Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

### F.    Commitment to the Overarching Conspiracy

562.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned, and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "faire share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with its own comparable price increase.

563.    There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

564.    The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the

leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – *i.e.*, Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian of Taro spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

565.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase on its own.

### G.    Low Quality Competitors Comply with the Overarching Conspiracy

566.    As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox." Several examples of this with respect to some of the Subject Drugs are alleged below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**H.      Teva and its Executives Knowingly Violated the Antitrust Laws**

567.     Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of Conduct. For example, Teva's Code of Conduct from the summer of 2013 states specifically:



568.     But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

569.     For example, when Patel started at Teva in late April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

570.    As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – senior marketing executives at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

571.    With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

572.    K.G. immediately forwarded that information to Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

573.    Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where

Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

574.    Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price increase on August 8, 2013. In the "Reasons for Increase" column, Patel again included specific information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

575.    This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

576.    As discussed more fully below, Teva increased prices on these three drugs two days later. Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

577.    Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors. Patel was aware that both Rekenthaler and Green were

168

communicating with competitors, sometimes at her direction. Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

578.     Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message. Rekenthaler called CW-2 back immediately and they had a three minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work email account to a personal email account, then forwarded the list from his personal email account to CW-2's personal email account.

## VI.   THE OVERARCHING CONSPIRACY AS LED BY TEVA WITH RESPECT TO THE SUBJECT DRUGS

### A.    Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

579.     When entering a generic drug market, Teva and the other Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

580.    Some illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to specific drugs over time.

### 1.    Teva/Mylan

#### a)    Fenofibrate

581.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48 mg and 145 mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

582.    On February 27, 2013, K.G., a senior marketing executive at Teva, emailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg." Specifically, K.G. was seeking "Competitive Intelligence" on Mylan's potential entry to the market. In order to get this information, Green called Mylan's Vice President of National Accounts, Nesta. Over the course of that day, Green and Nesta spoke at least four different times. That same day, Green reported back to K.G. and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

583.    A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate. On May 8, 2013, Green emailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate." This request for information was reiterated – and its purpose made clear – the following day when K.G. sent an internal email stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

584.    Up this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone. These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

585.    In one striking example of the coordination between the three companies, Nesta called Green at 2:42 pm on May 7, 2013 and they spoke for more than eleven minutes. Immediately after hanging up the phone – at 2:53 pm – Nesta called Berthold and spoke for nearly three minutes.

586.    On May 10, 2013, K.G. received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers. …" By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to

understand the logic you [K.G.] use for determining this." The logic was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

587.     Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

588.     Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48 mg and 145 mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed: "this is the customer we should concede on Fenofibrate."

589.     Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least those listed below. On these calls, executives at Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

### b)    Clonidine TTS

590.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

591.    In November 2011, Teva took over Mylan's business for Clonidine TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine TTS. Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine TTS.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

592.     On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called B.P., a senior national account executive at Mylan, to obtain the information and they spoke for six minutes. Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was projected to have between 65-70% market share for Clonidine TTS.

593.     To gain back some market share, Mylan challenged Teva's Clonidine TTS business at McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

594.     Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal. Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva. Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

595.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal email to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012. Those calls lasted three minutes and five minutes, respectively.

596.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four minutes and once for fourteen minutes. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine TTS market. As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Walmart and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a temporary discontinuation notice.

597.    Mylan's exit from the Clonidine TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market. For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS, Teva's direct invoice price to CVS for the .1 mg, .2 mg, and .3 mg Clonidine TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

598.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine TTS. For example, Teva submitted bids to CVS and Walmart – which were ultimately accepted by those companies – on October 4, 2012

and October 5, 2012, respectively. In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

599.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine TTS market, Mylan could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Green and Nesta spoke for ten minutes. That same day, E.G. of Teva sent an email to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

600.    In or about February 2013, Mylan relaunched Clonidine TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine TTS business at Econdisc. Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

601.    Rekenthaler acknowledged in an internal email dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems" For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing. Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain artificially higher prices at CVS.

602.     To carry out their scheme to allocate the Clonidine TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least thirty-three different times and spoke for nearly two hours and forty-five minutes.

603.     By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



From: ▮▮▮▮▮▮
Sent: Tuesday, April 09, 2013 2:24 PM
To: ▮▮▮▮▮▮ ; Dave Rekenthaler
Cc: ▮▮▮▮▮▮
Subject: Clonidine - Mylan Challenges
Importance: High


Kevin / Dave,


Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?


We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%.  We received the Omnicare challenge yesterday.


Based on a discussion with Kevin Green, Mylan would follow a price increase.

### c)      Tolterodine Extended Release ("ER")

604.    Pfizer is the manufacturer of Detrol LA, the brand name of Tolterodine ER. To resolve patent infringement claims against Teva by Pfizer related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer which allowed Mylan to launch its generic version of Tolterodine ER. On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

605.    Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression – based on conversations with potential customers – that Mylan was not in a position to launch until 30 to 60 days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an email to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share … I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

606.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected that on

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

January 1, 2014, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on January 2, 2014 generic launch date.

607.    At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014. D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure out the rest."

608.    T.C. informed her Teva colleagues of Mylan's plans. K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids. The goal is "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted 50-60 [%] share" while Mylan was only "looking for a 40% market share."

609.    On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C. and several others at Teva had a telephone conference scheduled from 8:00 am to 9:00 am to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 am, which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for over a minute. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22 am, Nesta returned Rekenthaler's calls and the pair spoke for an additional twelve minutes. During these calls,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

610.    For example, at 10:33 am – while Rekenthaler was still on the phone with Nesta, K.G. sent an email to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:

```
From:    Dave Rekenthaler
Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)
To:      ███████████; Maureen Cavanaugh
Cc:      Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language


Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."
```

611.    Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

612.    At 12:12 pm on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | | |
|---|---|---|
| CVS | 18 | |
| Wal-Mart | 5 | |
| Cardinal | 8 | |
| Omnicare | 1 | |
| Anda | 2 | |
| Rite Aid | 4 | |
| Econdisc | 15 | |
| McKesson | 6 | |
| | 59 | |

613.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser. The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with Nesta on December 23, 2013:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Dosages | Initial Pricing Plan | | Price after Dave Rekenthaler Speaks with Jim Nesta | |
|---|---|---|---|---|
| | **WALGREEN** | | **WALGREEN** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| | **CIGNA** | | **CIGNA** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| | **HUMANA** | | **HUMANA** | |
| Product Description | | Direct Invoice | | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | | 1,467.50 | | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | | 1,467.50 | | 1,800.00 |
| | **OPTUM RX** | | **OPTUM RX** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

614.   In addition to submitting inflated bids to Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

615.   The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine minutes and eight minutes, respectively.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**d)     Capecitabine**

616.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers – including Teva and Mylan – that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

617.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 email, J.P., a national account executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

618.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

619.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

620.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

621.     For example, at 12:46 pm that day, Nesta called Rekenthaler and they spoke for a little more than five minutes. Immediately after hanging up on the phone, Rekenthaler sent the following email:

From:     Dave Rekenthaler
Sent:     Mon 8/04/2014 12:51 PM (GMT-05:00)
To:                                          Nisha Patel02
Cc:       Maureen Cavanaugh
Bcc:
Subject: Capcetibine

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

622.     Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

623.     Less than an hour later, Rekenthaler sent another email, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

624.     On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an email to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead C.B. told Patel she "wi[ll] call" to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

625.     The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva. That same day that Mylan put a bid in to McKesson – August 7, 2014 – Nesta and Rekenthaler spoke by phone for nearly thirteen minutes. On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

626.     This market allocation "plan" was highlighted in other emails as well. On August 10, 2014, C.B. emailed Rekenthaler, Patel, and K.G. about the plan. C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm. Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

627.     The next morning, at 8:30 am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 am. The call lasted nearly six minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler emailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson, and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

628.     In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

629.     Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen minutes. The next day, K.G. circulated an internal email confirming that Teva "will be conceding this business" at Cigna.

### 2.     Teva/Sandoz

#### a)     Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa)

630.     During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

631.     In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

632.     On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "[w]e really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

633.     After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then

at Sandoz, for five minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal square split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz. …"

634.     Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and, in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16 pm, Rekenthaler forwarded an email to Patel and posed the question, "[w]ho's over at Sandoz now?" Patel did not respond by email, but due to the close proximity of their offices she likely related her conversations with CW-1 directly to Rekenthaler.

635.     Rekenthaler then called CW-2 at Sandoz at 1:26 pm that same day and they spoke for two minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48 pm, for seven minutes. Later that same evening, Teva submitted a cover bid to the customer of Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

### b)      Temozolomide

636.     The patent on Temodar, the branded version of Temozolomide, was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August

2013 – six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

637.    On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid. That same day, CW-1 received a telephone call from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide. Nothing was agreed to on the call.

638.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to The Pharmacy: "[p]lease find out if Teva is submitting an offer to them." The next morning, S.G., a national account executive at Sandoz, spoke with The Pharmacy and asked The Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his team:

> I just spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet received an offer from Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to understand their supply and launch status. [The Pharmacy] will be circling back and I will share the feedback we receive with everyone on this email trail.

639.    At the same time, CW-1 was reaching out to Teva directly to get more information. CW-1 called Patel at approximately 1:45 pm on July 23, 2013. After exchanging voicemails, they spoke for over fourteen minutes that same afternoon.

640.    Also, on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

From: ████████████████████████
Sent: Tuesday, July 23, 2013 3:26 PM
To: ████████
Subject:

8/11 launch

Looking to play nice in 2 player market

Have supply for that share.

What are your plans?

641. By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide. Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news …!"

642. On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: "[w]e'll send offers out to everyone. My instincts tell me Sandoz will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll send them out an offer same time as everyone else and respond from there." Rekenthaler most likely got his information from Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine minutes, where the two discussed how to carve up the market for the drug.

643. Teva and Sandoz were also coordinating through other channels. After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at

189

Teva, on a seven minute call on July 29, 2013 followed by an eleven minute call on July 31, 2013. After those calls, S.G. suggested in an internal email on July 31 that Sandoz ceded the business and instead submit a cover bid: "[The Pharmacy] has received an offer from Teva on Temozolomide. They are asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that we submit an offer."

644.    Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two times. The two spoke again on July 31, 2013 for six minutes. During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted The Pharmacy's business. The next day, August 1, 2013, D.P. another Sandoz executive, emailed Kellum, conveying the message from Green:



645.    Teva and Sandoz communicated their future plans with each other for other accounts in addition to The Pharmacy and CVS. On July 31, 2013, D.P. of Sandoz emailed an update on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and is planning ot send to Econdisc tomorrow[.]"

646.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.

There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

647.    Although Teva initially observed the CVS account in August 2013 due to Sandoz's inability to supply the 250 mg strength of Temozolomide, the companies had agreed that the account would revert to Sandoz once Sandoz could supply that dosage strength. In an internal email dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250 mg we kill the contract."

648.    CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide to develop and ensure the appropriate fair share balance between the two competitors.

### c)    Tobramycin

649.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal email in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

650.    As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of this information in an internal Teva

email the same day, writing, "[a]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn. Hearing they are ready to ship once they secure business, and we have been challenged." The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

651.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific amounts that each would maintain or concede to each other. Patel then memorialized the agreement in an email two days later. The result: Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare. Teva also planned to concede the Cardinal business to Sandoz.

652.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

653.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Rekenthaler wrote in an internal email, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

654.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

655.     CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's shared goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

656.     On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal email, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by the decision and responded, "[r]eally? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursues this opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four minutes.

### d)     Dexmethylphenidate HCL ER

657.     As Sandoz was preparing to enter the market on the 40 mg strength of Dexmethylphenidate HCL ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmethylphenidate HCL ER 40 mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen minutes. On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

658.     Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40 mg strength of Dexmethylphenidate HCL ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an email to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Wed 2/12/2014 6:34 PM (GMT-05:00) |
| To: | ███████████ |
| Cc: | |
| Bcc: | |
| Subject: | Re: ABC Dexmethylphenidate 40mg - Challenge |

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone

659.     One of the Teva national account managers on the email responded by confirming that the approach "makes total sense."

660.     On February 14, 2014, Teva also refused to lower its price for Dexmethylphenidate HCL ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

661.     Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmethylphenidate HCL ER, the customer was entitled to certain price protection terms (*i.e.*, a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one minutes. The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: "[t]he competitor (Sandoz) has not yet shipped. The new price will become effective on and the price protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14."

662.    Also, on February 21, 2014, Patel sent a calendar invitation to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmethylphenidate HCL ER.

663.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva. In February 2014, Sandoz's target market share for varying strengths of Dexmethylphenidate HCL ER varied by how many manufacturers were in the market. Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmethylphenidate HCL ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from them. In February 2014, for example, as Sandoz was seeking share on the 15 mg dosage strength of Dexmethylphenidate HCL ER, Par "gave up the business to keep the market share even." As Sandoz was entering the market, Rekenthaler of Teva was speaking to M.B., a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (eighteen and three minutes), two calls on February 19 (two and twenty-two minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

664.    The market allocation scheme between Teva and Sandoz on Dexmethylphenidate HCL ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmethylphenidate HCL ER 5mg on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmethylphenidate HCL ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this

dosage strength, Teva. When a Sandoz national account representative communicated this decision to the customers, he lied and explained that the decision not to bid was based on limited supply.

### 3.    Teva/Lupin

#### a)    Lamivudine/Zidovudine (Combivir)

665.    Teva launched Lamivudine/Zidovudine (brand name Combivir) in December 2011.

666.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were prepping to enter the market.

667.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

668.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ▮▮▮▮▮
> **Subject:** RE: what r you guys hearing on generic combivir?
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate.

669.    That "good friend" was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial communications between the two competitors. To confirm this

information, Green also spoke to Grauso of Aurobindo that same day for twelve minutes and Berthold of Lupin for four minutes.

670.    After speaking with Berthold, Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25, 2012, for seven minutes.

671.    In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably. Over the four-day period from May 7 to May 10, for example, the three companies spoke at least thirty-two times, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|------|----------|-------------|-----------|--------------|--------|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

672.     During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this four-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

673.     On May 10, 2012, at the conclusion of this four-day period of intensive communications, K.G. of Teva informed his colleagues of the results. He confirmed that "Lupin and Aurobindo anticipate approval and launch." Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40% market share in generic Combivir. K.G. also identified the specific accounts that Teva would concede to its competitors Aurobindo and Lupin.

674.     Even before the negotiations with Aurobindo and Lupin were finalized, K.G. made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market. On May 9, 2012, when a major customer was pressing Teva for a bid, K.G. instructed T.C. that Teva did not plan to keep that customer. When T.C. asked if she should provide any bid at all, K.G. directed her to provide a sham bid, saying:



From:
Sent:       Wed 5/09/2012 2:54 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Combivir - Multisource Strategy


We can send them a proposal that will not work.

675.     Three days later, when preparing a bid for that customer, T.C. pushed back on K.G.'s directive on price, asking: "[c]an we send something that at least looks like we are trying?"

But K.G. refused, responding that they could not go any lower or else Teva might risk actually winning the business. He concluded: "[w]e really need to concede this business with the accounts we have kept."

676.     In a separate email exchange with T.C. on that same day, May 11, 2012, K.G. told T.C. that another of her major customers was not on the list for Teva to retain with respect to generic Combivir. He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer "… in order to preserve market pricing as much as possible." K.G. pointed out that such a move would give Teva its fair share as the first entrant: "40-45% market share in a three player market." T.C. then informed that customer that Teva would not compete for its business because "we need to concede some share."

677.     Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

### b)       Irbesartan

678.     Teva received approval to manufacture generic Irbesartan in March 2012.

679.     On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

680.     At 11:27 am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen minutes. Shortly after hanging up the phone, Green emailed his colleagues with the information he obtained:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

From: Kevin Green
Sent: Tue 3/06/2012 12:26 PM (GMT-05:00)
To: ███████████████████; Dave Rekenthaler; ██████████████████
Cc: ████████████; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG

681.    That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

From: ███████████
Sent: Tue 3/06/2012 3:08 PM (GMT-05:00)
To: Dave Rekenthaler;████████████████████████; Kevin Green; T███████████
Cc: ███████████; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Then work harder….

682.    At 10:54 am the next day, Green called Berthold again. They spoke for nearly seven minutes. At 12:20 pm, K.G. of Teva shared with the sales team the competitively sensitive information Green had obtained. Included were the details Berthold had shared with Green about which competitors were launching/were not launching the drug, and the identity of the customers that received offers. K.G. stated that Teva was in a position to take up a 40% market share when it launched Irbesartan on March 30, 2012.

### c)    Drospirenone and Ethinyl Estradiol (Ocella)

683.    Barr Pharmaceuticals ("Barr") received approval to market Drospirenone and Ethinyl Estradiol (brand name Ocella) in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Givanvi®.

684.    In late 2012, Lupin received approval to market a generic Ocella product.

685.    By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves. On April 24, 2013, Berthold of Lupin called Green at Teva. The two spoke for over three minutes. Berthold called Green two more times the following day.

686.    The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis. In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

687.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four text messages.

688.    The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over then minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

689.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen minutes. On May 9, Green spoke with Berthold twice, for one and twelve minutes, respectively.

690.    The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with

one call lasting over seventeen minutes. Patel also called Rogerson at Actavis and the two spoke for more than five minutes.

691.    On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "[a]greed."

692.    On July 10, 2013, Green spoke to Berthold twice (for more than eight minutes and more than two minutes). After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin.

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:** ███████████
> **Cc:** ███████████; Nisha Patel02
> **Subject:** Ocella
>
>
> Tom,
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

693.    Later that day, Green called and spoke to Patel for more than seven minutes, conveying what he had learned from Berthold. During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after and the two spoke for more than four minutes. They spoke again first thing the next morning, for nearly one minute.

694.    The next day, Patel emailed Green, saying: "BTW, Ocella. Check!" Green, confused by the email, responded: "[h]uh… you are calling….correct?" Patel confirmed that she had indeed called her counterpart at Lupin: "[y]es. I was saying it's all done."

695.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty minutes.

696.    On July 29, 2013, Green announced to his colleagues: "Lupin has entered and we need to evaluate."

697.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take on which generic Ocella accounts. On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

698.    On September 9, 2013, K.G. of Teva sent an internal email to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

699.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement. He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

### d)    Norethindrone and Ethinyl Estradiol (Balziva)

700.    Teva markets its generic version of Norethindrone/Ethinyl Estradiol under the name Balziva®.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

701.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol.

702.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

703.    The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

704.    Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

705.    On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4.    Teva/Greenstone

#### a)    Oxaprozin

706.    Prior to July 2012, Teva and Dr. Reddy's dominated the Oxaprozin market. However, between July 2012 and March 2013, two additional competitors entered the market, yet the price of the drug went up more than 500% in the process.

707.    First, Sandoz entered the market in July 2012. Prior to Sandoz's entry into the market, Teva raised its prices by approximately 500%.

708.    This price increase was made possible by the fair share agreement, as Teva knew that it would not lose market share by raising prices, even with Sandoz's pending entry into the market. Indeed, when Sandoz did enter the market in July 2012, it matched Teva's higher prices and was still able to gain its "fair share" of the market."

709.    Greenstone entered the market for Oxaprozin 600 mg tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the days and weeks leading up to Greenstone's entry into the market, Green of Teva and Hatosy, an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

710.    During these conversations, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

711.    Part of the understanding between the companies was that Teva would concede at least two large customers – CVS and Cardinal – to Greenstone, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

712.    On March 27, 2013, T.C. of Teva forwarded an email that T.C. had received from Walmart to Green and Rekenthaler. The email from Walmart, sent the same day, requested that

Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a bid from a competitor (Greenstone).

713.    Rekenthaler's immediate reaction to T.C.'s email was "Great. More idiots in the market…" In subsequent emails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal … remember[?]" Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal and CVS to Greenstone. Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor strategy on their part for sure." In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone:

| From: | ████████ |
|---|---|
| Sent: | Wed 3/27/2013 4:36 PM (GMT-05:00) |
| To: | Dave Rekenthaler; Kevin Green |
| Cc: | |
| Bcc: | |
| Subject: | RE: Oxaprozin 600mg Tab |

I thought they said they were done after cardainl.. I am pissed.

714.    Teva took immediate steps to address the situation. That same day – March 27, 2013 – Green called Hatosy at Greenstone at 5:25 pm but she did not answer. The next morning, at 8:06 am, T.C. sent an email to Walmart stating: "[a]ddressing this morning…" Less than a half hour later, T.C. sent an email to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

715.    After Green spoke to T.C., he immediately called Hatosy at Greenstone. Hatosy related the information from Green to her boss, Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

716. During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

717. At 1:22 pm that day, after several of the communications outlined above, Walmart sent an email to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI – I just received word from Greenstone that they had met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the email to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

718. Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

### b)  Tolterodine Tartrate

719.    Greenstone entered the market for Tolterodine tartrate 1mg and 2mg tablets on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Hatosy and Nailor of Greenstone were speaking frequently to Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

720.    During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

721.    The day after Greenstone's entry – January 25, 2014 – in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated: "[a]s we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere. …"

722.     On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine tartrate. K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:

> From:    Dave Rekenthaler
> Sent:    Tue 1/28/2014 4:02 PM (GMT-05:00)
> To:      ▇▇▇▇▇▇▇▇▇
> Cc:      Maureen Cavanaugh; Nisha Patel02
> Bcc:
> Subject: RE: price challenge delphi 10707 cvs tolterdine
>
> It's Greenstone, new to market.  We can discuss.

723.     The next day, Patel and Hatosy of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two minutes.

724.     On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded – again not wanting to put details into writing:

> On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
>
> ▇▇▇ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

725.     The next day, Patel called Hatosy at Greenstone and the two spoke for nearly sixteen minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

726.    After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on Tolterodine tartrate.

### c)    Piroxicam

727.    On March 3, 2014, Greenstone received FDA approval to market Piroxicam capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

728.    Greenstone immediately began seeking potential customers. At 10:07 am on March 5, 2014, J.L. of Teva sent an email to Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy in place for Piroxicam?"

729.    Before responding to that email, Patel sought to negotiate strategy with Greenstone. Patel called Hatosy at Greenstone at 10:55 am and they spoke briefly. Shortly after that call, Patel also called Hatosy's boss, Nailor. At 2:14 pm that afternoon, Patel and Nailor spoke briefly. Immediately after hanging up with Nailor, Patel responded to J.L.'s email:



730.    Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market. On March 6, 2014, Patel requested a customer profitability and share analysis. During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they

210

could easily determine which customers to concede when talking to competitors about dividing the market.

731.    That same day, Patel had multiple calls with Nailor and Hatosy at Greenstone to discuss their plans for dividing the Piroxicam market. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

732.    The next day – March 7, 2014 – after the flurry of phone calls detailed above, Patel sent an email to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

733.    Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, Hatosy of Greenstone called Patel at 1:41 pm and they spoke briefly.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

734.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel called Hatosy and they spoke briefly. Hatosy called Patel back at 11:35 pm that same day and they spoke for fifteen minutes. Immediately after speaking to Patel, Hatosy called Nailor and they spoke for ten minutes. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

735.    For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesale distributor. Following an analysis of the market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would be prudent to concede that Anda business to Greenstone on Piroxicam, in order to alleviate any future challenges from Greenstone. Patel agreed with the decision to concede on April 1, 2014.

### d)    Cabergoline

736.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on Greenstone's behalf. In a December 9, 2014 email, F.H. directly sought to facilitate a customer allocation between Greenstone and Teva:

> Indeed to talk to you about Cabergoline. Greenstone is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains. [The Wholesaler] owes Greenstone a favor and would be ok if you walked away from their business. Greenstone has promised to play nice in the sandbox. Let me know if you are available to discuss.

737.    The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

738.    T.C. of Teva did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded: "[o]f course. I will let G[reen]stone know not to do anything crazy."

739.    The next day, after some internal conversations at Teva, T.C. agreed to the proposed allocation: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [The Wholesaler]."

740.    Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" – *i.e.*, not compete with Teva for other customers and drive prices down in the market.

### 5.    Teva/Actavis

#### a)    Amphetamine/Dextroamphetamine ER

741.    Teva began marketing Amphetamine/Dextroamphetamine ER (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR®.

742.    On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its Amphetamine/Dextroamphetamine ER business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

743.    Teva deferred its decision on pricing until Actavis was in a position to ship the product.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

744.    Actavis obtained FDA approval to manufacture various formulations of Amphetamine/Dextroamphetamine ER on June 22, 2012. At 9:58 pm that same evening, Rekenthaler instructed Teva employees to find out Actavis' plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32 am the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

**From:** ███████
**Sent:** Saturday, June 23, 2012 8:32 AM
**To:** Dave Rekenthaler; ████████████████    Kevin Green
**Subject:** Re: Actavis Adderall XR


Spoke to ███████. Going after approx 15 share.
1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdise. NOT Walgreens and CVS.

745.    The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

746.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of the market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

747.    One year later, Teva's customer renewed its request for a price reduction on Amphetamine/Dextroamphetamine ER, citing Actavis' desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: "…we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

### b)    Amphetamine/Dextroamphetamine IR

748.    In March 2014, Aurobindo was making plans to enter the market with Amphetamine/Dextroamphetamine IR (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-IR"). On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10%. Teva's senior marketing operations executive, K.G., indicating that Teva was aware that both Aurobindo and Actavis were launching.

749.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing email. The day before, on March 17, 2014, Patel had spoken to Actavis' Director of Pricing, Rick Rogerson, three times. Rekenthaler and Falkin of Actavis also spoke once on that day. On March 18, 2014, the day of the email, Rekenthaler and R.C., a senior-most executive at Aurobindo, had a thirty minute telephone conversation.

750.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for Amphetamine/Dextroamphetamine IR. Patel informed K.G. that the challenge was coming from Actavis and recommended that Teva concede that customer's account. At 1:43 pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Rogerson at Actavis at 1:55 pm. They spoke for just over four minutes.

### c)    Dextroamphetamine Sulfate ER

751.    Teva had a history of coordinating market share and price-fixing with competitors long before Actavis entered the Dextroamphetamine Sulfate ER market. When Impax was preparing to enter the capsules market, Impax communicated the plans with Teva. This allowed Teva to increase prices substantially even prior to Impax's entry. Consistent with the fair share rules, Impax then entered the market at the supracompetitive prices established by Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

752.     On June 19, 2014, as Actavis was entering the market for Dextroamphetamine Sulfate ER, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis' market share goals because he and Falkin of Actavis had spoken twice by phone that morning – once for more than eleven minutes and again for more than nine minutes.

753.     Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an email that Actavis had entered the market for Dextroamphetamine Sulfate ER. She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% - in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis. Later internal emails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

754.     When Aurobindo entered the Dextroamphetamine Sulfate ER tablet market in mid-2014, Teva again conceded to the new entrant, and communicated to Aurobindo which customers it would concede.

### d)     Clonidine TTS

755.     Teva began marketing Clonidine TTS in 2010 after the expiration of brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS®.

756.     On May 6, 2014, Actavis was granted approval to market Clonidine TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day for fifteen, one, and three minutes, respectively.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

757.     The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis' "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

758.     On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine TTS to more acceptable levels with an even more intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (five, ten, and eight minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54 am. At 10:02 am, she informed her colleagues of the results of the negotiations, instructing them: "[p]lease concede Ahold and HEB."

759.     The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis' pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

760.     Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance

towards his competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box .... If history repeats itself activist [sic] is going to be responsible in the market…"

761.   The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine TTS. On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "[w]e are trying to be responsible with share and price."

762.   When L.R., Teva's analytics manager, recommended giving up yet another Clonidine TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

### e)      Budesonide Inhalation

763.   Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

764.   On February 13, 2015, Rekenthaler informed other Teva employees of Actavis' plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

765.   On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three minutes. The following morning, Teva's T.C. confirmed to her

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis. She explained that Actavis' sense of urgency to obtain the accounts was due to concerns about getting its product into the market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis' entry into the market.

766.     In late July 2015, Sandoz entered the market at the elevated prices established by Teva and Actavis. Teva – which still had more than its fair share of the market – quickly conceded several large accounts to Sandoz so that it could get its fair share. And because Actavis and Teva communicated to Sandoz which accounts to target, Sandoz was able to add market share without decreasing the market price, in accordance with the fair share rules.

### f)     Celecoxib

767.     Teva received approval to market Celecoxib in May 2014.

768.     On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

769.     Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

770.     By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain ("The Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. Actavis reportedly sought 25% of The

Pharmacy's Celecoxib business. A representative of The Pharmacy told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

771.    Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything …. We're at 32% and I think that's reasonable."

772.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two minutes and another time for one minute. Patel spoke to A.B., a senior sales and marketing executive at Actavis, for eight minutes on December 5, and for over sixteen minutes on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one minute, nine minutes, and three minutes in duration.

### 6.    Teva/Par

#### a)    Omega-3-Acid Ethyl Esters

773.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

774.    On the morning of June 26, 2014, Patel emailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24 am that she had not heard anything yet but promised to "snoop around."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

775.    Patel had indeed already started "snooping around." At 9:46 pm, she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



776.    T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten text messages between them in the late afternoon and early evening of June. That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more…."

777.    The next morning, T.P. called Patel and they spoke for nearly thirty minutes. That was the first and only voice call ever between the two according to the phone records. That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler. At 11:27 am that same morning, Rekenthaler sent an email to T.C., a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this….

778.    Par launched Omega-3-Acid Ethyl Esters capsules the following Monday, June 30, 2014.

779.    After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

780.    As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal email on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

781.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

782.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

783.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

### b)    Entecavir

784.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C. further noted:

> We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time.

785.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers late that day or the next day. Rekenthaler noted: "[w]e are looking for aat least a 60 share. Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

786.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par. The two spoke two more times the next day, August 29, 2014.

787.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

788.    Also, on August 29, Rekenthaler emailed T.C. asking if she had received any feedback from CVS on Entecavir. T.C. replied that she had not and followed up later saying that ABC had indicated that it would sign Teva's offer letter. Rekenthaler replied: "[g]reat, that helps. We may end up conceding our friends up north [CVS] if they make too much fuss." T.C. dismissed that concern: "I think they will work with us really…We need them they need us so we just have to make it work."

789.    Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

790.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

791.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva

declined to do so, citing that the "pricing is competitive and in line with market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

792.     The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

### c)     Budesonide DR

793.     Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a two-player market: Par had 70% market share and Mylan had the remaining 30%.

794.     Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B., a senior national account executive at Par, called Rekenthaler at Teva. The two executives spoke for twenty-six minutes. The next day, April 2, 2014 – which happened to be the same day that Teva received FDA approval to market Budesonide DR – Par increased its price for Budesonide DR by over 15%.

795.     That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par…they are the two players in the mkt…as well as usage."

796.     Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan for fifteen minutes.

797.     On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

798.    Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 7.    Teva/Taro

### a)    Enalapril Maleate

799.    In 2009, Taro discontinued its sales of Enalapril Maleate under its own label and effectively excited the market. It continued supplying Enalapril Maleate thereafter only to certain government purchasers under the "TPLI" label.

800.    By mid-2013, the Enalapril Maleate market was shared by three players: Mylan was 60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant anticompetitive price increase for Enalapril Maleate in July 2013.

801.    Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril Maleate for its national contract (for government purchasers), which was slated to expire in September 2013.

802.    In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril Maleate. As a result of those conversations, Taro's plans changed.

803.    On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Patel called Aprahamian and left a message. He returned the call and the two spoke for

almost fourteen minutes. Then, on July 9, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril Maleate became effective – Aprahamian called M.C. at Wockhardt on his office phone and left a message. He then immediately called M.C.'s cell phone, which M.C. answered. They spoke for nearly eleven minutes.

804.    On the morning of July 19, Aprahamian sent an internal email to Taro colleagues signaling a change in plans:



From: Ara Aprahamian/US/TARO
To:
Cc:
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPLI label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

805.    Aprahamian followed up with another email shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

806.    In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

807.    On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril Maleate was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that email, Patel had spoken to Aprahamian on July 30 (eleven minute call) and July 31, 2013 (four minute call). Based on the agreement between the two companies, and in accordance with the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

808.     Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share…"

809.     In early December 2013, Taro was fully ready to re-enter the Enalapril Maleate market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two and eleven minutes.

810.     On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30 pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

811.     Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Patel spoke by phone for nearly five minutes.

812.     Taro's fact sheet for the Enalapril Maleate re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

813.     Taro began submitting offers on Enalapril Maleate the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

814.    Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril Maleate market. Aprahamian and M.A. talked for ten minutes on December 11, and for seven minutes on December 12.

815.    Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril Maleate market share goal of 15% had been raised to 20%.

816.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an email on January 2, 2014, S.K. of Wockhardt conveyed the details to his colleagues:

| From: | ███████ |
|---|---|
| Sent: | Thursday, January 2, 2014 10:20 AM |
| To: | ███████ |
| Subject: | RE: Competitive Offer for Enalapril |

██████

I spoke to ████ on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick.  Call to discuss.

817.    By May 2014 the market was stable, and market share of Enalapril Maleate was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril Maleate: "no bid due to potential market/customer disruption, aka strategic

reasons." The same day she sent that email – May 14, 2014 – Patel spoke to Aprahamian for more than four minutes and exchanged eight text messages with him.

818.    By June 2014, Taro had obtained 25% market share for Enalapril Maleate in a four-player market. Mylan and Teva each had approximately 28% market share.

819.    In January 2015, Aprahamian conducted a market analysis of Enalapril and noted that Teva might be leaving the market, but that Valeant would be entering the market. In reality, Valeant had always sold a small amount of Enalapril, with a market share of less than 1%. But Valeant was able to get word to Aprahamian in January 2015 of its future plans, even though it did not ramp up production of the drug until December 2015. Leveraging Teva's exit from the market, the competitors allowed Valeant to take the share forfeited by Teva, and in December 2015, Valeant sold more Enalapril tablets than either Mylan or Taro, despite the fact that its market share was less than 1% just a few months prior. Additionally, Valeant was able to ramp up production substantially without disturbing price because it knew from its competitors which accounts to target. Moreover, upon ramping up production, Valeant began charging prices that were higher than other competitors.

### b)    Nortriptyline HCL

820.    While Taro was approved in May 2000 to market generic Nortriptyline HCL, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

821.    By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "…Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

822.    In early November, Taro was reformulating re-launch plans, including a "Target Market share goal" for Nortriptyline HCL of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

823.    On November 6, 2013, Aprahamian pressed his team to "…get some offers on Nortrip[tyline] out. …" He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

824.    Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

825.    Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

826.    Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva. Their conversation lasted almost eleven minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business when McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

827.    The discussions of how to accommodate Taro into the Nortriptyline HCL market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

828.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "[l]ooking for Actavis..[sic] We have outstanding Teva offers out .. [sic]".

829.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no time in seeking Actavis' permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven minutes.

830.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

831.    The competitors continued consulting with each other over the coming months on Nortriptyline HCL. On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline HCL SKUs, and that HEB was interested in moving the business to Taro.

832.    Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

833.    Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four minutes.

834.    Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

835.    Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

836.    At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline HCL. Prior to this time – particularly in early 2014 – Nortriptyline HCL had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five minutes), she removed Nortriptyline HCL from contention in order to accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly took

233

into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline HCL price increase, it stated: "[d]elay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline HCL on January 28, 2015 – in coordination with both Taro and Actavis.

### 8. Teva/Zydus

837.   Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

838.   In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

### a)  Fenofibrate

839.   Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013. To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

840.   In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now as Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

841.   On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch

Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus' anticipated

entry into the Fenofibrate market. Notably, Zydus did not enter the Fenofibrate market until a few

weeks later on March 7, 2014.

842.    In the days leading up to the meeting, between February 19 and 24, Patel and Green

spoke by phone at least seventeen times – including two calls on February 20 lasting twenty-seven

minutes and nearly nine minutes, respectively; one call on February 21 lasting twenty-five

minutes; and a call on February 24 lasting nearly eight minutes.

843.    On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing

that matched Teva, Mylan, and Lupin. In the days leading up to the launch, individuals from all

four competitors were in regular contact with each other to discuss pricing and allocating market

share to Zydus. Indeed, between March 3 and 7, these competitors exchanged at least twenty-six

calls with each other. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

844.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six minutes and just over five minutes. During those calls they were discussing how to divide up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel emailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Fenofibrate. With respect to Fenofibrate, Patel recommended "[d]efend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven minutes.

845.    In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

846.    For example, on Friday, March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

847.    That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

848.    The following Monday – March 24, 2014 – Patel sent internal emails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen minutes. She also spoke with Berthold of Lupin for nearly twelve minutes.

849.    In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel emailed Rekenthaler stating "[n]eed to discuss. NC pending, and new request for Ahold. We

may not be aligned." Patel then sent an internal email directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight minutes. Patel also called Berthold of Lupin and they spoke for five minutes.

850.    On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and explained:

> [I]f we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere.

851.    K.G. agreed with the approach and on May 15, 2014, Patel sent an internal email directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award. The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty minutes.

852.    On June 2, 2014, Green called Patel and they spoke for nearly six minutes. He also called Rekenthaler, and they spoke for two minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

853.    On June 10, 2014, T.S., Senior Analyst, Strategic Support. at Teva emailed J.P., Director of National Accounts, stating: "[w]e are going to concede this business to Zydus per upper management." T.S. forwarded the email to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business." Rekenthaler responded, "[a]t Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. … Zydus has little

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

854.    The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen minutes.

### b)    Paricalcitol

855.    Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

856.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Zydus and another generic manufacturer not named as a defendant in this case planned to enter the market on day 181, which was March 29, 2014.

857.    In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

858.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER. After receiving that email, Rekenthaler called Green. The call lasted less than one minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty minutes. Later that afternoon, Patel also called Green. The two exchanged four calls that day,

including one that lasted nearly twenty minutes. On March 4, Patel called Green again and left a voicemail.

859.    On March 12, 2014, T.S. emailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal email asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

860.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing. The next day, on March 14, 2014, Patel called Green. A few minutes later, Green returned the call and they spoke for nineteen minutes. Rekenthaler then called Patel and they spoke for eleven minutes.

861.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six minutes and just over five minutes. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel emailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol. With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, Walmart, Rite Aid, Omnicare." Later that same day, Patel called Green again and they spoke for more than eleven minutes.

862.    Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

863.    For example, on March 27, 2014, Green called Patel. Patel returned the call and they spoke for nearly nine minutes. The next day, on March 28, 2014, OptiSource, one of Teva's

GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource email to Patel. Within minutes, Patel responded "[w]e should concede."

864.   That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

865.   Also, on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer. That same day, Patel called Green and left a twenty-two second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten minutes. Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal email to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "[m]ay we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

866.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business. Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus. Patel replied, "[w]e have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call and they spoke for nearly twelve minutes. After her discussion with Green, Patel sent an internal email stating, "[a]fter further review, I believe this is [a company not identified as a defendant in this case]." On April 22, 2014, Patel sent an internal email regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

     **c)**      **Niacin ER**

867.    Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

868.    Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Zydus planned to enter on June 28, 2014.

869.    Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green and Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

870.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER. The communications between Green, Rekenthaler, Patel, and Berthold are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

871.    In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC – a Teva customer. The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three minutes. Less than an hour later, Green called Patel and they spoke for eight minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Patel emailed K.G. reporting what Teva had learned on those calls:



-----Original Message-----
From: Nisha Patel02
Sent: Tuesday, May 06, 2014 4:26 PM
To: ███████████
Subject: RE: LIFO-niacin er
Importance: High

I have the share info and LOE tracker ready...I was getting mixed messages on the plan of action, so I did not send out or set up a meeting to discuss. Here's what I have picked up:

--Zydus responded in accordance with ABC's bid request. Offer is in writing.
--Zydus shipping either 6/18 or 6/28
--Zydus is the AG
--We are considering retaining ABC. My thought is that we need to concede due to the amount of erosion, but...
--Christine has indicated that we have direction to retain any and all share at any cost
  --This may be unrealistic
  --Several competitors entering
  --Should we agree that we will need to concede share, and determine retention/concession targets, I think we should consider conceding ABC --I have asked Liz to calculate the financials, including WAG and CVS exposure --LIFO buy in play
  --ABC needs commitment on a price, even though not yet valid.
  --LIFO is significant impact that is visible at ALL levels within ABC
  --There were talks of Teva providing a response with caveats (that ABC is open to), that I would like to review/suggest, since I am familiar with the triggers as well as LIFO

872.    K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

873.    Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Berthold of Lupin. These calls are listed below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

874.    Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

875.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, stating: "[a] customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the email, Rekenthaler called Green. The call lasted two minutes. Green returned the call a few minutes later and they spoke for twenty-eight minutes. Later that day, Patel called Green and they spoke for nearly twenty-one minutes.

876.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal email stating, "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well." Patel replied, "[p]lease be sure to consult with [K.G.] on this one. Thanks." Later

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that morning, Green called Rekenthaler. The call lasted two minutes. Green then called Patel and they spoke for nearly six minutes.

877.    On June 5, 2014, J.P. sent an internal email regarding "McKesson Niacin" stating "[p]er Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P. also entered the loss in Teva's internal database – Delphi – and noted that the reason for the concession was "Strategic New Market Entrant."

878.    On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

### d)    Etodolac ER

879.    Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only generic suppliers of the product. As described below, Teva and Taro – through Patel and Aprahamian – colluded to significantly raise the price of Etodolac ER in August 2013.

880.    On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian. During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

881. On May 14, 2014, Anda – a wholesaler customer of Teva – notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight text messages and had a four minute call with Aprahamian. The next day, on May 15, 2014, Green called Patel and they spoke for twenty minutes.

882. On May 20, 2014, Green called Patel and they spoke for four minutes. That same day, K.R., a senior sales executive at Zydus, also exchanged two text messages and had a thirty-nine second call with Cavanaugh of Teva. The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight minutes. That same day, K.R. of Zydus and Cavanaugh of Teva exchanged four text messages.

883. The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal email to certain Teva employees, including Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share

with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

884.    Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian at Taro for fourteen minutes.

885.    On July 2, 2014, Patel called Green and left a voicemail. The next day, on July 3, 2014, Patel sent an internal email advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

886.    When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal email asking, "[d]id we choose not to match this?" Patel responded, "[y]es. New market entrant – Zydus." K.G. replied, "[o]kay good. Thank you."

### 9.    Teva/Glenmark

#### a)    Moexipril HCL

887.    Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril HCL between May and July 2013. When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril HCL, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

888.    On August 15, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler, the Vice President of Sales at Teva, forwarded an email discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

> **From:** Dave Rekenthaler
> **Sent:** Monday, August 05, 2013 7:05 PM
> **To:** Nisha Patel02
> **Subject:** Fwd: ABC - Loss business on Moexipril
>
>
> ???
>
> Sent from my iPhone

889.    Rekenthaler forwarded the email only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

890.    Five minutes after receiving the email from Rekenthaler, Patel responded:

> From:    Nisha Patel02
> Sent:    Mon 8/05/2013 7:10 PM (GMT-05:00)
> To:      Dave Rekenthaler
> Cc:
> Bcc:
> Subject: RE: ABC - Loss business on Moexipril
>
>
> I know…made the call already

891.    The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

892.    Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Brown, the Vice President of Sales at Glenmark, called Patel at 9:45 am but did not reach her. Patel returned Brown's call at 10:08 am and the two spoke for approximately thirteen minutes. Later that day, at 1:11 pm, the two spoke again for approximately fifteen minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

893.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril HCL. Later that same day – August 6, 2013 – T.S. of Teva informed colleagues that "[t]oday is a new day and today….ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

### b)    Desogestrel/Ethinyl Estradiol (Kariva)

894.    Glenmark entered the market for Desogestrel/Ethinyl Estradiol (brand name Kariva) 0.15mg/0.02mg tablets on April 4, 2012 under its own brand name Viorele.

895.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, emailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva. The chart included a suggested re-bid price for Kariva of $76.14 – which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

896.    This sparked a flurry of communications that same day between Patel and three different Glenmark representatives – Brown and Grauso, and J.C., a sales and marketing executive at Glenmark – as set forth below.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

897.    After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

proposed re-bid price of $76.14 – virtually guaranteeing that the business would be awarded to Glenmark.

c)      **Gabapentin**

898.    Glenmark entered the market for Gabapentin 600 mg and 800 mg tablets on April 1, 2006.

899.    On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors. The PCMA described its Annual Meeting as "the…ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

900.    Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not become effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an email that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors. At around the time she sent the email, Patel exchanged two text messages with Brown of Glenmark.

901.    Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share. Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned internally that it did not "want to disrupt Glenmark's business too much."

249

**10.   Teva/Lannett**

    **a)   Baclofen**

902.   Except as set forth below, at all relevant times, Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

903.   Baclofen is available in 10 mg and 20 mg tablets.

904.   According to the NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10 mg tablets and by less than $0.0065 per unit for 20 mg tablets.

905.   Beginning around February 2014, however, the overall average market price rose by more than 550%. These price increases affected both dosages, *i.e.*, 10 mg and 20 mg tablets.

906.   According to NADAC data, the average market price for Baclofen increased by the following percentages:

    Baclofen 10 mg tablet: Between March 2014 and April 2014, prices increased 636%; and

    Baclofen 20 mg tablet: Between March 2014 and January 2015, prices increased 437%.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

907.    WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 0832-1025-00 | $0.10 | $0.49 | 2/21/14 | 390% |
| 1,000ct | Upsher-Smith | 0832-1025-10 | $0.10 | $0.49 | 2/21/14 | 390% |
| 100ct | Teva | 0172-4097-60 | $0.10 | $0.49 | 4/15/14 | 390% |
| 1,000ct | Teva | 0172-4097-80 | $0.09 | $0.49 | 4/15/14 | 444% |

908.    Although WAC data is not available for Par, upon information and belief, it implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

909.    Defendants had numerous opportunities to coordinate their price increases. All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland. and executives from at least Par, Teva, and Upsher-Smith attended the (ii) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices for Baclofen increased dramatically. *See* **Exhibit D**.

910.    In June 2014, Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply. In an internal email sent to his sales staff, K.S., a senior sales executive at Lannett, stated: "Baclofen launch in four weeks, need market intelligence. We can only take a 10% market share." At that time, Teva had a large market share in relation to the existing competitors in the market.

911.    Sullivan, a Director of National Accounts at Lannett and a recipient of the email, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger. On June 12, 2014, Sullivan messaged Patel, stating:



The message was sent at 11:16 am. At 11:30 am, Patel called Sullivan and they spoke for seven minutes. This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013. During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly. In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



912.     True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven minutes.

913.     On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail.

Patel called Sullivan back promptly, and they spoke for more than three minutes. After speaking, Patel sent another text message to Sullivan, stating: "Thank you!!" Sullivan responded: "No prob!"

914.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (*i.e.*, offer a lower price to maintain the account). Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Patel specifically agreed with the decision to concede, stating "I believe this is Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

915.    As set forth above, Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett entered the market a few months later. In fact, when Lannett entered the market it came in at the exact same WAC as Teva.

> ### 11.    Teva/Amneal
>
> #### a)    Norethindrone Acetate

916.    On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for Norethindrone Acetate was Amneal. The same day, Patel received phone calls from two different Amneal employees – S.R. (1), a senior sales and finance executive (almost twenty-five minutes, and S.R. (2), a senior sales executive (call lasting more than three minutes). These were the first calls Patel had with either S.R. (1) or S.R. (2) since she joined Teva in April 2013. That same day, S.R. (1) also spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

917.    After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market. At that time, market share was almost evenly split between the three competitors. When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

### 12.    Teva/Dr. Reddy's

#### a)    Oxaprozin

918.    In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

919.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

920.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

921.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

922.    Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Green, Walgreens did not "want to move but obviously want[s] the price."

923.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green. That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five minutes.

924.    Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

925.    While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's. Eager to avoid any further price erosion from the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

926.    At 12:33 pm that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor. At 2:20 pm, that colleague provided the information to Patel, copying Rekenthaler and K.G. With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two minutes and was their only telephone conversation in 2013.

927.    After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on April 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

928.    By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

**b)      Paricalcitol**

929.    Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file generic and had 180 days of generic exclusivity.

930.    Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC. All others are not an automatic concede, but we expect to concede." During March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol. By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

931.    By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market. On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

932.    At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

933.    On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("The Pharmacy") – Patel spoke with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50 am, Patel called V.B. and left a voicemail. V.B. returned the call at 9:18 am, and the two spoke for more than ten minutes. Later that day, at 2:46 pm, Dr. Reddy's provided The Pharmacy with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. A representative of The Pharmacy responded that it "[l]ooks like Teva is the right target." Shortly after this email exchange, at 3:21 pm, V.B. called Patel again and the two spoke for nearly nine minutes.

934.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The Pharmacy. The internal plan was that if The Pharmacy declined, then Dr. Reddy's would make an offer to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

935.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4 mcg portion of the business. Patel recommended to her boss, K.G., that Teva concede the business: "[w]e have ~70 share and it is ideal to concede here because of the incomplete family." K.G. agreed. Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently

emailed T.C., Teva's Senior Director of Sales & Trade Relations: "[d]ue to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well." T.C. relayed this statement, word-for-word, to Cardinal.

936.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity. ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014. In internal emails discussing this price challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug. When asked for his thoughts on this, Rekenthaler remarked:



```
From:     Dave Rekenthaler
Sent:     Tue 7/01/2014 9:42 AM (GMT-05:00)
To:       Nisha Patel02
Cc:
Bcc:
Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--


My thoughts are that Dr. Reddy is really a pain in my ass.  Have they picked anyone up to date?
```

937.    Despite the pricing challenge, Teva retained the ABC Paricalcitol business. As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

938.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks. On June 16, 2014, Teva's K.G. told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

939.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

940.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014. That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more

258

than twelve minutes. Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitol. Patel directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher" on Paricalcitol.

941.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's S.B., a Teva Strategic Customer Analyst, wrote an internal email, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

942.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

From:      Nisha Patel02
Sent:      Thu 7/17/2014 11:36 AM (GMT-05:00)
To:        █████████████
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)

Sorry! Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff pricing. Can't win!

943.    Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

944.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business.

259
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the RiteAid portion. Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)" Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

945.    On July 18, 2014 – a Friday – Patel called V.B. at Dr. Reddy's at 4:20 pm and left a message. V.B. returned the call on Monday morning, and the two spoke for more than four minutes. They spoke again the next morning, July 22, 2014, for more than six minutes. During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed that McKesson (that same day) "would be done after this" – meaning it would not compete for additional business because it had attained its fair share. McKesson passed this information along to Teva on July 22.

946.    The next day, July 23, 2014, Teva conceded its entire McKesson business – both Rite Aid and One Stop – to Dr. Reddy's. In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant." After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

947.    By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

13.     **Mylan/Sandoz**

a)     **Valsartan HCTZ**

948.     The first drug that CW-4, of Sandoz, and Nesta, of Mylan, coordinated about was

Valsartan HCTZ (brand name Diovan).

949.     Mylan was the first to file an ANDA to market the generic version – Valsartan

HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz

manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two

manufacturers of the generic for six months.

950.     Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21,

2012. In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one times by

phone during which they discussed, among other things, allocating market share for this product.

These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

951.    During these phone calls, Sandoz, and Mylan – through CW-4 and Nesta – agreed to divide up the market so that each competitor obtained roughly a 50% market share.

952.    Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

953.    On September 21, 2012 – the date of the Valsartan HCTZ launch – R.T., a senior sales and marketing executive at Sandoz, sent an internal email stating, "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs. a formidable competitor like Mylan. …you should be very proud!"

954.    That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of emails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, "…sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied:

I guess this is what they call "co-opetition".

955.    Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

956.    On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Kellum stating, "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction." Kellum replied, "[n]o price change."

957.    On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal email in advance of the meeting asking, "[a]re there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

**B.      Taking the Overarching Conspiracy to a New Level: Price Fixing (2012-2015)**

958.    As evident from the many examples above, by 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

959.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices – there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

960.    A troubling pattern began to emerge. Starting sometime in 2012 or even earlier and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – *i.e.*, that they would not punish a competitor for leading a price increase or steal a

competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increasing their own market share (unless they had less than "fair share").

961.    It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

### 1.    July 31, 2012 Price Increase

962.    Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following[51]:

| Drug | Competitors |
|---|---|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

---

[51] Watson Pharmaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012. The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

963.     Before raising prices on these drugs, Teva coordinated each of these price increases with competitors. For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase. For example:

a.  <u>Mylan</u>: Green spoke to Nesta on July 23 (seven minutes), July 24 (two calls: four and eight minutes); July 25 (four minutes); July 26 (four minutes); July 30 (two calls, including one that was eight minutes); and July 31, 2012 (five calls: six, two, four, seven and two minutes);

b.  <u>Watson</u>: Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (two calls: one and nine minutes);

c.  <u>Sandoz</u>: Green spoke to CW-2 at Sandoz on July 29, 2012 (two calls: two and four minutes) and July 31, 2012 (six minutes);

d.  <u>Breckenridge</u>: Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (four minutes);

e.  <u>Alvogen</u>: Green had several calls with Nesta at Mylan (noted above) on July 31, 2012. After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

**a)     Nadolol**

964.     As early as 2012, Teva was speaking to competitors about the drug Nadolol.

965.     In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

966.     By 2012, anticompetitive understandings among Teva, Mylan and Sandoz were firmly entrenched.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

967.    Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase, Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five calls on the day of the price increase.

968.    Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise Nadolol price. The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen minutes.

969.    Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013. The day before the Mylan increase Nesta spoke to Green four times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase, Green called Kellum twice in the morning, including a six minute call at 9:43 am. Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

From: Kellum, Armando
Sent: Friday, January 04, 2013 11:28 AM
To: ██████████████████████████████████████████████████
████████████████████████
Subject: Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

970.   Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

971.   Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50 am the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen minutes.

972.   Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

973.   To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who had been prescribed Nadolol for approximately the last fifteen years. In or about 2004, that individual paid between $10 and $20 out-of-pocket costs for a ninety-day supply. Today, that same ninety-day supply of Nadolol would cost the complainant more than $500.

974.   Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

b)      **Labetalol HCL**

975.    Prior to implanting a price increase on Labetalol HCL (among other drugs), Green and Rekenthaler spoke with competitors to ensure that the understanding to increase prices would hold, including Actavis and Alvogen. For example, in July 2012, Green spoke by phone with W.H. of Alvogen. On July 31, Green again spoke with W.H. Also, Rekenthaler spoke with A.S. of Actavis. These communications solidified the agreements between Defendants that each would adhere to the price increases.

976.    After Teva increased its pricing on Labetalol HCL on July 31, 2012, it continued to coordinate with its competitors to maintain that supracompetitive pricing for that drug. For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (*i.e.*, did not have enough supply to meet all of its demand). In an internal email sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

977.    That same day, Green spoke to CW-2 of Sandoz two times. After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

978.    T.C. of Teva agreed: "[w]e need to stay the TEVA course."

979.    Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four times on October 18, 2012.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### c)      Nitrofurantoin MAC

980.    Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

981.    For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (*i.e.*, other distributors). At 9:49 am on October 10, 2012, K.G. of Teva sent an internal email to the Teva sales team, including Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past. Please confirm current market pricing.

982.    Immediately after receiving that email, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen. At 10:01 am, Green called Nesta and the two spoke for ten minutes. After hanging up – at 10:11 am – Green called B.H. at Alvogen for the first of three calls that day, including one call lasting fourteen minutes. To close the loop, Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten minutes. Teva did not lower the price.

### 2.      February – April 2013: Increasing Prices Before A New Competitor Enters the Market: Budesonide Inhalation Suspension

983.    As of February 2013, Teva was the only company in the market for generic Budesonide inhalation suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. Before any additional competition could enter the market, effective February 8,

269

2013, Teva raised the WAC price for its Budesonide inhalation suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

984.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "as risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two minutes. This was the first-ever phone call between them based on the phone records produced to the State AGs.

985.    The next day, April 2, 2013, Rekenthaler spoke to A.B. two more times, including one call lasting eight minutes. Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm Actavis' pricing, Teva was informed by the customer that Actavis' pricing was "in line with [Teva's] current wholesale pricing."

986.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market. In the interim, Teva was able to continue to charge the agreed-upon price. In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 3.    May 13, 2013 Price Increase – Tizanidine

987.    As of May 2013, Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold. At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

988.    Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As Dr. Reddy's explained in an internal presentation, "[p]rice needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the large volumes we currently service."

989.    Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal email stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4 mg 150 ct went from $4.50 to $45.00. … We should secure confirmation but if this is true it would be very positive …." Kellum responded, "Wow! Thank you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team – no new offers."

990.    On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for four minutes. Two days later, CW-1 of Sandoz sent an internal email to Kellum regarding "Tizanidine" stating "[l]et's discuss."

991.    On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

increases were significant – ranging from 248% to 344%, depending on the formulation. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

992.    Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

993.    On May 29, 2013, customer Omnicare emailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking, "[a]re we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen minutes. Later that day, CW-1 replied to CW-3's email stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

994.    On June 14, 2013, Anda, a wholesale customer, emailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?" J.A. responded, "[w]e've heard they did." J.A. had learned of Mylan's intent to follow the price increase through this prior communication with Nesta. However,

Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

995.     On June 26, 2013, Meijer, a supermarket chain customer, emailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid." A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "[w]e cannot supply unfortunately."

### 4.     May 24, 2013 First List of Price Increases

996.     When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013. She sent the list via email, with an attached spreadsheet entitled Immediate PI File." The attached list included twelve different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase. 5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase. 5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

997.    For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs, Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

998.    The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

999.    The Teva increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013. Some illustrative examples of that coordination are set forth below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a)      **Glenmark**

1000.   A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

a.   <u>CW-5</u>: Four calls on May 2, 2013, two calls and one text message on May 3, 2013;

b.   <u>J.C.</u>: Three calls on May 6, 2013; two calls on May 7, 2013. For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price list immediately.

| From: | Nisha Patel02 |
|---|---|
| Sent: | Thu 5/02/2013 6:49 AM (GMT-05:00) |
| To: | ▮▮▮▮▮▮▮ |
| Cc: | |
| Bcc: | |
| Subject: | RE: Price Increases — will you be scheduling time next week to discuss? |

*When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.*

1001.   Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five minutes. Shortly after that call, at 7:44 am, Patel sent a follow up email where she identified six different "high priority" Glenmark drugs to add to the price increase list, including: Adapalene gel, Nabumetone, Ranitidine HCL, Moexipril HCL, and Moexipril HCL/HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1002.   As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in

anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:



From: ███████
Sent: Wed 5/15/2013 7:40 AM (GMT-05:00)
To: █████████
Cc: Nisha Patel02
Bcc:
Subject: Various Product Family Requests / RFP

Nisha would like to be made aware of any requests (including in-house RFPs) that include the following product families:

Adapalene

Nabumetone

Fluconazole Tabs

Ranitidine

Moexipril

Moexipril HCTZ

Pravastatin

Ondansetron

In the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected.

1003.   In accordance with the fair share understanding outlined above, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1004.   Patel also spoke to CW-5 of Glenmark for nearly six minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene gel; Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ, along with other non-Subject Drugs. Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

1005. After the Glenmark price increase implementation on May 16, 2013, and before Teva had the opportunity to follow those increases, several customers approached Teva looking for a lower price. Teva refused to bid on most of these solicitations so as to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark drugs: "IF we bid, we need to bid high, or we will disturb the market."

1006. Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved non high "quality" competitors. For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

1007. For example, the market for Fluconazole tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday, May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor. In an internal email that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called Hatosy, a national account manager at Greenstone but was unable to connect. Patel was ultimately not able to communicate with Hatosy by phone until May 28, 2013 when the two had a twenty-one minute call. The next day after speaking to Hatosy – May 29, 2013 – Patel promptly added Fluconazole to the Teva price list.

1008. Teva followed the Glenmark price increase for Fluconazole tablets on July 3, 2013. That same day, Patel spoke to Hatosy for nearly sixteen minutes and also spoke to CW-5 at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Glenmark for almost five minutes. The Teva price increases were a staggering 875% - 1,570% depending on the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Patel coordinated those increases with both Glenmark and Greenstone.

**b)**     **Sandoz**

1009.   In her May 24 "Immediate PI File," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Patel had spoken to CW-1 for nearly twenty-five minutes on May 15, 2013, and again for more than eighteen minutes on May 20, 2013, during which time she learned this information.

1010.   At the same time, Sandoz was internally discussing its "bidding high" strategy for Nabumetone. Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz pricing analyst sent the following email to Kellum and CW-1 confirming the strategy:

| | |
|---|---|
| From: | ▮▮▮▮▮▮ |
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; ▮▮▮▮▮▮ |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

1011.   Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15 am on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for

278

Ranitidine HCL). She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

1012.   After these conversations with Patel, at 10:02 am, CW-1 sent an email to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

From: █████████
Sent: Thursday, May 30, 2013 10:02 AM
To: Kellum, Armando
Cc: ██████
Subject: Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe

1013.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

1014.   The next day – June 12, 2013 – Patel exchanged at least five calls with CW-1 at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

1015.   At 8:27 am, after the first two of the phone calls listed above, Patel sent the following email clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To: ▮
Cc: ▮
Subject: RE: Isoniazid market pricing

▮

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply…which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

1016.   Later that day, at 3:21 pm, Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:

From:    Nisha Patel02
Sent:    Wed 6/12/2013 3:21 PM (GMT-05:00)
To:
Cc:      ▮
Bcc:
Subject: RE: Isoniazid market pricing

▮,

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

1017.   As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz. Patel spoke to CW-1 for more than sixteen minutes shortly before the increase, on January 22, 2015.

c)      **Taro**

1018.   Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene gel, she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro increase" on that drug. In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene gel at that time. Patel had heard the "rumors" about a Taro increase directly from Aprahamian, the Vice President of Sales and Marketing at Taro. During a nearly eleven minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase. This was the first call between Patel and Aprahamian since Patel joined Teva.

1019.   Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene gel in order to evaluate a potential Taro increase on the drug, including volume and pricing. Aprahamian indicated that the reason for his request was that the "[r]umor mill has some price changes in the market."

1020.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene gel:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1021.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene gel. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

### 5.   July 3, 2013 Price Increases

1022.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:

1023.   Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

1024.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – *i.e.*, had no competitors.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1025.   Patel – and other executives at Teva – went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

### a)   Upsher-Smith

1026.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

1027.   On June 13, 2013, K.G. of Teva sent an email to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1028.   On June 15, 2013, Patel exchanged six text messages with B.L., a senior national account executive at Upsher-Smith.

1029.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-

Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1030.   On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a defendant in this Complaint, also increased its price for the that drug. As a result, a national account executive at Teva sent an email to Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

1031.   On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

#### b)      Mylan

1032.   Immediately, after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an email with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for a certain, specific items that she had highlighted in blue, including nine Mylan drugs: Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets; Diltiazem HCL tablets; Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1033.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven minutes. Green also called Patel twice that day to report on what he had learned. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and three times on May 10, 2013.

1034.   On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013, Green spoke to Nesta six times.

1035.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin HCL, Methotrexate.

1036.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

1037.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydroxyzine Pamoate Capsules | Sandoz (39%); Actavis (61%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

1038.   In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had some inside information about at least Ketoprofen:



1039.   Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1040.   At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four minute call starting at 10:59 am. Within minutes after the call, Patel sent the following email internally at Teva:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

From: Nisha Patel02
Sent: Fri 6/28/2013 11:22 AM (GMT-05:00)
To: ███████████████████████
Cc: ███████████████████████
Bcc:
Subject: Competitor Increase Items

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).

█████,

Hearing that Ketoprofen is on the list.

1041.   Patel obtained this information directly from Green but got one significant point wrong (which confirms that she had advance notice of the Mylan increase). In fact, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

1042.   Patel consistently used the term "rumors" in emails to camouflage that Teva was communicating with competitors about future price increases. She used it on June 26, 2013 – after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

1043.   Similarly, on June 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate. Patel responded that Mylan's pricing was a little low on the drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

1044.   Moreover, this collusion between Teva and Mylan – two of the largest generic manufacturers in the country – facilitated collusion with smaller companies as well. At the same

time that senior executives from Teva and Mylan were speaking, both companies were also coordinating with other competitors (and potential competitors) for the drugs being allocated between Mylan and Teva. For example, Rekenthaler of Teva spoke a number of times with M.B. of Par at the same time that Patel and Green were discussing the Doxazosin Mesylate price increase with Nesta of Mylan. When Par – which already had an ANDA for the drug – re-entered the market in early 2014, it matched the supracompetitive pricing by Teva, Mylan, and Apotex. Similarly, M.A. of Mylan coordinated Greenstone's entry into the market through discussions with Hatosy of Greenstone. The two spoke a number of times between April and July 2014, in advance of Greenstone's August 2014 entry into the Doxazosin Mesylate market. And in both instances, this coordination between Mylan and Teva allowed the new competitors to enter the market and gain market share without disturbing the supracompetitive pricing.

### c)   Sandoz

1045.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Sandoz ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1046.   On July 9, 2013, CW-1 stated in an internal Sandoz email that he would "call around to [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1047.   Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Berthold at Teva and left a message. Rekenthaler called CW-2 back immediately and the two had a three minute conversation during which CW-2 asked Rekenthaler to provide him with a full,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work email account to a personal email account, and then forwarded the list from his personal email account to CW-2's personal email account:

| From: | David Rekenthaler [daverek@verizon.net] |
|---|---|
| Sent: | Monday, July 15, 2013 5:02 PM |
| To: | ▇▇▇@icloud.com |
| Subject: | Fwd: |

Sent from my iPhone

Begin forwarded message:

> **From:** Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
> **Date:** July 15, 2013, 4:59:27 PM EDT
> **To:** "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase [not actual inc] |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less EcondIsc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

1048.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1049.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only competitor in that market. Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

### 6.     July 19, 2013 Price Increase – Enalapril Maleate

1050.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

1051.   Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1052.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate. Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

1053.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting almost sixteen minutes. The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow

the Mylan price increase on Enalapril Maleate. This information sparked the following email exchange between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
> > Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
> >
> > Nisha Patel
> >
> > Teva Pharmaceuticals USA
> >
> > Director, Strategic Customer Marketing
> >
> > On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
> >
> > > This is all a result of a wockhardt price increase following a Mylan increase
> > >
> > > Sent from my iPhone

1054.  As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1055.  On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]." Patel responded: "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item … in the near future. Maybe next week."

1056.  That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate. Patel called

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Nesta of Mylan directly and they spoke three times, including calls lasting six and five minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40 am that evening (now the morning of July 13, 2013), K.K. created a contact on his cell phone with Green's cell phone number in it.

1057.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one minutes. During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

1058.   First thing the next morning, on Monday, July 15, 2013, Patel sent an email to a Teva executive stating "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase. Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one minute call; shortly thereafter, Green returned the call and they spoke for two more minutes. At 9:57 am that morning, K.K. reported internally the specific price ranges that he had obtained from Green.

1059.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Tuesday, July 16, 2013, Patel sent the following internal email to her supervisor K.G., again using the "rumors" to obfuscate the true source of her information:



> From: Nisha Patel02
> Sent: Tue 7/16/2013 11:08 AM (GMT-05:00)
> To:
> Cc:
> Bcc:
> Subject: Enalapril Increase Overview
>
> As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.
>
> This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:
>
> 1. Mylan: 44%
> 2. Wockhardt: 43%
> 3. Teva: 13%
>
> At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

1060.   That same day, Nesta called Patel and left a voicemail.

1061.   Patel's July 16, 2013 email referred to above was forwarded to Cavanaugh, who promptly approved the price increase. That same day, July 16, 2013, Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams, and sent the following agenda:

| Subject | Price Increase Discussion |
| --- | --- |
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ███████████████████████████Dave Rekenthaler███████████████████████████████████; Kevin Green; ███████████████████████ |
| Message | Sorry for the re-schedules!<br><br>We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

Notes

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
| --- | --- | --- | --- | --- |
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

1062.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Patel nevertheless described the simultaneous increase as a coincidence in an internal email that same day:

From: Nisha Patel02
Sent: Fri 7/19/2013 8:10 AM (GMT-05:00)
To: ███████████████████████████████████████████   Dave Rekenthaler; ███████

Cc:
Bcc:
Subject: RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

1063.   Within a few days after the increases, a customer complained to K.K. at Wockhardt asking: "What is going on in the market that justifies your price increases?" K.K.'s response to customer was direct: "Mylan took up first we are just following." Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

### 7.     August 9, 2013 Price Increases

1064.   On August 9, 2013, Teva raised prices on twelve different drugs. These increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

1065.   Patel began planning for the increase shortly after the July 3 increases were implemented. On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

1066.   That list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan, and Sandoz. In the days

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

1067.   Patel was also communicating indirectly with Mylan through Green. For example, on July 10, 2013 – the day before Patel sent the preliminary "Round 2" increase list – Green and Nesta spoke twice. Shortly after the second call, Green called Patel and the two spoke for just over seven minutes. The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

1068.   Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

1069.   By August 7, 2013, Patel had finalized the list. That day she sent an email to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for

296

Cavanaugh, summarizing the increases. As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive; Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 80.8% |
| DICLOFENAC TABLETS | 102% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.3% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 108% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 30.8% - Watson/Actavis, 0.5% - Apotex, 0.1% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 208% | Follow Mylan | Mylan, 31.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 23.2% - Apotex, 7.1% - Zydus, 3.8% - Lup/n, 1.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 63% |

1070.   K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the email, K.G. politely asked Patel to remove some of the incriminating information:

From: ▓▓▓▓▓▓
Sent:     Wed 8/07/2013 11:00 AM (GMT-05:00)
To:       Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC


Nisha,


Please add Teva share to the competitors commentary and change header to Market Share.


Under reasons, I would change to the following:


1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

1071.   In accordance with the executive's request, Patel deleted the information.

1072.  Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase.

1073.  The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors. The drug was slated for the lowest increase of all drugs on the list (7%).

1074.  The day before the price increase went into effect – August 3, 2013 – Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

1075.  As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

### a)  Mylan

1076.  Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Patel, who asked Green to communicate with Nesta of

Mylan and obtain what she referred to as "intel" on many different drugs. But at times Patel communicated directly with Nesta.

1077.   For example, on July 22, 2013, Patel sent Green an email with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

1078.   The next day – July 23, 2013 – at 4:30 pm, Green and Nesta spoke for more than six minutes. Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan. The call lasted more than three minutes.

1079.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July. Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:



From: Kevin Green
Sent: Monday, July 29, 2013 9:49 AM
To: ███████████
Cc: ███████
Subject: Walgreens: Items for discussion

███████

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

1080.   The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1081.   Following the same consistent pattern, Green and Nesta spoke six times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

1082.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel sent the following email with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:

```
From:     Nisha Patel02
Sent:     Wed 7/31/2013 3:23 PM (GMT-05:00)
To:       Kevin Green;                                    Dave Rekenthaler
Cc:
Bcc:
Subject:  RE: DELPHI 9429 Walgreens: Items for discussion


My initial commentary...


If we can take on the supply, we can bid on items we have already taken our increase on (bold).


**Enalapril: seeking share**

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list


There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't
implemented an increase by the time we respond. From what I understand, we have some time.
```

1083.  Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different drugs that it overlapped with Mylan on August 9, 2013, as set forth above.

### b)    Pravastatin

1084.  As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark. Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin. Shortly after that call, Patel

sent an email to her Teva colleague directing him to add Pravastatin, and several other Glenmark

drugs to the price increase list. In all, Patel spoke to CW-5 four times throughout the day on May

2, 2013, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

1085.  As of May 2013, the market for Pravastatin included five competitors: Glenmark,

Teva, Lupin, Zydus and Apotex. The number of competitors made it more difficult to coordinate

a price increase. This difficulty stemmed in part because two of the competitors – Zydus and

Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings,

and any price increase for that drug would require significant coordination and communication

before Teva could feel comfortable raising its own price.

1086.  Teva was able to achieve a sufficient level of comfort and substantially raise prices

for Pravastatin by systematically communicating and reaching agreement with each and every

competitor on that drug over the next several months.

1087.  On May 3, 2013, Green called M.K., a senior executive at Zydus, twice with one

call lasting four minutes. Over the next several weeks, Green communicated numerous times with

both M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on

Pravastatin.

1088.  On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold)

and Glenmark (J.C., a national account executive) multiple times. Those calls are detailed below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

1089.  By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase and were comfortable enough with the situation that one marketing executive at Teva indicated in an email to Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."

1090.  As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On May 15, 2013 – the day before Glenmark's increase would be effective – a Teva executive sent an email out to the pricing team stating that "Nisha would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin. The Teva executive concluded: "[i]n the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected."

1091.  That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

1092.   As was now the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva executives. At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

1093.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase. At that time, Patel did not view Zydus as a quality competitor. Patel stated: "I have asked to get Zydus' ability to supply on this. If it's not so great, I would like to add back to the increase list." Patel later indicated that "[t]he only threat was Zydus. Just waiting to hear on their ability to supply."

1094.   Green was responsible for coordinating with Zydus. As seen in the table above, on May 15 ,2013, Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen minutes. The next day, on May 16, Green spoke with M.K. for four minutes. Later that day, K.R. called M.K. and the two Zydus executives spoke for more than seventeen minutes. Green also spoke to Rekenthaler and Patel that same day, conveying what he had learned from his communications with the Zydus executives.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1095.  Also, on May 16, Patel's supervisor, K.G. sent an internal email to several colleagues, including Patel and Rekenthaler, stating "I think we need to understand additional competitor ability to take on additional share and pricing actions. The volume is huge for us. It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:



1096.  The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08 pm, Patel called Berthold at Lupin for an eleven minute call. While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 pm) and left a twenty-three second voicemail. Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight minutes.

1097.  As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20-24, Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

1098.   There were documented phone calls between Patel and B.H. since Patel had joined Teva.

1099.   But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price. For example, when she sent the "Immediate PI" spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

1100.   That would change shortly. On May 28, 2013, Apotex raised its price for Pravastatin. That same day, Green also exchanged six text messages with K.R. at Zydus. The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1101.   The day after the Apotex increase, Green spoke to K.R. at Zydus two more times, and exchanged four more text messages. Zydus then quickly followed with a price increase of its own on June 14, 2013.

1102.   Following the normal pattern, Green spoke to K.R. and M.K. at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

1103.   Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 8, 2013. As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1104.   When Patel sent the "Price Increase Overview" to her supervisor, K.G., on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Berthold and Lupin: specifically, that Lupin was "waiting on Teva" before implementing its own increase. Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1105.   A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases. In her response, Patel confirmed that it was Green ("KGn") who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

1106.   Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1107.   The extra work required to implement the Pravastatin price increase was well worth it to Teva. As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent Pravastatin increase. The results were staggering.

1108.   According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $837,079,079 (nearly $1 billion) *per quarter* for Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

1109.   Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

1110.   As a result of the price-fixing agreements set forth above, prices rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings.

1111.   NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter. For instance, the average market price for Pravastatin 40 mg increased by over 640%, from $0.09 per tablet in July 2013 to $0.67 per tablet by December 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





1112.   WAC pricing confirms that Apotex, Lupin, Teva, and Zydus all increased their Pravastatin prices substantially and largely in unison.

| Package Size (10 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |
| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |

| Package Size (40 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Zydus | 6838207216 | $0.24 | $0.72 | 6/14/2013 | 200% |
| 500ct | Zydus | 6838207205 | $0.22 | $0.72 | 6/14/2013 | 227% |
| 90ct | Teva | 0093720298 | $0.24 | $0.72 | 8/9/2013 | 200% |
| 1,000ct | Teva | 0093720210 | $0.22 | $0.72 | 8/9/2013 | 227% |
| 90ct | Lupin | 6818048709 | $0.24 | $0.72 | 8/28/2013 | 200% |
| 500ct | Lupin | 6818048702 | $0.22 | $0.72 | 8/28/2013 | 227% |
| 90ct | Apotex | 60505017009 | $0.38 | $0.84 | 5/28/2013 | 121% |
| 1,000ct | Apotex | 60505017007 | $0.38 | $0.84 | 5/28/2013 | 121% |
| 9,000ct | Apotex | 60505017008 | $0.38 | $0.84 | 5/31/2013 | 121% |

| Package Size (80 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Zydus | 6838207316 | $0.38 | $0.72 | 6/14/2013 | 89% |
| 500ct | Zydus | 6838207305 | $0.30 | $0.72 | 6/14/2013 | 140% |
| 90ct | Teva | 0093727098 | $0.38 | $0.72 | 8/9/2013 | 89% |
| 1,000ct | Teva | 0093727010 | $0.36 | $0.72 | 8/9/2013 | 100% |
| 90ct | Lupin | 6818048809 | $0.38 | $0.72 | 8/28/2013 | 89% |
| 500ct | Lupin | 6818048802 | $0.36 | $0.72 | 8/28/2013 | 100% |
| 90ct | Apotex | 60505132309 | $0.38 | $0.84 | 5/28/2013 | 121% |

1113.   Although WAC data is not available for Glenmark, upon information and belief, it implemented virtually identical price increases at virtually the same time for its Pravastatin products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1114.   Prices continued to increase after August of 2013. In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Pravastatin saw between October 2013 and April 2014. They sent letters to Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage Increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20 mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40 mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10 mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80 mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10 mg, 90ct | $6 | $34 | 406% |
| Pravastatin Sodium | 20 mg, 90ct | $7 | $35 | 400% |
| Pravastatin Sodium | 40 mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80 mg, 90ct | $14 | $52 | 271% |

1115.   These price increases cannot be explained by supply shortages or costs. According to a November 2014 report by the New York Times, a three-month supply of generic Pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[52]

c)   **Etodolac**

1116.   As of July 13, 2013, Teva sold both Etodolac and Etodolac ER. Teva's competitors for the standard version of Etodolac were Taro and Sandoz. For Etodolac ER, Teva had only one competitor – Taro.

1117.   When Patel first began planning for "Round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases. For example, when she circulated a long list of

---

[52] Elizabeth Rosenthal, *Lawmakers Look for Ways to Provide relief for Rising Cost of Generic Drugs*, N.Y. TIMES (Nov. 24, 2014), https://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-cost-of-generic-drugs.html (last visited September 24, 2020).

potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

1118.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1119.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for nearly sixteen minutes. Aprahamian called CW-3 back the next day and the two spoke again for eight minutes. After hanging up the phone with CW-3, Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen minutes. On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten minutes.

1120.   During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

1121.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
| Etodolac ER | Could follow IR (Shared with Taro) |

1122.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

1123.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

including for Etodolac. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voicemails, the two were able to connect for more than fourteen minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three minutes.

1124.   The Sandoz price increase for Etodolac was effective July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut."

1125.   When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| From: | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| Sent: | 7/30/2013 11:14:49 PM |
| To: | █████████████████████████████████████ |
| CC: | |
| Subject: | Re: Fw: Bid Request - Etodolac |
| Attachments: | _.gif; _; _ |

recent market changes, not taking on additional share...

1126.   Also, on July 26, Patel sent an email to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR. She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we follow in the near future, but a date has not been determined."

1127.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for

example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

1128.   Aprahamian was also speaking to his contact at Sandoz – CW-3 – during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

1129.   On August 1, 2013 – shortly after speaking with Patel – Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

1130.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 – which Patel attended – reflect the following:

4.  Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

1131.   When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1132.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

### 8.   July 2013 – January 2014: Competitors Seek to "Follow" Price Increases

1133.   As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan price increases. Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1134.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

1135.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta. The call lasted two-and-a-half minutes. A half hour later, Nesta returned the call and they spoke for nearly nineteen minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1136.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Nesta provided CW-4 with a list of drugs. Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high. After the phone call ended, CW-4 sent the following email to her superiors (the "July 2013 Email"):



1137.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 email. Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

1138.   Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products. Examples of this conduct are detailed below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### a)  Haloperidol and Trifluoperazine

1139.   Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

1140.   On August 6, 2013, Nesta at Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long. Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250% on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

1141.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal email stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL and that Sandoz needed to "rationalize the market."

1142.   On August 22, 2013, CW-2 emailed Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz. F.R. responded: "I believe the answer is yes? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

1143.   On September 18, 2013, CW-1 emailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

1144.   On September 25, 2013, Walgreens – a Mylan customer – emailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal email explaining that "Mylan took a price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

1145.   On October 2, 2013, CW-1 emailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:



1146.   Over the next several days, CW-4 and Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1147.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 emailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the email, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained: "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

1148.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

1149.   When Zydus entered the market for Haloperidol in late 2014, Green communicated frequently with Nesta to ensure that Zydus obtained market share without eroding market pricing.

### b)   Benazepril HCTZ

1150.   In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ. However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1151.   On July 12, 2013, a marketing executive at Sandoz sent an internal email regarding "Benazepril Orders for Cardinal" stating: "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was

confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1152.  The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 email outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above). That list did not include Benazepril HCTZ. CW-1 forwarded the July 2013 email to Kellum stating "[s]ee [CW-4's] note below for Mylan increases…..I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then emailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."

1153.  Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ. These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

1154.  On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the email, CW-1 stated: "Mylan is also in there. Be on the lookout for bumetanide and Benazepril/hctz."

1155.  One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ. The increase was large – nearly 334% on all dosage strengths.

1156.  On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1157.   A third competitor –Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic. When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan. Both before and after entering the market, CW-2 then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and L.J.) about obtaining market share on Benazepril HCTZ. Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

1158.   As a result, prices across the market rose more than 300% for Benazepril HCTZ, according to data compiled by the Healthcare Supply Chain Association released by Senator Sanders and Representative Cummings, as depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|---|---|---|---|---|
| 12.5-20 mg | 100 ct | $34 | $149 | 338% |
| 20-25 mg | 100 ct | $34 | $149 | 338% |
| 5-6.25 mg | 100 ct | $34 | $149 | 338% |

1159.   WAC data also confirms that Defendants Mylan and Sandoz both imposed dramatic price increases for Benazepril HCTZ by the following amounts:

| Package Size (25 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Price Increase |
|---|---|---|---|---|---|---|
| 20ct | Mylan | 0378477501 | $0.38 | $1.65 | 8/9/2013 | 334% |
| 20ct | Sandoz | 0185027701 | $0.32 | $1.65 | 8/20/2013 | 406% |

1160.   NADAC data shows that average market prices of Benazepril HCTZ remained stable prior to October 2013 but rose dramatically and remained artificially high after that time, as depicted for certain forms and dosages below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: NADAC Price Data

c)      **Levothyroxine**

1161.   Since approximately December 2010, Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1162.   In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine. Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Green of Teva. Notably, Levothyroxine was not a drug that Teva sold.

1163.   As dated above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone. The next morning – the day of the Mylan price increases – Green spoke twice with Kellum, including a six minute call at 9:34 a.m.

1164.   Shortly after handing up the phone with Green, Kellum sent an internal email stating, among other things, that he "[j]ust heard from a customer that … Mylan took a significant

price increase on Levothyroxine" and Kellum advised his team to "please be cautious" on this product. As the phone records demonstrate, Kellum's source for the information was not "a customer," but rather Green of Teva.

1165. That same morning, K.S. of Lannett called Nesta of Mylan. The phone call lasted forty-four seconds. Then, on January 10, 2013, Nesta called K.S. back and they spoke for more than six minutes. That same day, McKesson emailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan took a large price increase."

1166. The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan. Notably, after these phone calls, Nesta would not speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

1167. On August 6, 2013, Nesta called CW-4 twice. Both calls lasted less than a minute. A few minutes after the second call, Nesta called K.S. at Lannett. The call lasted twenty-four seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1168. On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal email that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s email stating, "[t]his is correct based on my info as well."

1169. Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1170.  On August 14, 2013, S.G. sent an email to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered "[w]e just noticed that as well."

1171.  On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M. a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us …." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1172.  During a September 10, 2013 earnings call, Lannett's CEO, A.B. was asked for his reaction to Mylan's Levothyroxine price increase. A.B. responded, "You mean after I sent them a thank you note? I'm just kidding … I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well…. So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

1173.  On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1174.  The three competitors – Mylan, Lannett, and Sandoz – did not stop there. They coordinated again to raise price on Levothyroxine in April/May 2014.

1175.   Consistent with the 2013 increase, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014. In the two days leading up to the increase, Nesta and K.S. of Lannett spoke by phone several times. These calls are listed below. Notably, these calls are the last documented telephone calls between the two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

1176.   On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine – P.C., a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating: "[n]ot sure if you knew already … Mylan increasing levos." Sullivan responded: "Thanks for the heads up … We heard 55% on contract price, can you confirm?" P.C. replied, "[y]es ~50-55%." Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Nesta only days prior.

1177.   Lannett quickly followed with the price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

1178.   These price increases are reflected in the WAC data:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 120% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.27 | $0.41 | 4/25/2014 | 55% |
| 100ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 1,000ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |

1179.  The below NADAC data shows the average market price increase for various dosages of Levothyroxine between November 2013 and August 2014:

| Dosage | 11/28/2013 NADAC | 8/20/2014 NADAC | Percentage of Increase |
|---|---|---|---|
| 25 mcg | 0.19346 | 0.34262 | 77% |
| 50 mcg | 0.22681 | 0.38441 | 69% |
| 75 mcg | 0.25029 | 0.42067 | 68% |
| 88 mcg | 0.25546 | 0.44153 | 73% |
| 100 mcg | 0.26215 | 0.44575 | 70% |
| 112 mcg | 0.31389 | 0.51975 | 66% |
| 125 mcg | 0.30482 | 0.52688 | 73% |
| 150 mcg | 0.31058 | 0.53083 | 71% |
| 175 mcg | 0.36448 | 0.64925 | 78% |
| 200 mcg | 0.35133 | 0.64696 | 84% |



327
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1180.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[53]

1181.   In 2015, patients complained of a dramatic price increase for their Levothyroxine medication. One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[54] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[55]

---

[53] *Why Are Some Generic Drugs Skyrocketing in Price?*, *supra* note 115 at 12, 38.

[54] Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS (Mar. 29, 2015, 5:51 PM), https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/ (last visited Oct. 6, 2020).

[55] Sean Kirby, Dee J. Hall & Bridgit Bowden, *Prices of Lifesaving Drugs Skyrocketing*, WIS. CTR. FOR INVESTIGATIVE JOURNALISM (Nov. 28, 2016, 10:16 AM), available at https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/ (last visited Oct. 6, 2020).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### d)  Clomipramine HCL

1182.  In addition to Sandoz and Mylan, Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking – more than a 3,440 increase to Taro's WAC pricing on certain formulations.

1183.  In the weeks leading up to the Taro price increase on Clomipramine HCL, Aprahamian of Taro, spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan. In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro. During these conversations, Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1184.   CW-3 of Sandoz also took contemporaneous notes of some of his conversations

with competitors. For example, after speaking with Aprahamian of Taro twice on April 30, 2013,

CW-3 made the following notes identifying Clomipramine HCL as one of the products that Taro

planned to increase on May 1st:



Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating

with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1185.   As part of the agreement to raise prices and not poach each other's customers on

Clomipramine HCL, Sandoz consistently refused to bid for Taro's customers after Taro raised its

price. For example, on April 30, 2013, Publix emailed Sandoz stating that it had received a price

increase letter from Taro regarding several products, including Clomipramine HCL, and asked

whether Sandoz wanted to bid for their business. Kellum emailed CW-4 stating "I'm not inclined

to do anything here as there may be opportunities for us. We can blame supply if these are in fact

opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

1186.   Taro did agree to concede one customer to Sandoz so that the competitor could

achieve its fair share of the market. On May 1, 2013, Rite Aid emailed Sandoz asking for a bid on

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clomipramine HCL. Kellum responded: "I want to raise price and perhaps pick up share here if possible. [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to access supply etc. …"

1187.   The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five minutes. CW-3 hung up the phone and immediately called Kellum. The two spoke for eight minutes. First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five minutes. Within a half hour, CW-3 again contacted Kellum and spoke for two minutes. Later that day, CW-4 of Sandoz emailed Kellum regarding an upcoming call with Rite Aid stating: "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible. … like we don't already know the cat's out of the bag."

1188.   Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Aprahamian forwarded the email to M.P, Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

1189.   Mylan was the next to increase price on Clomipramine HCL. On May 16, 2013, Mylan increased to the same WAC per unit as Taro. In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts. Some of these calls are detailed in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

1190.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for their business. Aprahamian responded that he was "[n]ot inclined to take on new business. Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to over react [sic] to this product. Not sure how long Mylan is out."

1191.   On July 16, 2013, CW-4 of Sandoz sent an email identifying Clomipramine HCL as a Mylan price increase product. By this time, Sandoz knew that Mylan had increased its price on this product.

1192.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing its price for Clomipramine HCL. Aprahamian forwarded the notice to M.P. stating: "FYI, Sandoz is in the market (and adjusted price to match ours) now with product as expected. Don't want to alert the reps as they could overreact. They did take Rite Aid as you know. Will see what happens from here."

1193.   Two days later – on July 22, 2013 – Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1194.   These price increases are illustrated below:

| Package Size (25 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Mylan | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

1195.   On August 5, 2013, Walgreens – a Mylan customer – emailed Sandoz and requested a bid on Clomipramine HCL. S.G., a national account executive at Sandoz, sent an internal email asking, "[s]hould we consider a 25% share of their business?" Kellum responded negatively, based on the agreement in place with Mylan, stating: "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls lasted less than a minute (likely voicemails). The next day, on August 7, 2013, S.G. replied to Kellum's email, stating: "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

1196.   In October 2013, CW-4 and Nesta spoke by phone several times. At least some of these calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1197.   After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum. The call lasted one minute. Approximately one-half hour later, Kellum emailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1198.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating: "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel…which should have been good."

1199.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint. After several conversations with antitrust counsel, Kellum prepared the following response to Bloomberg with regard to Clomipramine HCL:

> ▮,
>
> Here are the details on our price increase for Clomipramine.
>
> 1) On July 22, 2013 We raised WAC by the following %'s
>    25mg     2,778%
>    50m      2,325%
>    75mg     1,778%
>
> 2) We were not the first to raise the price but rather followed Mylan and Taro when we learned they had taken a price increase which we first learned from the pricing services we subscribe to "Analysource" (First Databank) and Prospectorrx (Gold Standard).
>
> 3) We had a very small market share (1%) and have since gained ~15% market share Rite Aid and Mckesson by providing lower prices than their incumbent suppliers (Taro and Mylan/Taro).

1200.   As is clear from the allegations, Kellum's statement was a lie. In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance and stayed true to its commitments to keep those prices high.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1201.   In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

**9.     March 7, 2014: Price Increases and Overarching Conspiracy Converge (Niacin ER)**

1202.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1203.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20, 2014.

1204.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price. On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to the market and sends offers out." K.G. immediately forwarded the email to Patel with the instruction: "[p]lease see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven minutes.

1205.   Within a week, Teva was ready to implement the price increase. On March 5, 2014, Patel sent an email to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1206.   Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

1207.   During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven minutes. During this and several subsequent calls, discussed in more detail above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

1208.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

1209.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

1210.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an email from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the email to several people internally at Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:

> **From:** ▮▮▮▮▮▮▮
> **Sent:** Monday, March 24, 2014 2:10 PM
> **To:** ▮▮▮▮▮▮▮▮▮▮ Dave Rekenthaler
> **Cc:** Maureen Cavanaugh; Nisha Patel02; ▮▮▮▮▮▮▮
> **Subject:** FW: Niacin ER
>
> I want to make sure our strategy has not changed> we are conceding correct ?

1211.   That same day, Patel spoke to Berthold at Lupin three times, as shown below:



| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

1212.   Patel responded:

> **From:** Nisha Patel02
> **Sent:** Mon 3/24/2014 1:13 PM (GMT-05:00)
> **To:** ▮▮▮▮▮▮▮
> **Cc:** Maureen Cavanaugh; ▮▮▮▮▮▮▮▮▮▮▮ Dave Rekenthaler
> **Bcc:**
> **Subject:** RE: Niacin ER
>
> Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

1213.   The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER. "[w]ith the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%)….We need to keep everybody else."

### 10.   April 4, 2014 Price Increases

1214.   On April 4, 2014, Teva raised prices on twenty-two different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge, Heritage, VersaPharm, and Rising – as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

1215.   Leading more price increases was part of the strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy was well known, understood, and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:



1216.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel

338

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014." She stated: "[a]ttached is

my list of potential items. Note that they still need to go through the review process."

1217.   The initial list contained drugs sold by Actavis, Lupin, and Greenstone, among

others. Not surprisingly, Patel was communicating frequently with each of those competitors

throughout December 2013 and into early January 2014.

1218.   On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet.

In the days leading up to February 7, Patel was feverishly coordinating by phone with a number

of different competitors to identify price increase candidates, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

1219.   Those efforts were successful. By February 26, 2014, Patel had a more refined list

of "PI Candidates," which she forwarded to another colleague for his review. That list included

the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract $5.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

1220.   Patel continued to refine the list over the next several weeks.

1221.   On March 17, 2014, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. with the statement: "[o]nce you verify these are acceptable, we can finalize for the increase." Patel and Rekenthaler both were communicating frequently with competitors – in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising – to coordinate the price increases in the week before Patel sent the price increase list to K.G. At least some of those communications are reflected in the table below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

1222.   Rekenthaler had also previously spoken with his contact at VersaPharm – J.J., a senior national account executive – on January 22, 2014 (a five minute call) and March 7, 2014 (a three minute call) to secure VersaPharm's agreement to follow the Teva increase on two drugs.

Those were the only two identified phone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, VersaPharm followed with its own price increase shortly after the Teva increase.

1223.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increased items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – *i.e.*, the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1224.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1225.   These price increases were well coordinated and agreed to between Teva and its competitors. Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.

1226.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

a)      **Cephalexin**

1227.   Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva: Patel and Green. As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

1228.   As of late October 2013, however, neither of those options was available to Berthold. Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1229.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where Teva was the only competitor in the market – Berthold already knew that Teva would follow the increase.

1230.   On October 14, 2013, Berthold called Rekenthaler at Teva. They ultimately spoke for sixteen minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records.

1231.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension – Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase. He called T.S. at 9:18 am that morning and left a message. T.S. returned the call at 9:57 am, and the two spoke for nearly five minutes.

1232.   Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:



1233.   The Lupin increase on Cephalexin oral suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own email with specific price points that Lupin would be charging for Cephalexin.

1234.   K.G. of Teva responded later that day, asking: "[d]id Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

1235.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the email from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the email to Patel stating: "Nisha, let's add this to our list to discuss." Patel called Berthold the same day and left a message.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1236.   When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

1237.   On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90-185%, depending on the formulation.

### b)    Azithromycin and Medroxyprogesterone

1238.   In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets. Patel and Hatosy, a national account executive at Greenstone, were communicating frequently during that time, including exchanging six text messages on November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

1239.   Pfizer was directly involved in the approval process for these price increases. On November 8, 2013 – only two days after Patel and Hatosy exchanged six text messages – a senior pricing executive at Greenstone sent an email to Greenstone's General Manager seeking approval to implement the price increases. The General Manager approved of the price increases the next day, but indicated that he had sent a message to a senior Pfizer executive for sign off, and wanted "to socialize this with him" and let him know that the price increases that Greenstone was seeking to take were consistent with the other price increases currently happening with great frequency in the U.S. generic industry. Part of that socialization process included explaining the strategy behind

the price increases. Pfizer approached the price increases on November 22, 2013. The next day, Patel spoke to Hatosy at Greenstone for nearly one minute.

1240.   On December 2, 2013 – the same day that Greenstone was slated to send out notices of the price increases to its customers – Patel spoke to Hatosy at Greenstone three times within a span of twenty minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

1241.   After the last of those three calls, Patel sent an email to several colleagues at Teva notifying them of an impending Greenstone price increase – one that would not be effective for another month:

| From: | Nisha Patel02 |
|-------|---------------|
| Sent: | Mon 12/02/2013 2:23 PM (GMT-05:00) |
| To: | ███████████████████████████ |
| Cc: | ██████████████████ ; Dave Rekenthaler |
| Bcc: | |
| Subject: | Azithro OS Price Increase |

FYI, I'm hearing that Greenstone just announced an increase on Azithromycin Oral Suspensions, effective January 1st. Please take this into consideration for bid requests we may receive.

1242.   On December 5, 2013, Patel continued to communicate with Hatosy about the Greenstone increase, and how Teva would react to unsolicited customer requests for bids – trading two voicemails. The next day, Patel sent another email to K.G. about Azithromycin suspension:



From:    Nisha Patel02
Sent:    Fri 12/06/2013 11:33 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Azithro Susp Question

I mentioned earlier in the week that Greenstone took an increase that is effective January 1st. (As a reminder, I intend to add these items to my list of potential price increases for Q1 2014.)

Since the new pricing requires a WAC increase, I am inclined to decline to bid at this time. Further, in a 2 player market, we have 54% share and this includes a gain of ~4% in June.

Do you agree with the "decline to bid at this time" approach?

1243.   K.G. agreed with Patel's recommendation. Later that day, J.L. of Teva sent the following notice to several Teva colleagues:



From:
Sent: Friday, December 06, 2013 2:27 PM
To:
Cc:                        Nisha Patel02
Subject: RE: Giant Eagle Cephalexin Offer

We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.

As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time. Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.

The request was left open to see if we could supply for internal purposes only.

Please inform the customer that we are unable to provide an offer at this time.

1244.   That same day, Teva declined to bid on Azithromycin for multiple customers.

1245.   Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and

347

Medroxyprogesterone tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with Hatosy of Greenstone for more than five minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

1246.   Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension. A national account executive at Teva asked Patel: "[c]an we provide any better pricing than Greenstone? … I know we have picked up our target share." Patel had spoken with Hatosy of Greenstone twice earlier that day, including one call lasting more than fifteen minutes. Patel's response to the national account executive was: "[l]et's talk tomorrow."

1247.   Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets on April 4, 2014. Patel spoke twice with Hatosy from Greenstone that same day.

### c)    Clarithromycin ER

1248.   Teva and Actavis were coordinating several drugs Teva price-fixed on April 4, 2014. One of the drugs was Clarithromycin ER tablets. As of December 2013, Teva, Actavis and Zydus were the only generic manufacturers actively selling Clarithromycin ER.

1249.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1250.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At 9:37 am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April 1, I suspect that Actavis isn't interested in picking up a lot of additional share."

1251.   Immediately after receiving that email, at 9:40 am, Patel called Rogerson at Actavis and the two spoke for more than seventeen minutes. Shortly after hanging up the phone with Rogerson, at 10:12 am, Patel responded to the email, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

1252.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price. At 9:19 am, Patel called Rogerson at Actavis and they spoke for more than six minutes. Shortly after that call, at 9:45 am, Patel sent an email internally at Teva stating: "[i]t looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

1253.   When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

1254.   Similarly, in March 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

1255.   At 9:54 am on March 14, 2014, Rogerson called Patel and left a message. Patel called Rogerson back at 10:31 am, and the two spoke for more than twelve minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

From: Nisha Patel02
Sent: Friday, March 14, 2014 10:47 AM
To: ██████████████████████
Cc: Dave Rekenthaler; ████████████████
Subject: Market Increases


NAMs,


I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I
believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):


Tamoxifen

Mirtazipine

Estazolam

1256.   In fact, these increases would not become effective until April 15, 2014, again

demonstrating that Teva knew in advance of its competitors' price increase plans.

1257.   Within half an hour of sending that email, Patel instructed colleagues to add the

Actavis drugs to the Teva price increase list. She added: "[w]e intend to follow where we can."

1258.   Less than two hours later, at 12:37 pm, Patel called Rogerson again. They spoke

for more than five minutes. Shortly after hanging up the phone, at 12:51 pm, Patel wrote another

email to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need

to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

1259.   First thing the next business day – which was the following Monday, March 17,

2014 – Patel forwarded the "PI Candidates" list to her colleague K.G. The list included both

Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson. After quickly

exchanging voicemails, they spoke for more than nineteen minutes. Rekenthaler of Teva and

Falkin of Actavis also exchanged four text messages that day and had one call lasting more than

six minutes.

1260.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less

than three weeks later, on April 4, 2014. Patel and Rogerson spoke twice by phone that day.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Rekenthaler and Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1261.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

1262.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva had bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

### d)   Ketoconazole

1263.   Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
|---|---|
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

1264.   Taro was a common competitor on both drugs, but there were different sets of competitors for each information. For Ketoconazole cream, Teva's competitors were Taro and Sandoz. For Ketoconazole tablets, Teva's competitors were Taro, Mylan and Apotex.

1265.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz. During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

1266.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an email internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:



From: ████████
Sent: Friday, April 04, 2014 3:01 PM
To: ████████ Kellum, Armando;
████████████████████
Subject: Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

1267.   CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

1268.   That same day, Aprahamian sent a similar email internally to his colleagues at Taro.

1269.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal email stating: "we are not going to bid this product….Taro has 27% share in a 4-player market." In a follow up email, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro

would need to lie about the reason: "[y]es, we are declining, but we need to advise its [sic] due to supply."

1270.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1271.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement the price increases until October. The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1272.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The email from Cardinal was forwarded to Patel, who responded immediately:



From:      Nisha Patel02
Sent:      Wed 5/14/2014 10:05 AM (GMT-05:00)
To:        ▮▮▮▮▮▮▮▮▮▮
Cc:        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Bcc:
Subject:   RE: Cardinal Ketoconazole CR NBO # 11796


Unable to bid at this time. For internal purposes, it is for strategic reasons.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1273.   Shortly before sending the email, Patel exchanged several text messages with Aprahamian at Taro. She would ultimately exchange eight text messages and had one phone call lasting more than four minutes with Aprahamian on that day.

1274.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, internal purposes)."

1275.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and CW-1 at Sandoz spoke for more than three minutes.

1276.   The Teva increases on Ketoconazole were significant. For the cream, Taro, Teva and Sandoz all increased WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

### e)   Estradiol/Norethindrone Acetate and Cyproheptadine HCL

1277.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. One of those new co-conspirators was Breckenridge. Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1278.   On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets. Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label. For Cyproheptadine HCL,

Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1279.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six minute call on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1280.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1281.   With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine HCL. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking to S.C., Patel sent the following email regarding the customer's request:



| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Fri 2/07/2014 2:46 PM (GMT-05:00) |
| To: | |
| Cc: | |
| Bcc: | |
| Subject: | RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72 |

Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

1282.   With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two-player market. For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1283.   On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and Cyproheptadine HCL tablets (contract increases of as much as 526%). In addition, Teva increased the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on Cyproheptadine HCL tablets by as much as 95% - to exactly match Breckenridge's WAC price on both products.

### f)    Diflunisal

1284.   Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1285.   Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal. For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1286.   Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen minutes. When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014, Diflusinal was on the list, with Teva expecting to lead the increase.

1287.   Teva and Rising continued to coordinate the increase over the next several months. For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
| --- | --- |

1288.   That same day, Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1289.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased its WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1290.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal. Consistent with fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

### g)    Ethosuximide

1291.   On the April 4, 2014 Teva price increase list, VersaPharm was a competitor on two different drugs: Ethosuximide capsules and Ethosuximide oral solution.

1292.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January, neither drug was on the list.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1293.   VersaPharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, VersaPharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at VersaPharm, and speaking for five minutes on January 22, 2014. When Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

1294.   Rekenthaler called again and spoke with J.J. at VersaPharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide capsules, Teva raised its WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

1295.   On April 9, 2014 – only five days after the Teva increase – VersaPharm increased its own pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

1296.   Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of VersaPharm never spoke by phone again.

**11.     Impact of April 4, 2014 Price Increases to Teva**

1297.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1298.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1299.   For example, on October 2, 2014 Sandoz followed Teva's price increase on three drugs: (1) Amoxicillin/Clavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets. Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three minutes.

1300.   Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

1301.   Indeed, even before Actavis followed the price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Patel's initial response to the customer was "[w]e believe the market is still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Patel wrote: "I can't quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs recently."

1302.   Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium tablets. Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

### 12.     April 15, 2014 Price Increase (Baclofen)

1303.   Effective February 21, 2014, Upsher-Smith took a significant price increase on Baclofen, ranging from 350%-420% to the WAC price, depending on the formulation. Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith and Upsher-Smith was considering whether to exit the market or significantly raise the price.

1304.   The primary competitors in the market for Baclofen at this time was Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

1305.   Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases – but decided against it. The primary reason was that Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor. In other words, Qualitest would likely compete for market share if Teva increased its price.

1306.   Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems, and could exit the market for at least 3-4 months, if not permanently.

1307.   Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase. Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

1308.   Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith. In the week before she started her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty minutes. During these initial communications, Patel and B.L.

reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

1309.   There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Patel's prior conversations with B.L. and based on the history of collusion between the two competitors.

1310.   Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly. Teva increased its WAC pricing by 350-447%, depending on the dosage strength. Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

1311.   Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow. Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply programs, Teva deferred to Upsher-Smith. As Patel told K.G. in a June 11, 2014 email: "Dynamics have changed, but I think we need to see if Upsher wants to pick up share. We have an unreasonably high share." K.G. agreed: "I think this is the right thing to do….we should just give them a high bid."

1312.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-Smith. On April 28, 2014 – only three days after the Teva price increase – J.M., a Senior Direct of Sales and Marketing at Upsher-Smith, made the following pronouncement:

> On Apr 18, 2014, at 3:07 PM, ████████████████ @upsher-smith.com> wrote:
>
> Qualitest is out. Teva matched our pricing. Bac is our newest ~$20M product.
>
> ███
> Sent from my iPhone
>

1313.   Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith. As discussed more fully above, Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

1314.   According to NADAC data, the average market price for Baclofen remained steady prior to the Spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10 mg tablets and by less than $0.0065 per unit for 20 mg tablets.

1315.   Beginning around February 2014, however, the overall average market price rose by more than 550%. These price increases affected both the 10 mg and 20 mg dosages of Baclofen.

1316.   According to NADAC data, the average market price for Baclofen increased by the following percentages:

> Baclofen 10 mg tablet: Between March 2014 and April 2014, prices increased 636%; and
>
> Baclofen 20 mg tablet: Between March 2014 and January 2015, prices increased 437%.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1317.   WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen consistent with the timing of the communications set forth above, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 0832102500 | $0.10 | $0.49 | 2/21/14 | 420% |
| 100ct | Teva | 0172409760 | $0.10 | $0.49 | 4/15/14 | 420% |
| 1,000ct | Upsher-Smith | 0832102510 | $0.10 | $0.49 | 2/21/14 | 420% |
| 1,000ct | Teva | 0172409780 | $0.09 | $0.49 | 4/15/14 | 447% |

1318.   Although data is unavailable for Par, upon information and belief, Par implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva. And as set forth above, when Lannett entered the market, it came in at the exact same WAC price as Teva.

**13.    July 1, 2014 Price Increase (Fluocinonide)**

1319.   There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and Fluocinonide 0.05% ointment. As of June 2014, Teva, Taro, Sandoz, and Fougera were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

above. On June 11, 2014, Teva identified the market-share breakdown for each of the different formulations of those drugs as follows:

| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

1320.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four formulations of Fluocinonide in July 2013, based in part on discussions that started between Patel and Aprahamian even before Patel started her employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

1321.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to Taro's WAC prices are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

Taro notified its customers of the increases the day before they became effective – June 2, 2014.

1322.   Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for a

round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1323.  On May 14, 2014, Patel and Aprahamian exchanged eight text messages and had one phone conversation lasting more than four minutes.

1324.  Subsequent to the May 14 communications, Patel directed a colleague to create a list of future price increase candidates. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro – including the four formulations of Fluocinonide – with the notation "Follow/Urgent" listed as the reason for the increase, *even though Taro had not yet increased its price on these drugs or notified its customers that it would be doing so*. The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

1325.  On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% cream and Fluocinonide 0.05% emollient cream, but did not give a reason for the opportunity to Teva. The CVS representative offered to move a significant

amount of business from Taro to Teva, stating: "Opportunity knocks." The email was forwarded to Patel, who responded:



1326.   Of course, Patel already knew the bid request was due to a price increase, because she had previously spoken to Aprahamian in May and included Fluocinonide on her list of price increases with the notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

1327.   T.C. stated that she had not heard about the price increase from anyone else but indicated that she would "snoop around." Patel stated: "OK. Thanks. I'll do the same."

1328.   Patel immediately began snooping around by exchanging five text messages with Aprahamian at Taro. Later that afternoon, she reported that she had "[c]onfirmed that Taro increased," but was "still working on intel." K.G. at Teva suggested it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations. He asked Patel to provide "guidance" by the next day. Patel responded at 4:23 pm, making it clear she had been talking to Aprahamian not only about Fluocinonide but, other drugs as well:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high quality competitor. It's just a matter of who the others are.)

Shortly after sending that email, Patel called Aprahamian and they spoke for nearly seven minutes. As discussed more fully below, Taro had also increased its prices for Warfarin Sodium and Carbamazepine on June 3. Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1329.   First thing the next morning – June 4, 2014 – Patel exchanged two more text messages and spoke on the phone for more than twenty-five minutes with Aprahamian. Within minutes after hanging up the phone with Aprahamian, Patel sent the following email to K.G., making it clear that she had "intel" but did not want to put anything in writing:



From: Nisha Patel02
Sent: Wed 6/04/2014 10:44 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Fluo Crm and E Crm Info
Attachments: Analysource_Report_20140604113534(1).xlsx

,

Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd like to discuss further. I have additional intel (I can discuss with you) that will be useful.

We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor--I think we need to be responsible where we have adequate market share.

Thanks,

Nisha

1330.   That same day, Teva received a bid from another large customer, Walmart. Shortly after that email was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

> From:     Nisha Patel02
> Sent:     Wed 6/04/2014 2:09 PM (GMT-05:00)
> To:       ███████████████
> Cc:       ███████████████
> Bcc:
> Subject:  RE: Item Questions
>
> ███████████
>
> (Please consider the Taro items alert items.) Based on quality of competitor, the intention of being responsible in the
> market, and market share, below is my commentary:
>
>   1. Gel: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC,
>      assuming we can supply.
>   2. Ointment: Should not pursue. We have reasonable share.
>   3. Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

After further discussion, Teva decided not to bid on any of the Walmart business.

1331.   On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained from Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail-order pharmacies, and group purchasing organizations). Prior to sending that "intel" Patel had spoken to Aprahamian on June 17 for fifteen minutes and June 19 for fourteen minutes. The contract price points obtained by Patel were not publicly available.

1332.   Sandoz was also a competitor on two Fluocinonide formulations – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel. Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period. At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

During one of the phone calls on June 20, Aprahamian dictated to CW-3 the specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available. Based on the history and pattern of practice between CW-3 and Aprahamian (see above re: Clomipramine), it was understood that Sandoz would follow the Taro price increase.

1333.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees – including Patel and Rekenthaler – for a 3 pm conference call that day. The notice stated: "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment. We are targeting an announcement date of Monday, June 30th for an effective date of July 1st." The next morning, at 9:57 am, Patel and Aprahamian spoke again for nearly thirteen minutes.

1334.   The Teva price increases went into effect on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Patel spoke to her contact at Sandoz – CW-1 – several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1335.   These prices are reflected in the WAC data:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15 gm | Taro | $0.79 | $2.43 | 6/3/2014 | 206% |
| 30 gm | Taro | $0.56 | $2.43 | 6/3/2014 | 337% |
| 60 gm | Taro | $0.39 | $2.43 | 6/3/2014 | 524% |
| 15 gm | Teva | $0.79 | $2.43 | 7/1/2014 | 206% |
| 30 gm | Teva | $0.56 | $2.43 | 7/1/2014 | 337% |
| 60 gm | Teva | $0.39 | $2.43 | 7/1/2014 | 524% |

1336.   The average market price for Fluocinonide remained artificially high after July 2014, according to NADAC data:

**Fluocinonide 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|
| 15 gm | 0.74086 | 1.65196 | 8/20/2014 | 123% |
| 30 gm | 0.52141 | 1.61352 | 8/20/2014 | 209% |
| 60 gm | 0.37029 | 1.42319 | 8/20/2014 | 284% |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Fluocinonide 0.05% Ointment**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 gm  | 1.2108    | 2.554     | 8/20/2014        | 111%                   |
| 30 gm  | 0.78538   | 2.44041   | 8/20/2014        | 210%                   |
| 60 gm  | 0.59659   | 1.9948    | 8/20/2014        | 234%                   |



**Fluocinonide 0.05% Gel**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|--------|-----------|-----------|------------------|------------------------|
| 15 gm  | 1.16749   | 1.98267   | 8/20/2014        | 70%                    |
| 30 gm  | 1.19417   | 1.78605   | 8/20/2014        | 50%                    |
| 60 gm  | 0.78302   | 1.60736   | 8/20/2014        | 105%                   |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Fluocinonide Emollient 0.05% Cream**

| Dosage | Old NADAC | New NADAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|
| 15 gm | 0.919 | 1.55634 | 8/20/2014 | 69% |
| 30 gm | 0.5995 | 1.795 | 8/20/2014 | 199% |
| 60 gm | 0.42707 | 1.45117 | 8/20/2014 | 240% |



1337.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014 but followed the increase on the gel three months later, on October 10, 2014). Sandoz increased its WAC pricing on the gel by 491%. That same day, Patel spoke to CW-1 at Sandoz by phone for more than three minutes.

1338.  Fougera also sold a formulation of Fluocinonide.

1339.  During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream but had yet to gain any significant market share due to supply problems. Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro, and Teva were all communicating frequently. At least some of those communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

### 14.  August 28, 2014 Price Increases

1340.  On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (5.9%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (5.4%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33 %); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (5.7%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

1341.   In the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increase in advance.

1342.   The day before the increase became effective – August 27, 2014 – Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

1343.   In addition to those phone communications noted above, representatives from Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other Defendant, attended.

### a)   Enalapril Maleate

1344.   With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as shown above. Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen minutes, and again twice on August 14, 2014, including one call lasting eight minutes.

### b)   Prochlorperazine

1345.   Similarly, with regard to Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and 11. Nesta, in turn, communicated with M.D., a senior sales executive at Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

1346.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

c)      **Mylan**

1347.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1348.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

1349.   Patel, in turn, forwarded the email to the Teva sales team and stated: "Our intention is to follow Mylan on his increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ tablets; Enalapril Maleate tablets, Cimetidine tablets; Fluvastatin Sodium capsules; Loperamide HCL capsules; and Prazosin HCL.

1350.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. Previously, Patel had relied on Green to obtain specific Mylan customer price points (referred to as "intel") through his communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow up email about the Mylan strategy, Patel noted that one of her Mylan increase strategies

would not have been appropriate for this situation, and concluded that: "Plus, we really need some

intel" about the Mylan contract price points.

1351.   Patel continued to push for specific contract price points from Mylan. On April 28,

2014, Patel sent an email to the Teva sales team, stating: "To date, we have no intel on Mylan's

recent increases. I realize there is a lot of travel going on, but whatever you can gather and share

would be greatly appreciated."

1352.   On May 9, 2014, Patel sent another email:



| From: | Nisha Patel02 |
| Sent: | Fri 5/09/2014 9:55 AM (GMT-05:00) |
| To: | |
| Cc: | Dave Rekenthaler; |
| Bcc: | |
| Subject: Mylan Increase Intel | |

NAMs,

Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated.  Our intention is to become better, quicker followers, but without intel, we are unable to do so.

In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.

Please send any intel to me and Tom.

1353.   Shortly after receiving that email – at 11:15 am that morning – Rekenthaler called

Nesta at Mylan and left a message. Nesta returned the call at 11:23 am, and the two spoke for

nearly eight minutes.

1354.   Separately, and before Rekenthaler was able to convey any information he had

obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items)

directly to T.S. at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these. Please help! There are several requests
> often for offers, but I have ZERO intel. A little frustrating/discouraging, as
> we are bound to hear complaints on how long it took to close the Delphi

request. Is there anything you are able to get to help when you are back?...At some point, I know I'll have to find another source of magic :))

1355.   The next day, T.S. sent Patel an email with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

```
From:
Sent:         Tue 5/13/2014 1:34 PM (GMT-05:00)
To:           Nisha Patel02
Cc:
Bcc:
Subject:      FW: Dirt
Attachments:  Mylan-Price List A.xlsx


FYI
```

1356.   The email was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her email was created by a Mylan employee.

1357.   Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Patel was more confident that Teva would follow the Mylan price increases exactly, without disrupting the market. That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1358.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

1359. Also, on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium tablets, Flurbiprofen tablets; and Prochlorperazine tablets.

### d) Taro

1360. Taro also significantly raised its prices on the following drugs which overlapped with Teva: Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1361.   Patel learned of the price increases for certain of these drugs in advance, based on her conversations with Aprahamian. It was understood that Teva would follow the Taro price increases based on these and prior conversations. In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1362.   Specifically, on May 28, 2014, T.S. of Teva sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet. That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
| --- | --- |
| CARBAMAZEPINE TABLETS 200MG 10O | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 10OO | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

1363.   Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight text messages and spoke for more than four minutes by phone.

1364.   On June 3, 2014 – the date of the Taro price increases on Clotrimazole, Warfarin Sodium, Fluocinonide, Carbamazepine, and other drugs – Patel and Aprahamian exchanged five text messages. After exchanging those text messages, Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)" At 5:08 pm that evening, Patel called Aprahamian and the two spoke for nearly seven minutes.

1365.   First thing the next morning, Patel and Aprahamian exchanged two text messages. Then, at 9:56 am, the two spoke again for almost twenty-six minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an email to K.G. making it clear that she had obtained

380

additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

1366.   On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. K.G. – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more than nine minutes.

1367.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

1368.   As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva, Taro and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014. In the days between the Taro and Zydus price increases for Warfarin Sodium, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1369.   On June 13, 2014 – the date of the Zydus increase on Warfarin Sodium – Teva was presented with an offer from a customer for a one-time buy on that drug. Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal email alerting her group, including her supervisor K.G., about

381

a list of drugs on which Teva planned to raise prices. A number of them – including Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream, emollient cream, gel and ointment, and Warfarin Sodium tablets – included the notation "Follow/Urgent – Taro" as the reason for the increase. For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

1370.   On June 18, 2014, Patel sent that same list to the entire sales Team at Teva, informing them of the status of Teva's next price increase. She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued: "[w]hile we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

1371.   Some of the "intelligence" referred to by Patel was gathered during a phone conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen minutes.

1372.   The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus. The timing and duration of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

1373.   On August 28, 2014, Teva followed the Taro price increases on Clotrimazole topical solution, Warfarin Sodium tablets, and Carbamazepine chewable tablets and Carbamazepine.

### e)      Zydus

1374.   In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle capsules.

1375.   As of June 2014, Zydus and Teva had a large majority of the market share of Topiramate Sprinkle, while Actavis had just 3% of the market.

1376.   In April 2014, Zydus raised its price for Topiramate Sprinkle capsules. Patel was in frequent communication with Green at the time of the Zydus price increase.

1377.   In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1378.   Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above – Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent – Zydus." Two days before that – the same day that Green had extensive phone calls with both Rekenthaler and Patel – Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

1379.   Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### 15.   January 28, 2015 Price Increase

1380.   Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1381.   When Patel left the pricing department at Teva her position was not refilled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1382.   On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

1383. Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.

1384. Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-2015: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, D.C. (January 8, 2015). These industry events were well-attended by Teva's competitors.

1385. Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

### a)      Propranolol HCL tablets

1386. On January 15, 2015, Actavis sent a notice to its customers informing them of a significant price increase to its WAC and Suggested Wholesale Price ("SWP") for Propranolol HCL tablets. The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1387. In the days before Actavis sent notice to its customers, Falkin and Rekenthaler, spoke frequently. For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1388. Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan – the other quality competitor in the market for Propranolol HCL tablets, in its own name and/or through its subsidiary, UDL. The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1389. On January 16, 2015, more than a month before Actavis' price increases were disclosed to the public, Rekenthaler forwarded Teva's price increase list to Patel. Propranolol was on the list, with the following explanations about the pricing strategy and reasons for the price increase:

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1390.   Teva raised its pricing for Propranolol HCL tablets on January 28, 2015 - before the Actavis price increase even became effective. As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1391.   When Actavis' price increase on Propranolol HCL tablets did become effective - on February 17, 2015 - Rekenthaler and Falkin continued to discuss pricing. For example, the dya before those price increases became visible to the public - February 16, 2015 - Rekenthaler and Falkin spoke twice, including one call lasting nearly twenty-three minutes.  Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1392.   Mylan followed the Teva and Actavis price increases for Propranolol with a price increase on July 10, 2015.

1393.   Heritage and Par/Endo also agreed to these price increases.

1394.   According to NADAC data, various dosage levels of Propranolol HCL tablets saw the following price increases:

> Propranolol HCL 10 mg tablets: Between February 18, 2015 and September 23, 2015, the average price increased by 819%;

> Propranolol HCL 20 mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

> Propranolol HCL 40 mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

> Propranolol HCL 80 mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1395.   The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL tablets showing simultaneous price increases by Actavis, Heritage, Mylan, Teva, and Par.





1396.   The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol tablets.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



b)      **Ciprofloxacin HCL and Glimepiride**

1397.  Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increases to the Ciprofloxacin HCL WAC were 201-533% depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

1398.  In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases. At least some of those phone communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

1399.  V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014.

1400.  Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how T.W. obtained this information, the subject line of the email clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated that Teva initiated price increases, but did not include Glimepiride:



> On Aug 28, 2014, at 4:11 PM, ███████████████ > wrote:
>
> Hi All,
> Teva had price increases today.  No glimepiride though!
> See products below.
> Thanks,
> ████

1401.  J.M., a senior marketing executive at Dr. Reddy's, replied: "[t]hanks for sending. This was shown in the pricing compendium today. I was a little disappointed. However, some of the price increase[s] were led by other companies more than a month ago. So I am still hopeful they may follow." Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between V.B. and Patel during their various conversations.

1402.  In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015. In the interim, V.B. and Patel continued to communicate, exchanging four text messages on October 10, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1403.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased it pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine minutes) and once on December 18, 2014.

1404.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

c)      **Griseofulvin**

1405.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension. In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase. Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

1406.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

1407.   Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor- Actavis" as the reasons for the price increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1408.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015. As discussed above, in the days leading up to the price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin microsize oral suspension matched Actavis' WAC pricing exactly.

### C.  COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCCESSFULLY COLLUDING WITH TEVA

#### 1.  Apotex

1409.   Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2, an increase in five points over that twelve-month period.

1410.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Doxazosin Mesylate and Pravastatin.

1411.   Teva increased its pricing on Doxazosin Mesylate in August 2013. Teva's new increased price (a 1,053% increased) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1412.   Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

1413.   That relationship continued through April 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader

at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex. The two spoke on March 7, 2014, for two minutes and three minutes, respectively. They spoke again on March 20 for four minutes, and again on March 25 for two minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1414.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

## 2.   Zydus

1415.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitors rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus' increase was more personnel-oriented: Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in connection with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to include Zydus more fully in the conspiracy.

1416.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus' entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1417.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1418.   In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices – Green and Patel spoke four times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three times.

1419.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increase on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight minutes. On August 20, the two exchanged an additional pair of phone calls.

1420.   Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

### 3.   Heritage

1421.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013. Initially, Patel gave Heritage a

ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1422.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with Vice President of Heritage, Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

1423.   Heritage's successful efforts to coordinate price increases with Teva on multiple drugs including Acetazolamide, Glipizide-Metformin, Leflunomide, Nystatin, and Theophylline ER – as described above.

### 4.     Lupin

1424.   In Patel's initial May 2013 quality competitor list, Lupin was given a ranking of +2. When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1425.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Patel and Berthold spoke at least seventy-six times by phone. Green, while still at Teva, also had a very strong relationship with Berthold. As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1426.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following drugs: Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets. Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1427.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin oral suspension. As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin oral suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1428.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

### 5.   Par

1429.   In Patel's initial May 2013 quality competitor ranking list, Par was given a +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1430.   Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S. a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven times by phone.

1431.   Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently throughout 2013 and 2014. From

the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. at Par at least thirty-two times by phone.

1432.   Patel was aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets. Patel forwarded the email to T.S. with three question marks: "???" T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday. Just received call back with more information."

1433.   The following Monday, Patel also forwarded the original email (discussing the competitive challenge from Par on Labetalol HCL) to Rekenthaler, saying: "[n]eed to make a decision quickly." One minute after receiving that email, Rekenthaler called M.B. at Par and the two spoke for eighteen minutes. Shortly after hanging up the phone with M.B., Rekenthaler sent another email to Patel, stating: "[h]old off on this until I get back with you." Rekenthaler spoke to M.B. again later that afternoon for three minutes.

1434.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

### 6.   Greenstone

1435.   Greenstone was not a highly-ranked competitor when Patel first created the quality competitor ranking list in May 2013. Patel had, at that time, given Greenstone a ranking of 0.

However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

1436.   One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with Hatosy, a national account executive at Greenstone. Patel and Hatosy were former co-workers at ABC and had a longstanding relationship. From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and Hatosy communicated by phone or text at least 66 times. Patel also spoke to Hatosy's supervisor, Nailor, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

1437.   Patel and Hatosy of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: December 2, 2013 – the day that Greenstone sent notices to customers of its price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone.

1438.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

### 7.   Amneal

1439.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1440.   One of the reasons why Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Rekenthaler of Teva had a

strong relationship with S.R. (2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight times by phone, and attended many trade association meetings and customer conferences together as well. Rekenthaler and S.R. (2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants).

1441.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R. (1), a senior sales and finance executive at Amneal, and S.R. (2). As discussed above, Patel and S.R. (1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1442.   Patel also spoke to S.R. (2) regarding Norethindrone Acetate in September 2014 and continued to communicate with S.R. (2) into at least 2015 – sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct. In the message exchange below (relating to a non-Subject Drug), S.R. (2) informs Patel that Amneal will concede one customer – Econdisc ("E") – so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



1443.   On the day of this message exchange, Patel and S.R. (2) also spoke by phone for nearly five minutes.

### 8.     Rising

1444.   In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1. When Patel updated her rankings a year later, Rising improved to a ranking of +2.

1445.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1446.   Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for Diflunisal tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between

the two competitors, CW-2 contracted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1447.   On April 4, 2014, Teva increased the price on Diflunisal tablets by as much as 182%, as well as Hydroxyzine Pamoate by as much as 165%. In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31, 2014.

1448.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing matched Teva's WAC price increase from April 2014.

1449.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

### 9.    Breckenridge

1450.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her rankings a year later, Breckenridge improved to a ranking of +2.

1451.  Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1452.  For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate and Cyproheptadine HCL tablets. In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six minutes.

1453.  On April 4, 2014, Teva followed the Breckenridge price increases on Estradiol/Norethindrone Acetate tablets increasing the WAC pricing by over 100% and Cyproheptadine HCL tablets increasing the WAC pricing by over 900%, to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Estradiol/Norethindrone Acetate by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

1454.  As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen minutes. Similarly, Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1455.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 10.   Glenmark

1456.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Glenmark, for example, declined slightly in the rankings. In Patel's initial May 2013 quality competitor list, Glenmark was given a ranking of +3. When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1457.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at the company – CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message one-hundred-twenty-one (121) times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Fluconazole tablets, Moexipril HCL, Moexipril HCL/HCTZ, Nabumetone, Ranitidine HCL.

1458.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged forty-four phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Patel exchanged thirty-six calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol and Gabapentin tablets - demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 11.    Camber

1459.   In Patel's initial May 2013 quality competitor ranking list, she gave Camber a ranking of -2. When Patel updated her rankings a year later, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

1460.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1461.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1462.   One of those drugs was Raloxifene HCL tablets.

1463.   Teva had begun marketing Raloxifene HCL in March of that year. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well but had not yet entered by September 2014.

1464.   The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin. As discussed more fully above, Teva, Lupin, and Aurobindo agreed to divide up the generic Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

1465.   As the anticipated product launches for Raloxifene HCL approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1466.   Teva's discussions with Actavis escalated over the coming week. On September 10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen minutes and one minute, respectively. On September 11, they talked for ten more minutes. On September 16, Rekenthaler spoke by phone a total of six times with different Actavis personnel, including one call with A.B. lasting thirty-four minutes.

1467.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the affirmative. Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer, Econdisc.

1468.   Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1469.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two minutes. The next day, Rekenthaler initiated a series of four phone calls with Ostaficiuk. The two spoke for a total of thirty minutes that day. Notably, these are the first identified phone calls ever between the two competitors. As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene HCL.

1470.   On September 24, Patel discussed a Raloxifene HCL allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc. She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk –

stating: "Camber indicated that they are targeting Econdisc and a smaller retailer … and they then would be 'done.'"

1471.  As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer. At 9:07 am that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler planned to discuss the matter with Camber:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Wed 9/24/2014 9:07 AM (GMT-05:00) |
| To: | ████████████ |
| Cc: | Dave Rekenthaler; ██████████████████ |
| Bcc: | |
| Subject: | Re: Econdisc Reloxifene Intel |

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone

1472.  Indeed, at 9:28 am that morning, Rekenthaler called Ostaficiuk and the two spoke for two minutes. They spoke two more times that day, including one call that lasted eight minutes.

1473.  Some of these calls also related to Camber's entry into the market for Lamivudine/Zidovudine. Teva and Lupin were already in the market for Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into the market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1474.   On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen minutes, to close the loop on the Lamivudine/Zidovudine communications.

1475.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene HCL market and armed with the information Rekenthaler had gathered from Camber's President, K.G. concluded: "[o]kay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Rekenthaler and Ostaficiuk spoke again twice that day.

1476.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene HCL product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1477.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene HCL. Rekenthaler called Ostaficiuk that day, for a short one minute call.

1478.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene HCL or Lamivudine/Zidovudine. As a result of this communication, on Monday September 29, 2014, Ostaficiuk sent the following email to his colleagues at Camber:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Message | |
|---|---|
| From: | Kon Ostafciuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | ▮▮▮▮▮ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▮▮▮▮▮ ▮▮▮▮▮ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▮▮▮▮▮ |
| CC: | ▮▮▮▮▮ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▮▮▮▮▮ |
| Subject: | RE: McKesson — dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers…

Not even a "bad price"!

Please acknowledge…We do not want to upset them more!

Thank you,
Kon

1479.   A.R., a senior sales executive at Camber, replied: "[w]e have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent details for all offers, if Teva, no offer." A.R. also added that "[w]e are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied: "[t]hank you. We don't want to antagonize either of them and start a war…"

1480.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business. J.P., a Director of National Accounts at Teva, sent an email to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: "I thought they were done after securing Econdisc?" Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating: "[y]ou're positive they sent them an offer?"

1481.   J.P. of Teva "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the

customer. After further discussion with the customer, Teva staff learned it was a misunderstanding. Camber never actually made the offer but had instead complied with its agreement with Teva.

1482.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene HCL. A Camber employee described the prospect of Teva being on backorder for this drug as a "[g]ame changer." Expressing her understanding of the rules of the conspiracy, she pointed out: "[f]air share only applies when there is not supply constraints." Ostaficiuk responded optimistically, but cautiously: "[g]ood luck guys but go fishing and gather information before we commit…."

## VII.   THE OVERARCHING CONSPIRACY AS TO THE TOPICAL SUBJECT DRUGS

### A.   Generic Topical Products – An Overview

1483.   Topical products include any drug that is administered by means of contact, most often with an external body surface. Topical products come in a variety of dosage forms, including creams, gels, lotions, ointments, shampoos, and solutions. Although topical products are mostly dermatology-related, they can also be used to treat other conditions such as pain and allergies.

1484.   Topical products are a niche market segment within the generic pharmaceutical industry. Historically, there have been fewer generic manufacturers that have focused on selling topical products than "conventional" generic drugs such as oral solids (*e.g.*, pills). This is because manufacturers of generic topical products typically face higher barriers to entry including technical hurdles relating to proving bioequivalence – which must be shown through multiple clinical trials. Further, once a manufacturer obtains FDA approval, topical products often require higher levels of investment in manufacturing to produce the various dosage forms involved.

1485.   Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Defendants Taro, Perrigo, and Fougera (now Sandoz). Indeed,

between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment. Several other manufacturers make up the remaining third, including Actavis, Mylan, Teva, G&W, Glenmark and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:



1486.  Similarly, the following chart from an internal Sandoz presentation details a consistent picture for 2014:



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1487.   The limited number of manufacturers of generic topical products has created an environment that is ripe for collusion. Many topical products have only two or three competitors – which increases the likelihood that any market allocation or price fixing agreement will succeed. In addition, sales and pricing executives at many of the prominent generic topical manufacturers are very familiar with their counterparts at competitor companies because of the extensive product overlap between them. This personal familiarity among sales executives has led to greater opportunities to collude – which those executives have taken advantage of by consistently communicating and agreeing with each other to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

**B.      The Early Days – Collusion From 2009 to Early 2012**

1488.   The key manufacturers of generic topical products during this early time period – Fougera (and later Sandoz), Perrigo, Taro, and Actavis – had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases. These competitors met with each other regularly at trade shows and customer conferences – in addition to speaking frequently by phone – and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common. The following Section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to specific products.

**1.      Fougera/Perrigo/Taro**

1489.   CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1490.   Upon moving to Fougera, CW-6 was instructed by his supervisor, Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did. This practice – facilitating anticompetitive conduct through a third competitor – was pervasive throughout the industry.

1491.   During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences. At these events, he would regularly discuss competitively sensitive topics with his competitors. CW-6 was also prolific communicator by phone and exchanged thousands of calls and text messages with his competitors. After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

1492.   CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped. CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics. The goal of these conversations was always to keep prices as high as possible. CW-6 and T.P. also spoke often by phone. For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two phone calls.

1493.   CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone. During these conversations, the competitors coordinated customer allocation

and price increases on products where Fougera and Taro overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six phone calls.

1494.   There were several products where all three companies – Fougera, Perrigo, and Taro – sold a particular drug. In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors. This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

1495.   During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Wesolowski of Perrigo and Blashinsky of Taro.

### 2.   Actavis and Taro/Perrigo

1496.   Perfetto, then a sales and marketing executive at Actavis, had a collusive relationship with Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Glenmark, the competitors exchanged at least one hundred and twenty phone calls.

1497.   Similarly, M.D. a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped. Between August 2011 and December 2013, the two competitors exchanged at least eighty-three phone calls.

1498.   During this early period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 3.     Sandoz/Taro

1499.   CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012). At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence. Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

1500.   CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships. CW-4 viewed providing this information as a way to demonstrate value to the company. CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz. When CW-4 felt pressure from superiors to deliver useful information, she intended to engage in more anticompetitive conduct.

1501.   CW-4 had longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

1502.   In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher prices. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

1503.   After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

1504.   In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. Between January 2011 and October 2013, the two exchanged at least seventy-three phone calls.

1505.   During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro.

1506.   The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2009 and early 2012.

### a)      Carbamazepine ER Tablets

1507.   Carbamazepine ER, also known by the brand name Tegretol XR, is a drug prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.

1508.   Shortly after their high-level conversation in 2009 about Taro's and Sandoz's respective views on competition and market-share, D.S. of Taro and CW-4 had the opportunity to put their understanding into practice as Taro and Sandoz both prepared to enter the market for Carbamazepine ER.

1509.   Taro received FDA approval in late March 2009 to enter the Carbamazepine ER market as the first-to-file generic. A few months later, in June 2009, Sandoz received approval to launch as the authorized generic. As the authorized generic, Sandoz would not be required to wait until the end of Taro's 180-day exclusivity period to enter the market.

1510.  Not only was Carbamazepine ER a high-volume, lucrative branded product for Sandoz's parent company, Novartis, but Novartis had also given Sandoz late notice that it would be entering as the authorized generic. As a result, Sandoz's sales and marketing executives felt a great deal of pressure to secure market share within a short time frame.

1511.  As the Taro launch grew close, R.T., a senior marketing executive at Sandoz, pressured CW-4 to obtain information from Taro about its impending launch. Confident that their recent conversation meant that D.S. would readily provide such information, CW-4 reached out to him.

1512.  During one in a series of phone calls between the two, D.S. informed CW-4 that Taro had sent offers to Walmart, Walgreens, and SUPERVALU. Consistent with "fair share" principles and the fact that Taro would be the first to enter the market, D.S. told CW-4 that Taro's goal was to secure 50-60% market share and that it would be pursuing other smaller customers as well. CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target. As requested, CW-4 reported this information directly to R.T. at Sandoz.

1513.  Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

1514.  After the initial launch, CW-4 and D.S. continued to discuss and share competitively sensitive information about Carbamazepine ER. For example, when Taro was delayed in launching the 100 mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch. R.T., in turn, asked CW-4 to obtain the information.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1515.   After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100 mg formulation because Taro was having trouble filling orders on the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

1516.   Through even 2011, Sandoz refused to challenge for Taro's customers with respect to Carbamazepine ER. For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER. CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business. The purpose for pursuing CVS, he opined, would be ███████████ ████████████████████████████████████████████████ He added: ███████ ████████████

1517.   M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles. Further, the executive concluded that challenging for the business at CVS would ████████ the market and erode pricing. As a result, Sandoz declined to bid on the Carbamazepine ER business at CVS.

### b)   Imiquimod Cream

1518.   Imiquimod cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin. Imiquimod cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers. In 2012, the annual market for Imiquimod cream in the United States exceeded $200 million.

1519.   On February 25, 2010, Fougera received FDA approval to market Imiquimod cream. At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

### i.       Perrigo Entry (April 2010)

1520.   Less than two months later, on April 13, 2010, Perrigo announced that it would be the authorized generic for Imiquimod cream. That same day, D.K., a senior Fougera executive, sent the following email to Kaczmarek, also a senior Fougera executive:



1521.   Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four minutes. CW-6 hung up and immediately called T.P., a sales executive at Perrigo, and they spoke for nearly nine minutes. When CW-6 hung up with T.P., he promptly called Kaczmarek back. That call lasted less than one minute.

1522.   It is rare that the entry of a generic competitor would cause prices to actually increase – but it did so in this case. Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod cream. That same day, CW-6 called T.P. The call lasted more than two minutes. Immediately after hanging up,

CW-6 called his supervisor, Kaczmarek, and they ultimately spoke for more than six minutes. Immediately after hanging up with Kaczmarek, CW-6 called T.P. back. The call lasted one minute.

1523. The next business day, Monday April 19, 2010, Perrigo sent an internal email stating that ████████████████████████████████████████████████████████ ██████████ As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

1524. That same day, Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

1525. The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida. Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and Wesolowski and S.K., senior executives from Perrigo.

1526. Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference. On April 26, 2010, T.P. and CW-6 spoke by phone for seven minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four minutes.

1527.   Similarly, on April 27, 2010, D.K. emailed Kaczmarek while they were still at the NACDS meeting, stating that he needed ████████████████████████████████ ████████████████████████████████████████████████████████████████

1528.   On April 28, 2010, Perrigo officially entered the Imiquimod cream market and published WAC pricing that was slightly higher than Fougera's. That same day, D.K. emailed Fougera executives with an update regarding his conversations at the NACDS meeting. With respect to Imiquimod cream, D.K. stated, ████████████████████████████████ ████████████████████████████ D.K. explained that Fougera gave up McKesson and ABC to Perrigo because ██████████████████████████████████████████ D.K. also noted that he was pleased that Perrigo has ████████████████████████████████ ██████████████████████ CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business. Kaczmarek explained that ██████████████████ CW-3 replied: ██████████████████████████

1529.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the market. D.K. also explained: ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ D.K. stated that Perrigo's share would likely settle in the range of 30-40% ████████████████████████████████████████ ██████████████████████████████

1530.  Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten of its Imiquimod customers to Perrigo.

1531.  On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod cream, which included a statement that ███████████████████████████████ ████████ While reviewing the presentation, L.B. challenged D.K. about the statement, asking ████████ ████████████████████████████████████████████████████████████ D.K. assured L.B. that ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████

1532.  The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six minutes, likely to confirm (again) the agreement in place between the two competitors.

1533.  Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod cream. Previously, Perrigo had been selling the authorized generic through a license with a branded manufacturer. That same day, CW-6 called T.P. That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two minutes.

1534.  On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled ████████████████████████ during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding. Fougera is

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

██████████████████████████████████████ Later that year, in November

2010, CW-6 also noted in his monthly recap that ███████████████████ in the market.

1535.   Fougera also continued to monitor the status of other competitors' plans to enter

the Imiquimod market. For example, on February 7, 2011, a Glenmark employee called CW-6,

and they spoke for four minutes. Later that day, CW-6 sent the following email to Kaczmarek and

D.K. regarding Imiquimod cream:



Pleased that Fougera would not be facing any imminent competition from Glenmark, D.K.

replied:



ii.      **Sandoz Entry (February 2011)**

1536.   Although Fougera was fortunate that Glenmark had no near-term plans to enter the

Imiquimod cream market, another competitor – Sandoz – did receive FDA approval on February

28, 2011 to launch the product. That same day, CW-6 of Fougera and T.P. of Perrigo exchanged

at least five calls, including two calls lasting two minutes each.

1537.   On March 1, 2011, one of Fougera's customers, NC Mutual, also emailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod. The NC Mutual employee further noted: ███████████████████████████ CW-3 promptly forwarded the email to Kaczmarek. That same day, CW-6 called T.P. and they spoke for more than three minutes.

1538.   When Sandoz entered the market, it did so seamlessly – initially taking comparable share from the existing competitors Fougera and Perrigo.

1539.   For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer. In total, the customers accounted for approximately 13% of the Imiquimod cream market (ABC at 8% and Rite Aid at 5%).

1540.   On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz. The next day, on March 4, 2011, Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, ████████████████████████ ██████████████████████████████████ Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four minutes. A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five minutes.

1541.   Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida. These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S, sales executives from Taro.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1542.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four minutes. Later that day, Kellum – CW-4's boss – sent an internal email from ECRM stating that he had ████ Taro may be entering the Imiquimod market.

1543.   Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011. The call lasted one minute.

1544.   By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod cream market and Kellum recommended that they ████████████████████████ ████████████████████ referred to a consortium composed of HEB, Ahold, Schnucks, and Giant Eagle. These were all Perrigo customers, and Sandoz intended to obtain their Imiquimod business ████████████████████████████ ████████████████████ Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that ████████████████████████████████ ████████████████████ Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

1545.   On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward:



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### iii.  Taro Entry (July 2011)

1546.  A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod cream. Taro immediately began coordinating its entry with competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve minutes. Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they spoke for five minutes. The next day, on April 19, 2011, D.S. called CW-4 again. The call lasted one minute.

1547.  On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval for Imiquimod cream but advised that Taro would not formally launch until June. D.S. also told CW-4 that Taro had already received a pre-commitment from Econdisc, and now would only go after smaller customers. CW-4 understood that D.S. shared this information with her so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller customers, it was only to obtain its fair share of the market. CW-4 also understood that Sandoz should not compete for the Econdisc business.

1548.  The next day, on April 20, 2011, CW-4 shared this competitive intelligence with R.T., a senior sales and marketing executive at Sandoz:



1549.  Perrigo and Fougera were also simultaneously coordinating how they would reach to Taro's entry. For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that Taro had received FDA approval to market Imiquimod cream and asked, ███████

████████ This set off a flurry of communications that same day between CW-6 of Fougera

and T.P. of Perrigo, who were both concurrently reporting to, and taking direction from, their

supervisors, Kaczmarek and Wesolowski. These calls are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

1550.   Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and

called H.M., a sales executive at Taro. The two men spoke for eight minutes. Upon hanging up,

CW-6 called Kaczmarek. The called lasted on minute. First thing the next morning, CW-6 sent a

text message to T.P. of Perrigo.

1551.   By early July 2011, Taro was finally starting to enter the Imiquimod cream market.

On July 5, 2011, T.P. of Perrigo reached out to CW-6 of Fougera. The call lasted only two minutes,

but it set off another rush of communications among the three competitors – Perrigo, Fougera, and

Taro – to make sure they were on the same page regarding Taro's entry. These calls, which all

occurred within the span of approximately fifteen minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

1552.   At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz. On July 7,

2011, D.S. of Taro called CW-4 of Sandoz. The call lasted two minutes. CW-4 returned the call

and they spoke for sixteen minutes. A few hours later, CW-4 called D.S. and they spoke for another four minutes.

1553.   On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine minutes. As soon as CW-6 hung up he call his boss, Kaczmarek, and the two spoke for five minutes. Later that day, Kaczmarek emailed the Fougera sales team stating, ████████████ ████████████████████████████████████████

1554.   On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communication starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

1555.   The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business. That same day, CW-6 of Fougera called T.P. of Perrigo. The call lasted on minute. T.P. returned the call and they spoke for six minutes.

1556.   On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers. CW-4 understood this to mean that the market would remain strong

with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed this competitive intelligence along internally at Sandoz:



1557.   On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6 that it had received a competitive offer for Imiquimod cream, but similarly would not identify which competitor made the offer. Thereafter, CW-6 spoke several times with T.P. of Perrigo and H.M. of Taro, in an effort to discover which competitor made the offer. These calls are described below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

1558.   During those calls, CW-6 was able to confirm that Taro had in fact made the offer. Later that day, CW-6 sent the following email to Kaczmarek:



1559.   An hour-and-a-half later, CW-6 followed up with Kaczmarek stating:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Kaczmarek ultimately agreed, and Fougera gave up the customer to Taro.

1560.   The goal of these communications between the various competitors on Imiquimod cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors. The results were highly successful.

1561.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an email to other senior Fougera executives regarding Imiquimod cream stating, ████████████

████████████████████████████████████████████

████████████████████████████

1562.   Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod cream and how that should be accommodated in the market. As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations. Some of these calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

1563.   After this series of calls, on September 30, 2011, Kaczmarek emailed other Fougera

sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod cream

at Walmart, a Fougera customers. Kaczmarek explained that ███████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Kaczmarek   reluctantly

recommended that Fougera give up Walmart's business and ██████████████████████████

Kaczmarek noted that, if Fougera defended Walmart's business, Taro would likely just go after

other customers at lower and lower prices ████████████████████  On the other hand, if

Fougera gave up Walmart, Taro would hopefully ███████████████████████████████████

██████████████████████████████████████  D.K.   agreed   with   Kaczmarek's

recommendation and Fougera ultimately ceded the business to Taro in order to keep the market

stable.

### c)       Triamcinolone Acetonide Cream and Ointment

1564.    Triamcinolone Acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes. Triamcinolone Acetonide is available as both a cream and an ointment.

1565.    As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide cream and ointment. They took advantage of their already ongoing collusive relationship to raise prices on both products.

1566.    On July 1, 2010 and again on July 10, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment. CW-3, a sales executive at Fougera, later described these prices as a ███████████████ On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

1567.    In the days leading up to, and surrounding these increases, CW-6 of Fougera and T.P. of Perrigo exchanged at least eight calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

1568.    After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1569.   For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because Perrigo's price increase. CW-3 of Fougera emailed Kaczmarek, his supervisor, stating, ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

1570.   That same day, Kaczmarek called CW-6. The call lasted two minutes. CW-6 then called T.P. of Perrigo and they spoke for three minutes. CW-6 hung up with T.P., called Kaczmarek back, and they spoke for five minutes. Immediately upon hanging up, Kaczmarek responded to CW-3's email, with a copy to CW-6. Confident that the agreement with Perrigo was strong, Kaczmarek stated, ██████████████████████████████ At that time, T.P. called his supervisor, Wesolowski, and they spoke for five minutes.

1571.   The following week, on August 2 and 6, K.O. of Par spoke twice with a sales executive from Taro calling from the company's main line. Between October 2010 and March 2011, K.O. spoke at least ten times with D.S. of Taro, and also exchanged calls with Taro's main company line during this period as well (which makes it impossible to determine from phone records whether she was speaking with D.S. or someone else from Taro). Upon information and belief, K.O. communicated to D.S. that Par was following the price increase on Triamcinolone Acetate as well, and that Par would also follow the fair share rules and not poach market share from other manufacturers.

### d)      Adapalene Cream

1572.   Adapalene cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

1573.   On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene cream. Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

1574.   Fougera quickly realized, however, that it would be alone in the market for long, and that Perrigo would soon emerge as a competitor. On August 9, 2010, Kaczmarek emailed D.K., a senior executive at Fougera, regarding ███████████████ stating ████████████████

████████████████████████████████████████████████████████████████████

Similarly, a few weeks later, on August 20, 2010 D.K. informed other Fougera executives: ████

████████████████████████████████████████████████████████████████████

████████████████████   Several Perrigo representatives attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

1575.   On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo. The call lasted less than one minute. Minutes later, T.P. called CW-6 back and they spoke for three minutes.

1576.   Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo would be shipping Adapalene cream in two weeks and sending out offers to customers starting that day. D.K. passed that information along to other senior Fougera executives.

1577.   On October 1, 2010, M.A., a marketing executive at Fougera, emailed D.K. to inform him that there had been no publicly reported changes in the Adapalene market. D.K. responded: ████████████████████████████████████████████

1578.   Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo exchanged several calls. Shortly after hanging up with T.P., CW-6 called his supervisor Kaczmarek to report on his conversations. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:56:59 | 0:10:40 |

1579.   On October 8, 2010, D.K. emailed Kaczmarek with a subject line ▮▮▮▮▮▮▮

stating ▮▮▮▮▮▮▮▮▮▮▮▮ That same day, Kaczmarek called CW-6 and they spoke for two

minutes. After that call, CW-6 again exchanged several calls with T.P. of Perrigo. After hanging

up with CW-6, T.P. immediately called his supervisor, Wesolowski. These calls are detailed

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 10:53:45 | 0:03:30 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:59:25 | 0:00:38 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:01:31 | 0:04:47 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:07:04 | 0:00:49 |

1580.   CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the days

leading up to Perrigo's launch of Adapalene cream. As before, CW-6 and T.P. continued to keep

their supervisors, Kaczmarek and Wesolowski, informed of their conversations. These calls are

detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1581.   On October 25, 2010, Perrigo entered the Adapalene cream market and published WAC pricing that matched Fougera's WAC pricing exactly. That same day, CW-6 and T.P. spoke again for nearly four minutes.

1582.   From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo. CW-6 of Fougera and T.P. of Perrigo also discussed which customers Fougera would give up. For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times. Shortly after the last of those calls, CW-6 sent the following email to Kaczmarek regarding ███████████████ ██████████ stating:



1583.   Fougera wasted no time in acting on CW-6's recommendations and ceding significant share to the new entrant, Perrigo. Perrigo, in turn, focused specifically on the list of customers provided by CW-6. For example, on October 25, 2010, Publix informed Fougera that it had received a competitive offer for Adapalene cream and offered Fougera the opportunity to retain the business. The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid stating, ████████████████████████████████████████████████████ ████

1584.   Also, on October 35, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene cream. On October 28, 2010, CW-3 forwarded the request to Kaczmarek asking: ███████████████████████████ Kaczmarek responded in the affirmative. Later that day, CW-3 responded to NC Mutual stating: ████████████████████ ████████████████████████████████████

1585.   On October 26, 2010, Rite Aid advised Fougera that it had received a competitive bid for Adapalene cream. Consistent with the plan, on November 2, 2010, Fougera ceded the account to Perrigo, telling the customer: ██████████████████████ and reasoning that ██████████████████████████

1586.   On October 29, 2010, Kroger informed CW-3 that it had received a competitive offer from Perrigo from Adapalene cream. CW-3 forwarded the email to Kaczmarek asking: ███ ████████████████████████████████████████████ ████████████████████████████████ Kaczmarek responded: ████████████████████████████████ ████████████████████████████ CW-3 would later acknowledge in his October 2010 monthly recap that the decision not to match Perrigo's offer was a ██████████████ meant ████████████████████ to the new entrant, Perrigo.

1587.   Further, by the end of October 2010, Fougera had also given up Cardinal's Adapalene cream business to Perrigo.

1588.   The agreement operated successfully for both Fougera and Perrigo. Fougera was impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the agreed-upon customers as it entered the market for Adapalene cream. As D.K. noted in an internal email,

████████████████████████████████████████████████

██████████████████████████████████ He stated further, ████████████████████

████████████████████████

### e)      Betamethasone Dipropionate Lotion

1589.   Betamethasone Dipropionate lotion, also known by the brand name Diprolene, is a topical steroid used to treat inflammation caused by allergic reactions, eczema, and psoriasis.

1590.   In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate.

1591.   On December 16, 2010, CW-6 of Fougera emailed Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors. With a strong collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product:



1592.   Also, on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate. Notes from that meeting stated: ████████████████████ ████████████████████ That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several calls. After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

1593.   After this series of phone calls, Perrigo also decided to raise prices – and did so even before Fougera. On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504% to $37.50. That same day, T.P. called CW-6 and they spoke for seven minutes. Just minutes after hanging up, CW-6 again called Kaczmarek. The call lasted one minute.

1594.   Three days later, on January 7, 2011, the Fougera sales team held a conference call during which they discussed the upcoming increase on Betamethasone Dipropionate, among other products. That same day, T.P. called CW-6 and they spoke for four minutes. Over the course of the day, the two competitors would exchange several more calls and CW-6 would continue to keep Kaczmarek apprised of his discussions. This call pattern is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

1595.   On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 – slightly higher than Perrigo's WAC pricing. The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1596.   At the same time that Fougera was coordinating to raise prices on Betamethasone Dipropionate lotion, it also coordinated with Actavis to increase prices on the ointment and cream formulations. Actavis increased prices on Betamethasone Dipropionate cream in December 2010, and Fougera and Taro agreed to follow this increase in January 2011, which they ultimately did within days of each other. At the same time that Actavis increased its prices on cream, it also increased its prices on Betamethasone Dipropionate ointment. And although Fougera did not follow this increase until late in 2011, it complied with the fair share agreement to support Actavis' price increase by refraining from taking any of Actavis' customers during this time period.

**f)      Clotrimazole Betamethasone Dipropionate Cream and Lotion**

1597.   Clotrimazole Betamethasone Dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate (a synthetic corticosteroid). CBD comes in both a cream and lotion. These products are used to treat a variety of inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch. In 2013, annual sales of CBD cream and lotion in the United States exceeded $150 million.

**i.      March and April 2011 – Actavis Raises Prices and Fougera and Taro Follow**

1598.   In early 2011, the competitors in the generic market for CBD cream were Fougera, Taro, and Actavis. The competitors in the generic market for CBD lotion were Fougera and Taro.

1599.   On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD cream by 227% and to increase contract prices to customers by as much as 1100%. Notably, Actavis had not yet conveyed the proposed

increases to its customers. In fact, in that March 9, 2011 email, J.R. specifically told his colleagues ███████████████████████████████

1600.   Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. For example, on March 9, 2011 – the same day that J.R. circulated the price increase proposal internally at Actavis – D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In that recap, D.H. reported that for CBD ███████████████████ Further, D.H. reported: ████████████████████████ The reference to ████████ ████████ is a reference to all of Taro's betamethasone products, including CBD cream and lotion. Importantly, Taro had not yet raised its prices on those products.

1601.   Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

1602.   For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing executive, eight times for a total of approximately fifty-two minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three times for a total of approximately fifteen minutes.

1603.   On March 25, 2011, Actavis informed its customers of the price increases for CBD cream. By happenstance, just days before the announcement, Actavis learned that its API costs for CBD cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

1604.   Before the announcements went out, Perfetto emailed the Actavis sales executives, telling them to ██████████ and to stick to the story that the price increase is ██████████ ██████████ One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis' ██████████ In reality, Actavis knew the API ██████████ and were ██████████ for the pricing of prescription medications such as CBD cream.

1605.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis' formal price increase announcement on March 25, 2011, including calls between the following individuals:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

1606.   On March 30, 2011 – just three business days after Actavis sent out its price increase notices for CBD cream – Fougera sent out notices to its customers stating that it was raising prices for CBD cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD cream by 54% and increased contract prices across the board, in some cases by over 1200%. The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen minutes.

1607.   Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD cream and CBD lotion. For some customers, Taro raised prices for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CBD cream by approximately 1350% and raised prices for CBD lotion by approximately 960%. The next day H.M. called CW-6 and they spoke for eighteen minutes.

1608.   On April 14, 2011, Fougera followed Taro with a price increase on CBD lotion – raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At the time, Fougera's gross profit margin on CBD lotion was already 67%, yet, with this price increase, their gross profit percentage would soar to 96%. Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

1609.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids. For example, after Taro's increase, Walmart, a Taro customer for CBD cream and lotion, asked Fougera to bid for that business. Kaczmarek cautioned ███████████████████████████████████████ In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the ███████████████████████ ███████████████████████████████ Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer. Instead, a Fougera employee asked internally: ███████████████████████ Kaczmarek determined that Fougera should opt for the latter.

1610.   Shortly, after pulling off one massive coordinated price increase, Taro wasted no time planning the next. In an email to Kaczmarek on May 6, 2011, D.K. detailed how Taro had already approached Fougera about raising CBD prices again:



#### ii.    Taro Increases Prices on CBD Cream in April 2012 While Actavis and Fougera Play Nice in the Sandbox

1611.   By March 5, 2012, Taro reignited its desire to raise prices on CBD cream. Over the next several weeks, representatives of Taro spoke several times with their contracts at Actavis and Fougera. During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

1612.   The day after the final calls detailed above, March 20, 2012, Taro increased its WAC prices for CBD cream by approximately 7% and its contract prices by 15% for most of its existing customers.

1613.   In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

1614.   On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis' recent RFP bid still stood because ███████████████████████████████ ████████████████████ At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was ████████████ ██████████████████ and that Actavis ████████████████ Aprahamian replied, ███████ ████████████████████████ The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 24, 2012. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was ███████████████████████████ ████████████████ Aprahamian, however, responded simply and directly: ████████████

### iii.   Fougera and Taro Raise CBD Lotion Prices in Late 2012/Early 2013

1615.   In the fall of 2012, a fourth competitor (Prasco) was entering the CBD cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD lotion market. Facing new competition on CBD cream, Sandoz and Taro sought to maximize profits by raising the price of CBD lotion.

1616.   Starting in late August 2012, Sandoz began planning a 100% price increase on CBD lotion to take place in October, which – assuming ███████████████████████ – would bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

planned increase, Sandoz made repeated overtures to Taro to secure that ███ behavior, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

1617.   On October 18, 2012, Sandoz increased prices for CBD lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to poach Sandoz's customers. For example, when MMCAP emailed Taro on October 26, 2012 to request a bid from Taro from a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

1618.   Taro also made plans to follow the Sandoz price increase. On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD lotion in anticipation of Taro's planned price increase. That same day, H.M. spoke with CW-3 of Sandoz for five minutes. The pair spoke again on January 7, 2013 for thirteen more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three minutes.

1619.   On February 12, 2013, Taro instituted its price increase on CBD lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

1620.   After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked ███████████████████████ Just as Taro did not poach Sandoz's customers when Sandoz raised CBD lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to ██████████████████ for CBD lotion bids, because ██████████████ ███████

### g)      Fluocinonide Solution

1621.   Fluocinonide solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash. Fluocinonide solution comes in 20 ml and 60 ml bottles.

### i.      Fougera Raises Prices in May 2011 and Taro Follows

1622.   In early 2011, the competitors in the Fluocinonide solution market were Teva, Taro, and Fougera. All three competitors produced Fluocinonide solution in 60 ml bottles, while only Taro produced them in 20 ml bottles.

1623.   In the beginning of April 2011, Fougera's Fluocinonide solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking. As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production. Fougera was working to re-launch its Fluocinonide solution products by mid-May 2011.

1624.   On April 21, 2011, Kaczmarek learned by email that Teva was ███████

Fluocinonide solution; that is, Teva was stopping production and leaving the market. This meant

the only competitors in the market would now be Fougera and Taro.

1625.   Even though it was still on backorder due to supply problems, Fougera viewed

Teva's exit as an opportunity to increase prices. In internal calculations of the expected benefit

from the pricing again, Fougera assumed that ████████████████████████████

and they would split the market 50/50. Fougera estimated that this would provide it with a yearly

gain of $4.6 million.

1626.   On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide solution by

100% from – $12.50 to $25.00 – with the change effective the following day. That evening,

Fougera also sent out contract price-change notifications to customers where it had existing

contracts for Fluocinonide solution. With those increases, the average net sales price jumped 800%

from $2.50 to $20.

1627.   On May 13, 2011 – three days after Fougera sent out its price changes – CW-6 and

H.M. of Taro exchanged two calls, with one lasting five minutes.

1628.   One week later, on May 20, 2011, Taro followed Fougera's lead by substantially

increasing its pricing for Fluocinonide solution. Taro increased the WAC price for the 20 ml and

60 ml formulations by 200% and 400%, respectively. Taro also increased average net sales prices

by 260% and by over 500% for the 20 ml and 60 ml formulations, respectively.

1629.   Following their respective price increases, the market share between Taro and

Fougera stabilized to rough parity. By September 2011, Fougera had approximately 50% market

share and Taro had approximately 48% market share.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### ii.   Fougera Raises Prices in February 2012 and Taro Follows

1630.   On January 25, 2012, CW-6 and H.M. exchanged several calls. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

1631.   First thing the next morning, on January 26, 2012, Kaczmarek sent an email to his Fougera colleagues stating, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████   The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

1632.   This price increase opportunity was viewed as pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

1633.   First thing the next morning, on January 27, 2012, Kaczmarek called CW-6 and they spoke for twenty-two minutes. CW-6 hung up and immediately called H.M. of Taro. The call lasted on minute. A few minutes later, CW-6 called H.M. again and they spoke for twenty-one minutes. Later that day, CW-6 called Kaczmarek twice. The calls lasted four minutes and three minutes, respectively.

1634.   Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee. Now, the price increase had grown even larger. The plan was to raise Fougera's WAC price from $25 to $80.99 and increases its average net sales

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price from $18.08 to $58.57. This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012. Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: ██████████

1635.   On February 13, 2012, CW-6 called H.M. and they spoke for five minutes. The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide solution as planned.

1636.   The increases more than tripled Fougera's WAC price as well as direct and indirect contract prices for its customers. The increase was so dramatic, that third party data vendor MediSpan – which tracks WAC prices – reached out to Fougera to confirm the new WAC amount was not an error.

1637.   On February 15, 2012, the day after the increases, CW-6 called H.M. again and they spoke for six minutes. Later that day, Blashinsky, circulated an email informing others at Taro that prices in the Fluocinonide solution ████████████████████████████████████████

████████

1638.   In furtherance of their price increase conspiracy, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share. Indeed, Taro refused to poach even very small customers. For example, Meijer requested that Taro submit a bid for Fluocinonide solution. Internally, Taro noted ████████ ████████████████████████████████████ of market share. Nonetheless, Taro declined to provide Meijer with a bid and instead falsely claimed that Taro did not have inventory to supply them.

1639.   Similarly, HD Smith asked Taro to bid for its Fluocinonide solution business after Fougera increased. The representative at HD Smith even stated that she ████████████████████

S.B., a Taro sales executive, relayed this news to J.J., a senior Taro sales executive, who then chastised him for even considering the offer.



1640. While Taro planned and implemented corresponding price increases, representatives of Taro and Fougera remained in contact, including but not limited to exchanging the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

1641. The day after the final calls detailed above, on March 9, 2012, Taro implemented its price increase, which essentially doubled its WAC and contract prices for both the 60 ml and 20 ml formulations of Fluocinonide solution.

**h)      Erythromycin Base/Ethyl Alcohol Solution**

1642. Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

1643.   In the summer of 2011, Fougera and Wockhardt were the only competitors in the market for Erythromycin Solution. However, both manufacturers would experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

1644.   Between May 17 and 19, 2011, Perrigo discussed internally whether to re-enter the Erythromycin Solution market. The next day, May 20, 2011, T.P. of Perrigo CW-6 of Fougera and they spoke for seven minutes. Immediately after that call, T.P. called his supervisor, Wesolowski, and they spoke for three minutes. The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

1645.   On August 5, 2011, CW-3 of Fougera emailed his supervisor, Kaczmarek, stating,

███████████████████████████████████████████████████████

███████████████████████████████████████████

1646.   Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales executive, three times, including one lasting ten minutes. Notably, these were the first phone calls ever between the two competitors according to available phone records. Indeed, CW-6 and M.C. were not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

1647.   Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.D. did not have an independent relationship, CW-6 acted as the go-between – relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

1648.   On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

1649.   On November 5, 2011, Wesolowski of Perrigo sent an internal email to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011. Wesolowski stated, ███████████████████████ ████████████████████ Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera. At the same time, CW-6 was speaking with W.C. of Wockhardt. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

1650.   The next day, on November 18, 2011, K.K. another Wockhardt sales executive, called CW-4 of Fougera. The call lasted two minutes. Later CW-3 sent the following email to his supervisor Kaczmarek:



1651.   It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing. In response to CW-3's email, Kaczmarek stated simply: ███████

1652.   On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four minutes. Later that same day, CW-6 sent the following email to Kaczmarek regarding Erythromycin Solution:



1653.   Kaczmarek forwarded the email along internally to A.R., a Fougera operations manager. A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

1654.   A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher – indeed, approximately 200% higher – than the market WAC pricing at that time.

1655.   CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself. On these calls,

the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

1656.   Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

1657.   At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek emailed his sales team stating, ████████████████████████████████████████████

████████ CW-3 responded with the following email:



1658.   Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013. Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek. These calls detail below:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

1659.   The next day on March 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing. That morning, Kaczmarek sent the following email to his sales team:



1660.   That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five minutes and called A.F., a sales executive at Perrigo. Further, CW-6 called his contact at Perrigo, T.P., and the two competitors spoke for fifteen minutes. Immediately after hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five minutes.

1661.   The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the following email regarding Erythromycin Solution to other Perrigo executives:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1662.  That same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team. Kaczmarek advised: ███████████ ████████████████████████████████████ As he explained, blanketing the market with offers is ███████████████████████████████████

1663.  Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, A.F. and T.P. As was his practice, after hanging up with T.P., CW-6 immediately reported back to Kaczmarek what he had learned. These calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

1664.  On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the following internal email to his sales team, lying about the source of his information to avoid putting evidence of illegal conduct into writing:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1665.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order. By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

1666.   By August 2012, Fougera had resolved those supply issues. Around this time, Sandoz had completed its acquisition of Fougera. As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

1667.   After the Fougera acquisition was completed, CW-6 left the company for another position. At some point before he left Fougera, CW-6 introduced CW-3 – who would be remaining at Sandoz after the acquisition – to T.P. at Perrigo. This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

1668.   The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

1669.   On September 5, 2012, S.G. a Sandoz sales executive, emailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Kellum responded, ██████████████████████████ On September 6, 2012, CW-3 called T.P. of Perrigo and they spoke for eleven minutes.

1670.   The next day, on September 7, 2012, CW-3 sent an internal email including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers that Fougera had targeted when it re-launched Erythromycin Solution in May 2012. Not wanting to have discussion in writing, CW-1 responded to CW-3 directly, stating, ████████████████████

1671.   On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three minutes. CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz. The call lasted on minute. Later that day, CW-3 called K.K. of Wockhardt. The call lasted one minute.

1672.   The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Walmart and advised that they would be the only customers Sandoz would be bidding on at this time. That same day, K.K. of Wockhardt called CW-3 and they spoke for four minutes.

1673.   Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six calls, including two calls lasting eight minutes and seven minutes, respectively. By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Walmart to Sandoz.

### i)      Nystatin Ointment

1674.   Nystatin ointment, also known by the brand name Mycostatin, is a topical antifungal medication used to treat fungal skin infections.

1675.   In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin ointment.

1676.   On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases. While Nystatin ointment as one of the products deemed worthy of consideration, the initial conclusion was that its █████████████████ ███████████████

1677.   Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to the problem of low prices and low profits on Nystatin ointment. Between February 7 and February 28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other, exchanging twenty-seven calls and three text messages, with eleven of the calls taking place on February 28, 2011. During these calls, the competitors hatched a plan for Fougera to leave the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would return to the market at that new, higher pricing.

1678.   By March 1, 2011, word of the plan formulated during those phone calls and had begun to spread into the market, reaching J.E. at Fougera by way of a customer. Perplexed, J.E. emailed Kaczmarek, asking: █████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████

1679.   Kaczmarek responded in the affirmative: ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ In fact, other Fougera personnel were already preparing a draft letter announcing the discontinuation of the product.

1680.   Fougera subsequently discontinued Nystatin ointment effective March 15, 2011.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1681.   By late March 2011, numerous large customers including Meijer, Morris & Dickson, Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin ointment business to the only remaining alternative in the market – Perrigo.

1682.   With essentially the entire market transferred to Perrigo, and customers left with no alternative suppliers, the stage was set for the next phase of the plan. On June 1, 2011, Perrigo instituted a large WAC price increase on Nystatin ointment. Indeed, the price of a 15 gm tube increased by 493%, and the price of a 30 gm tube increased by 269%.

1683.   That same day, CW-6 of Fougera called T.P. of Perrigo. The two competitors spoke for six minutes. Nine days later, on June 10, 2011, CW-6 and T.P.'s discussion intensified with the two competitors exchanging seven calls that day.

1684.   As those phone calls were taking place – and less than three months after it had discontinued the product – Fougera was taking the first steps towards re-launch by starting to market the remaining inventory of Nystatin ointment that it had on hand when it discontinued the product.

1685.   On June 12, 2011, senior Fougera executive D.K. requested and update on discontinued items that the company might want to bring permanently back into its product line. J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to Nystatin ointment: ███████████████████████████████████ ████████████ Recognizing the lucrative opportunity presented by following Perrigo's price hike, D.K. replied, █████████████████████████████████ ████████████████████

1686.   But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement. Late in the evening on June 14, 2011, Perfetto,

then a senior sales and marketing executive at Actavis, sent an email to Aprahamian and other Actavis colleagues with the subject line: ███████████████████████████ ████████████████████████ The text that followed was simple and clear: ██████████████

1687.   The next day, Actavis marketing executive J.M. responded with some projections of the financial implications of Actavis entering the Nystatin market. The recent sharp WAC increase by Perrigo made the prospect of entry surprisingly irresistible. J.M. wrote: █████████ ████████████████████████████████████████████████████████

████████████████████ J.M. estimated that if Actavis secured a 30% share of the current two-player market, the company would realize more than $3.8 million in sales. Aprahamian agreed that the time was right to capitalize on the Perrigo price hike, saying: █████████████████ ████████████████████████████████████████████████████████

████████████████████

1688.   Meanwhile, Fougera continued selling off its previously stockpiled inventory of Nystatin ointment and made plans to fully re-enter the market at the new higher WAC prices. On June 27, 2011, D.K. of Fougera emailed Kaczmarek asking: █████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████

1689.   Actavis made its move in early November 2011. On November 4, 2011, just days before the launch, Actavis executive D.M. opined in an email to Aprahamian, Perfetto and other colleagues that conditions were favorable for a very successful launch, including the 187% increase in the price of Nystatin ointment over the past year, and the fact that Fougera had not re-entered the market yet. Aprahamian inquired how much share Actavis could handle. In response, D.M., mindful of the fair share rules of the game, replied: █████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████

1690.   On November 7, 2011, Actavis re-entered the market with WAC prices that exactly matched Perrigo's.

1691.   On the day of the Actavis launch, the phone lines among the three competitors were alive with activity. In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to discuss the Actavis development. After the second call, T.P. called M.D., an Actavis sales executive, setting off a chain of three more calls back and forth between them totaling more than twenty-three minutes collectively. During these calls, the competitors discussed which customers Actavis should target to obtain its market share goals without eroding the high prices currently in the market.

1692.   In the coming weeks, having coordinated its entry with market leader Perrigo, Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite Aid, among others.

1693.   Meanwhile, unable to gear up its production for an immediate re-launch, Fougera set its sights on a June 2012 re-launch date for Nystatin ointment.

1694.   On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be. The competitors' prices were identical to the penny with each charging $14.00 for a 15 gm tube, and $21.00 for a 30 gm tube. Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying: ████████████████████████████████████████████

1695.   On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and ▮▮▮▮▮▮▮▮ for Nystatin ointment. CW-6 initially emailed Cardinal asking for contract pricing, emphasizing that Fougera did not ▮▮▮▮▮▮▮▮▮▮▮▮ Knowing that the most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two minutes that morning.

1696.   The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing. On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin ointment to one customer by saying, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ On that same day, CW-6 sent the following message to another customer: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

1697.   On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin ointment. Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: ▮▮▮▮▮▮▮▮▮

1698.   That same day, CW-6 called T.P. of Perrigo, and they spoke for ten minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three minutes.

1699.   With all decisions made and cleared with its competitors, Fougera re-entered the Nystatin ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.



### 4.   G&W and Its Relationships

1700.   Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years. During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped. These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

#### a)   G&W/Fougera

1701.   Defendant Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera. Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases. The two competitors conspired with regard to several products on which G&W and Fougera overlapped, some examples of which are discussed below.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1702.   Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies. Indeed, when CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did – Kaczmarek, CW-6's supervisor at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

1703.   One example of this involved Grauso's relationship with Perfetto, then a senior sales and marketing executive at Actavis. Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine phone calls. Because CW-6 did not have contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

1704.   During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Orlofski of G&W.

1705.   Grauso left G&W in December 2011 to take a position as a senior executive at Aurobindo. With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to Grauso's former colleagues – Kurt Orlofski and Erika Vogel-Baylor. Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

1706.   This worked well for the first few months of 2012. However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6. David Berthold, the Vice President of Sales at Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

1707.   At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even

though Grauso had left. No specific products were discussed at the meeting. The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

1708.   After the dinner, Vogel-Baylor began to communicate directly with CW-6. Indeed, between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three phone calls and text messages. During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, her superior Orlofski.

1709.   The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and 2012.

### i.        Metronidazole Cream and Lotion

1710.   Metronidazole 0.75% is a topical antibiotic commonly used to treat the skin lesions that result from rosacea. Among other formulations, it is manufactured as a cream and lotion. In 2013, the combined annual market for Metronidazole cream and lotion in the United States exceeded $70 million.

1711.   In 2011, Actavis, Fougera, G&W and Harris Pharmaceutical ("Harris") each marketed Metronidazole cream, and Actavis and Fougera shared the market for Metronidazole lotion.

1712.   In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W. On July 6, 2011, Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice. The calls lasted four minutes and twenty-one minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1713.   The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six minute call to Grauso.

1714.   Confident that at least G&W was on board with the planned increase, Actavis raised the price on Metronidazole cream and lotion effective July 22, 2011. The new WAC price for Metronidazole cream was $153.33 for a 45 gm tube, an increase of 278%. The WAC price for Metronidazole lotion increased by 189% to $208.03 for a 59 ml bottle.

1715.   That same day, M.A., a Fougera marketing executive, emailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors. He inquired of M.A. about G&W's current share of the market, saying: ████████

████████████

1716.   The next morning, on Saturday, July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called Grauso and the two competitors spoke for four minutes. A few minutes later, CW-6 called Grauso and they spoke for fourteen minutes.

1717.   Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metronidazole cream or lotion, saying: ████████████████

████████████

1718.   By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: ████████████████

████████████████

█████████████████ By early afternoon, a price increase announcement letter had already

been drafted and circulated for comment, incorporating Kaczmarek's ███████ formula.

1719.   Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m.

1720.   Less than twenty minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained. A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

1721.   During those calls – only three days after the Actavis increase and before G&W had even been able to follow – Kaczmarek informed the Fougera team that ███████████ ███████████████████████

1722.   In the early afternoon on Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metronidazole cream and lotion and another product. CW-6 asked whether the request was the result of supply issues or ███████████ ████████ The buyer, tongue-in-cheek, asked which answer would yield the better price. CW-6, following Kaczmarek's earlier instructions replied: ████████████████████████ ██████████

1723.   That same day, Fougera informed its customers that it was increasing its pricing for both Metronidazole cream and lotion effective July 26, 2011, closely tracking Actavis' new prices. The new WAC price for Metronidazole cream was $151.80 for a 45 gm tube. The new WAC price for Metronidazole lotion was $205.95 for a 59 ml bottle.

1724.   Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a

response to a disgruntled customer that emailed protesting that the roughly 150% price hike was

██████████

1725.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure, saying instead: ███████████████████████

1726.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metronidazole cream were already in full swing. On July 26, 2011 – the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera. The call lasted one minute. CW-6 hung up and immediately called Kaczmarek.

1727.   Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brough Actavis into the conversation, initiating a two minute call with Perfetto. Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven minutes. Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five minutes.

1728.   By that evening, Grauso had spoken to Perfetto by phone for thirty-five more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

1729.   Over the next two day, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six more times.

1730.   With its competitors fully apprised, G&W raised the price of Metronidazole cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1731.   As the news of yet another Metronidazole cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply. One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes. Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

1732.   Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase, saying: ███████████ ███ Then, to ensure that K.K. did not try to compete for the business, he added: ██████ ████████████

1733.   Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metronidazole cream. The new Harris WAC price was $135.00, an increase of 437%.

1734.   On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metronidazole cream, but only by a small margin considering the market-wide increases. Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position.

1735.   The following day, the customer followed up with Vogel-Baylro to let her know that Harris would not be fighting G&W for the primary position. The customer added that the Harris representative was upset about the outcome – not because it failed to win the primary position, but rather ████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### ii.    Calcipotriene Solution

1736.   Calcipotriene solution, also known by the brand name Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells. This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

1737.   In early 2010, the market for generic Calcipotriene was shared by Fougera, Hi-Tech, and Impax. Even with the three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

1738.   On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection. Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information. On July 28, 2010 he forwarded a copy of the FDA letter to CW-6 at Fougera. Pleased with the news, CW-6 replied: █████████████

1739.   By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

1740.   One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight minutes. During those calls, Grauso informed CW-6 that G&W would soon be launching its own generic Calcipotriene. Shortly after speaking with Grauso, CW-6 emailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor – G&W was launching that week.

1741.   G&W did, indeed, launch Calcipotriene that week – on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen minutes.

1742.   A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

1743.   At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal email advising the team to █████████████████████████████████ ████████████████████████████████████████████████████████████████

1744.   Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso and they spoke for five minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

1745.   Fougera acted quickly. Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

### iii.      Fluocinolone Acetonide Cream & Ointment

1746.   Fluocinolone Acetonide is a steroid that reduces inflammation. In its topical formulations (cream – 0.025%, 0.01% and ointment – 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

1747.   In early 2011, Fougera had 100% share of the market for these products and was making plans to implement a price increase.

1748.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover,

they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone Acetonide market to ensure the success of the price hike saying: ████████

████████████████████████████████████████████████████████████

1749.   The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor – G&W. Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six minutes.

1750.   The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch. The two exchanged sixteen calls during October and November 2011:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |

1751.   On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone Acetonide the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

1752.   D.K., a senior executive at Fougera was quite displeased with the development considering Fougera's impending price increase, saying: ███████████████ J.B., also a senior executive at Fougera concurred: █████████████████████████████

1753.   Less than a half hour later, Kaczmarek called CW-6. The call lasted two minutes. Immediately after hanging up, CW-6 placed to call to Grauso. They spoke for six minutes. Later that day, the competitors exchanged two more calls lasting nine minutes and eighteen minutes, respectively.

1754.   Having received some peace of mind from the conversations between CW-6 and Grauso, D.K. of Fougera sent an internal email recommending that Fougera move forward with the planned price increase on Fluocinolone Acetonide, adding ████████████████

1755.   To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon. Less than an hour after his final call with CW-6, Grauso initiated the first of three calls to his superior, Orlofski, to update him on the Fluocinolone Acetonide discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek.

1756.   Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

1757.   At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Acetonide cream and ointment by 200%.

1758.   Fougera knew from its discussions with G&W that G&W would follow the price increase. On the morning of December 28, 2011, D.K. of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet. The co-worker reported that the competitor had not.

1759.   Shortly before noon that day, CW-6 and Grauso had a twenty minute phone conversation. Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

1760.   Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Acetonide cream and ointment to within pennies of Fougera's prices. D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would ███████████████████████████████████████ ████████████████

1761.   Fougera was satisfied with G&W's compliance and promptly gave up its Walmart business to G&W, quoting intentionally high prices on this drug to allow the rival to ████████ ███████ Specifically, Kaczmarek recommended giving G&W 30-35% share of the market, adding ████████████████████████████████████████████

1762.   In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share. CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W – Grauso – had left the company for employment at Aurobindo a few weeks earlier. Less than one hour later, Orlofski called CW-6 back. On February 8, 2012, Orlofski called Kaczmarek. Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five minutes.

1763.   At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would ███████████████████████████ ████████

1764.   In late 2012, Sandoz (having recently acquired Fougera) learned that Teligent was planning to enter the market. In advance of Teligent's entry, Sandoz raised its WAC prices again, and also made plans to concede to Teligent its fair share of the market. For example, when Ahold sought to negotiate lower pricing from Sandoz based on Teligent's entry on March 6, 2013, CW-1 of Sandoz notified others internally that Sandoz ███████████████████████████ ████████████████████████████████████████████████████████████ In exchange for Sandoz and G&W conceding market share, Teligent agreed to match the WAC price increases announced by Sandoz and G&W on each formulation.

### iv.   Betamethasone Valerate Lotion

1765.   Betamethasone Valerate, also known by brand names such as Betamethacot, Beta-Val and Betacort Scalp lotion, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes. It is manufactured in various formulations, including cream, lotion, and ointment.

1766.   In mid-2011, two companies shared the market for Betamethasone Valerate lotion – Fougera with 79% of the market and Teva with 21% market share.

1767.   In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Betamethasone Valerate lotion market. Grauso called CW-6 late in the afternoon of November 9, 2011. They also spoke three times the next morning. Later that day, CW-6 informed his Fougera colleagues that G&W would be launching █████████████ and that he believed Teva had discontinued the product. He opined that, under those circumstances, Betamethasone Valerate lotion █████████████████████ Kaczmarek responded: █████████████████

1768.   Fougera promptly began preparing for an even larger price increase than CW-6 had recommended. On December 13, 2011, CW-6, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Betamethasone Valerate lotion from $20.00 to $60.00 per 60 ml bottle. The average net sales price for the product would go from $10.11 to $30.33.

1769.   With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W, initiating what became a series of twelve phone calls with Grauso at G&W from December 14 through December 21, 2011, in the days leading up to Fougera's price increase for Betamethasone Valerate lotion.

1770.   Fougera's new $60.00 WAC price went into effect on December 22, 2011.

1771.   CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Betamethasone Valerate lotion launch, including a twenty minute call on December 28, 2011, Grauso's last day as a G&W employee. During these calls, the competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

1772.   On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a ████████████ for the G&W launch of Betamethasone Valerate lotion, saying ████████████████████████ That same day, she sent an email to Walmart announcing the G&W launch. On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price.

1773.   Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer – Rite Aid – on January 10, 2012, offering a price of $10.20.

1774.   Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened. Late in the afternoon of January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Aurobindo. Grauso called him back quickly and the two spoke for five minutes. Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers. As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

1775.   At 10:02 p.m. that same day, Vogel-Baylor emailed Orlofski with the news she had just received about Fougera:



1776.   At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team re-submit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price. That same day, G&W also issued a revised price proposal to Walmart, quoting the new price of $20.00.

1777.   Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised G&W launch pricing for this product ███████████████████ The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

1778.   One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Betamethasone Valerate lotion: ████████ ████████████████████████████████ By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

1779.   In a February 17, 2012 email exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: ██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████

### v.      Metronidazole .75% Gel

1780.   Metronidazole Topical .75% gel, also known by the brand name Metrogel, is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea.

1781.   As of June 2011, there were three competitors in the market for Metronidazole gel – Fougera, Sandoz, and Taro.

1782.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products. In pursuit of that goal, on July 6, 2011, J.P., a product manager at Sandoz, sent an internal email asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped. The list included Metronidazole gel. J.P. urged that obtaining such information would ██████████████████████████ ████████████████████████

1783.   That same day, July 6, 2011 CW-4, a senior sales executive at Sandoz, exchanged three calls with D.S. at Taro, including one call lasting sixteen minutes. During these calls, D.S. informed CW-4, among other things, that Taro would be raising prices on Metronidazole gel.

Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

1784.  Later that day, CW-4 responded to J.P.'s email stating ███████████ ████████████████ She then listed out the competitive intelligence she had just gathered from Statler. Regarding Metronidazole gel, she included the notation ████████████

1785.  Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metronidazole gel.

1786.  In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metronidazole gel market. Despite only recently entering the market, G&W quickly got to work coordinating a price increase on Metronidazole gel. For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow – and follow they did.

1787.  From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia. Representatives from all four competitors in the Metronidazole gel market – Fougera, Sandoz, Taro, and G&W – were in attendance. These representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, D.S. of Taro, and Vogel-Baylor and Orlofski of G&W. Grauso, then at Aurobindo, was also in attendance.

1788.  On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metronidazole gel, which included a 245% increase to the WAC price from $39.99 to $137.99. That same day, Vogel-Baylor used her former colleague Grauso (then at Aurobindo) to convey information to CW-6 at Fougera regarding the Metronidazole gel price. Increase.

1789.  For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight minutes. Grauso hung up and immediately called CW-6 of Fougera. The two men spoke for

four minutes. Immediately upon hanging up, Grauso called Vogel-Baylor back and they spoke for eleven minutes. Grauso then called CW-6 again and spoke to him for five minutes. Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for thirteen minutes. These calls, which all occurred within the span of less than an hour, are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

1790.   Later that evening, CW-6 emailed his boss at Fougera, Kaczmarek, asking him to give him a call. CW-6 and Kaczmarek spoke by phone three times the following day.

1791.   On February 7, 2012, Vogel-Baylor emailed Orlofski her latest price increase analysis for Metronidazole gel. The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera. The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five minute call.

1792.   The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement. As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metronidazole gel. These calls are detailed in the chart below:

| Date | Call Ty | Target Name | Direction | Contact Name | Time | Duration |
|------|---------|-------------|-----------|--------------|------|----------|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

1793.   Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven minutes. Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one minutes. Grauso hung up the phone and immediately called CW-6 at Fougera. That call lasted one minute. The next day, Vogel-Baylor instructed her team to generate price increase letters for Metronidazole gel, and to issue them by 1:00 p.m. on February 17, 2012.

1794.   Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same. For example, on February 15, 2012, two days before G&W sent its notice letters to its customers. Blashinsky, then a senior marketing executive at Taro, informed his colleagues that prices had ███████ ████████ for Metronidazole gel and one other product. ███████████████ he added. B.S., a senior executive at Taro, responded: ████████████████████████████████ ████████████████████████

1795.   On February 17, 2012, Orlofski emailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week. Orlofski stated, ████████████ ████████████████ Blashinsky responded, ████████████████████ ██████ next day, Orlofski emailed B.S., a senior Taro executive, asking ████████████

483

███████████████████████████████████████████████████ B.S. replied, ████████████████████████████████████████

1796.   On February 17, 2012, G&W sent out letters notifying its customers of the Metronidazole price increase. That same day, Grauso called Vogel-Baylor and they spoke for sixteen minutes. Following the now normal pattern, Grauso hung up and called CW-6 at Fougera. The two men spoke for five minutes. Immediately upon hanging up, Grauso called Vogel-Baylor again. That call lasted two minutes.

1797.   On February 18, 2012, a GPO customer emailed Vogel-Baylor after receiving the Metronidazole gel notice asking, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Vogel-Baylor responded, ███████████████████████████████████████████ ████████████████████████████████████████ Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increases, but she could not tell the customer that. Ultimately, the customer negotiated a 45-day notice period and noted, ███████████████ ██████████████████████

1798.   On February 20, 2012, Blashinsky reiterated to his colleagues that ██████████ ████████████ were taking place in the Metronidazole gel market, and that Taro ████████████████ ██████████

1799.   From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida. Senior executives from all four competitors in the Metronidazole gel market – Fougera, Sandoz, Taro, and G&W – were in attendance. These representatives included Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski of

G&W. During the conference, the competitors were actively discussing and agreeing on the details of the Metronidazole gel price increase.

1800.   On February 22, 2012, the first day of the GPhA meeting, Orlofski emailed B.S. again, stating ████████████████████████████████████████████████████ ████████████████████████████ B.S. replied, ████████████████████████

1801.   Immediately after meeting with Orlofski on February 22, B.S. emailed Blashinsky regarding Metronidazole gel stating: ████████████████████████████████████ Blashinsky responded, ████████████ B.S. replied, ████████████████████ to which Blashinsky answered, ████████████████████ B.S. further inquired, ████████████ ████████████ and Blashinsky replied, ████████████████████████ Of course, Fougera and Sandoz had not increased their Metronidazole gel pricing yet – but B.S. of Taro understood that they would, based on his conversation with Orlofski.

1802.   Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an email to the Fougera Pricing committee stating: ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

1803.   On March 5, 2012, CW-3, then a sales executive at Fougera, emailed Kaczmarek predicting that ████████████████████████████████████ with one customer that had already received a pre-increase price quote from Fougera. Kaczmarek was unsympathetic, responding that he was willing to lose the customer in the interest of maintaining the agreed-upon

higher prices. He added that with respect to Fougera's price at another Metronidazole gel customer,

███████████████████████████████████

1804.   On March 9, 2012, Rite Aid emailed Sandoz asking for a bid on Metronidazole gel. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment ████████████ Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying:

██████████████████████████████

1805.   One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline. Kellum not only confirmed that fact, but also suggested a pretext: ██████████████████████ Consistent with this instruction, CW-4 responded to Rite Aid: ████████████████████████████████████████

█████████████████████████

1806.   Within the next several weeks, all three competitors followed G&W's increase on Metronidazole gel as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

1807.   On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee[56] lasting twelve minutes and two minutes, respectively.

1808.   Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors. The competitors, however, refused to break ranks. On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metronidazole gel in light

---

[56] Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as coming from the Taro main company number.

of the Taro increase. CW-6 relayed the information to Kaczmarek, saying: ████████████

Kaczmarek responded simply: ████████████

1809.   The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metronidazole gel market. CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying: ████████

████████████████████████████████████████████

### b)   G&W/Glenmark

1810.   In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Glenmark. Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

1811.   Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communications through email, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences. For example, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone. Indeed, between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

1812.   This Section will discuss a coordinated price increase on one product, Ciclopirox cream. A later Section of this Complaint will address additional collusion between the two competitors in March 2013 regarding Ciclopirox cream as well as various formulations of a different product, Mometasone Furoate.

### i.     Ciclopirox Cream – April 2012

1813.   Ciclopirox Olamine cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin. Ciclopirox cream is used to treat skin infections such as athlete's foot and ringworm.

1814.   In the summer of 2011, the market for Ciclopirox cream was evenly split between four competitors – Perrigo with 26%; Paddock Laboratories, LLC ("Paddock")[57] with 30%; Fougera with 21%; and Glenmark with 21%. G&W was not in the market at this time.

1815.   On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox cream. Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information. The two competitors also spoke again the next morning.

1816.   G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox cream. After confirming Fougera's plans to exit, G&W began making plans to enter the market.

1817.   On October 28, 2011, Vogel-Baylor emailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches. Regarding Ciclopirox cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that ███████████████

██████████████

1818.   Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

1819.   On February 3, 2012, Vogel-Baylor emailed Orlofski, a senior G&W executive, notifying him that Ciclopirox cream was now available in small quantities and that several

---

[57] Perrigo acquired Paddock in July 2011.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

additional batches would be ready for shipment in the next few weeks. She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

1820.   On February 20, 2012, Orlofski emailed Vogel-Baylor with a list of the tasks that she was accountable for. One of those responsibilities was to secure approximately 200% market share of Ciclopirox cream per the company's launch plan.

1821.   The next day, on February 21, 2012, Orlofski exchanged eight text messages with S.K., a high-level executive at Perrigo. Two days later, on February 23, 2012, the two competitors exchanged an additional ten text messages.

1822.   As of March 2012, Glenmark had 60% share of the Ciclopirox cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

1823.   By March 19, 2012, G&W had secured the Ciclopirox cream business at Walgreens. Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market of Ciclopirox cream.

1824.   On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox cream. C.M. responded: ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ Vogel-Baylor responded: ██ ███████████████████████████████████████████████████████ C.M. replied: ██████████████████████████████████████████████ Vogel-Baylor answered immediately stating: ███████████████████████████████████████████████████ ████████████████████████████████████

1825.   On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the

upcoming RFP. That same day, while they were both at Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

1826.   Two days later, on March 29, 2012, Vogel-Baylor emailed CW-5 stating, ████ ████████████████████████████████████████████████ and asked the Glenmark executive to send his full contact information. The next day, CW-5 responded to Vogel-Baylor's email, providing his contact information and adding, ████████████████████████ After exchanging a few more emails, the two then also exchanged several text messages.

1827.   On April 2, 2012, CW-5 emailed Vogel-Baylor stating that he had forgotten his cell phone at home and was ████████████████████████████████████ ████████████

1828.   Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls. During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox cream.

1829.   For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty text messages and phone calls. In the early morning of April 12, 2012, Vogel-Baylor emailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix. She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

1830.   On April 18, 2012, Vogel-Baylor emailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP. Regarding Ciclopirox cream, Vogel-Baylor emailed C.W. with specific pricing to submit for the upcoming Publix RFP. Regarding Ciclopirox cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including

increased pricing on the bid. Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid. That same day, Vogel-Baylor exchanged at least twenty text messages and phone calls with CW-5 of Glenmark.

1831.  That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox cream.

1832.  From April 24 to April 27, 2012, the NACDS held its annual meeting Palm Beach, Florida. Representatives from Glenmark, G&W, and Perrigo all attached, including S.K. of Perrigo, Orlofski and Vogel-Baylor of G&W, and CW-5 of Glenmark.

1833.  S.K. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began. Between April 19 and 24, 2012, Orlofski and S.K. exchanged at least fifteen text messages. Orlofski also called S.K. once on April 24, 2012. The call lasted less than one minute. Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period. On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight text messages with CW-5.

1834.  That same day, April 24, 2012, Cardinal emailed G&W requesting a bid on Ciclopirox cream. C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: ██████████████████████████████████████████████████████ G&W declined to bid on the opportunity.

1835.  The next day, on April 25, 2012, Vogel-Baylor emailed C.M. asking him to ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1836.   Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices the Ciclopirox cream between 233% and 408% depending on the formulation.

1837.   On May 21, 2012, Kroger, a Glenmark customer, emailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox cream. Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

1838.   On May 24, 2012, Vogel-Baylor emailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox cream. C.M. responded that Perrigo had submitted low pricing on the RFP.

1839.   By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously). Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. at Perrigo. Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. of Perrigo. After speaking with T.P., CW-6 hung up and immediately called Vogel-Back back. This call pattern is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

1840.   Later that day, Vogel-Baylor replied to her colleague C.M. stating, ██████ ████████████████████████████████████████████████████ Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Orlofski.

1841.   On June 4, 2012, G&W sent its price increase notice to Walgreens. In an internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15 gm, 30 gm, and 90 gm package sizes as $7.14, $11.22, and $19.39, respectively.

1842.   On June 6, 2012, Vogel-Baylor and CW-5 of Glenmark exchanged eight phone calls. All of the calls lasted less than one minute.

1843.   On June 11, 2012, C.M. of G&W emailed Vogel-Baylor stating that he had spoken with Walgreens and the customer had told him ████████████████████████████ ████████████████████████ C.M. stated, ████████████████ ████████████████████████████████ Vogel-Baylor responded: ████████████████████████████████ That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty messages.

1844.   Vogel-Baylor forwarded her exchange with C.M. to Orlofski. The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen text messages with CW-5 of Glenmark. Also, on June 13, 2012, Orlofski sent a text message to S.R. of Walgreens. G&W ultimately retained the Walgreens business.

1845.   Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day. During that time period, the two competitors exchanged five-hundred and forty-five text messages.

1846.   On June 29, 2012, C.M. emailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox cream. Vogel-Baylor asked: ████████████████ C.M. replied: ████████████████████████████████████████ ████████████████████████ Vogel-Baylor responded: ████████████████ Vogel-Baylor later changed her mind and recommend to C.M. that he bid on the MMCAP business. As she

explained: ███████████████████████████████████████████

████████████████████████

### 5.    Additional Collusive Relationships

1847.   The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this time period. Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

1848.   The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example. During his tenure at Fougera, CW-6 had only eight calls with E.B., according to available phone records. However, Fougera overlapped with Hi-Tech on the product – Lidocaine ointment – and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012. This collusion is detailed in the following Section.

### a)    Lidocaine Ointment

1849.   Lidocaine ointment, also known by brand names such as Xylocaine Topical solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

1850.   In late 2011, Hi-Tech began making plans to launch Lidocaine ointment. At that time, Fougera was the sole generic manufacturer in the market.

1851.   On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss █████████ ████████████████████ referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time. That anticompetitive conduct is discussed above in an earlier Section of this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1852.  The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four minutes. The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone – according to the available phone records. During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

1853.  Fougera held its internal strategy meeting on November 28, 2011. A few days later, on December 2 and then again on December 5, 2011, CW-6 called E.B. The calls lasted one minute each.

1854.  Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine ointment by 200%.

1855.  Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation. That call lasted one minute. An hour later, Kaczmarek called CW-6 back and they spoke for six minutes. Further, on March 7, 2013, E.B. called CW-6 and they spoke for five minutes. CW-6 called E.B. back a few minutes later. The call lasted on minute. During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine ointment market, as well as pricing.

1856.  One week later, on March 13, 2012, Hi-Tech entered the Lidocaine ointment market and matched Fougera's increased WAC pricing.

1857.  After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine ointment customers to the new entrant. For example, on March 22, 2012, ABC emailed Fougera to advise that it had received an offer for Lidocaine ointment and asked

whether Fougera wanted to bid to retain the business. CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he directed that CW-3 ███████ to the new player.

1858.   Similarly, on March 27, 2012, CW-6 asked Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine ointment. CW-6 suggested that Fougera ███████ ████████████████████████████ to which Kaczmarek replied: ███████

1859.   On May 17, 2012, Walmart emailed K.K., another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine ointment and asked whether Fougera wanted to bid to retain the business. K.K. forwarded Walmart's request to Kaczmarek, asking how he should respond.

1860.   First thing the next morning, Kaczmarek called CW-6 and they spoke for ten minutes. A few hours later, Kaczmarek called CW-6 again and they spoke for three minutes. Immediately upon hanging up, CW-6 called E.B. of Hi-Tech. The call lasted on minute. A half hour later, CW-6 called E.B. again. The call lasted one minute. That same morning, Kaczmarek responded to K.K.'s email stating, ████████████████████████████████ ██████

1861.   Later that day, Kaczmarek emailed the sales team regarding Lidocaine ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34% market share, and advised that Fougera was ████████████████ S.H., a Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech. Therefore, Kaczmarek recommended that Fougera ████████████████████ ████████ The next day, on May 19, 2012, CW-6 called E.B., speaking for four minutes – likely letting him know that Fougera was now done conceding customers to the new entrant.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### C.    Focus on Price Increases Intensifies – Collusion from Late 2012 – 2016

#### 1.    Shifts in the Market Foster Collusion

1862.   In late 2012 and early 2013, there were several changes in and among various manufacturers of topical products – at both the corporate and personnel levels – that facilitated and fostered a heightened focus on collusion among many of these competitors.

1863.   For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty dermatology company, making Sandoz a much more prominent manufacturer of topical products. Indeed, Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

1864.   As a result of the acquisition, most Fougera executives, including Kaczmarek and CW-6, eventually lost their jobs. Indeed, out of the five Fougera sales executives in place prior to the acquisition, CW-3 was the only one to retain a longer-term position with Sandoz.

1865.   Because of Sandoz's size and the fact that it manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more overlapping products. In turn, and as discussed in further detail below, CW-3 would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

1866.   Further, in the months following the Fougera acquisition, three key Actavis executives – Boothe, Perfetto, and Aprahamian – left Actavis to assume senior-level positions with competitors. In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo. One month later, in January 2013, Perfetto became the Chief Commercial

Officer of Taro. And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

1867.   As discussed below, these former colleagues – now competitors – would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

### a)   Post-Fougera Acquisition Sandoz Sales Executives Feel Pressure to Demonstrate Their Value

1868.   As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else. Although Teva and Mylan were comparable in size in Sandoz, they had fewer topical products. The other key players in the topical space, Perrigo and Taro, were smaller companies.

1869.   Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market. CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products. The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next. As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

1870.   In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line. Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections. As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable. CW-3 was responsible for identifying areas to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

1871.   Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition. For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform. Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

**b)     Key Relationships Emerge and Existing Relationships Strengthen**

1872.   The pressures that Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products. For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors – Taro and Perrigo – with regard to overlapping products. Similarly, Perfetto would capitalize on his relationship with his former colleague Boothe and collude with respect to products on which Taro and Perrigo overlapped. Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition. Each of these relationships is explored in greater detail below.

**i.     Sandoz/Taro**

**(1)     CW-3's Relationship with Aprahamian and H.M. of Taro**

1873.   Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis. CW-3 and Aprahamian had known each other since

2006 – when CW-3 worked at Cardinal and Aprahamian worked at ABC. The two men had lost touch over the years at trade shows and customer conferences.

1874.   Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again. For example, although they had exchanged only two calls in 2011 according to phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor). CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

1875.   CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis. Three examples – Desonide lotion, Ciclopirox shampoo, and Betamethasone Valerate ointment – are discussed in detail below. However, once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

1876.   Aprahamian's move to Taro was a promotion. As Vice President of Sales and Marketing, Aprahamian had the power to set prices. Similarly, when Aprahamian told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

1877.   Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Indeed, every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass

the information along to his superiors, CW-1 and Kellum. The expectation was always that Sandoz would follow the increases – and Sandoz did.

1878.   When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him. Many examples of this are discussed below in subsequent Sections of this Complaint.

1879.   Although Sandoz consistently followed Taro's price increases, the company could not always do so right away. This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets. In the meantime, Kellum would order that Sandoz place the product on strict allocation – meaning that Sandoz would allocate product to a customer based on regular usage – so that there was not a run on Sandoz's inventory from a competitor's increase.

1880.   Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers. Aprahamian was very animated and would say things like: "Don't take my f***king customers," "Don't take my business," or "Don't be stupid." CW-3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

1881.   Aprahamian and CW-3 also coordinated on product launches. For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

1882.   For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CW-3 specific contract price points so that Sandoz did not launch at too low a price. Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

1883.   CW-3 also colluded with H.M. of Taro. Shortly after the Fougera acquisition, CW-6 – who would not be staying at Sandoz – provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz. According to phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one phone calls and text messages through March 2014, when H.M. left Taro. Notably, CW-3 and H.M. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

1884.   While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices. CW-3 considered H.M.'s information to be reliable. However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M. anymore and to simply call him directly because he was responsible for pricing.

1885.   During this time period, CW-3 and H.M. were acting at all times at the direction of, or approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and Perfetto of Taro. In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

### (2)   CW-4's Relationship with D.S. of Taro

1886.   As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products. However, CW-4 was unsure what impact the Fougera

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

1887.   CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations – both in person and over the phone – during which they discussed which manufacturers of topical products were responsible and which were not. D.S. reiterated what he had conveyed to CW-4 previously – that ██████████████████████ CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high. Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

1888.   After these conversations, CW-4 felt more secure and less anxious about her new circumstances. CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

1889.   During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

1890.   Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio. At this time, there were several products where Fougera had less than its fair share.

1891.   Shortly thereafter, CW-4 conveyed this information to D.S. at Taro. CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not get alarmed and would understand that it was only because Sandoz was looking for its "fair share" on that product. Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa. D.S. listened to what CW-4 said and did not disagree.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## ii.    CW-3's Relationship with T.P. of Perrigo

1892.   Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo. The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one phone calls throughout the end of 2014.

1893.   CW-3 and T.P. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped. CW-3 and T.P. generally spoke only by phone. They did not exchange emails or text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

1894.   CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P. – that the competitors would not poach each other's customers and would follow each other's price increases.

1895.   Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

1896.   Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

1897.  When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

1898.  During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

### iii.      Perfetto's Relationship with Boothe of Perrigo

1899.  Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives, Perfetto and Boothe, moved to Taro and Perrigo, respectively. As a result of those moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

1900.  Indeed, between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one hundred and nineteen phone calls. During this time period, the two former colleagues colluded on numerous overlapping products. Some examples of these products are discussed in detail below.

### c)      Sandoz Management Knew of, and Encouraged, the Collusion with Competitors

1901.  Early on after the Fougera acquisition, CW-3 had a conversation with Kellum informing him that he could provide competitive intelligence on the Fougera product line. Shortly

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because he told them he did.

1902.   CW-3 conveyed competitive intelligence to Kellum and CW-1 through emails and phone calls. When communicating by email, CW-3 would disguise the true source of his information by stating that he had received it from a customer. When CW-3 had truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name to his email. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer – or if CW-3 provided information relating to customers that he did not have responsibility for – it meant that CW-3 had gotten that information from a competitor.

1903.   As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other relationships are explored in greater detail in subsequent Sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

1904.   For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a ████████ in July 2013 to collude on products where Taro was a competitor. The ████████ had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at a higher price.

1905.   Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Indeed, Kellum routinely admonished Sandoz employees for putting information that was too blatant into emails. At one point, Kellum told CW-1 ███████ ████████████████████████████████████████████ Similarly, as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 ████████████████ ███████████ CW-1 agreed with him.

## 2.      Taro Emerges as a Leader Among Generic Topical Manufacturers

### a)      Increased Focus on Fair Share and Price Increases

1906.   As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro. The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

1907.   First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured. To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level. This included compiling intelligence from not only customers, but from competitors as well.

1908.   For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, emailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where ████████████████████████ Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1909.   Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014. Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

1910.   For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone – its highest grossing product. When an executive at Dr. Reddy's learned of the news, he sent an email stating: █████████████████████████████████ ███████████████████████████████████████████ To that, a senior sales and marketing executive at Dr. Reddy's responded, ████████████████████ ████████████████████████████████████████████████████████████ ███████████

1911.   Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products. The chart below, which was included in the Credit Suisse investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implemented, and the size of the increases.



1912.   As a result of these June 2014 increases, Credit Suisse increased its target pricing for Taro and its parent company Sun Pharmaceuticals from $85 to $150 per share. As justification

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for the increase, Credit Suisse emphasized that there had been zero rollbacks of Taro price increases in recent years:



1913.   These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro. Indeed, between 2008 and 2016, Taro's profits increased by an astounding 1300%. As the graph below demonstrates, Taro's financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER